

Steven E. Fineman (*pro hac vice* to be filed)
Rachel Geman (*pro hac vice* to be filed)
Paulina do Amaral (*pro hac vice* to be filed)
Jason L. Lichtman (State Bar No. 6290052)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500
Facsimile: (212) 355-9592

*Attorneys for Plaintiff-Relator*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* LAZARO SUAREZ, and on behalf of the STATES of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW HAMPSHIRE, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, VIRGINA, WASHINGTON, WISCONSIN, and the DISTRICT OF COLUMBIA, | **1:15-cv-08928**<br>**Judge Ruben Castillo**<br>**Magistrate Judge Sheila M. Finnegan**<br><br>JURY TRIAL DEMANDED |
| Plaintiff-Relator, | |
| v. | |
| ABBVIE, INC., and ABBOTT LABORATORIES | |
| Defendants. | |

### COMPLAINT

**FILED**

OCT 08 2015

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

1268804.10

**TABLE OF CONTENTS**

Page

I. Statement of the Case.........................................................................2

II. Jurisdiction and Venue......................................................................4

III. Parties.................................................................................................5

    A. Relator........................................................................................5

    B. Defendants.................................................................................5

IV. Background of Applicable Law.........................................................6

    A. False and Misleading Statements About a Drug's Use Are Prohibited Under Any Circumstances.........................................6

    B. Federal and State Laws Prohibit Kickbacks to Providers and Payments to Induce or Reward Referrals, and Regulate the Use of Free Drugs......................................................................7

V. Prescription Drug Payment Under Government Programs...................9

    A. The Medicare Program Pays Certain of the Cost of Prescriptions for Its Enrollees...................................................9

    B. The Medicaid Program Pays the Cost of Prescriptions for Its Enrollees...............................................................................9

    C. Other Government Programs Similarly Cover Prescription Drug Costs................................................................................11

VI. Humira: Background, Usages, and Side Effects................................12

VII. The Illegal Promotion of Humira: the "Ambassador Program"..........13

    A. The Ambassador Program: Purpose, Job Description, Metrics, and Compensation.......................................................13

    B. Ambassadors' Interactions with Health Care Providers: A Blurred and Problematic Role.....................................................15

    C. Ambassadors' Interactions with "Patients": A Blurred and Dangerous Role........................................................................20

    D. By Covering-Up The Real Nature of the Ambassador Program, AbbVie Also Has Violated its Corporate Integrity Agreement...............27

VIII. The Ambassador Program Has Been a Tremendous Success, and May Be a Cornerstone of Future Branding Efforts...................................28

IX. AbbVie's Unlawful Conduct has Caused the Submission of False Claims to Federal and State Health Care Programs..................................29

**TABLE OF CONTENTS
(CONTINUED)**

Page

A.  AbbVie's Kickbacks to Providers Caused the Submission of False Claims and Making of Material False Statements to Government Programs. ....................................................................................... 29

B.  AbbVie's False Certifications of Compliance with the Law Constituted Making of False Statements Material to False Claims......... 31

C.  AbbVie and Abbott Conspired With Each Other, Quintiles, and Doctors to Defraud Government Programs. ............................................ 32

X.  Claims for Relief.................................................................................................... 32

COUNT I          Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A)................................................................... 32

COUNT II         Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B)................................................................... 32

COUNT III        Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C)................................................................... 33

COUNT IV         Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G)................................................................... 33

COUNT V          Violation of the State of California False Claims Act, Cal. Gov't Code § 12650 et seq. .............................. 34

COUNT VI         Violation of the California Insurance Frauds Prevention Act Cal. Ins. Code § 1871, et seq. ................. 35

COUNT VII        Violation of the State of Colorado Medical False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5, et seq. ....... 36

COUNT VIII       Violation of the State of Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. § 17b-301a et seq. ..................................................... 37

COUNT IX         Violation of the State of Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201 et seq. ....... 39

COUNT X          Violation of the District of Columbia False Claims Act, D.C. Code § 2-308.13 et seq. .................................... 41

COUNT XI         Violation of the State of Florida False Claims Act, Fla. Stat. § 68.081 et seq.................................................... 43

COUNT XII        Violation of the State of Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 et seq................. 45

COUNT XIII       Violation of the State of Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 et seq........................................ 46

**TABLE OF CONTENTS**
**(CONTINUED)**

Page

| | | |
|---|---|---|
| COUNT XIV | Violation of the State of Illinois False Claims Act, 740 Ill. Comp. Stat. § 175/1 et seq. | 47 |
| COUNT XV | Violation of the Illinois Insurance Frauds Prevention Act, 740 Ill. Comp. Stat. § 92/5, et seq. | 49 |
| COUNT XVI | Violation of the State of Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 et seq. | 50 |
| COUNT XVII | Violation of the State of Iowa False Claims Act, Iowa Code § 685.1, et seq. | 51 |
| COUNT XVIII | Violation of the State of Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1 et seq. | 53 |
| COUNT XIX | Violation of the State of Maryland False Health Claims Act, Md. Code Ann. Health-Gen. § 2-601, et seq. | 54 |
| COUNT XX | Violation of the Commonwealth of Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5A et seq. | 56 |
| COUNT XXI | Violation of the State of Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 et seq. | 58 |
| COUNT XXII | Violation of the State of Minnesota False Claims Act, Minn. Stat. § 15C.01, et seq. | 60 |
| COUNT XXIII | Violation of the State of Montana False Claims Act, Mont. Code Ann. § 17-8-401 et seq. | 61 |
| COUNT XXIV | Violation of the State of Nevada False Claims Act, Nev. Rev. Stat. § 357.010 et seq. | 63 |
| COUNT XXV | Violation of the State of New Hampshire Medicaid False Claims Act, N.H. Rev. Stat. Ann. § 167:61-B, et seq. | 64 |
| COUNT XXVI | Violation of the State of New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1 et seq. | 66 |
| COUNT XXVII | Violation of the State of New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1, et seq. | 68 |
| COUNT XXVIII | Violation of the State of New York False Claims Act, N.Y. State Fin. Law § 187 et seq. | 69 |

**TABLE OF CONTENTS**
**(CONTINUED)**

Page

| | | |
|---|---|---|
| COUNT XXIX | Violation of the State of North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 et seq. | 71 |
| COUNT XXX | Violation of the State of Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053 et seq. | 73 |
| COUNT XXXI | Violation of the State of Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 et seq. | 74 |
| COUNT XXXII | Violation of the State of Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 et seq. | 76 |
| COUNT XXXIII | Violation of the State of Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 et seq. | 77 |
| COUNT XXXIV | Violation of the State of Vermont False Claims Act 32 V.S.A. § 630 et seq. | 79 |
| COUNT XXXV | Violation of the Commonwealth of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 et seq. | 81 |
| COUNT XXXVI | Violation of the State of Washington Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.005, et seq. | 82 |
| COUNT XXXVII | Violation of the State of Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931 et seq. | 84 |
| JURY TRIAL DEMAND | | 88 |

**COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS UNDER 31 U.S.C. § 3729 *ET SEQ.* AND STATE LAW COUNTERPARTS**

This is an action brought on behalf of the United States of America by Lazaro Suarez

("Relator"), by and through his attorneys, against Defendants, pursuant to the *qui tam* provisions

of the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq.* and pursuant to the following

State *qui tam* and Insurance Fraud Prevention Acts statutes: the California False Claims Act, Cal.

Gov't Code § 12650 *et seq.* (Deering 2000); the California Insurance Frauds Prevention Act, Cal.

Ins. Code § 1871 *et seq.*; the Connecticut False Claims Act for Medical Assistance Programs,

Conn. Gen. Stat. § 17b-301a *et seq.* (2010); the Delaware False Claims and Reporting Act, Del.

Code Ann. tit. 6, § 1201 *et seq.* (2000); the District of Columbia False Claims Act, D.C. Code

§ 2-308.13 *et seq.* (2000); the Florida False Claims Act, Fla. Stat. § 68.081 *et seq.* (2000); the

Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.* (2007); the Hawaii False

Claims Act, Haw. Rev. Stat. § 661-21 *et seq.* (2006); the Illinois False Claims Act, 740 Ill.

Comp. Stat. § 175/1 *et seq.* (2000); the Illinois Insurance Frauds Prevention Act, 740 Ill. Comp.

Stat. § 92/1 *et seq.*, the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-

11-5.5 *et seq.* (2007); the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat.

Ann. § 46:437.1 *et seq.* (2006); the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12,

§ 5A *et seq.* (2007); the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et

seq.* (2007); the Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.* (1999); the

Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq.* (2007); the New Jersey False Claims

Act, N.J. Stat. Ann. § 2A:32C-1 *et seq.* (West 2007); the New York False Claims Act, N.Y. State

Fin. Law § 187 *et seq.* (McKinney 2010); the North Carolina False Claims Act, N.C. Gen. Stat.

§ 1-605 *et seq.* (2010); the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053 *et

seq.* (2007); the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.* (2008); the

1

Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.* (2006); the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.* (West 2006); the Vermont False Claims Act, 32 V.S.A. § 630 *et seq.* (2015); the Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.* (2011); and the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931 *et seq.* (2007) ("State *qui tam* statutes" or "*Qui Tam* States").

## I.  Statement of the Case.

1.  This is an action to recover damages and civil penalties on behalf of the United States and the *Qui Tam* States, arising from false and/or fraudulent records, statements and claims made, used, and caused to be made, used or presented by Defendants AbbVie, Inc. and Abbott Laboratories (together, "Defendants") under the False Claims Act and the State *qui tam* statutes involving a drug called Humira.

2.  Humira is a powerful and expensive injectable drug that treats various autoimmune diseases affecting the skin, the gastrointestinal tract, and other parts of the body. Because Humira blocks a protein that is part of the body's response to infection, treatment with Humira may increase the risk of serious –and sometimes fatal– conditions, including tuberculosis and deadly cancers.

3.  Humira was the highest-grossing drug in the world in 2014, achieving worldwide net sales of $12.5 billion, $6.5 billion of which was paid in the U.S. alone. U.S. sales of Humira in the last three years have totaled approximately $16 billion.

4.  This case is about Defendants' scheme to increase prescriptions and ensure patients' continued use of Humira by placing company representatives called "Ambassadors" into sick patients' homes, and using those Ambassadors for improper marketing. Under the misleading guise of patient education and support, Defendants have turned Ambassadors, who are trained nurses, into covert sales representatives.

1268804.10                                                         2

5.     In order to get this extraordinary ongoing direct access to patients, Defendants pitch Ambassadors to doctors as free "extensions of your office." Specifically, Defendants offer up their Ambassadors to perform general and time-consuming tasks that otherwise must be performed by doctors and their staff, including patient management, billing communications, and other functions such as waste disposal. These extensive free services are kickbacks.

6.     Once with patients one-on-one, Ambassadors do not provide, and are not permitted to provide, fair and balanced information to patients. Defendants instruct the Ambassadors to deflect frequent questions from patients about Humira's cancer risks (and other serious risks where questions sometimes arise), training them to say that "[cancer] is a great question for your doctor; I am here to get you your Humira for five dollars or less."

7.     Fulfilling that promise, Defendants have given away tens of thousands of free dosages of Humira that, among things, and intentionally, help Part D Medicare patients fill the "Donut Hole." The Ambassadors have a crucial role in connecting patients with the AbbVie Patient Assistance Foundation that provides these free drugs. This free medicine is a further kickback, and an especially improper one insofar as it influences patients' decisions to try a drug that can then only be stopped carefully and under supervision.

8.     Defendants' public representations about the Ambassador Program are that it is an education and support program for patients. In reality, the Ambassadors' goal is to ensure that patients *start on* and *continue to take* Humira. The Ambassador position is a dangerous hybrid of sales representative and nurse, in that its actual functions violate the precepts of both roles. Ambassadors do not provide fair and balanced information, and they are constrained from providing true patient care despite the fact that, due to their ongoing involvement with patients, they put barriers in the doctor-patient relationship.

9.     The Ambassador program has been enormously successful.  Defendant AbbVie has

bragged at national sales meetings about how the Ambassador Program has resurrected the

otherwise-plateauing sales of Humira, and attributed a sharp and specific rise in sales directly to the

Ambassador Program by showing a before-and-after graph.

10.     This growth in sales of Humira has been procured by the misconduct described above

in the form of kickbacks and providing information that is not fair and balanced to patients, as

Defendants are aware.  Defendants forbid Ambassadors from using the word "Humira" in emails and

from memorializing the patient-related questions they have.  The true role of the program is hidden

under the misleading guise of "education" and "support."

**II.     Jurisdiction and Venue.**

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

§ 1331 and 31 U.S.C. § 3732, the latter of which confers jurisdiction on this Court for actions

brought pursuant to the Federal False Claims Act, 31 U.S.C. §§ 3729 and 3730.  Plaintiff-Relator

establishes subject matter jurisdiction under 31 U.S.C. § 3730(b).  This Court also has supplemental

jurisdiction over the state claims under 28 U.S.C. § 1367.

12.     There has been no public disclosure within the meaning of 31 U.S.C. § 3730(e)(4)(A)

of the allegations Plaintiff-Relator is asserting, and Plaintiff-Relator is an original source.  Plaintiff-

Relator has direct and independent knowledge of the allegations contained herein.

13.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because Defendants

have regularly conducted substantial business within the district at all relevant times and are

headquartered here.

### III. Parties.

#### A. Relator.

14.     Plaintiff-Relator Lazaro Suarez is a resident of North Bay Village, Florida who worked for AbbVie via its sub-contractor and co-conspirator Quintiles Transactional Holdings, Inc. ("Quintiles") as a "Nurse Educator" and "Patient Ambassador" (the formal names for the positions he held) from approximately March 23, 2013 to October 2014 in the South Florida area.

15.     Plaintiff-Relator was hired by Quintiles but, among other things, reported to and worked with personnel at AbbVie, maintained an AbbVie email address, and worked exclusively in connection with AbbVie's drug Humira.

16.     Mr. Suarez had approximately 15 years of clinical experience before going to work for Defendants. He received a B.S. in nursing in 2000 from the University of Miami and has been a Registered Nurse since 1996.

17.     Mr. Suarez was successful during his tenure as an Ambassador, earning recognition and awards, and being promoted to a trainer position. On numerous occasions, Mr. Suarez was recognized for his work in various ways. On at least a dozen times, Mr. Suarez received a financial reward (between $50-150) for his work, including four times during a single month. He was frequently held out as an example for his peers by his supervisors and was flown to other cities to train new Ambassadors in other parts of the country.

#### B. Defendants.

18.     AbbVie, Inc., a "research-based pharmaceutical company," was incorporated in Delaware on April 10, 2012. AbbVie, Inc. is headquartered and maintains its principal place of business in North Chicago, Illinois. AbbVie, Inc. was formed when Abbott Laboratories separated into two companies at the end of 2012, and became its own company on January 1, 2013.

19.     Abbott Laboratories is an Illinois corporation that is headquartered and maintains a principal place of business in Abbott Park, Illinois. Abbott designed and initiated the Ambassador Program. When Relator was hired, his formal title was "Nurse Educator on 4620-Abbott-Patient Ambassador project."

20.     In this Complaint, given AbbVie, Inc. was responsible for the Ambassador Program for most of the time covered in this case and continues to at present, Defendants are referred to collectively as "AbbVie." Except as otherwise indicated in a particular claim for relief, the claims Relator brings on behalf of the United States and the *Qui Tam* States are against both Defendants for each individual Defendant's own time period of responsibility for the Ambassador Program.

## IV.     Background of Applicable Law.

### A.     False and Misleading Statements About a Drug's Use Are Prohibited Under Any Circumstances.

21.     Under the Food, Drug and Cosmetics Act ("FDCA"), 21 U.S.C. §§ 301-97, new pharmaceutical drugs cannot be marketed in the United States unless the sponsor of the drug demonstrates to the satisfaction of the FDA that the drug is safe and effective for each of its approved uses. 21 U.S.C. § 355(a), (d). Approval of the drug by the FDA is the final step in a multi-year process of study and testing.

22.     Under the FDCA, a drug may not be introduced into interstate commerce unless its sponsor has shown that the drug is safe and effective for the intended conditions of use. *See* 21 U.S.C. § 321. The same general requirements about the promotion of prescription drugs apply to both professional and consumer-oriented marketing. In particular, promotional materials may only make claims that are supported by "substantial" scientific evidence (according to strict scientific procedures) and they may not be false or misleading. FDA oversight helps ensure a "fair balance" in all promotional claims and materials. Federal regulations require that the risks as well as the

benefits of a drug be clearly identified and given appropriate prominence. Promotional materials must be consistent with the FDA-approved product labeling.

23.     Furthermore, and crucially, the manufacturer must not disseminate materials that are "false and misleading," such as those that only present favorable information when unfavorable information exists, that exclude mandatory information about the safety and efficacy of the drug use, or that present conclusions that "clearly cannot be supported by the results of the study." 21 C.F.R. § 99.101(a)(4).

24.     In fact, the FDA has promulgated extensive regulations on the content and form of prescription drug advertising. Advertisements "shall present a true statement of information in brief summary relating to...effectiveness." 21 C.F.R. 202.1(e)(6)(i).

25.     FDA regulations also enumerate a number of tactics that can render advertising "false, lacking in fair balance, or otherwise misleading, or otherwise violative" of section 502(n) of the Act. 21 U.S.C. § 352.

26.     These requirements also apply to industry sponsored or controlled activity whether it is educational or promotional. *See* Guidance for Industry: Industry-Supported Scientific and Educational Activities, 62 Fed. Reg. 64,093, 64,096-99 (1997).

27.     Regulations on prescription drug advertisements are found in 21 C.F.R. § 202.1, and further underscore the importance of true statements related to side effects.

**B.      Federal and State Laws Prohibit Kickbacks to Providers and Payments to Induce or Reward Referrals, and Regulate the Use of Free Drugs.**

28.     The Anti-Kickback Statute ("AKS") makes it illegal for individuals or entities to knowingly and willfully "offer[] or pay[] remuneration (including any kickback, bribe, or rebate) ... to any person to induce such person ... to purchase, ... order, ... or recommend purchasing ... or

ordering any good ... or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2).

29.     Violations of the AKS occur where, for example, pharmaceutical companies provide extensive valuable products or services to procure use of their drugs.

30.     Further, direct support offered by manufacturers to insured patients to reduce or eliminate out-of-pocket costs can implicate the AKS: "[w]here remuneration is paid purposefully to induce or reward referrals or items or services payable by a Federal health care program, the anti-kickback statute is violated." OIG Special Advisory Bulletin: Pharmaceutical Manufacturer Copayment Coupons (Sept. 2014).

31.     Related, the Federal Prescription Drug Marketing Act ("PDMA") regulates drug manufacturer use of free drug samples and coupons. 21 U.S.C. §353.

32.     Violation of the AKS is a felony punishable by fines and imprisonment and can also result in exclusion from participation in federal health care programs. 42 U.S.C. § 1320a-7b(b)(2) and 42 U.S.C. § 1320a-7(b)(7).  State laws have similar prohibitions.

33.     As codified in the Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148, § 6402(f), 124 Stat. 119, codified at 42 U.S.C. § 1320a-7b(g), "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]."

34.     Compliance with the AKS, 42 U.S.C. § 1320a-7b(b), is a condition of payment under the federal health care programs.

V.    **Prescription Drug Payment Under Government Programs.**

      A.    **The Medicare Program Pays Certain of the Cost of Prescriptions for Its Enrollees.**

    35.    Medicare Part D covers pharmacy-dispensed outpatient drugs including Humira.  Part D prescription drug plans may exclude from coverage drugs that are not "reasonable and necessary" to the patient's treatment.  42 U.S.C. § 1395w-102(e)(3)(A).  Specific coverage policies and decisions are generally made by sponsors who contract with CMS to provide such coverage and are responsible for making coverage determinations in accordance with statutes and regulations.

    36.    The pharmacies where prescriptions of Humira are filled agree to provide pharmaceuticals to Medicare Part D Plans ("PDPs") for Medicare patients that they serve, and the PDPs in turn reimburse these pharmacies for the cost of the drugs, plus a fixed dispensing fee meant to provide the pharmacies with a profit for providing services to Medicare patients.  PDPs (or MA-PDPs) are administered under contract with CMS by private entities such as Blue Cross Blue Shield plans, large commercial insurers such as Humana, and pharmacy benefit managers.

    37.    Every time a beneficiary fills a prescription covered under Part D, PDPs must submit a summary called the prescription drug event, or PDE, record.  The PDE record contains drug cost and payment data that enable CMS to administer the Part D benefit.  CMS uses the PDE record to calculate reimbursement to PDPs for the cost of drugs, plus an amount meant to provide the PDPs with a profit for administering the PDP.

      B.    **The Medicaid Program Pays the Cost of Prescriptions for Its Enrollees.**

    38.    Medicaid is a joint Federal-State program that pays for medical assistance for individuals and families with low incomes and relatively few assets.  Although pharmacy coverage is an optional benefit under federal Medicaid law, all States currently provide coverage for

outpatient prescription drugs to all categorically eligible individuals and most other enrollees within their Medicaid programs.

39.     The state Medicaid programs adhere to federal guidelines. Federal statutes and regulations restrict the drugs and drug uses that the Federal Government will pay for through its funding of state Medicaid programs. Federal reimbursement for prescription drugs under the Medicaid program is limited to "covered outpatient drugs." 42 U.S.C. §§ 1396b, 1396r-8(k)(2)-(3). Covered outpatient drugs are drugs that are used for "a medically accepted indication." 42 U.S.C. § 1396r-8(k)(3).

40.     A medically-accepted indication is listed in the labeling approved by the FDA, or that is included in one of the drug Compendia identified in the Medicaid statute. 42 U.S.C. § 1396r-8(k)(6).

41.     Providers who fill prescriptions for Medicaid enrollees submit their Medicaid claims for reimbursement by "batching" them daily, and submitting them electronically to the *Qui Tam* States. These claims include the claims for prescriptions of Humira that were falsely induced pursuant to the unlawful Ambassador Program.

42.     As part of each electronic claim, the office and pharmacies affix their unique Medicaid provider identification numbers, which serve as electronic stamps indicating that, as Medicaid providers, they are in compliance with all applicable federal and state laws.

43.     The offices and pharmacies are reimbursed on a monthly basis by the *Qui Tam* States for all approved claims.

44.     Through the Federal Medical Assistance Percentage ("FMAP"), State Medicaid administrators obtain the Federal Government's share of the offices' and pharmacies' reimbursements by submitting a quarterly Form 64 to CMS. The funds made available to the state

remain federal funds, in a Federal Reserve account, until they are drawn by the state and used to pay the offices' or pharmacies' claims. 42 C.F.R. § 430.30(d)(3), (4). Thus, claims submitted to state Medicaid agencies, including those in the *Qui Tam* States, are presented to the Federal Government within the meaning of the FCA.

45.     The Federal Government also "approves," within the meaning of the False Claims Act, the claims submitted and paid through the Medicaid program. When a state presents its Form 64 (*i.e.*, the quarterly report of actual expenditures) to CMS, the amounts of any fraudulent claims the state paid will be included in those reports. Based on the information in the reports, CMS determines and approves whether the claims that the state paid with federal funds were appropriate. If CMS determines that certain claims paid by the state were improper, CMS may recoup the amount of the erroneously expended funds by reducing the amount of money provided to the state during the next quarter.

46.     The Form 64 constitutes the United States' means for approving and paying the amount of federal funds expended by the state. To the extent these reports overstate the amount of federal funds to which the state was entitled because of false or fraudulent prescriptions, they constitute false records or statements caused to be made or used to get false claims paid and approved by the United States.

## C.     Other Government Programs Similarly Cover Prescription Drug Costs.

47.     Other Government Programs adhere to similar rules in determining a drug's eligibility for reimbursement.

48.     In addition to Medicaid and Medicare, the Federal Government reimburses a portion of the cost of prescription drugs under several other federal health care programs, such as CHAMPUS/TRICARE (administered by the Department of Defense); CHAMPVA (administered by

the Department of Veterans Affairs); and The Federal Employee Health Benefit Program

(administered by the Office of Personnel Management, for federal employees).

### VI. Humira: Background, Usages, and Side Effects.

49.     Humira ("Human Monoclonal Antibody In Rheumatoid Arthritis") is a powerful and

expensive drug that treats a range of serious autoimmune conditions; it has black box warnings for

potential deadly side effects, including lymphoma, tuberculosis, and other infections. Originally

approved in 2002 as a second-line treatment for Rheumatoid Arthritis, Humira is currently approved

to treat the following autoimmune conditions: Rheumatoid Arthritis, Psoriatic Arthritis, Ankylosing

Spondylitis, Juvenile Idiopathic Arthritis, Crohn's Disease, Ulcerative Colitis, and Plaque Psoriasis.

50.     Humira is the brand name for Adalimumab, a tumor necrosis factor (TNF) inhibiting

anti-inflammatory drug. Humira binds to TNFα receptors. TNFα normally binds to TNFα receptors,

which leads to the inflammatory response of many autoimmune diseases. By binding to TNFα,

Humira reduces the inflammatory response. Because TNFα is part of the immune response that

protects the body from infection, treatment with Humira may also increase the risk of serious and

sometimes fatal infections.

51.     Humira must be injected subcutaneously. Once acclimated, patients generally need to

be injected, or to inject themselves, approximately every two weeks. Once a patient starts on

Humira, they generally are advised to stay on it indefinitely. Indeed, patients are warned that if they

abruptly stop treating with Humira (rather than tapering off slowly) they may have a "severe"

reaction or "flare up" of their condition after which they may not respond to Humira or other similar

treatment thereafter.

VII. **The Illegal Promotion of Humira: the "Ambassador Program".**

A. **The Ambassador Program: Purpose, Job Description, Metrics, and Compensation.**

52.     The Ambassador Program was launched around the time the sales curve for Humira appeared to be flattening.  AbbVie has referred to the Ambassadors by various synonyms, including "Nurse Ambassador," "Nurse Educator," "Patient Ambassador," and "Humira Ambassador."  Here, the position is referred to as the "Ambassador" position and the program as the "Ambassador Program."

53.     Through the Ambassador Program, AbbVie has used Registered Nurses to serve as company representatives for direct dealings with patients, doctors, and office staff.  Ambassadors are primarily tasked with going into patients' homes to discuss the patients' disease states and their treatment with Humira and to work with patients directly to enable payment for the drug.  In so doing, the Ambassadors assume several functions of the physicians and administrative functions of their office staff associated with Humira treatment, which offers tremendous value and time-saving to physicians and incentivizes them to prescribe Humira, and also has the effecting of diluting the doctor-patient relationship.  Further, the direct patient contact between AbbVie (the manufacturer) and the patients enables the ongoing gathering of patient information – and provides a slanted and improper forum for discussion of Humira's side effects.

54.     An early job description for the position of Ambassador Manager described the program as follows, with express reference to the program's connection to AbbVie's "commercial organization":  "Interact[ing] closely with commercial organization to drive increased brand performance and retention on the HUMIRA brand by ensuring 'Best in Class' support and education regarding myHUMIRA platform services."

55.     As of March 2013, AbbVie, via Quintiles, was describing the "Nurse Educator" role
for the Humira "Patient Ambassador Program" in more careful (and less accurate) terms as an
"educational based program designed as a resource for patients living with auto-immune diseases
that have been prescribed specific medications. Patient Ambassadors provide education about
specific disease treatments, and resources to help patients better begin and manage their disease state
and resources associated with their prescribed medication. Patient Ambassadors are responsible for
participating in one-on-one communications with patients as well as appropriate medical
professionals within the associated treatment process. Since the program is strictly educational
based, Patient Ambassadors, do not provide medical advice or work clinically within this role."

56.     The program is limited to patients using Humira for on-label indications. In those
instances when Relator learned a patient had been prescribed Humira for an off-label indication, he
did not do the visit.

57.     Ambassadors work with, and report to, personnel in sales as well as to managers in
the Ambassador department.

58.     Tellingly, as reflected on the Field Coaching Logs and in other places, AbbVie
evaluates Ambassadors' performance on prescription-based metrics: (a) number of patients enrolled,
(b) number of unique live visits, (c) percent of patients with the drug, (d) number of offices
launched, and (e) total number of offices enrolling. None of these have anything to do with
education.

59.     These core metrics reflect how senior personnel evaluate the Ambassador Program as
a whole and determine the resources to put into it. Managers have stressed to Ambassadors that the
prescription-based metrics demonstrate the value of the Ambassador Program to senior level AbbVie

personnel, especially in the high adherence rate of patients who are prescribed Humira. Managers in the Ambassador program report only the core business-related metrics to AbbVie decision-makers.

60.     All of the Ambassadors' variable compensation depends on these bottom-line, prescription-related metrics. Ambassadors can earn up to approximately 20% of their overall compensation in quarterly bonuses that are entirely dependent on the number and/or percent of offices that launch the program and/or patients who take Humira.

61.     Recently, the Ambassador Program has expanded in two ways. First, having realized the benefits of having the Ambassadors in the field focus on newer patients who may be wavering on whether to take the medicine, and/or for whom payment has not been set up, AbbVie launched the "low touch" program for patients who already have been taking Humira for longer periods. Specifically, established patients communicate with company-paid nurses who work from home only by telephone. Second, as of approximately fall 2014 the company piloted "Operation Dakota," a program in which prospective Humira patients living in sparsely-populated areas have contact with Ambassadors by telephone or video, so that no market is beyond the reach of the Ambassador Program.

62.     Regardless of whether communications with patients are in person or over the phone, all Ambassadors have the same duties and the same purpose: getting patients to start and stay on Humira.

**B.      Ambassadors' Interactions with Health Care Providers: A Blurred and Problematic Role.**

63.     AbbVie is well aware, as reflected in its Ambassador Guidelines, that Ambassadors may not function as sales representatives if they are not providing fair and balanced information regarding side effects. Consequently, the Guidelines direct that Ambassadors "will be restricted

from being part of recurring call plan visits because they are not part of AbbVie's sales force and any extensive interactions could have HR and other implications."

64.     However, Ambassadors play a crucial useful role in interfacing with physicians and off-loading the work of their office, thus providing free and valuable services and influencing prescription decisions.

65.     Before the Ambassador Program, many physicians were disinclined to prescribe Humira because it is a very expensive, injectable drug that requires a great deal of non-billable support from the doctor and/or his or her office. Patients need training in how to inject themselves with Humira, assistance with paying for the drug, and disposal of the injection equipment or "sharps" by authorized means. Due to the added burden on their staff, many doctors resist prescribing Humira. The Ambassadors step in to take over these functions and thus relieve the initial barrier to the sale.

66.     In the earlier time period of the tenure of the Ambassador Program, Ambassadors had dramatically overlapping duties with sales representatives. Even in the more recent period, however, Ambassadors have had substantial direct involvement with doctors and their staff through a variety of channels.

**1.      Routine sales calls.**

67.     In the early years of the Program, and until some point in 2013, Ambassadors regularly accompanied sales representatives on routine sales calls to pitch the Ambassador Program. The sales pitch has been consistent, however, regardless of whether the Ambassadors have personally joined the sales representatives on their call visits or not. For example, Relator attended periodic meetings with the sales team and the local District Manager to discuss business planning and sales calls. Frequently, sales representatives told Relator to expect a call from a particular

doctor or his or her office based on the sales representative's having just pitched the Ambassador Program and its benefits to the doctor.

68.    As a marketing pitch, sales representatives detail exactly how the Ambassadors save the doctors and their staff substantial time: "we will take that [patient] call," "we will take that [patient's] insurance question," "doctor, we will take your concerns about [calls to the office, dealing with billing, disposal] *off the table*." After touting the program, the sales representative (and, along with the Ambassador, during the time when the Ambassadors routinely attended initial sales calls) "closes" with the question of whether the doctor would write more Humira if the time and service related concerns were "off the table."

69.    Tellingly, the sales representatives tell doctors to "*think of [the Ambassador] as an extension of your office.*" This plants the seed for doctors to muddy the role of the Ambassador in descriptions to patients.

70.    Among the doctors who responded positively to the marketing pitch and opted to prescribe Humira as a result of the Ambassador Program was Dr. Avelino A. Guiribitey. Among those who dramatically increased their prescriptions were Dr. Alejandro Pedrozo and other doctors identified herein.

### 2.    Targeted visits to doctors' offices unaccompanied by sales representatives.

71.    AbbVie also orchestrates targeted visits by Ambassadors to certain doctors, and requires Ambassadors to attend office locations on their own (unaccompanied by sales representatives), on the request of doctors and their staff.

72.    Based on their knowledge of which providers are generally high-prescribers of injectable biologics, senior members of AbbVie's sales organization identify key accounts that might benefit from receiving visits from Ambassadors. Relator had at least four such calls in August 2014

alone, in which he described the Ambassador Program and touted its benefits to doctors and their staff.

73.     In addition, Ambassadors are expected to provide, and do provide, free materials to office staff (Humira travel kits; "Talking Training Pens") on request. Ambassadors are expected to work, and do work, with office staff to bring pre-printed Prior Authorization and other benefit forms to doctors' offices.

74.     AbbVie recently issued an initiative to place dedicated Humira terminals in doctors' offices that print benefit verification forms and other insurance-related documents, with a goal to deploy 2000 such terminals. At the time Relator left his employment with AbbVie, there were already approximately 200 such terminals placed by AbbVie in doctors' offices as a free benefit.

75.     Ambassadors also visit, or communicate with, doctors' offices to respond to specific questions about specific patients, including if the patient has routed an administrative question to the doctor's office rather than to the Ambassador.

76.     Finally, Ambassadors attend "launch" or "re-launch" events where they meet with doctors and their staff once a doctor has joined the Ambassador Program, or re-joined it. For example, Relator attended a re-launch meeting with Dr. Robert Sarro's office. Dr. Sarro and his assistant had been persuaded that the Ambassador Program would "make their lives easier."

77.     While Ambassadors are expected to share with other Ambassadors and/or senior management success stories of their direct interactions with doctors, managers warn Ambassadors not to formally record all the time they spend with doctors. In other words, Ambassadors typically enter their daily activities on the CRM (Customer Relations) section of the Sales Force database (*e.g.*, first live visit, pre- and post-calls to patients after their first few injections). However, on the informal monthly ride-alongs, managers tell Ambassadors that if they are only doing a drop off of

materials or a quick program orientation, they should not document an office call in the database. Given the frequency of those "short" visits, and their intimate role in effectuating the Ambassadors' regular duties in visiting doctors, the injunction against logging these visits had the result of dramatically understanding the time Ambassadors spent with doctors and their offices.

### 3.   Speaker dinners.

78.     Finally, AbbVie used to require Ambassadors to attend as many speaker events as possible, and ensured that Ambassadors were seated next to key potential prescribers so they could pitch the program directly.  Examples of doctors who were influenced in their prescribing behavior by speaker dinners include Dr. Jerome R. Obed and Dr. Varee N. Poochareon.

79.     At some point, around the same time that AbbVie took the precaution not to actually have the Ambassadors attend every sales call, AbbVie also changed the requirement that Ambassadors regularly attend speaker dinners.

80.     Overall, AbbVie has ensured that Ambassadors maintain active, various contacts with doctors' offices in which they discuss the Ambassador Program and provide additional services to doctors' offices even beyond the substantial time they spend with patients, as discussed below.  The contacts further the initial pitch that the Ambassador is an extension of the doctor's office.

81.     Notably, some doctors, especially in the competitive South Florida dermatology market for wealthy older patients, even came to brag about the program and imply it was a service the doctor had arranged for his or her own patients.  For example, Hollywood Dermatology had a "Concierge" service and represented the Ambassador Program as a benefit to *their* patients as needed.  One high-prescribing doctor in that practice was Dr. Eduardo Weiss.

82.     Other examples of high-prescribing dermatologists who actively have touted the Ambassador Program, and worked especially closely with Ambassadors, included Dr. Francisco Kerdel (a company speaker and affiliate of among the highest prescribing, if not the highest

prescribing, dermatology offices in South Florida, Florida Academic Dermatology Center), Dr. Tory Sullivan, and Drs. Pedrozo and Weiss, above.

C.     **Ambassadors' Interactions with "Patients":  A Blurred and Dangerous Role.**

83.     The Ambassador Program capitalizes on, and violates, patients' trust of nurses and their need for care and assistance, and uses that trust to ensure that the patients start and continue to use Humira.

84.     As with the Ambassadors' interactions with physicians, AbbVie has recognized that inserting a company representative into patients' homes presents a host of potential problems. AbbVie thus characterizes the Ambassadors merely as "educators."

85.     For example, the Ambassador Guidelines expressly provide that if a patient "expresses uncertainty over using the Ambassador, the HCP treatment plan, or desire to continue or start treatment with HUMIRA for any reason (such as the patient says 'I am afraid of getting cancer from using Humira'), the Ambassador shall refer the patient back to his/her physician for a further discussion."  In reality, the Ambassador's job is to overcome patients' uncertainty all the time when it comes to the decision to *start* or *continue* on Humira; it is only in the area of the drug's serious risks where the Ambassadors are not permitted to speak.

86.     Underscoring the misleading conduct, AbbVie provides Ambassadors with company business cards with their Registered Nurse (R.N.) status displayed, and instructs Ambassadors to brag about their history as nurses to patients.  On the other hand, AbbVie management also tells Ambassadors not to *publicly* refer to themselves as healthcare providers, or even to their "patients" as "patients."

87.     For example, AbbVie management praised Relator in a formal review in August, 2014 for his "sincere relationships with *patients*."  But, in field observations from manager Sean Garrison, in the section on "*patient* observation interactions "Relator was also told that "while you

build fantastic rapport with your patients…by using the word 'people' vs 'patient' you may be able more appropriately identify your role as an educator vs a clinician. It may open up some more/different dialogue as well."

88.     Of course patients are confused. This confusion matters because the Ambassador Program causes patients to have fewer interactions with their actual health care providers and interferes with doctor-patient relationships.

### 1.     Contacting the patient and the initial visit.

89.     When assigned a new client, Ambassadors begin with a call to set up an appointment. Notably, in a material percentage of the time, the patient has *not yet decided whether to fill the prescription*, and thus Ambassadors highly influence the decision to take Humira in the first place.

90.     Patients frequently told Relator that they likely would not have started on Humira if he had not contacted them. Like other Ambassadors, Relator was expected to memorialize what the company referred to as "Magic Moments," "Moments of Wow," "Making Magic" incidents, and/or "Highlight Stories" in which the outcome of the interaction was that the patient was persuaded by the Ambassador to take or remain on Humira.

91.     Examples that Relator saw or penned include anecdotes where patients said "I really wasn't gonna take this, if you hadn't called me I just wasn't ready for this…." and an anecdote where a "client [was] thinking about stopping…" but was convinced by the Ambassador not to.

92.     The initial patient visit takes an average of one hour, and as many as two-and-a-half. Typically about one third of the visit is spent making sure the patient has access to reimbursement or, as needed, free drugs. The rest is related to patients and their experiences. Ambassadors are told that if the patient is not doing 75% of the talking, something is wrong. Among other things, the Ambassador is expected to discuss the patients' experience with the underlying disease and their

concerns, consciously engendering a trust relationship with the patient, who perceives the Ambassador as an extension of his or her doctor's office.

93.     This perception is understandable, especially given that doctors, at AbbVie's urging, tell patients that "a nurse will be contacting you" about starting on the drug.

94.     In presenting Humira, the Ambassadors show the patient a company-created video that addresses how Humira works. Generally, the Ambassadors discontinue the video when the video turns to the more serious side effects of Humira. Ambassadors believe this is not a problem because in any case patients foreseeably have stopped paying attention to the dense and rushed material around that time (given patients have someone right in front of them with whom to discuss the drug). Thus, especially combined with their inability to discuss side effects, Ambassadors foreclose avenues of giving fair and balanced information to patients.

95.     Similarly, and again instead of being meaningfully fair and balanced, the Ambassador is supposed to hand the patient the long and complex package insert presented in tiny print, explain that it would take far too long to review on the spot, and recommend that the patient review it him or herself. AbbVie likely knows that the dissemination of the package insert to patients is a potential defense to its systematic failure to allow Ambassadors to convey fair and balanced information to patients. AbbVie has set up its systems to require the Ambassadors to regularly order a monthly or quarterly quota of package inserts, regardless of whether they need them.

96.     Crucially, when patients have questions about Humira's serious side effects, the Ambassadors abandon their role as "educators" entirely and, despite being experts on Humira and the conditions it treats, must withhold the most important safety information from the patients, instead referring patients to their doctors. However, because the Ambassador Program obviates the

need for patients to see their doctors very often, far fewer patients are likely to get their questions about safety answered.

97. All of this is reinforced in trainings. In role-plays, Ambassadors practice how to respond to questions about cancer (about which a distinct minority of new patients ask; virtually all serious side effect questions by patients are about cancer), and other difficult questions about side effects. When asked about dangerous side effects, the Ambassadors are trained to say "that's a great question for your doctor; I'm here to help you get medication for five dollars or less."

## 2. MyHumira.com.

98. In addition to the objective of the initial contact and first visit of getting the patient started on Humira, another key objective of the Ambassador Program is to get patients to enroll on the website "MyHumira," which allows AbbVie to track macro information about the drug and the doctors that prescribe it.

99. Specifically, MyHumira.com reflects AbbVie's effort to use the Ambassador program to target the marketing of Humira. MyHumira is a service platform through which AbbVie compiles specific data about each patient's personal information, including geographic location, disease profile, provider information, Humira usage, payment source information, and Ambassador interaction, among other things.

100. Every one of the Relator's managers, including Tracey Calamita, Reed Morton, Donald Lane Murray, Sean Garrison, and Maya Stewart (National Ambassador Manager), repeatedly reminded the Relator (and other Ambassadors) to carefully track patient data so that AbbVie could better focus its resources. The common phrase was to "focus resources to have maximal return."

## 3. Ongoing contacts.

101. Following the initial, major visit, Ambassadors typically make two additional in-person visits.

102.     Following the initial visits, Ambassadors then typically switch to phone contact with the patients. All of the Ambassadors log their patient visits on company databases. On these databases, there are pre-sent drop boxes and there are no spaces for characterizing the calls or for reporting adverse events Ambassadors may hear about, as discussed further in Section 5.

### 4.     Serving as the conduit to ensure free Humira for Government Payor patients.

103.     Ambassadors also have a crucial role in assisting patients with coverage for Humira, tasks that (as noted above) require the Ambassadors to spend about a third of the first visit on payment information.

104.     Some of this work is simply replacing what otherwise is the work of the doctors' office staff in dealing with insurance companies. AbbVie has instructed Ambassadors that while they may not call insurers directly, they can (and should) be on the phone when patients call, and can (and should) encourage patients to initiate calls to learn about coverage.

105.     While Ambassadors encourage commercial patients to obtain Humira co-pay cards, they take a different but equally effective approach with Government Payor patients. For that population, Ambassadors are required to contact Medicare to determine the patients' payment status: namely, how much the patient must pay in the first couple of months of treatment, when the payment is relatively manageable, and at what point the patient's coverage stops during the gap period before coverage resumes (the so-called "Donut Hole").

106.     At that point, armed with that information, the Ambassador refers the patient to the "Patient Assistance Foundation."

107.     As AbbVie managers told Relator, true, independent charity foundation assistance for Humira runs out in the first couple of months of the year, but AbbVie's *own* Patient Assistance Foundation has ample free supply to give patients during their Medicare Part D payment gap period.

108.    In Relator's experience, *all* patients (save one or two who appeared to be quite wealthy) were able to obtain free drugs from AbbVie through the Patient Assistance Foundation based on how AbbVie's Patient Assistance Foundation generously (and laxly) defined "need."

109.    Thus, Ambassadors have a key role in facilitating this process by working with offices, insurance companies, and, most importantly, sending patients to obtain free Humira from AbbVie directly.

110.    As touted at national meetings attended by all the Ambassadors, AbbVie gave out substantial amounts of free drugs per year. Relator recalls the amount from 2013 to be 94,000 dosages. This degree of assistance to Government Payor patients enables hundreds or thousands of patients to get launched on this costly drug in the form of having a payment plan from the get-go.

111.    Finally, and further underscoring the attention AbbVie pays to Medicare reimbursement information, AbbVie management provides information about open enrollment periods for Medicare plans and requires Ambassadors to try to push their patients into plans that maximize reimbursement for Humira.

### 5.    Adverse events.

112.    Approximately ten percent of Relator's patients experienced an adverse event while taking Humira, including injection site reactions, failure to improve (or worsening conditions), and infections.

113.    If a patient reports an adverse event, the Ambassador reports the incident to AbbVie, although, as medical professionals, they should report it to the FDA directly. The Ambassadors also tell the patients to call their doctors, but do not get on the phone with them to ensure that they do so, despite regularly joining phone calls with patients for other calls (namely to ensure payment). The Ambassadors themselves do not raise the issue with the doctors or doctors' staff, even though the Ambassadors may well be visiting the patient's doctor's office for various office-assistance reasons.

114.    Further, given the blurred role of the Ambassadors, and how the Ambassador Program interferes with and attenuates communication between the patient and his or her actual doctor and his or her staff, it is not clear how often this reporting occurs.

115.    Ironically, Relator knows of at least one instance in which a patient who tried to report an adverse event to a doctor's office was simply routed back to the Ambassador.

116.    Not only is there no opportunity for Ambassadors to report adverse events on their weekly reporting, but Ambassadors are instructed not to put in writing any questions at all about patients interactions, not just those limited to adverse events.

117.    Thus, Ambassadors help ensure that patients get started on Humira (by convincing them to fill prescriptions and often facilitating a plan where the patient is ensured the medicine will be provided), and stay on it, in part through the adverse event handling policies.

**6.      Hiding and distorting the content of interactions with patients.**

118.    AbbVie's efforts to obscure the true nature of the Ambassador Program are apparent in various ways.

119.    The company has instructed the Ambassadors not to refer specifically to Humira in writing up patient visits, despite the fact that Humira is the only reason for their presence in the patient's home.  As manager Lane Murray wrote to Relator:  "Thanks for sharing your Magic Moments with the team!! I appreciate the fact that you took the time to be a leader on this by encouraging our team to follow your lead and submitting their Moments of Wow! …….PS Also, don't forget that we cannot utilize the name of the drug when writing these up. . . (instead, say 'current therapy' or their 'current drug' etc….) We'll discuss writing these up a little more tomorrow!"  In the follow-up discussion, Mr. Murray, consistent with other messaging from other AbbVie managers, expressed concerns about creating a paper trail about Humira.

120.    Indeed, Ambassadors are specifically and repeatedly told that if they have a question about what they permissibly can do in the course of their patient interactions, they should not write it down and call their supervisor instead. This point was made during the Ambassadors' initial training and reiterated frequently by AbbVie management personnel, including Tracey Calamita, Lane Murray, and Sean Garrison.

121.    Taken together, the prohibitions against mentioning Humira by name, against using the word "patients" to describe the patients, against recording time with doctors, and against recording adverse events have served to limit the record of the Ambassadors' actual work.

### D.    By Covering-Up The Real Nature of the Ambassador Program, AbbVie Also Has Violated its Corporate Integrity Agreement.

122.    AbbVie was formed as a result of negotiations to resolve charges brought by the Office of the Solicitor General of the United States stemming from Abbott's improper pharmaceutical promotion practices.

123.    Unfortunately, AbbVie has continued such improper practices.

124.    The above sections discuss various ongoing attempts by AbbVie to cover-up the true nature of the Ambassador Program.

125.    This sort of conduct demonstrates AbbVie's reckless or knowing misconduct, and also violates its Corporate Integrity Agreement ("CIA" or "Agreement"), thus permitting AbbVie to avoid stipulated penalties and other adverse consequences.

126.    On May 7, 2012, Abbott entered into a CIA with the Office of the Solicitor General of the United States in which Abbot agreed to separate into two, publicly traded companies: "one a diversified medical products company, which may retain the Abbot name (Diversified Company); and the other a research-based human pharmaceuticals company (Pharmaceutical Company), which will not be a subsidiary or corporate affiliate of Abbott." Agreement, at 1.

127.     AbbVie, the Pharmaceutical Company, assumed "sole responsibility for the terms and obligations of the CIA." Agreement, at 2.

128.     The CIA requires compliance with applicable statutes to this case, such as the Anti-Kickback Act, and requires reporting of all breaches of the Act. Agreement, at 27 (I).

129.     The CIA contains stipulated penalties in the event of non-compliance, in particular, $1,000 per day for failure to comply with obligations and $5,000 for each false certification required by the CIA. Agreement, at 54.

130.     Through the unlawful Ambassador Program and the cover-up, AbbVie is in violation of the CIA.

## VIII.  The Ambassador Program Has Been a Tremendous Success, and May Be a Cornerstone of Future Branding Efforts.

131.     The Ambassador Program has been wildly successful. As of May 2014, the company hit a self-described milestone: a senior executive wrote to the entire Ambassador team that 10,000 patients were supported by an Ambassador.

132.     A typical Ambassador conducts about 20 visits a week, with the rest of the time spent working with physician offices and doctors, and other functions, and traveling. As discrete nursing visits, the collective value of these services is enormous; as the acknowledged explanation for a set amount of sales growth of Humira, the value is astronomical.

133.     At AbbVie's annual meetings in 2013 and 2014, Ambassadors were told that until the Ambassador Program was initiated, sales of Humira had begun to plateau after its ninth year on the market.

134.     In front of the all the Ambassadors, a VP-level company representative put a graph up at each meeting comparing where sales were *before* the program and where the sales had gone *as a direct result of the Ambassador Program*.

135.    The difference amounted to billions of dollars in sales.  The Ambassador Program is the reason for Humira's dramatic growth.

136.    Further, AbbVie intends to continue to use the Ambassador Program.  High-level managers have spoken of AbbVie's longer-term plan to effectively extend the Humira patent by making usage of branded Humira more attractive because of the Ambassador program.  Because generics likely will not offer Ambassador Program analogs, AbbVie can still promote Humira as being advantageous for patients (and doctors).

137.    And even though a future generic provider may not invest in a similar program, other companies will (and have).  AbbVie's initiative has been so successful that other companies have adopted the model, with implications for direct pharma-company-to-patient marketing in various arenas.  In AbbVie's case, the Ambassador Program consists of kickbacks to doctors in the form of free services and products and unlawful imbalanced marketing to patients.

**IX.    AbbVie's Unlawful Conduct has Caused the Submission of False Claims to Federal and State Health Care Programs.**

138.    The illegal promotional schemes served their intended purpose, as they induced doctors to write prescriptions of Humira, and induced patients to stay on the drug.

139.    AbbVie has caused Medicaid, Medicare, and other Government Programs and *Qui Tam* States to pay hundreds of millions of dollars that they should not have paid, unjustly enriching AbbVie by allowing it to be paid for claims that were not reasonable and necessary and/or that were produced by kickbacks.

**A.    AbbVie's Kickbacks to Providers Caused the Submission of False Claims and Making of Material False Statements to Government Programs.**

140.    AbbVie provides healthcare professional with services of value in return for or to induce purchasing, ordering, arranging for or recommending purchasing or ordering of good or items

for which payment was made by Government Programs, in violation of the federal Anti-Kickback statute, 42 U.S.C. § 1320a-7b(b), and state analogs.

141.    These kickbacks caused healthcare professionals to prescribe or recommend that other healthcare professionals prescribe Humira.

142.    Government Programs, including Medicare and Medicaid, do not cover claims for drugs where there is a kickback involved in the underlying transaction—including claims that were submitted for payment of a drug as a result of a kickback given to a healthcare professional to prescribe that drug. Claims submitted to Government Programs where a kickback is involved in the underlying transaction are false within the meaning of the federal False Claims Act and State analogs.

143.    In order to enroll in and bill Medicare, providers must sign CMS Form 855, which states:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. … I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

144.    Similarly, any provider who submits claims to Medicaid must sign a provider agreement with each Medicaid program to which it submits claims.

145.    Claims that were submitted to Government Programs as a result, in part or in whole, were tainted by kickbacks provided by AbbVie and were therefore false within the meaning of the federal False Claims Act and State analogs. Here, these agreements were false when made.

146.    Government Programs paid reimbursements for those false claims, and as a result have incurred and continue to incur significant damages due to AbbVie's illegal use of kickbacks.

**B.**   **AbbVie's False Certifications of Compliance with the Law Constituted Making of False Statements Material to False Claims.**

147.   The Medicaid Rebate Agreement with the United States Secretary of Health and Human Services, which is part of the Social Security Act, 42 U.S.C. § 1396s, provides that drug products are only eligible for reimbursement if and when parties to the agreement are in compliance with applicable federal and state laws.

148.   These laws include, but are not limited to, the federal and corresponding state anti-kickback statutes, the FDAMA, and the Food, Drug & Cosmetic Act and all related regulations.

149.   As described in this Complaint, AbbVie has knowingly and repeatedly violated these laws in the promotion of Humira and employment of the Ambassador Program.

150.   Accordingly, AbbVie, expressly and impliedly, falsely certified their compliance with these federal and state statutes and regulations.

151.   These certifications of compliance with these statutes and regulations were material to Government Programs' decisions to make reimbursements for Humira.  Had Government Programs known that the certifications of compliance with the law were false, they would not have made reimbursements for its drugs.

152.   These false certifications of compliance with the law constituted the making, using, or causing to be made or used, false records or statements material to false or fraudulent claims, and they directly caused Government Programs to pay or reimburse for prescriptions that were not eligible for payment or reimbursement.

153.   AbbVie knew that the certifications of compliance with the law were false, and that its false certifications would cause Government Programs to make payments for its drugs.

C.    **Abbvie and Abbott Conspired With Each Other, Quintiles, and Doctors to Defraud Government Programs.**

154.    AbbVie's work with Abbott, and Quintiles, and with doctors, to deploy the Ambassador Program and hide its true role has constituted a conspiracy with the result of defrauding Government Programs.

X.    **Claims for Relief.**

## COUNT I
### Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

155.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

156.    AbbVie knowingly presented and caused to be presented to the Federal Government false or fraudulent claims for payment in violation of 31 U.S.C. § 3729(a)(1).

157.    As a result of the actions as set forth above in this Complaint, the United States of America has been, and may continue to be, severely damaged.

## COUNT II
### Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

158.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

159.    AbbVie knowingly made, used, or caused to be made or used, false or fraudulent records or statements material to the payment of a false or fraudulent claims, thereby causing false or fraudulent claims for payment to actually be paid or approved, in violation of 31 U.S.C. § 3729(a)(2).

160.    The United States of America, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid and may still be paying or reimbursing for Humira prescribed to patients enrolled in Government Programs.

161.    As a result of the actions as set forth above in this Complaint, the United States of America has been, and may continue to be, severely damaged.

## COUNT III
### Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(C)

162.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs as though fully set forth herein.

163.    As detailed above, AbbVie and Abbott knowingly conspired with each other, with Quintiles, and with doctors and medical professionals to utilize the Ambassador Program in violation of 31 U.S.C. §§ 3729(a)(1)(A) and (B). These overt acts were committed in furtherance of the conspiracy.

164.    As a result of the conspiracy's acts, the United States of America has been, and may continue to be, severely damaged.

## COUNT IV
### Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(G)

165.    Plaintiff -Relator incorporates herein by reference the preceding paragraph as though fully set forth herein. This claim is against Defendant AbbVie only.

166.    As detailed above, AbbVie knowingly made, used, and/or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the Government, and/or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property to the Government pursuant to 31 U.S.C. § 3729(a)(1)(G).

167.    As a result of AbbVie's actions as set forth above, the United State of America has been, and may continue to be, severely damaged.

## COUNT V
### Violation of the State of California False Claims Act,
### Cal. Gov't Code § 12650 *et seq.*

168.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

169.    This is a civil action brought by Plaintiff-Relator, on behalf of the State of California, against Defendants under the California False Claims Act, Cal. Gov't Code § 12652(c).

170.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Cal. Gov't Code § 12651(a)(1).

171.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(2).

172.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of California, or its political subdivisions, in violation of Cal. Gov't Code § 12651(a)(7).

173.    The payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code § 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code § 14107.2.

174. AbbVie violated Cal. Bus. & Prof. Code§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2 by engaging in the conduct alleged herein.

175. AbbVie also violated Cal. Gov't Code § 12651(a) by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, Cal. Bus. & Prof. Code §§ 650-650.1, and Cal. Welf. & Inst. Code § 14107.2, compliance with which are express and implied conditions of payment for claims submitted to the State of California.

176. The State of California, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of state and state subdivision funded health insurance programs.

177. As a result of AbbVie's actions, as set forth above, the State of California and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT VI**
**Violation of the California Insurance Frauds Prevention Act**
**Cal. Ins. Code § 1871, *et seq*.**

178. Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

179. On information and belief, the Ambassador Program was used to induce Humira usage for patients insured by both public and private payors and insurance companies in California.

180. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, employed "runners, cappers, steerers, or other persons...to procure clients or patients to perform or obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer," acts which are expressly prohibited by the California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7(a).

181.     As a result of the actions as set forth above, the State of California has been, and may continue to be, severely damaged.

## COUNT VII
### Violation of the State of Colorado Medical False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5, *et seq.*

182.     Plaintiff-Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

183.     This is a civil action brought by Plaintiff-Relator, in the name of the State of Colorado, against AbbVie pursuant to the State of Colorado False Claims Act, Colo. Rev. Stat. § 25.5-4-306.

184.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval to an officer or employee of the state of Colorado under the Colorado Medical Assistance Act, in violation of Colo. Rev. Stat. § 25.5-4- 305(1)(a).

185.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims for payment or approval to an officer or employee of the state of Colorado under the Colorado Medical Assistance Act, in violation of Colo. Rev. Stat. § 25.5-4-305(1)(b).

186.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state in

Case: 1:15-cv-08928 Document #: 1 Filed: 10/08/15 Page 42 of 94 PageID #:42


connection with the Colorado Medical Assistance Act, in violation of Colo. Rev. Stat. § 25.5-4-305(1)(f). AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the state in connection with the Colorado Medical Assistance Act, in violation of Colo. Rev. Stat. § 25.5-4-305(1)(f).

187. Colo. Rev. Stat. Ann. § 25.5-4-414 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Colorado Medicaid program.

188. AbbVie violated Colo. Rev. Stat. Ann. § 25.5-4-414 by engaging in the conduct alleged herein, and further violated the Colorado Medicaid False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and Colo. Rev. Stat. Ann. § 25.5-4-414, compliance with which are express and implied conditions of payment for claims submitted to the State of Colorado.

189. The State of Colorado, or its political subdivisions, unaware of the falsity of the claims and/or statements made or caused to be made, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of state and state subdivision-funded health insurance programs.

## COUNT VIII
### Violation of the State of Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. § 17b-301a *et seq.*

190. Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

191.     This is a civil action brought by Plaintiff-Relator, on behalf of the State of
Connecticut, against AbbVie under the Connecticut False Claims Act for Medical Assistance
Programs, Conn. Gen. Stat. § 17b-301d.

192.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the
information involved, or with actual knowledge of the falsity of the information, knowingly
presented, or caused to be presented, and may still be presenting or causing to be presented, to an
officer or employee of the State of Connecticut, or its political subdivisions, false or fraudulent
claims for payment or approval under a medical assistance program administered by the Department
of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(1).

193.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the
information involved, or with actual knowledge of the falsity of the information, knowingly made,
used or caused to be made or used, and may still be making, using or causing to be made or used,
false records or statements to secure the payment or approval by the State of Connecticut, or its
political subdivisions, false or fraudulent claims under a medical assistance program administered by
the Department of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(2).

194.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the
information involved, or with actual knowledge of the falsity of the information, knowingly made,
used or caused to be made or used, and may still be making, using or causing to be made or used,
false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to
the State of Connecticut, or its political subdivisions, under a medical assistance program
administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(7).

195.     Conn. Gen. Stat. § 53a-161c prohibits the solicitation or receipt of any remuneration,
including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind

38

in return for furnishing any item or service for which payment may be made in whole or in part under the Connecticut Medicaid program.

196.    AbbVie violated Conn. Gen. Stat. § 53a-161c by engaging in the conduct alleged herein.

197.    AbbVie further violated the Connecticut False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and Conn. Gen. Stat.§ 53a-161c, compliance with which are express and implied conditions of payment for claims submitted to the State of Connecticut.

198.    The State of Connecticut, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of state and state subdivision funded health insurance programs.

199.    As a result of AbbVie's actions, as set forth above, the State of Connecticut and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT IX**
**Violation of the State of Delaware False Claims and Reporting Act,**
**Del. Code Ann. tit. 6, § 1201 *et seq.***

200.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

201.    This is a civil action brought by of Plaintiff-Relator, on behalf of the State of Delaware, against AbbVie under the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1203(b).

202.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an

officer or employee of the State of Delaware, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Del. Code Ann. tit. 6, § 1201(a)(1).

203.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, § 1201(a)(2).

204.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, § 120l(a)(7).

205.    Del. Code Ann. tit. 31, § 1005 prohibits the solicitation or receipt of any remuneration (including kickbacks, bribes or rebates) directly or indirectly, overtly or covertly, in cash or in kind in return for the furnishing of any medical care or services for which payment may be made in whole or in part under any public assistance program.

206.    AbbVie violated Del. Code Ann. tit. 31, § 1005 by engaging in the conduct alleged herein.

207.    AbbVie further violated Del. Code Ann. tit. 6, § 1201(a) by their deliberate and systematic violation of federal and state laws, including the FDCA, the Anti- Kickback Act, and Del. Code Ann. tit. 31, § 1005, compliance with which are express and implied conditions of payment for claims submitted to the State of Delaware.

208. The State of Delaware, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of healthcare programs funded by the State of Delaware.

209. As a result of AbbVie's actions, as set forth above, the State of Delaware and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT X**
**Violation of the District of Columbia False Claims Act, D.C. Code § 2-308.13 *et seq*.**

210. Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

211. This is a civil action brought by Plaintiff-Relator, on behalf of the District of Columbia, against AbbVie under the District of Columbia False Claims Act, D.C. Code § 2-308.15(b).

212. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the District, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of D.C. Code § 2-308.14(a)(l).

213. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be used, and may still be making, using, or causing to be made or used, false records or statements to get false claims paid or approved by the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(2).

214.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(7).

215.     D.C. Code § 4-802(c) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for "(1) Referring a recipient to a particular provider of any item or service or for which payment may be made under the District of Columbia Medicaid program, or (2) Recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the District of Columbia Medicaid Program."

216.     AbbVie violated D.C. Code § 4-802(c) by engaging in the conduct alleged herein.

217.     AbbVie further violated D.C. Code§ 2-381.02(a) by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, D.C. Code§ 4-802(c), compliance with which are express and implied conditions of payment for claims submitted to the District of Columbia

218.     The District of Columbia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the District.

219.     As a result of AbbVie's actions, as set forth above, the District of Columbia and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XI
### Violation of the State of Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*

220.     Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

221.     This is a civil action brought by Plaintiff-Relator, on behalf of the State of Florida, against AbbVie under the Florida False Claims Act, Fla. Stat. § 68.083(2).

222.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

223.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

224.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(g).

225.     Fla. Stat. § 409.920 makes it a crime to "[k]nowingly charge, solicit, accept, or receive anything of value, other than an authorized copayment from a Medicaid recipient, from any source in addition to the amount legally payable for an item or service provided to a Medicaid

recipient under the Medicaid program or knowingly fail to credit the agency or its fiscal agent for any payment received from a third-party source;" or "knowingly, solicit, offer, pay or receive any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing or arranging of the furnishing of any item or service for which payment may be made, in whole or in part, under the Medicaid program, or in return for obtaining, purchasing, leasing, ordering, or arranging for or recommending, obtaining, purchasing, leasing, or ordering any goods, facility, item, or service, for which payment may be made, in whole or in part, under the Medicaid program."

226.    Fla. Stat. § 456.054(2) also prohibits the offering, payment, solicitation, or receipt of a kickback to a healthcare provider, whether directly or indirectly, overtly or covertly, in cash or in kind, in exchange for referring or soliciting patients.

227.    AbbVie violated Fla. Stat. § 409.920(c) and (e) and § 456.054(2) by engaging in the conduct alleged herein.

228.    AbbVie further violated Fla. Stat. § 68.082(2) by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-kickback Act, Fla. Stat. § 409 .920( c) and (e) and § 456.054(2) , compliance with which are express and implied conditions of payment for claims submitted to the State of Florida.

229.    The State of Florida, or its agencies, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance plans funded by the State of Florida or its agencies.

230.    As a result of AbbVie's actions, as set forth above, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

**COUNT XII**
**Violation of the State of Georgia False Medicaid Claims Act,**
**Ga. Code Ann. § 49-4-168 *et seq*.**

231.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

232.    This is a civil action brought by Plaintiff-Relator, on behalf of the State of Georgia, against AbbVie pursuant to the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.2(b).

233.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

234.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

235.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Georgia, or its political subdivisions, in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

236.    AbbVie further violated the Georgia False Medicaid Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA and the federal Anti-

Kickback Act, , compliance with which are express and implied conditions of payment for claims submitted to the State of Georgia.

237.    The State of Georgia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of Medicaid.

238.    As a result of AbbVie's actions, as set forth above, the State of Georgia and/or political subdivisions have been, and may continue to be, severely damaged.

### COUNT XIII
**Violation of the State of Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.***

239.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

240.    This is a civil action brought by Plaintiff-Relator, on behalf of the State of Hawaii, against AbbVie under the Hawaii False Claim Act, Haw. Rev. Stat. § 661-25.

241.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Hawaii, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Haw. Rev. Stat. § 661-21(a)(l).

242.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(2).

243. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(7).

244. AbbVie further violated Haw. Rev. Stat. § 661-21(a) by their deliberate and systematic violation of federal and state laws, including the FDCA and Anti-kickback Act, , compliance with which are express and implied conditions of payment for claims submitted to the State of Hawaii.

245. The State of Hawaii, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of state funded health insurance programs.

246. As a result of AbbVie's actions, as set forth above, the State of Hawaii and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XIV
### Violation of the State of Illinois False Claims Act, 740 Ill. Comp. Stat. § 175/1 *et seq.*

247. Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

248. This is a civil action brought by Plaintiff-Relator, on behalf of the State of Illinois, against AbbVie under the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/4(b).

249. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(A).

250.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to get false or fraudulent claims paid or approved by the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(B).

251.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to conceal, avoid or decrease an obligation to pay or transmit money to the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(G).

252.    In addition, 305 Ill. Comp. Stat. 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks) prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Illinois Medicaid program.

253.    AbbVie violated 305 Ill. Comp. Stat. 5/8A-3(b) by engaging in the conduct alleged herein.

254.    AbbVie furthermore violated 740 Ill. Comp. Stat. 175/3(a) by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and

the Illinois Vendor Fraud and Kickback statute, compliance with which are express and implied conditions of payment for claims submitted to the State of Illinois.

255. The State of Illinois, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

256. As a result of AbbVie's actions, as set forth above, the State of Illinois and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XV
**Violation of the Illinois Insurance Frauds Prevention Act, 740 Ill. Comp. Stat. § 92/5, *et seq*.**

257. Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

258. AbbVie's use of the Ambassador Program was intended to induce Humira usage for patients insured by both public and private payors and insurance companies in Illinois.

259. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, offered and/or paid "remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer," acts which are expressly prohibited by the Illinois Insurance Frauds Prevention Act, Ill. Comp. Stat. 92/5.

260. As a result of AbbVie's actions, as set forth above, the State of Illinois has been, and may continue to be, severely damaged.

## COUNT XVI
**Violation of the State of Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.***

261.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

262.    This is a civil action brought by Plaintiff-Relator, on behalf of the State of Indiana, against AbbVie under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-4(a).

263.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to be presented, false claims to the State of Indiana, or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(l).

264.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

265.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit money to the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(6).

266.    Ind. Code § 12-17.6-6-12 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind

in return for furnishing any item or service for which payment may be made in whole or in part under the Indiana Medicaid program.

267.    AbbVie violated Ind. Code § 12-17.6-6-12 by engaging in the conduct alleged herein.

268.    AbbVie further violated Indiana's False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and Ind. Code § 12-17.6-6-12, compliance with which are express and implied conditions of payment for claims submitted to the State of Indiana.

269.    The State of Indiana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

270.    As a result of AbbVie's actions, as set forth above, the State of Indiana and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XVII**
**Violation of the State of Iowa False Claims Act, Iowa Code § 685.1, *et seq*.**

271.    Plaintiff-Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

272.    This is a civil action brought by Plaintiff-Relator on behalf of the State of Iowa against AbbVie under the State of Iowa False Claims Act, Iowa Code § 685.3(2)(a).

273.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of Iowa Code § 685.2(1)(a).

274.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to obtain payment or approval of false claims by the State of Iowa, in violation of Iowa Code § 685.2(1)(b).

275.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state of Iowa, in violation of Iowa Code § 685.2(1)(g).

276.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing and improperly avoiding or decreasing obligations to pay or transmit money to the State of Iowa, in violation of Iowa Code § 685.2(1)(g).

277.    AbbVie furthermore violated the Iowa False Claims Law, Iowa Code § 685.1, *et seq.* by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, compliance with which are express and implied conditions of payment for claims submitted to the State of Iowa.

278.    The State of Iowa, unaware of the falsity of the claims and/or statements made or caused to be made by AbbVie, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of state funded health insurance programs.

279.    As a result of AbbVie's actions, as set forth above, the State of Iowa has been, and may continue to be, severely damaged.

## COUNT XVIII
### Violation of the State of Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1 *et seq.*

280.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

281.    This is a civil action brought by Plaintiff-Relator, on behalf of the State of Louisiana's medical assistance programs, against AbbVie under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1.

282.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims, in violation of La. Rev. Stat. Ann. § 46:438.3(A).

283.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly engaged in misrepresentation, and may still be engaging in misrepresentation, to obtain, or attempt to obtain, payment from medical assistance programs funds, in violation of La. Rev. Stat. Ann. § 46:438.3(B).

284.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly submitted, and may continue to submit, claims for goods, services or supplies which were medically unnecessary or which were of substandard quality or quantity, in violation of La. Rev. Stat. Ann. § 46:438.3(D).

285.    In addition, La. Rev. Stat. Ann. § 46:438.2(A) prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes and/or rebates,

directly or indirectly, overtly or covertly, in cash or in kind, for furnishing healthcare goods or services paid for in whole or in part by the Louisiana medical assistance programs.

286.    AbbVie violated La. Rev. Stat. Ann.§ 46:438.2(A) by engaging in the conduct alleged herein.

287.    AbbVie further violated La. Rev. Stat. Ann. § 46:438.3 by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and La. Rev. Stat. Ann.§ 46:438.2(A) , compliance with which are express and implied conditions of payment for claims submitted to the State of Louisiana.

288.    The State of Louisiana, its medical assistance programs, political subdivisions and/or the Department, unaware of the falsity of the claims and/or statements made by AbbVie, or their actions as set forth above, acted in reliance, and may continue to act in reliance, on the accuracy of AbbVie's claims and/or statements in paying for prescription drugs and prescription drug-related management services for medical assistance program recipients.

289.    As a result of AbbVie's actions, as set forth above, the State of Louisiana, its medical assistance programs, political subdivisions and/or the Department have been, and may continue to be, severely damaged.

**COUNT XIX**
**Violation of the State of Maryland False Health Claims Act,**
**Md. Code Ann. Health-Gen. § 2-601, *et seq.***

290.    Plaintiff-Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

291.    This is a civil action brought by Plaintiff-Relator on behalf of the State of Iowa against AbbVie under the State of Maryland False Health Claims Act, Md. Code Ann. Health-Gen. § 2-604(a)(1)(i).

292.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of Md. Code Ann. Health-Gen. § 2-602(a)(1).

293.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to obtain payment or approval of false claims by the State of Iowa, in violation of Md. Code Ann. Health-Gen. § 2-602(a)(2).

294.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money to the State of Iowa, in violation of Md. Code Ann. Health-Gen. § 2-602(a)(7).

295.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money to the State of Iowa, in violation of Md. Code Ann. Health-Gen. § 2-602(a)(8).

296.    In addition, MD Code Ann., Criminal Law, § 8-512, prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Maryland Medicaid program.

297.    AbbVie violated the MD Code Ann., Criminal Law, § 8-512 by engaging in the conduct alleged herein.

298.    AbbVie further violated the Maryland False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and Section 8-512 of Maryland's Criminal Law, compliance with which are express and implied conditions of payment for claims submitted to the State of Maryland.

299.    The State of Maryland, unaware of the falsity of the claims and/or statements made or caused to be made by AbbVie, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of state-funded health insurance programs.

300.    As a result of AbbVie's actions, as set forth above, the State of Maryland has been, and may continue to be, severely damaged.

**COUNT XX**
**Violation of the Commonwealth of Massachusetts False Claims Act,**
**Mass. Gen. Laws ch. 12, § 5A *et seq*.**

301.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

302.    This is a civil action brought by Plaintiff-Relator, on behalf of the Commonwealth of Massachusetts, against AbbVie under the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12 § 5C(2).

303.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws ch. 12 § 5B(1).

304.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(2).

305.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(8).

306.     In addition, Mass. Gen. Laws Ann. Chap. 118E § 41 prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Massachusetts Medicaid program.

307.     AbbVie violated Mass. Gen. Laws Ann. Chap. 118E § 41 by engaging in the conduct alleged herein.

308.     AbbVie further violated Mass. Gen. Laws Ann. Chap. 12 § 5B by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, Mass. Gen. Law Ann. Chap. 118E § 41, compliance with which are express and implied conditions of payment for claims submitted to the State of Massachusetts.

309.     The Commonwealth of Massachusetts, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these

claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

310.     As a result of AbbVie's actions, as set forth above, the Commonwealth of Massachusetts and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXI**
**Violation of the State of Michigan Medicaid False Claims Act,**
**Mich. Comp. Laws § 400.601** *et seq.*

311.     Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

312.     This is a civil action brought by Plaintiff-Relator, on behalf of the State of Michigan, against AbbVie under the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.610a(1).

313.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or false representations of material facts in an application for Medicaid benefits, in violation of Mich. Comp. Laws § 400.603(1).

314.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made false statements or false representations of a material fact for use in determining rights to a Medicaid benefit, in violation of Mich. Comp. Laws § 400.603(2).

315.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, and may still be concealing or failing to disclose, an event affecting

its initial or continued right to receive a Medicaid benefit, or the initial or continued right of any other person on whose behalf AbbVie have applied for or is receiving a benefit with intent to obtain a benefit to which AbbVie were not entitled or in an amount greater than that to which AbbVie were entitled, in violation of Mich. Comp. Laws § 400.603(3).

316.    AbbVie, in possession of facts under which it is aware or should be aware of the nature of their conduct and that their conduct is substantially certain to cause the payment of a Medicaid benefit, knowingly made, presented or caused to be made or presented, and may still be presenting or causing to be presented, to an employee or officer of the State of Michigan, or its political subdivisions, false claims under the Social Welfare Act, Mich. Comp. Laws §§ 400.1-400.122, in violation of Mich. Comp. Laws § 400.607(1).

317.    In addition, Mich. Comp. Laws Ann. § 400.604 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Michigan Medicaid program.

318.    AbbVie violated Mich. Comp. Laws Ann. § 400.604 by engaging in the conduct alleged herein.

319.    AbbVie further violated Michigan Comp. Laws. Serv. § 400.607 by their deliberate and systematic violation of federal and state laws, including the FDCA, the federal Anti-Kickback Act, and Mich. Comp. Laws Ann. § 400.604, compliance with which are express and implied conditions of payment for claims submitted to the State of Michigan.

320.    The State of Michigan, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or

statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of Medicaid.

321. As a result of AbbVie's actions, as set forth above, the State of Michigan and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXII
### Violation of the State of Minnesota False Claims Act, Minn. Stat. § 15C.01, *et seq*.

322. Plaintiff-Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

323. This is a civil action brought by Plaintiff-Relator on behalf of the State of Minnesota and its political subdivisions against AbbVie under the State of Minnesota False Claims Act, Minn. Stat. § 15C.05(a).

324. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval to an officer or employee of the state Minnesota or a political subdivision thereof, in violation of Minn. Stat. § 15C.02(a)(1).

325. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to obtain payment or approval of false claims by the State of Minnesota or a political subdivision thereof, in violation of Minn. Stat. § 15C.02(a)(2).

326. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false

records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Minnesota, in violation of Minn. Stat. § 15C.02(a)(7).

327.     In addition, Minn. Stat. § 256B.0914, prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Minnesota Medicaid program.

328.     AbbVie violated Minn. Stat. § 256B.0914 by engaging in the conduct alleged herein.

329.     AbbVie further violated the Minnesota False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and Minn. Stat. § 256B.0914, compliance with which are express and implied conditions of payment for claims submitted to the State of Minnesota.

330.     The State of Minnesota, unaware of the falsity of the claims and/or statements made or caused to be made by AbbVie, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of state funded health insurance programs.

331.     As a result of AbbVie's actions, as set forth above, the State of Minnesota has been, and may continue to be, severely damaged.

## COUNT XXIII
### Violation of the State of Montana False Claims Act,
### Mont. Code Ann. § 17-8-401 *et seq*.

332.     Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

333.     This is a civil action brought by Plaintiff-Relator, on behalf of the State of Montana against, AbbVie under the Montana False Claims Act, Mont. Code Ann. § 17-8-406(1).

334.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Montana, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Mont. Code Ann. § 17-8-403(1)(a).

335.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(b).

336.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(g).

337.    In addition, MCA § 45-6-313 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Montana Medicaid program.

338.    AbbVie violated MCA § 45-6-313 by engaging in the conduct alleged herein.

339.    AbbVie furthermore violated the Montana False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and

MCA § 45-6-313, compliance with which are express and implied conditions of payment for claims submitted to the State of Montana.

340.    The State of Montana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

341.    As a result of AbbVie's actions, as set forth above, the State of Montana and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXIV
### Violation of the State of Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq.*

342.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

343.    This is a civil action brought by Plaintiff-Relator, on behalf of the State of Nevada, against AbbVie under the Nevada False Claims Act, Nev. Rev. Stat. § 357.080(1).

344.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false claims for payment or approval, in violation of Nev. Rev. Stat. § 357.040(1)(a).

345.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of false claims, in violation of Nev. Rev. Stat. § 357.040(1)(b).

346.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Nevada, or its political subdivisions, in violation of Nev. Rev. Stat. § 357.040(1)(g).

347.     In addition, N.R.S. § 422.560 prohibits the solicitation, acceptance or receipt of anything of value in connection with the provision of medical goods or services for which payment may be made in whole or in part under the Nevada Medicaid program.

348.     AbbVie violated N.R.S. § 422.560 by engaging in the conduct alleged herein.

349.     AbbVie further violated N.R.S. § 357.040(1) by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and N.R.S. § 422.560, compliance with which are express and implied conditions of payment for claims submitted to the State of Nevada.

350.     The State of Nevada, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of health insurance programs funded by the state or its political subdivisions.

351.     As a result of AbbVie's actions, as set forth above, the State of Nevada and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XXV
**Violation of the State of New Hampshire Medicaid False Claims Act,**
**N.H. Rev. Stat. Ann. § 167:61-B, *et seq.***

352.     Plaintiff-Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

353.    This is a civil action brought by Plaintiff-Relator on behalf of the State of New Hampshire against AbbVie under the State of New Hampshire Medicaid False Claims Act, N.H. Rev. Stat. Ann. § 167:61-cII.(a).

354.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval to an officer or employee of the department, in violation of N.H. Rev. Stat. Ann. § 167:61-bI.(a).

355.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get a false or fraudulent claim paid or approved by the department, in violation of N.H. Rev. Stat. Ann. § 167:61-bI.(b).

356.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the department, in violation of N.H. Rev. Stat. Ann. § 167:61-bI.(e).

357.    In addition, New Hampshire prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New Hampshire Medicaid program. N.H. Rev. Stat. Ann. § 167:61-a, I(i) & (j)

358.    AbbVie violated New Hampshire law by engaging in the conduct alleged herein.

359. AbbVie further violated N.H. Rev. Stat. Ann. § 167:61-b by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and New Hampshire's anti-kickback statute, compliance with which are express and implied conditions of payment for claims submitted to the State of New Hampshire.

360. The State of New Hampshire, or its political subdivisions, unaware of the falsity of the claims and/or statements made or caused to be made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

361. As a result of AbbVie's actions, the State of New Hampshire or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXVI**
**Violation of the State of New Jersey False Claims Act,**
**N.J. Stat. Ann. § 2A:32C-1 *et seq.***

362. Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

363. This is a civil action brought by Plaintiff-Relator, on behalf of the State of New Jersey, against AbbVie pursuant to the New Jersey Fraud False Claims Act, N.J. Stat. Ann. § 2A:32C-5(b).

364. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented or caused to be presented, and may still be presenting or causing to be presented, to an employee, officer or agent of the State of New Jersey, or to any contractor, grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in violation of N.J. Stat. Ann. § 2A:32C-3(a).

365.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

366.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(g).

367.    In addition, N.J.S.A. § 30:4D-17 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New Jersey Medicaid program.

368.    AbbVie violated N.J.S.A. § 30:4D-17 by engaging in the conduct alleged herein.

369.    AbbVie further violated the New Jersey False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and N.J.S.A. § 30:4D-17, compliance with which are express and implied conditions of payment for claims submitted to the State of New Jersey.

370.    The State of New Jersey, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of Medicaid.

371.    As a result of AbbVie's actions, as set forth above, the State of New Jersey and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXVII**
**Violation of the State of New Mexico Medicaid False Claims Act,**
**N.M. Stat. Ann. § 27-14-1, *et seq*.**

372.    Plaintiff-Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

373.    This is a civil action brought by Plaintiff-Relator on behalf of the State of New Mexico against AbbVie under the State of New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-7(B).

374.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, a false or fraudulent claim for payment under the Medicaid program, in violation of N.M. Stat. Ann. § 27-14-4(A).

375.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain false or fraudulent claims under the Medicaid program paid for or approved by the state, in violation of N.M. Stat. Ann. § 27-14-4(C).

376.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Mexico or one of its political subdivisions, relative to the Medicaid program, in violation of N.M. Stat. Ann. § 27-14-4(E).

377. In addition, N.M. Stat. Ann. § 30-44-7 *et seq.* prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New Mexico Medicaid program.

378. AbbVie violated N.M. Stat. Ann. § 30-44-7 *et seq.* by engaging in the conduct alleged herein.

379. AbbVie further violated N.M. Stat. Ann. § 27-14-1 *et seq.* by their deliberate and systematic violation of federal and state laws, including the FDCA and federal Anti-Kickback Act, compliance with which are express and implied conditions of payment for claims submitted to the State of New Mexico.

380. The State of New Mexico, or its political subdivisions, unaware of the falsity of the claims and/or statements made or caused to be made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

381. As a result of AbbVie's actions, as set forth above, the State of New Mexico or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XXVIII
**Violation of the State of New York False Claims Act,**
**N.Y. State Fin. Law § 187 *et seq.***

382. Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

383. This is a civil action brought by Plaintiff-Relator, on behalf of the State of New York, against AbbVie under the New York False Claims Act, N.Y. State Fin. Law § 190(2).

384. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

385. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.Y. State Fin. Law § 189(1)(b).

386. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the State of New York, or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(g).

387. In addition, New York law prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New York Medicaid program. NY Soc. Serv. § 366-d.

388. AbbVie violated NY Soc. Serv. § 366-d by engaging in the conduct alleged herein.

389. AbbVie further violated the New York State False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, the federal Anti-Kickback Act, and NY Soc. Serv. § 366-d, compliance with which are express and implied conditions of payment for claims submitted to the State of New York.

390.     The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of health insurance programs funded by the state or its political subdivisions.

391.     As a result of AbbVie's actions, set forth above, the State of New York and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXIX**
**Violation of the State of North Carolina False Claims Act,**
**N.C. Gen. Stat. § 1-605 *et seq*.**

392.     Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

393.     This is a civil action brought by Plaintiff-Relator, on behalf of the State of North Carolina, against AbbVie under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-608(b).

394.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

395.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

396.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made,

used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of North Carolina, or its political subdivisions, in violation of N.C. Gen. Stat. § 1-607(a)(7).

397.    In addition, N.C. Gen. Stat. Ann. § 108A-63 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the North Carolina Medicaid program.

398.    AbbVie violated N.C. Gen. Stat. Ann. § 108A-63 by engaging in the conduct alleged herein.

399.    AbbVie further violated the North Carolina False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and N.C. Gen. Stat. Ann. § 108A-63, compliance with which are express and implied conditions of payment for claims submitted to the State of North Carolina.

400.    The State of North Carolina, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

401.    As a result of AbbVie's actions, as set forth above, the State of North Carolina and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XXX
### Violation of the State of Oklahoma Medicaid False Claims Act,
### Okla. Stat. tit. 63, § 5053 *et seq.*

402.     Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

403.     This is a civil action brought by Plaintiff-Relator, on behalf of the State of Oklahoma, against AbbVie pursuant to the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053.2(B)(1).

404.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Oklahoma, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Okla. Stat. tit. 63, § 5053.1(B)(1).

405.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(2).

406.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(7).

407.     In addition, Okla. Stat. Ann. tit. 56, § 1005 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in

cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Oklahoma Medicaid program.

408.    AbbVie violated Okla. Stat. Ann. tit. 56, § 1005 by engaging in the conduct alleged herein.

409.    AbbVie furthermore violated the Oklahoma Medicaid False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and Okla. Stat. Ann. tit. 56, § 1005, compliance with which are express and implied conditions of payment for claims submitted to the State of Oklahoma. The State of Oklahoma, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of Medicaid.

410.    As a result of AbbVie's actions, as set forth above, the State of Oklahoma and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXXI
### Violation of the State of Rhode Island False Claims Act,
### R.I. Gen. Laws § 9-1.1-1 *et seq.*

411.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

412.    This is a civil action brought by Plaintiff-Relator, on behalf of the State of Rhode Island, against AbbVie pursuant to the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-4(b).

413.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Rhode Island or a member of Rhode Island's National Guard, false or fraudulent claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

414.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

415.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(7).

416.    In addition, R.I. Gen. Laws § 40-8.2-9 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Rhode Island Medicaid program.

417.    AbbVie violated R.I. Gen. Laws § 40-8.2-9 by engaging in the conduct alleged herein.

418.    AbbVie further violated the Rhode Island False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and R.I. Gen. Laws § 40-8.2-9, compliance with which are express and implied conditions of payment for claims submitted to the State of Rhode Island.

419.    The State of Rhode Island, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or

statements, paid, and may continue to pay, for prescription drugs and prescription drug- related

management services for recipients of Medicaid.

420.    As a result of AbbVie's actions, as set forth above, the State of Rhode Island and/or

its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXXII**
**Violation of the State of Tennessee Medicaid False Claims Act,**
**Tenn. Code Ann. § 71-5-181 *et seq.***

421.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this

Complaint as though fully set forth herein.

422.    This is a civil action brought by Plaintiff-Relator, on behalf of the State of Tennessee,

against AbbVie under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-183(b).

423.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the

information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and may still be presenting or causing to be presented, to the

State of Tennessee, or its political subdivisions, false or fraudulent claims for payment under the

Medicaid program,, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

424.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the

information involved, or with actual knowledge of the falsity of the information, knowingly made,

used or caused to be made or used, and may still be making, using or causing to be made or used,

false or fraudulent records or statements to get false or fraudulent claims under the Medicaid

program paid for or approved by the State of Tennessee, or its political subdivisions, in violation of

Tenn. Code Ann. § 71-5-182(a)(1)(B).

425.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the

information involved, or with actual knowledge of the falsity of the information, knowingly made,

used, or caused to be made or used, and may still be making, using or causing to be made or used,

false or fraudulent records or statements to conceal, avoid or decrease an obligation to pay or

transmit money to the State of Tennessee, or its political subdivisions, relative to the Medicaid

program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

426.     AbbVie violated Tenn. Code Ann. § 71-5-182(a)(l) by their deliberate and systematic

violation of federal and state laws, including the FDCA and Anti-Kickback Act, compliance with

which are express and implied conditions of payment for claims submitted to the State of Tennessee.

427.     The State of Tennessee, or its political subdivisions, unaware of the falsity of the

claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or

statements, paid, and may continue to pay, for prescription drugs and prescription drug-related

management services for recipients of the Medicaid program.

428.     As a result of AbbVie's actions, as set forth above, the State of Tennessee and/or its

political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXXIII**
**Violation of the State of Texas Medicaid Fraud Prevention Act,**
**Tex. Hum. Res. Code Ann. § 36.001 *et seq*.**

429.     Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this

Complaint as though fully set forth herein.

430.     This is a civil action brought by Plaintiff-Relator, on behalf of the State of Texas

against, AbbVie under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann.

§ 36.101(a).

431.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the

information involved, or with actual knowledge of the falsity of the information, knowingly made or

caused to be made, and may still be making or causing to be made, false statements or

misrepresentations of material fact that permitted AbbVie to receive a benefit or payment under the

Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(1).

432.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, or caused to be concealed or not disclosed — and may still be concealing or failing to disclose, or causing to be concealed or not disclosed — information that permitted AbbVie to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

433.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, caused to be made, induced or sought to induce, and may still be making, causing to be made, inducing or seeking to induce, false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Tex. Hum. Res. Code Ann. § 36.002(4)(B).

434.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, and may still be making, claims under the Medicaid program for services or products that were inappropriate, in violation of Tex. Hum. Res. Code Ann. § 36.002(7)(C).

435.    In addition, § 36.002(5) imposes liability on one who "knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or

the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program."

436.    AbbVie violated § 36.002(5) by engaging in the conduct alleged herein.

437.    AbbVie violated Hum. Res. Code § 36.002 by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and § 36.002(5) , compliance with which are express and implied conditions of payment for claims submitted to the State of Texas.

438.    The State of Texas, or it political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

439.    As a result of AbbVie's actions, as set forth above, the State of Texas and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXXIV
### Violation of the State of Vermont False Claims Act
### 32 V.S.A. § 630 *et seq.*

440.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

441.     This is a civil action brought by Plaintiff-Relator, on behalf of the State of Vermont, against AbbVie under the State of Vermont False Claims Act, 32 V.S.A. § 632(b)(1).

442.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Vermont, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of 32 V.S.A. § 631(a)(1).

443.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Vermont, or its political subdivisions, in violation of 32 V.S.A. § 631(a)(2).

444.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Vermont, or its political subdivisions, in violation of 32 V.S.A. § 631(a)(9).

445.    In addition, 33 V.S.A. § 141(d) prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Vermont Medicaid program.

446.    AbbVie violated 33 V.S.A. § 141(d) by engaging in the conduct alleged herein.

447.    AbbVie furthermore violated Vermont's False Claims Act, §631(a), by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and 33 V.S.A. § 141(d), compliance with which are express and implied conditions of payment for claims submitted to the State of Vermont.

448.    The State of Vermont, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

449. As a result of AbbVie's actions, as set forth above, the State of Vermont and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXXV
### Violation of the Commonwealth of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*

450. Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

451. This is a civil action brought by Plaintiff-Relator, on behalf of the Commonwealth of Virginia, against AbbVie under the Commonwealth of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.5(A).

452. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the Commonwealth of Virginia, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

453. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

454. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to

the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

455.    In addition, Va. Code Ann. § 32.1-315 prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Virginia Medicaid program.

456.    AbbVie violated Va. Code Ann. § 32.1-315 by engaging in the conduct alleged herein.

457.    AbbVie furthermore violated Virginia's Fraud Against Tax Payers Act, § 8.01-216.3a, by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and Va. Code Ann. § 32.1-315, compliance with which are express and implied conditions of payment for claims submitted to the Commonwealth of Virginia.

458.    The Commonwealth of Virginia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

459.    As a result of AbbVie's actions, as set forth above, the Commonwealth of Virginia and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXXVI
### Violation of the State of Washington Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.005, *et seq.*

460.    Plaintiff-Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

461.    This is a civil action brought by Plaintiff-Relator on behalf of the State of Washington against AbbVie under the Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.050(1).

462.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the state of Washington Medicaid program, in violation of Wash. Rev. Code § 74.66.020(1)(a).

463.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get false or fraudulent claims paid or approved by the state of Washington Medicaid program, in violation of Wash. Rev. Code § 74.66.020(1)(b).

464.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state of Washington Medicaid program, in violation of Wash. Rev. Code § 74.66.020(1)(g).

465.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing,

obligations to pay or transmit money or property to the state of Washington Medicaid program, in violation of Wash. Rev. Code § 74.66.020(1)(g).

466.    In addition, Wash. Rev. Code 74.09.240, prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Washington Medicaid program.

467.    AbbVie violated Wash. Rev. Code 74.09.240 by engaging in the conduct described herein.

468.    AbbVie furthermore violated the Washington Medicaid Fraud Act, Wash. Rev. Code 74.66.005, *et seq.*, by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and Wash. Rev. Code 74.09.240, compliance with which are express and implied conditions of payment for claims submitted to the State of Washington.

469.    The State of Washington, unaware of the falsity of the claims and/or statements made or caused to be made by AbbVie, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of state-funded health insurance programs.

470.    As a result of AbbVie's actions, as set forth above, the State of Washington and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XXXVII
**Violation of the State of Wisconsin False Claims for Medical Assistance Law,
Wis. Stat. § 20.931 *et seq.***

471.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

472.    This is a civil action brought by Plaintiff-Relator, on behalf of the State of Wisconsin, against AbbVie under the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931(5)(a).

473.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to any officer, or employee, or agent of the State of Wisconsin, or its political subdivisions, false or fraudulent claims for medical assistance, in violation of Wis. Stat. § 20.931(2)(a).

474.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain approval or payment of false claims for medical assistance, in violation of Wis. Stat. § 20.931(2)(b).

475.    In addition, Wis. Stat. Ann. § 49.49 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Wisconsin Medicaid program.

476.    AbbVie violated Wis. Stat. Ann. § 49.49 by engaging in the conduct alleged herein.

477.    AbbVie further violated the Wisconsin False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and Wis. Stat. Ann. § 49.49, compliance with which are express and implied conditions of payment for claims submitted to the State of Wisconsin.

478.    The State of Wisconsin, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

479.    As a result of AbbVie's actions, as set forth above, the State of Wisconsin and/or its political subdivisions have been, and may continue to be, severely damaged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator prays for judgment against AbbVie as follows:

A.    That AbbVie be ordered to cease and desist from submitting any more false claims, or further violating the FCA and the State *Qui Tam* Statutes;

B.    That judgment be entered in the United States of America's favor and against Defendants in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a)(1), plus a civil penalty of not less $5,500 or more than $11,000 per claim as provided by 31 U.S.C. § 3729(a)(1), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, to the extent such multiplied penalties shall fairly compensate the United States of America for losses resulting from the various schemes undertaken by AbbVie, together with penalties for specific claims to be identified at trial after full discovery;

C.    That judgment be entered in the *Qui Tam* States' favor and against AbbVie in the amount of the damages sustained by the State *Qui Tam* Statutes multiplied as provided for in the State *Qui Tam* Statutes, plus civil penalties in the ranges provided by the State *Qui Tam* Statutes;

D.    That Plaintiff-Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(D), Cal. Gov't Code § 12652(G), Cal. Ins. Code § 1871.7(g), Colo. Rev. Stat. § 25.5-4-306(4), Conn. Gen. Stat. § 17b-301e, Del. Code Ann. Tit. 6, § 1205, D.C. Code Ann.

§ 2- 381.03(F)(1), Fla. Stat. § 68.085, Ga. Code Ann. § 49-4-168.2, Haw. Rev. Stat. § 661-27, 740 Ill. Comp. Stat. § 175/4(D), 740 Ill. Comp. Stat. 92/25, Ind. Code § 5-11-5.5-6(A), Iowa Code § 685.3, La. Rev. Ann. Stat. § 46:439.4, Md. Code Ann. Health-Gen. § 2-605, Mass. Ann. Laws Ch. 12, § 5F, Mich. Comp. Laws Serv. § 400.610a(9), Minn. Stat. § 15C.13, Mont. Code Ann. § 17-8-410, Nev. Rev. Stat. § 357.220, N.H. Rev. Stat. Ann. § 167:61-E, N.J. Stat Ann. § 2A:32C-7, N.M. Stat. Ann. § 27-14-9, N.Y. Fin. Law § 190(6), N.C. Gen. Stat. § 1-610, Okla. Stat. Tit. 63, § 5053.4, R.I. Gen. Laws § 9-1,1-4(D), Tenn. Code Ann. § 71-5-183(D)(1)(A), Tex. Hum. Res. Code § 36.110, the Vermont False Claims Act, 32 V.S.A. § 630 *et seq.*, Va. Code Ann. § 8.01-216.7, Wash. Rev. Code § 74.66.070, and Wis. Stat. § 20.931(11);

E.       That AbbVie be ordered to disgorge all sums by which they have been enriched unjustly by their wrongful conduct; and

F.       That judgment be granted for Plaintiff-Relator for all costs, including, but not limited to, court costs, litigation costs, expert fees, and all attorneys' fees incurred by Plaintiff-Relator in the prosecution of this suit; and

G.       That Relator be granted such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiff-Relator hereby demands a

trial by jury of all issues so triable.

Dated: October 6, 2015       Respectfully submitted,

By:_____
      Jason L. Lichtman

Steven E. Fineman (*pro hac vice* to be filed)
Rachel Geman (*pro hac vice* to be filed)
Paulina do Amaral (*pro hac vice* to be filed)
Jason L. Lichtman (State Bar No. 6290052)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:    (212) 355-9500
Facsimile:      (212) 355-9592

*Attorneys for Plaintiff-Relator*



# Lieff
# Cabraser
# Heimann&
# Bernstein
Attorneys at Law

Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
t 212.355.9500
f 212.355.9592

October 6, 2015

Rachel Geman
Partner
rgeman@lchb.com

## VIA HAND DELIVERY

Thomas G. Bruton, Clerk of Court
Everett McKinley Dirksen U.S. Courthouse
219 South Dearborn Street
Chicago, IL 60604

RE:   *U.S. ex rel. Lazaro Suarez, et al v. AbbVie, Inc.*
      **False Claims Act – UNDER SEAL Complaint**

Dear Mr. Bruton:

Enclosed in the accompanying sealed envelopes are the original and two copies of a federal False Claims Act *qui tam* Complaint. This Complaint is to be filed ***in camera*** and ***under seal*** pursuant to 31 U.S.C. 3730(b)(2), which provides that a *qui tam* Complaint "shall be filed in camera, shall remain under seal for at least 60 days, and shall not be served on the defendant until the court so orders." Per the statute, Relator has not served the Complaint on the Defendants, and therefore is not including a summons or a proof of service with the Complaint.

Please do not hesitate to contact me if you have any questions.

Respectfully,

Rachel Geman

Rachel Geman