Robert A. Clifford (State Bar No. 0461849)
Shannon M. McNulty (State Bar No. 6281984)
Clifford Law Offices, PC
120 N. LaSalle Street, 31st Floor
Chicago, Illinois 60602
Telephone: 312.899.9090
Facsimile: 312.251.1160

Rachel Geman (*pro hac vice*)
Jason L. Lichtman (State Bar No. 6290052)
Katherine I. McBride (*pro hac vice* to be filed)
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:  (212) 355-9500
Facsimile:  (212) 355-9592

*Attorneys for Plaintiff-Relator*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* LAZARO SUAREZ, and on behalf of the STATES of CALIFORNIA, COLORADO, CONNECTICUT, DELAWARE, FLORIDA, GEORGIA, HAWAII, ILLINOIS, INDIANA, IOWA, LOUISIANA, MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, MONTANA, NEVADA, NEW JERSEY, NEW MEXICO, NEW YORK, NORTH CAROLINA, OKLAHOMA, RHODE ISLAND, TENNESSEE, TEXAS, VERMONT, VIRGINIA, WASHINGTON, WISCONSIN, and the DISTRICT OF COLUMBIA, | NO. 1:15-cv-08928 |
| Plaintiff-Relator, | JURY TRIAL DEMANDED |
| v. | |
| ABBVIE, INC., | |
| Defendant. | |

## SECOND AMENDED COMPLAINT

1850057.7

# TABLE OF CONTENTS

**Page**

I.    Introduction: AbbVie's Ambassador Program Was Designed and Functions as a Kickback to Doctors....................................................... 1

II.    Jurisdiction and Venue................................................................... 4

III.    Parties......................................................................................... 5

      A.    Relator Suarez............................................................. 5

      B.    Defendant AbbVie. ...................................................... 6

IV.    Background of Applicable Law. ...................................................... 6

      A.    Federal and State Laws Prohibit Kickbacks to Providers and Payments to Induce or Reward Referrals................................... 6

      B.    False and Misleading Statements about a Drug's Use Are Prohibited. ...................................................................... 9

      C.    The Provision of Free Drugs.......................................... 9

V.    Framework for Prescription Drug Payment under Government Programs. ........ 10

      A.    The Medicare Program Pays Certain of the Cost of Prescriptions for Its Enrollees........................................................... 10

      B.    The Medicaid Program Pays the Cost of Prescriptions for Its Enrollees. ...................................................................... 10

      C.    Other Government Programs Similarly Cover Prescription Drug Costs.................................................................................. 12

VI.    AbbVie Deployed Its Own "Nurses" to Induce Prescriptions of Humira. .......... 13

      A.    Background on Humira.................................................. 13

      B.    Prescribing Humira Is Expensive for Doctors. ..................... 13

      C.    AbbVie Used the Ambassador Program to Meet Doctors' Resource Needs............................................................................. 16

VII.    AbbVie Intentionally Designed the Ambassador Program to Increase its Profits. ....................................................................................... 20

      A.    Ambassadors and Sales Representatives Ensure Financial Success Through Marketing the Program Directly to Doctors............................. 22

      B.    Ambassadors Visited Doctors with Sales Representatives...................... 24

      C.    Ambassadors Conducted Targeted Visits to Doctors Informed by Sales Strategy................................................................... 25

      D.    Ambassadors Attended Speaker Dinners to Pitch and Represent the Program......................................................................... 28

# TABLE OF CONTENTS
## (CONTINUED)

**Page**

VIII.    Ambassadors Engage in Marketing, and also Provide Improper Patient Care. ...................................................................................................... 28

     A.    AbbVie's Ambassadors Work Directly with Patients so that Doctors Don't Have To. ..................................................................... 29

     B.    Ambassadors Are Directed to Hide and Distort Their Patient Interactions in Written Records. ............................................................ 33

     C.    Leveraging Patient Interactions to Inform AbbVie's Marketing Efforts. ................................................................................................ 34

     D.    Serving as the Conduit to Keep Government Payor Patients on Humira During the Coverage "Donut Hole." .......................................... 35

     E.    Examples of the Ambassador Program in Practice. ................................. 37

IX.    The Ambassador Program Was Nationwide and Operated Consistently Throughout the Country ............................................................................ 40

X.    Falsity, Materiality, and Scienter. ..................................................................... 42

     A.    AbbVie's Kickbacks to Providers Caused the Submission of False Claims. ................................................................................................ 42

     B.    AbbVie's False Certifications of Compliance with the Law Constituted the Making of False Statements. ........................................... 43

     C.    Materiality is Satisfied. ....................................................................... 44

     D.    Scienter is Satisfied. ........................................................................... 44

XI.    Claims for Relief. ............................................................................................ 45

COUNT I Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A) ........................... 45

COUNT II Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B) .......................... 45

COUNT III Violation of the State of California False Claims Act, Cal. Gov't Code § 12650 *et seq.* .................................................................................... 46

COUNT IV Violation of the State of Colorado Medical False Claims Act, Colo. Rev. Stat. § 25.5-4-303.5, *et seq.* ............................................................... 47

COUNT V Violation of the State of Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. § 17b-301a *et seq.* ............................... 49

COUNT VI Violation of the State of Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1201 *et seq.* ............................................................ 51

COUNT VII Violation of the District of Columbia False Claims Act, D.C. Code § 2-308.13 *et seq.* ...................................................................................... 53

# TABLE OF CONTENTS
## (CONTINUED)

**Page**

COUNT VIII Violation of the State of Florida False Claims Act, Fla. Stat. § 68.081 *et seq.* ................................................................. 54

COUNT IX Violation of the State of Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168 *et seq.* ........................................ 56

COUNT X Violation of the State of Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq.* ........................................................ 58

COUNT XI Violation of the State of Illinois False Claims Act, 740 Ill. Comp. Stat. § 175/1 *et seq.* ................................................... 59

COUNT XII Violation of the Illinois Insurance Frauds Prevention Act, 740 Ill. Comp. Stat. § 92/5, *et seq.* ........................................ 61

COUNT XIII Violation of the State of Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq.* ............... 61

COUNT XIV Violation of the State of Iowa False Claims Act, Iowa Code § 685.1, *et seq.* ........................................................... 63

COUNT XV Violation of the State of Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1 *et seq.* ...... 65

COUNT XVI Violation of the State of Maryland False Health Claims Act, Md. Code Ann. Health-Gen. § 2-601, *et seq.* ....................... 66

COUNT XVII Violation of the Commonwealth of Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5A *et seq.* ................... 68

COUNT XVIII Violation of the State of Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.601 *et seq.* ......................... 70

COUNT XIX Violation of the State of Minnesota False Claims Act, Minn. Stat. § 15C.01, *et seq.* ........................................... 72

COUNT XX Violation of the State of Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.* ........................................ 74

COUNT XXI Violation of the State of Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq.* .......................................... 75

COUNT XXII Violation of the State of New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1 *et seq.* ..................................... 77

COUNT XXIII Violation of the State of New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1, *et seq.* .......................... 79

COUNT XXIV Violation of the State of New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.* ........................................ 80

# TABLE OF CONTENTS
## (CONTINUED)

**Page**

COUNT XXV Violation of the State of North Carolina False Claims Act, N.C.
Gen. Stat. § 1-605 *et seq.* .................................................................. 82

COUNT XXVI Violation of the State of Oklahoma Medicaid False Claims Act,
Okla. Stat. tit. 63, § 5053 *et seq.* ........................................................ 84

COUNT XXVII Violation of the State of Rhode Island False Claims Act, R.I.
Gen. Laws § 9-1.1-1 *et seq.* ............................................................... 85

COUNT XXVIII Violation of the State of Tennessee Medicaid False Claims Act,
Tenn. Code Ann. § 71-5-181 *et seq.* .................................................... 87

COUNT XXIX Violation of the State of Texas Medicaid Fraud Prevention Act,
Tex. Hum. Res. Code Ann. § 36.001 *et seq.* .......................................... 88

COUNT XXX Violation of the State of Vermont False Claims Act 32 V.S.A. §
630 *et seq.* ...................................................................................... 90

COUNT XXXI Violation of the Commonwealth of Virginia Fraud Against
Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.* ................................. 92

COUNT XXXII Violation of the State of Washington Medicaid Fraud False
Claims Act, Wash. Rev. Code § 74.66.005, *et seq.* ................................. 94

COUNT XXXIII Violation of the State of Wisconsin False Claims for Medical
Assistance Law, Wis. Stat. § 20.931 *et seq.* .......................................... 96

JURY TRIAL DEMAND ...................................................................................... 99

Plaintiff and Relator Lazaro Suarez ("Suarez" or "Relator") files this Second Amended Complaint against Defendant AbbVie Inc. ("AbbVie" or "Defendant") on behalf of the United States of America, the District of Columbia, and the plaintiff States named herein (the "Qui Tam States"), pursuant to the qui tam provisions of the Federal Civil False Claims Act, 31 U.S.C. § 3729 *et seq*. and state law analogs.

## I.    Introduction: AbbVie's Ambassador Program Was Designed and Functions as a Kickback to Doctors.

1.    This case is about AbbVie's fraudulent scheme to induce and reward prescriptions of one of its most expensive drugs, Humira. To do so, AbbVie devised and employs a sophisticated—and very effective—kickback scheme.

2.    In or about 2012, after nearly a decade on the market, the sales curve for Humira showed signs of flattening out. Faced with declining sales growth, AbbVie launched a new initiative—the "Ambassador Program"—to increase prescriptions for Humira and to ensure patients' continued refilling of those prescriptions, and thus increasing AbbVie's profits from the same.

3.    Through the Ambassador Program, AbbVie provides free professional services to health care providers (HCPs) in exchange for their using Humira over another course of treatment. If, *and only if*, a doctor chooses to prescribe Humira, AbbVie makes an AbbVie representative (an "Ambassador", a Registered Nurse) available to perform time-consuming tasks that are otherwise fulfilled by the physician and their own professional staff.[1]

4.    AbbVie actively and vigorously promotes the Ambassador Program to physicians as a valuable and tangible economic benefit to their practice. AbbVie, through its Sales

---

[1] AbbVie has referred to the Ambassadors using various titles, including "Nurse Ambassador," "Nurse Educator," "Patient Ambassador," and "Humira Ambassador." Here, the position is referred to as the "Ambassador" position and the program as the "Ambassador Program."

Representatives and Ambassadors, pitches Ambassadors to doctors as free "extensions of your office" available to take on administrative and patient work so the doctor doesn't have to. And, as detailed herein, they operate that way in practice.

5.      Doctors make money by seeing patients and billing for those visits. They do not bill (or get paid) for administrative work that results. When an AbbVie-paid nurse steps in to perform administrative and patient care tasks for a physician (e.g., answering myriad patient questions and concerns, counseling patients on insurance coverage) that physician is freed up from those (non-billable) administrative tasks. As a result, the doctor sees more patients, bills for more patients, and boosts the bottom line. The impact is significant: one study estimates that the cost to physicians of interacting with health insurance plans alone, and of paying their staff to do the same, costs at least $68,859 per physician per year.

6.      The costs of patient support to the physician are particularly prevalent here, given that Humira (and Humira patients) typically require significant non-billable support due to chronic disease states, concerns about side effects, and the need to learn and manage self-injections, among other things. Because Ambassadors step in to provide extensive professional and patient management work (and provide valuable goods to patients that further ease burdens on prescribing health care professionals), they save physicians and their staff time and resources they would otherwise have to spend on necessary patient care, and administrative billing and insurance services, among other things. AbbVie confers independent value to health care providers, and does so for sales and marketing purposes.

7.      These benefits constitute kickbacks, making physicians more likely to prescribe Humira than another treatment that does not come with free professional staffing support. Offering such incentives to induce and reward prescriptions is illegal, and for good reason—rules

prohibiting kickbacks protect patients from doctors whose medical decisions may be improperly clouded by financial considerations when they choose to prescribe a certain drug.

8.      The Ambassador Program was intentionally designed as a marketing program, and AbbVie further exacerbated the misconduct by creating a cover story for the Program. AbbVie claims the Ambassador program is about "patient education and support", which is not only a perversion of the meaning of education (as education does not mean a one-way outcome of taking Humira no matter what), but false.  The Program is about sales.  AbbVie not only fails to disclose, but it hides, the true facts.

9.       Notably, all of the Ambassadors' variable compensation depends on bottom-line, prescription-related metrics. Further, Nurse Ambassadors are instructed not to create a record of important aspects of their work, including: their time spent "dropping-by" doctor's offices to market the program, their collaboration with members to the Sales team to market the Program to doctors and target physician accounts, or any questions they have for their supervisors about their interactions with Humira patients.

10.     The Program has been a success in boosting AbbVie's bottom line. At AbbVie's annual meetings in 2013 and 2014, for example, a VP-level company executive boasted to the Ambassadors that they had resurrected the otherwise-plateauing sales of Humira, attributing a sharp and specific rise in sales to the Program by displaying before-and-after graphs of Humira sales with and without Ambassadors on offer.

11.     The Medicaid Rebate Agreement with the United States Secretary of Health and Human Services, which is part of the Social Security Ac 42 U.S.C. § 1396s, provides that drug products are only eligible for reimbursement if and when parties to the agreement are in compliance with applicable federal and state laws.  Because the Ambassador Program is an

unlawful kickback to prescribing doctors who benefit financially from the Program, AbbVie is not in compliance with the Federal anti-kickback statute, contrary to its certifications. Compliance with the anti-kickback statute ("AKS") is an implied precondition of reimbursement to providers submitting claims to the Government.[2]

12.     All kickbacks present the harm of improper influence on clinical decision-making, and this case is no exception.  This case further presents related harms: the specter of patient decision-making and influence in the hands of a pharmaceutical company whose eye is on its brand, not on overall patient health.

## II.     Jurisdiction and Venue.

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which confers jurisdiction on this Court for actions brought pursuant to the Federal False Claims Act, 31 U.S.C. §§ 3729 and 3730.  Relator establishes subject matter jurisdiction under 31 U.S.C. § 3730(b).  This Court also has supplemental jurisdiction over the state claims under 28 U.S.C. § 1367.

14.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because AbbVie is headquartered within this district and regularly conducts substantial business herein.

15.     There has been no public disclosure within the meaning of 31 U.S.C. § 3730(e)(4)(A) of the allegations Relator asserts herein.  Irrespective of any alleged public disclosure, Relator has direct and independent knowledge of the allegations herein, and provided that information to the government prior to bringing suit.

---

[2] Evidence linking AbbVie's conduct to specific government reimbursements for Humira is included in § VIII.E, infra.

### III. Parties.

####    A.    Relator Suarez.

16.    Relator Lazaro Suarez is a resident of North Bay Village, Florida who worked for AbbVie via its sub-contractor Quintiles Transactional Holdings, Inc. as a "Nurse Educator" and "Patient Ambassador" (the formal names for the positions he held) from approximately March 23, 2013 to October 2014 in the South Florida area.[3]

17.    Suarez was hired by Quintiles but reported to and worked with personnel at AbbVie, maintained an AbbVie email address, and worked exclusively in connection with AbbVie's drug Humira.

18.    Suarez was successful during his tenure as an Ambassador, regularly earning recognition and awards for his role in the Program. On at least a dozen occasions, he received a financial reward (between $50-150) for his work, including four times during a single month. These rewards were related in practice to volume of Humira prescriptions.

19.    Suarez was frequently held out as an example for his peers by his supervisors and, as detailed further below, was flown to train Ambassadors from throughout the country on numerous occasions. He regularly worked and communicated with Ambassador and sales teams in regions outside of Florida and beyond the southeastern United States, giving him first-hand experience with the nationwide implementation of the Ambassador Program and the scope of AbbVie's misconduct alleged herein.

20.    Suarez had approximately 15 years of clinical experience before going to work for AbbVie. He received a B.S. in nursing in 2000 from the University of Miami and has been a Registered Nurse since 1996.

---

[3] When Relator was hired, his formal title was "Nurse Educator on 4620-Abbott-Patient Ambassador project."

21.     Since leaving his employment with AbbVie and Quintiles, Suarez continued to learn about, and kept abreast of, information about the conduct in this action via his own "MyHumira" membership and by ongoing communications with AbbVie and/or Quintiles personnel. Suarez has also observed how other companies have borrowed tactics from the unlawful promotion of Humira.

**B.     Defendant AbbVie.**

22.     AbbVie, Inc., ("AbbVie") is a "research-based pharmaceutical company" incorporated in Delaware on April 10, 2012.  AbbVie is headquartered and maintains its principal place of business in North Chicago, Illinois.  AbbVie was formed when Abbott Laboratories separated into two companies at the end of 2012, and became its own company on January 1, 2013.

**IV.     Background of Applicable Law.**

**A.     Federal and State Laws Prohibit Kickbacks to Providers and Payments to Induce or Reward Referrals.**

23.     The False Claims Act imposes civil liability on any person who "knowingly presents, or causes to be presented" a false or fraudulent claim for payment to the United States. 31 U.S.C. § 3729(a)(1)(A). A claim is false under the FCA if the defendant supplied a "kickback" as an impetus for the underlying transaction. 42 U.S.C. § 1320a–7b(g).

24.     The Anti-Kickback Statute ("AKS") makes it illegal for individuals or entities to knowingly and willfully "offer[] or pay[] remuneration (including any kickback, bribe, or rebate) ... to any person to induce such person ... to purchase, ... order, ... or recommend purchasing ... or ordering any good ... or item for which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2).

25.     Violations of the AKS occur where pharmaceutical companies provide valuable products or services to procure use of their drugs.  Indeed, if even *one purpose* of an offer of value is to pay kickbacks, that is sufficient under the law.

26.     Compliance with the AKS, 42 U.S.C. § 1320a-7b(b), is a condition of payment under the federal health care programs. Whether or not a claim complies with the AKS is material to the government's decision to pay that claim, as a matter of law.  *See Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019). Thus, it does not matter if the medical care or item provided was also medically necessary; filing a kickback-tainted claim triggers liability.

27.     The Office of the Inspector General ("OIG") has explained that arrangements under which physicians are relieved of "financial obligations they would otherwise incur" pose a "*significant risk*" leading to an inference "that the remuneration may be in exchange for generating business," thus serving as a kickback inducing the prescription. OIG Supplemental Compliance Program Guidance for Hospitals, 70 Fed. Reg. 4858-01, 4866

28.     As the OIG has expressly set forth

> if goods or services provided by the [drug] manufacturer *eliminate an expense that the physician would have otherwise incurred (i.e., have independent value to the physician)* . . . the arrangement may be problematic [under the AKS] if the arrangement is tied directly or indirectly to the generation of federal health care program business for the manufacturer.

OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 FR 23731-01.

29.     Moreover, under the anti-kickback statute, neither a legitimate purpose for an arrangement (e.g. physician education), nor a fair market value payment, will necessarily protect remuneration if there is also an illegal purpose (i.e. the purposeful inducement of business). *Id.* at *23737.

30.     Similarly, OIG has, in several advisory opinions, identified "suspect characteristics" of arrangements among sellers, sales agents, and purchasers that "appear to be associated with an increased potential for program abuse." Among those "suspect characteristics" are arrangements wherein:

(a)     Compensation of the agent is based on percentage of sales;

(b)     There is direct contact between the sales agent and physicians in a position to order items or services that are then paid for by a Federal health care program;

(c)     There is direct contact between the sales agent and Federal health care program beneficiaries;

(d)     The program uses sales agents who are health care professionals or persons in a similar position to exert undue influence on purchasers or patients.

*See* OIG Advisory Opinion 98-10 (August 31, 1998).

31.     The OIG has further expressly warned against the risks pharmaceutical companies using medical professionals, like nurses, to promote its products.  Specifically, OIG explains that risks of fraud and abuse are "compounded" where a "health care professional is involved in marketing activity."  This type of marketing is "closely scrutinized under the anti-kickback statute because physicians and other health care professionals are in an exceptional position of public trust and thus may exert undue influence when recommending health care-related items or services." OIG Advisory Opinion 11-08 (June 14, 2011).

32.     Violation of the AKS is a felony punishable by fines and imprisonment and can also result in exclusion from participation in federal health care programs.  42 U.S.C. § 1320a-7b(b)(2) and 42 U.S.C. § 1320a-7(b)(7).  State laws have similar prohibitions.

**B.** **False and Misleading Statements about a Drug's Use Are Prohibited.**

33.　　Drug Manufacturers are prohibited from disseminating materials that are "false and misleading," such as those that only present favorable information when unfavorable information exists, that exclude mandatory information about the safety and efficacy of the drug use, or that present conclusions that "clearly cannot be supported by the results of the study." 21 C.F.R. § 99.101(a)(4).

34.　　In fact, the FDA has promulgated extensive regulations on the content and form of prescription drug advertising.　Advertisements "shall present a true statement of information in brief summary relating to…effectiveness." 21 C.F.R. 202.1(e)(6)(i).

35.　　FDA regulations also enumerate a number of tactics that can render advertising "false, lacking in fair balance, or otherwise misleading, or otherwise violative" of section 502(n) of the Act. 21 U.S.C. § 352.　These requirements apply to industry sponsored or controlled activity whether it is educational or promotional.　*See* Guidance for Industry: Industry-Supported Scientific and Educational Activities, 62 Fed. Reg.　64,093, 64,096-99 (1997). Regulations on prescription drug advertisements are found in 21 C.F.R. § 202.1, and further underscore the importance of true statements related to side effects.

**C.** **The Provision of Free Drugs.**

36.　　There are also limits on benefits pharmaceutical companies may provide that subsidize or provide free drugs to Government Payor patients.

37.　　If a patient is not financially needy, providing a free drug, which puts the patient on the path to continuing to take that drug, can be improper.　Here, as shown below, AbbVie used its Ambassadors as a conduit to connect patients with free drugs, which was outside of the stated purpose of the program.

## V. Framework for Prescription Drug Payment under Government Programs.

### A. The Medicare Program Pays Certain of the Cost of Prescriptions for Its Enrollees.

38.     Medicare Part D covers pharmacy-dispensed outpatient drugs including Humira. Part D prescription drug plans may exclude from coverage drugs that are not "reasonable and necessary" to the patient's treatment. 42 U.S.C. § 1395w-102(e)(3)(A). Specific coverage policies and decisions are generally made by sponsors who contract with CMS to provide such coverage and are responsible for making coverage determinations in accordance with statutes and regulations.

39.     The pharmacies where prescriptions of Humira are filled agree to provide pharmaceuticals to Medicare Part D Plans ("PDPs") for Medicare patients that they serve, and the PDPs in turn reimburse these pharmacies for the cost of the drugs, plus a fixed dispensing fee meant to provide the pharmacies with a profit for providing services to Medicare patients. PDPs (or MA-PDPs) are administered under contract with CMS by private entities such as Blue Cross Blue Shield plans, large commercial insurers such as Humana, and pharmacy benefit managers.

40.     Every time a beneficiary fills a prescription covered under Part D, PDPs must submit a summary called the prescription drug event, or PDE, record. The PDE record contains drug cost and payment data that enable CMS to administer the Part D benefit. CMS uses the PDE record to calculate reimbursement to PDPs for the cost of drugs, plus an amount meant to provide the PDPs with a profit for administering the PDP.

### B. The Medicaid Program Pays the Cost of Prescriptions for Its Enrollees.

41.     Medicaid is a joint Federal-State program that pays for medical assistance for individuals and families with low incomes and relatively few assets. Although pharmacy coverage is an optional benefit under federal Medicaid law, all States currently provide coverage

for outpatient prescription drugs to all categorically eligible individuals and most other enrollees within their Medicaid programs.

42.     The state Medicaid programs adhere to federal guidelines.  Federal statutes and regulations restrict the drugs and drug uses that the Federal Government will pay for through its funding of state Medicaid programs.  Federal reimbursement for prescription drugs under the Medicaid program is limited to "covered outpatient drugs." 42 U.S.C. §§ 1396b, 1396r-8(k)(2)-(3).  Covered outpatient drugs are drugs that are used for "a medically accepted indication." 42 U.S.C. § 1396r-8(k)(3).  A medically-accepted indication is listed in the labeling approved by the FDA, or that is included in one of the drug Compendia identified in the Medicaid statute.  42 U.S.C. § 1396r-8(k)(6).

43.     Providers who fill prescriptions for Medicaid enrollees submit their Medicaid claims for reimbursement by "batching" them daily, and submitting them electronically to the *Qui Tam* States.  These claims include the claims for prescriptions of Humira that were falsely induced pursuant to the unlawful Ambassador Program.

44.     As part of each electronic claim, the office and pharmacies affix their unique Medicaid provider identification numbers, which serve as electronic stamps indicating that, as Medicaid providers, they are in compliance with all applicable federal and state laws.

45.     The offices and pharmacies are reimbursed on a monthly basis by the *Qui Tam* States for all approved claims.

46.     Through the Federal Medical Assistance Percentage ("FMAP"), State Medicaid administrators obtain the Federal Government's share of the offices' and pharmacies' reimbursements by submitting a quarterly Form 64 to CMS.  The funds made available to the state remain federal funds, in a Federal Reserve account, until they are drawn by the state and

used to pay the offices' or pharmacies' claims. 42 C.F.R. § 430.30(d)(3), (4). Thus, claims submitted to state Medicaid agencies, including those in the *Qui Tam* States, are presented to the Federal Government within the meaning of the FCA.

47. The Federal Government also "approves," within the meaning of the False Claims Act, the claims submitted and paid through the Medicaid program. When a state presents its Form 64 (*i.e.*, the quarterly report of actual expenditures) to CMS, the amounts of any fraudulent claims the state paid will be included in those reports. Based on the information in the reports, CMS determines and approves whether the claims that the state paid with federal funds were appropriate. If CMS determines that certain claims paid by the state were improper, CMS may recoup the amount of the erroneously expended funds by reducing the amount of money provided to the state during the next quarter.

48. The Form 64 constitutes the United States' means for approving and paying the amount of federal funds expended by the state. To the extent these reports overstate the amount of federal funds to which the state was entitled because of false or fraudulent prescriptions, they constitute false records or statements caused to be made or used to get false claims paid and approved by the United States.

## C.    Other Government Programs Similarly Cover Prescription Drug Costs.

49. Other Government Programs adhere to similar rules in determining a drug's eligibility for reimbursement.

50. In addition to Medicaid and Medicare, the Federal Government reimburses a portion of the cost of prescription drugs under several other federal health care programs, such as CHAMPUS/TRICARE (administered by the Department of Defense); CHAMPVA (administered by the Department of Veterans Affairs); and The Federal Employee Health Benefit Program (administered by the Office of Personnel Management, for federal employees).

## VI.    AbbVie Deployed Its Own "Nurses" to Induce Prescriptions of Humira.

### A.    Background on Humira.

51.    Humira ("Human Monoclonal Antibody In Rheumatoid Arthritis") is the brand name for Adalimumab, a tumor necrosis factor (TNF) inhibiting anti-inflammatory drug.  It is a powerful and expensive drug that is a treatment option for a range of autoimmune conditions. Originally approved as a second-line treatment for Rheumatoid Arthritis, Humira is now indicated for Rheumatoid Arthritis, Psoriatic Arthritis, Ankylosing Spondylitis, Juvenile Idiopathic Arthritis, Crohn's Disease, Ulcerative Colitis, Plaque Psoriasis, Hidradenitis Suppurativa, and Uveitis.

52.    Humira was first approved 2002 has since grown to become the world's best-selling drug.  Its sales account for the vast majority of AbbVie's total revenues.

53.    Humira must be injected subcutaneously.  Once acclimated, patients generally need to be injected, or to inject themselves, approximately every two weeks.   Typically, once a patient starts on Humira, they will be advised to stay on it indefinitely.  Indeed, patients are warned that if they abruptly stop treatment with Humira (rather than tapering off slowly) they may have a "severe" reaction or "flare up" of their condition after which they may not respond to Humira or other similar treatment.

54.    Humira carries a black box warning for serious and life-threatening side effects, including lymphoma, tuberculosis, and other infections.

### B.    Prescribing Humira Is Expensive for Doctors.

55.    Doctors and their staff are heavily burdened by administrative work.  This work keeps doctors from seeing additional patients, which also drives payment.

56.    In a study conducted by a general medicine practice with five physicians, the doctors reported receiving an average of 23.7 calls from patients *per day*, with questions ranging

from acute medical issues, administrative questions (e.g. prior authorization for insurance), and questions about test results and clinical follow up, among other things.[4]  In addition, the physicians received an average of 16.8 patient emails per physician per day addressing similar topics.[5]  Following that study, the practice "hired additional front-desk staff and medical assistants to handle the increased tasks associated with the comprehensive management of chronic diseases"—thereby freeing up more physician time to see patients.[6]

57.    Time spent on such administrative work is generally not reimbursed by payers, but seeing patients is.[7]  One study estimated that physicians spend up to 20% of their workday on these tasks.[8]

58.    Physician practices must interact with numerous health plans in the U.S. multipayer system, each with their own requirements and procedures. Moreover, interactions increase with plans' attempts to "manage care," such as requiring prior authorizations for many specialist, imaging, and hospital services. Each health plan offers many different insurance products to consumers, and each may have its own formulary (or list of approved drugs); prior authorization requirements; and rules for billing, submitting claims, and adjudication.[9]

59.    Within this framework, Humira is particularly challenging for doctors as it is an expensive drug that requires a great deal of non-billable support from the doctor and their staff.

---

[4] Baron, Richard J., "What's Keeping Us So Busy in Primary Care? A Snapshot from One Practice." *New England Journal of Medicine,* 362;12 April 29, 2010.

[5] *Id.*

[6] *Id.*

[7] *See* Chen, Melinda A. et. al. "Patient Care Outside of Office Visits: A Primary Care Physician Time Study." *Society of General Internal Medicine*, September 2, 2010.

[8] *Id.*

[9] Morra, Dante et al. "US Physician  Pratices Versus Canadians: Spending Nearly Fourt Times As Much Money Interacting with Payers." *Health Affairs,* August 2011. *Available at* https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2010.0893.

For that reason, many physicians were historically disinclined to prescribe it. This all changed when AbbVie took these considerations off the table by eliminating the need for the doctor's and their staff to do this work, instead providing a Registered Nurse to do it for them.

60. Humira prescribers work in Rheumatology, Gastroenterology, and Dermatology practices. These practices typically employ nurses and professional staff to provide general advice and counseling to patients and assistance with insurance and billing for prescriptions. As to Humira, for example, professional office staff counsel patients on, among other things: how to self-inject, help them with insurance coverage and insurance forms (including, where applicable, obtaining prior authorizations from their insurer), navigate specialty pharmacy and prior authorization requirements, answer patient questions, and conduct follow-ups to ensure patient adherence to prescribed medication regimes.

61. These services are time consuming and resource intensive. The staff members that perform them are professionals that command substantial salaries and benefits and are often overworked.

62. The financial impact of excessive administrative complexity on physician organizations can be dramatic. In one study of a typical ten-physician practice, it was estimated that excessive administrative complexity cost the practice more than $250,000 per year. Another physician organization saw 32 percent growth in the staffing of its professional billing office over a six-year period, to 250 full-time equivalents. The expansion was needed to help deal with administrative complexity and was independent of the practice's programmatic growth.[10]

---

[10] Blanchfield, Bonnie et al. "Saving Billions Of Dollars—And Physicians' Time—By Streamlining Billing Practices." *Health Affairs*, June 2010. *Available at* https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2009.0075.

63.     Even just *one* aspect of these services—dealing directly with insurance companies—is a significant cost to the physician.  In a May 2009 survey of physicians and practice administrators published in *Health Affairs*, physicians themselves reported spending forty-three minutes *per day* (nearly three weeks per year) interacting with health plans on behalf of patients—including looking at prior authorization requirements, pharmaceutical formularies, claims, credentialing, contracting and data on quality.  For professional staff (i.e. Registered Nurses, Medical Assistants, and Licensed Practical Nurses) these numbers are even higher—spending 3.8 hours per physician per day interacting with health plans, and clerical staff devoting up to 7.2 hours per physician per day. [11]

64.     On average, this works out to a cost of at least $68,859 per physician per year (in 2009 dollars) for interacting with health plans alone.  For medical specialist practices, the amount increases to $78,913 per physician per year. [12]

### C.     AbbVie Used the Ambassador Program to Meet Doctors' Resource Needs.

65.     Recognizing the challenges to increasing Humira prescriptions (and profits), and eyeing physicians' resource needs that stood in the way, AbbVie developed and deployed a marketing scheme called the Ambassador Program.

66.     Since in or about early 2012, AbbVie (originally as Abbott) partnered with Quintiles Transactional Holdings, Inc.—now IQVIA—to launch the Ambassador Program around the time the sales curve for Humira appeared to be flattening.  The purpose of this nationwide marketing strategy was to bolster Humira's volume and market share, protect it from

---

[11] *Casalino et. al.*, "What Does It Cost Physician Practices to Interact With Health Insurance Plans?" *Health Affairs,* May 14, 2009, available at:
https://www.healthaffairs.org/doi/10.1377/hlthaff.28.4.w533
[12] *Id.*

encroachment by competitors and bio-similars (including, for example, Enbrel), and to maximize revenues and profits.

67.     The Program, detailed below, was designed to overcome resistance to prescribing Humira and reward physicians for doing so.  It was tremendously successful in these efforts—with a commensurate boost to AbbVie's bottom line. Indeed, following an initial boost to its profits from Humira due to the Ambassador Program, AbbVie acted quickly to expand the Program (and its results) into territories throughout the United States.   As of May 2014, the company hit a self-described milestone:  a senior executive wrote to the entire Ambassador team that 10,000 patients were supported by an Ambassador.  That same year, Humira was the highest-grossing drug in the world, achieving global net sales of $12.5 billion, $6.5 billion of which was paid in the U.S. alone.  The success has only continued with the expansion of the Program across and throughout the United States—U.S. sales of Humira from 2015 to present totaled $55.8 billion.

68.     The Ambassador Program provides independent value to doctors who prescribe Humira because it saves them time and money they (or their staff) would otherwise have to spend on patient care and administration. Through the Program, at no cost and considerable gain to the physician's office, AbbVie nurses provide valuable professional services including patient care (including regular in-person visits and communications with patients in response to questions about their treatment and disease states), pharmacy and insurance authorization assistance, open enrollment resources, paperwork help, advice on insurance products, and other services and support.

69.     In practice, this includes hours-long visits to patients in their homes, and addressing myriad patient questions and concerns that would otherwise be directed to the

physician's office (including those having nothing to do with Humira or the diagnosis). For example, Relator Suarez frequently worked with patients to address their computer and other technology issues in fulfilling their prescriptions or dealing with their doctors' offices and insurance companies. Patients, with access to a Nurse directly in their own home, also frequently used the opportunity to raise questions and concerns about their medical histories and other health issues (indeed, a review of non-Humira related medical history was part of the Ambassadors' jobs). And, notwithstanding a purported policy to direct medical treatment back to the physician, in the moment, Nurse Ambassadors would often draw on their past clinical work to assuage patient questions and concerns, thereby preventing yet another call to the doctor. This was the entirely foreseeable result of the required application of the program, where general patient health was a standard part of the intake.

70.     Suarez also frequently served as a translator for Spanish-speaking patients, including calling Medicare with them to translate and verify their coverage for the drug under their current Medicare plan, and assisting in their switching to another plan if needed.

71.     Also as part of his patient visits, Suarez and other Ambassadors were provided with Humira travel kits (akin to a lunch box or cooler) that could be used, among other things, to keep the drug cool when away from refrigerator access. This resource, and the direction from the Ambassador provided along with it, stood in place of numerous calls to doctor's offices about, for example: (1) how to travel with Humira; (2) the appropriate temperature to maintain the drug; (3) whether or not to skip a Humira dose; (4) related concerns about diagnoses and disease states.

72.     Without an Ambassador, these types of questions (and many others)—and the time required to answer them—fall to the physician and their staff. Having AbbVie nurses step

in to do it for them offers tremendous value and time-saving to physicians, thereby incentivizing them to prescribe Humira. If given the choice between two medications, one which comes with free nurses and administrative staff and another that requires the provider to pay professional salaries, the provider cannot but help factor the substantial nursing kickback into their prescribing calculus.

73.     A typical Ambassador conducts about 20 patient visits *a week*. As discrete nursing visits, the collective value of these is spent working with physician offices and doctors, and other functions, and traveling.

74.     When visiting doctor's offices apart from patient visits, Ambassadors reinforce the benefits of the Program to the physician and their office staff, and providing information and training about the resources available through the Ambassador Program. Relator Suarez recalls discussing with doctor's and their staff, on numerous occasions, topics including: specific follow up questions about individual patients he had visited, information about the number of patients he was able to see and service through the Program and the services offered, and information about providing free or reduced cost Humira to low income patients through the AbbVie Patient Assistance Foundation.

75.     Doctors recognize the benefits of the Ambassador Program to their advantage beyond the direct relief of their staffing needs and costs, leveraging the Program to their marketing advantage as well. For example, in the competitive South Florida dermatology market for wealthy older patients, physicians came to brag about the program and imply it was a service the doctor had arranged for his or her own patients. Hollywood Dermatology had a "Concierge" service and represented the Ambassador Program as a benefit to *their* patients as needed. One high-prescribing doctor in that practice was Dr. Eduardo Weiss.

76.     Other examples of high-prescribing dermatologists who actively have touted the Ambassador Program in marketing their practices, and worked especially closely with Ambassadors, included Dr. Francisco Kerdel (a company speaker and affiliate of among the highest prescribing, if not the highest prescribing, dermatology offices in South Florida, Florida Academic Dermatology Center), Dr. Tory Sullivan, and Drs. Pedrozo and Weiss.

## VII.   AbbVie Intentionally Designed the Ambassador Program to Increase its Profits.

77.     Although it is publicly represented as a "patient education" initiative, the Nurse Ambassador program is actually designed, and functions, to protect and boost AbbVie's profits from the prescription and sale of Humira.

78.     In an email from Elaine Sorg, Vice President of U.S Immunology, Ms. Sorg urged Ambassadors that "patient enrollment in this program is *critical* to the long term success of HUMIRA" and noted that she "look[ed] forward to seeing enrollment numbers that exceed our expectations." (Emphasis added).

79.     AbbVie Senior Management routinely applied pressure to increase the reach of the Ambassador Program. For example, during a June 17, 2013 Ambassador team meeting, it was emphasized that Senior Management wanted "a solid 2-3 enrollments per week with a goal of 4-5 new enrollments by Q4").  At the time, the stated goal of the program was to ensure that 80% of new Humira patients across the country received a face to face meeting and injection training from an Ambassador.

80.     AbbVie's own metrics used to evaluate the Program substantiate its intended purpose to induce and reward Humira prescriptions.  AbbVie tracks the success of the Ambassador program by conducting "return-on-investment" calculations and analyses, weighing the costs of the program (and, likely, the legal risks) against the huge profits generated by Humira's expanding market share and volume.  Such internal "ROI" analysis (which is not

publicized or shared with the investing public, despite its positive results) is a classic "red flag" demonstrating that the Program's primary purpose is financial, not scientific or medical.

81.     AbbVie also tracks the increased prescriptions that result from the Program. Tellingly, as reflected on the Field Coaching Logs, AbbVie evaluates Ambassadors' performance on prescription-based metrics: (a) number of patients enrolled, (b) number of unique live visits, (c) percent of patients with the drug, (d) number of offices launched, and (e) total number of offices enrolling, rewarding additional accounts won, and prescriptions induced, by the Ambassador. These metrics are all unrelated to patient education, the ostensible purpose of the program.

82.     Tellingly, Ambassadors' compensation is tied to prescription metrics (and thus, not related to education). In fact, *all* of the Ambassadors' variable compensation depends on these bottom-line, prescription-related metrics. Ambassadors can earn up to approximately 20% of their overall compensation in quarterly bonuses that are entirely dependent on the number and/or percent of offices that launch the program and/or patients who take Humira. Similarly, AbbVie managers and executives with responsibility over the program have significant financial incentives tied to meeting or exceeding prescription and market-share quotas.

83.     These core metrics for evaluating and compensating Ambassadors reflect how senior personnel evaluate the Ambassador Program as a whole and determine the resources to put into it. Managers have stressed to Ambassadors that the prescription-based metrics demonstrate the value of the Ambassador Program to senior level AbbVie personnel, especially in the high adherence rate of patients who are prescribed Humira. Managers in the Ambassador program report only the core business-related metrics to AbbVie decision-makers.

84. Importantly, that patients obtain assistance in learning to inject themselves (something they would otherwise, if they needed the help, be done in connection with the doctors' offices) does not alter the fact that the marketing program called the Ambassador program was a kickback. The kickbacks provide independent value to doctors in eliminating expenses they would otherwise incur, and are thus unlawful.

A. **Ambassadors and Sales Representatives Ensure Financial Success Through Marketing the Program Directly to Doctors.**

85. AbbVie has ensured that Ambassadors maintain active, various contacts with doctors' offices in which they discuss the Ambassador Program and provide additional services to doctors' offices even beyond the substantial time they spend with patients. The contacts further the initial pitch that the Ambassador is an extension of the doctor's office.

86. AbbVie is well aware, as reflected in its Ambassador Guidelines, that Ambassadors may not function as sales representatives if they are not providing fair and balanced information regarding side effects (which is legally required of sales representatives). Consequently, the Guidelines direct that Ambassadors "will be restricted from being part of recurring call plan visits to doctors because they are not part of AbbVie's sales force and any extensive interactions could have HR and other implications."

87. Nevertheless, Ambassadors work with, and report to, Sales team personnel as well as to managers in the Ambassador department.

88. Ambassadors play a crucial role in interfacing with physicians and marketing their free and valuable professional services (and thereby influencing prescription decisions). AbbVie uses the Ambassador Program as a powerful tool to access doctors and other prescribers (particularly those who have previously refused or resisted the efforts of AbbVie sales representatives to pay them detailing visits to promote AbbVie products). Ambassadors are

often able to get a foot in the door with a physician's office where a sales representative could not.

89.     Through a variety of in-person meetings and tactics and a collaboration of the Sales and Ambassador teams, AbbVie presents the Ambassador Program to prescribers as a value add to the practice—a free "extension" of their otherwise paid-for resources.  Members of the Sales Team that Relator worked with, including John Little, regularly pitched the Program to doctors using these terms.

90.     An early job description for the position of Ambassador Manager described the program as follows, with express reference to the program's connection to AbbVie's "commercial organization":  "Interact[ing] closely *with commercial organization to drive increased brand performance* and retention on the HUMIRA brand by ensuring 'Best in Class' support and education regarding myHUMIRA platform services" (emphasis added).

91.     Later, as of March 2013, AbbVie, via Quintiles, hastily changed the description of the program to an "educational based program designed as a resource for patients living with auto-immune diseases that have been prescribed specific medications.  Patient Ambassadors provide education about specific disease treatments, and resources to help patients better begin and manage their disease state and resources associated with their prescribed medication.  Patient Ambassadors are responsible for participating in one-on-one communications with patients as well as appropriate medical professionals within the associated treatment process.  Since the program is strictly educational based, Patient Ambassadors, do not provide medical advice or work clinically within this role."  This was false.

92.     To avoid detection of real marketing nature of the program, Ambassadors have been cautioned about their written communications with the Sales team, explicitly directed to use

"limited" communications over email with sales. Indeed, in a call agenda for May 20, 2013 team call, one agenda item, "COMMUNICATION WITH SALES" cautioned Ambassadors to have "CAREFUL CAREFUL COMMUNICATION (phone vs. email) with sales colleagues."  Further they are instructed to refrain from using the word "Humira" when leaving a message.  However, even with communications discouraged so as not to leave a paper trail, Ambassadors' coordination with the sales team is a key part of the strategy to identify and target prescribers, and key evidence of the true goals of the Program.

> **B.**     **<u>Ambassadors Visited Doctors with Sales Representatives.</u>**

93.     In the early years of the Program, and until some point in 2013, Ambassadors regularly accompanied sales representatives on sales calls to physicians' offices to pitch the Ambassador Program.  This arrangement begs the key question of why representatives of a patient *education* program would coordinate with sales representatives.  The explanation, of course, is that the program was designed to increase prescription volume, not educate patients.

94.     The sales pitch to doctors has been consistent, however, regardless of whether the Ambassadors have personally joined the sales representatives on their call visits.  Suarez attended periodic meetings with the sales team and the local District Manager to discuss business planning and sales calls.  Frequently, sales representatives told Relator to expect a call from a particular doctor or his or her office based on the sales representative's having just pitched the Ambassador Program and its benefits to the doctor.  In this calls, Suarez was expected to affirm the pitch and close the deal with the physician.

95.     In the marketing pitch, sales representatives, including John Little, among others, detail exactly how the Ambassadors save the doctors and their staff substantial time:  "we will take that [patient] call," "we will take that [patient's] insurance question," "doctor, we will take

your concerns about [calls to the office, dealing with billing, disposal] *off the table*." And to doctors, time is money.

96. After touting the program, the sales representative (at times accompanied by the Ambassador) "closes" with the question of whether the doctor would write more Humira if the time and service related concerns were "off the table."

97. Doctors responded positively to the marketing pitch and opted to prescribe Humira as a result of the Ambassador Program. Among the doctors who responded positively to the marketing pitch and opted to prescribe Humira as a result of the Ambassador Program was Dr. Avelino A. Guiribitey. Among those who dramatically increased their prescriptions were Dr. Alejandro Pedrozo and other doctors identified herein.

### C. Ambassadors Conducted Targeted Visits to Doctors Informed by Sales Strategy.

98. Based on their knowledge of which providers are generally high-prescribers of injectable biologics, senior members of AbbVie's sales organization identify key accounts that might benefit from receiving visits from Ambassadors.

99. High-prescribers are the key target of additional marketing efforts for the Program. Ambassadors attend "launch" or "re-launch" events where they meet with doctors and their staff once a doctor has joined the Ambassador Program, or re-joined it. For example, Relator attended a re-launch meeting with Dr. Robert Sarro's office. Dr. Sarro and his assistant had been persuaded that the Ambassador Program would "make their lives easier."

100. Such visits are a successful marketing strategy. For example, in or about August 2014, Relator Suarez attended a lunch with a physician where he described the scope of the services available through the Ambassador program, as well as the amount of time Ambassadors have available for each patient. Following that lunch, AbbVie's Senior Immunology Specialist

reported that the lunch was "extremely effective" and that they were "looking forward to continuing this optimization strategy in our top offices." This strategy, of course, was tied to marketing Ambassadors to high prescribers.

101. Key accounts also receive targeted, less formal visits and office drop-bys from Ambassadors to market the Program. Suarez had at least four such calls in August 2014 alone, in which he described the Ambassador Program and touted its benefits to doctors and their staff.

102. These visits are expressly for the purpose of marketing. For example, in a May 2013 Ambassador team call, one agenda item encouraged Ambassadors to drop off brochures at a physicians' office because it "gives you another reason to go into the office" which is effective because the Ambassador himself is the "best brochure" for the Program.

103. Ambassadors also visit, or communicate with, doctors' offices to respond to specific questions about specific patients, including if the patient has routed an administrative question to the doctor's office rather than to the Ambassador.

104. Managers warn Ambassadors not to formally record all the time they spend with doctors, including these marketing efforts. Ambassadors typically enter their daily activities on the CRM (Customer Relations) section of the Sales Force database (*e.g.*, first live visit, pre- and post-calls to patients after their first few injections). However, on the informal monthly ride-alongs, managers tell Ambassadors that if they are only doing a drop off of materials or a quick program orientation, they should not document an office call in the database.

105. Ambassadors are explicitly instructed to disguise their efforts to market to doctors in their written records. For example, an Ambassador team call the week of July 17, 2013, in which the team discussed communication with doctor's offices and received direction to avoid

creating a paper trail when stopping by a doctor's office to drop off Ambassador Program materials, (the exact words on the call agenda are "**don't document**").

106.     Given the frequency of those "short" visits, and their intimate role in effectuating the Ambassadors' regular duties in visiting doctors, the injunction against logging these visits had the result of dramatically underestimating the time Ambassadors spent with doctors and their offices.

107.     This directive from the top evidences explicit policies and efforts to conceal the marketing and sales purposes of the Program.

108.     In addition, Ambassadors are expected to provide, and do provide, free materials to patients and office staff (Humira travel kits (valued at approximately $15 to $20 dollars or more); "Talking Training Pens" used to train patient on how to inject themselves) on request. These travel kits are coolers that enable patients to travel with Humira and maintain the drug at the appropriate temperature, thereby reducing patient questions (and the time required to answer them) on how to safely travel with the drug, and can be used to keep a variety of materials cool while in transit.

109.     Ambassadors are expected to work, and do work, with office staff to bring pre-printed Prior Authorization and other benefit forms to doctors' offices.

110.     AbbVie also issued an initiative to place dedicated Humira terminals in doctors' offices that print benefit verification forms and other insurance-related documents, with a goal to deploy 2000 such terminals.  At the time Relator left his employment with AbbVie, there were already approximately 200 such terminals placed by AbbVie in doctors' offices as an additional free benefit of prescribing Humira.

### D. **Ambassadors Attended Speaker Dinners to Pitch and Represent the Program.**

111.    AbbVie used to require Ambassadors to attend as many speaker events as possible, and ensured that Ambassadors were seated at tables next to key potential prescribers so they could pitch the program directly.  Examples of doctors who were influenced in their prescribing behavior by speaker dinners include Dr. Jerome R. Obed and Dr. Varee N. Poochareon.

112.    At some point, around the same time that AbbVie took the precaution not to actually have the Ambassadors attend every sales call, AbbVie also changed the requirement that Ambassadors regularly attend speaker dinners.  However, throughout the period in which that policy was in place, AbbVie's deployment of Ambassadors to these dinners was designed to influence prescription decisions.

## VIII. **Ambassadors Engage in Marketing, and also Provide Improper Patient Care.**

113.    The Ambassador Program capitalizes on, and violates, patients' trust of nurses and their need for care and assistance, and uses that trust to ensure that the patients start and continue to use Humira.

114.    Underscoring the misleading conduct, AbbVie provides Ambassadors with company business cards with their Registered Nurse (R.N.) status displayed, and instructs Ambassadors to brag about their history as nurses to patients.  On the other hand, AbbVie management also tells Ambassadors not to *publicly* refer to themselves as healthcare providers, or even to their "patients" as "patients."

115.    For example, AbbVie management praised Relator in a formal review in August, 2014 for his "sincere relationships with *patients*."  But, in field observations from manager Sean Garrison, in the section on "*patien*t observation interactions ," Mr. Garrison wrote to Relator that

"while you build fantastic rapport with your patients…by using the word 'people' vs 'patient' you may be able more appropriately identify your role as an educator vs a clinician. It may open up some more/different dialogue as well."

116. Although they step in to provide one-on-one consultations to patients, AbbVie's Ambassadors do not provide, and are not permitted to provide, fair and balanced information in these meetings. Instead, AbbVie instructs the Ambassadors to deflect patient's questions about side effects, like Humira's cancer risks. In trainings for the Ambassador Program, role play scenarios demonstrate the response that "[cancer] is a great question for your doctor; I am here to get you your Humira for five dollars or less." The issue, of course, is that with an AbbVie-paid Ambassador serving as their direct point of contact about Humira, it reduces interactions between patients and their health care providers, so far fewer patients are likely to get their questions and concerns about safety answered.

### A. AbbVie's Ambassadors Work Directly with Patients so that Doctors Don't Have To.

117. When assigned a new client, Ambassadors begin with a call to set up an appointment. Notably, in a material percentage of the time, the patient has *not yet decided whether to fill the prescription*, and thus Ambassadors highly influence the decision to take Humira in the first place. Patients frequently told Relator that they likely would not have started on Humira if he had not contacted them.

118. Through these initial calls, the Nurse Ambassador steps in to assist in fulfilling the Humira prescription and answering patient questions about it. Because the Ambassador is there to answer these questions, the doctor doesn't have to. However, reducing interactions between the healthcare provider and the patient in this way severs critical decision-making points

between doctor and patient, and replaces it instead with a pharmaceutical company representative standing in to guide and counsel patients.

119.    After the initial contact, the Ambassador then sets up an in-person meeting, typically in the patient's home.  The initial patient visit takes an average of one hour, and as many as two-and-a-half.  Typically about one third of the visit is spent making sure the patient has access to reimbursement or, as needed, free drugs.  The rest relates to the patients, their diagnoses, and their personal experiences.  Ambassadors are told that if the patient is not doing 75% of the talking, something is wrong.  During these visits, the Ambassador is expected to discuss the patients' experience with the underlying disease and their concerns, and to familiarize themselves with the patient and their needs more broadly (i.e. family, financial, and living situation), consciously engendering a trust relationship with the patient, who perceives the Ambassador as an extension of his or her doctor's office.

120.    This perception is understandable, especially given that doctors, at AbbVie's urging, tell patients that "a nurse will be contacting you" about starting on the drug.

121.    During these initial and follow up meetings, Ambassadors advise patients on their diagnoses and treatment plans.  For example, Ambassadors would advise patients on ways in which to limit adverse events at injection sites, including by taking Benadryl prior to administering a Humira injection.

122.    Ambassadors also discuss with patients their backgrounds and related diagnoses, including comorbidities and co-mortalities to the diagnosis resulting in a Humira prescription. During these interactions, patients regularly raised additional questions and concerns about symptoms and health concerns that may or may not have been related to Humira or their underlying diagnosis treated by Humira. Of course, as Registered Nurses, Ambassadors could

draw on their experiences in offering suggestions and guidance, including assuaging concerns and thus preventing the need for additional calls to the doctor (saving the doctors time, and money, in the process).

123. In presenting Humira, the Ambassadors show the patient a company-created video that addresses how Humira works. Generally, the Ambassadors discontinue the video when the video turns to the more serious side effects of Humira. Ambassadors believe this is not a problem because in any case patients foreseeably have stopped paying attention to the dense and rushed material around that time (given patients have someone right in front of them with whom to discuss the drug). Thus, especially combined with their inability to discuss side effects, Ambassadors foreclose avenues of giving fair and balanced information to patients.

124. Similarly, and again instead of being meaningfully fair and balanced, the Ambassador is supposed to hand the patient the long and complex package insert presented in tiny print, explain that it would take far too long to review on the spot, and recommend that the patient review it him or herself. AbbVie likely knows that the dissemination of the package insert to patients is a potential defense to its systematic failure to allow Ambassadors to convey fair and balanced information to patients. AbbVie has set up its systems to require the Ambassadors to regularly order a monthly or quarterly quota of package inserts, regardless of whether they need them.

125. The Ambassador's job is to overcome patients' uncertainty when it comes to the decision to *start* or *continue* on Humira. Given that their performance and variable pay is tied to prescription-related metrics, the Ambassador's success in their job is explicitly tied to their success in doing so.

126. Crucially, when patients have questions about Humira's serious side effects, the Ambassadors abandon their role as "educators" entirely and, despite being experts on Humira and the conditions it treats, must withhold the most important safety information from the patients, instead referring patients to their doctors.

127. Tellingly, it is only in the area of the drug's serious risks where the Ambassadors are not permitted to speak. The Ambassador Guidelines expressly provide that if a patient "expresses uncertainty over using the Ambassador, the HCP treatment plan, or desire to continue or start treatment with HUMIRA for any reason (such as the patient says 'I am afraid of getting cancer from using Humira'), the Ambassador shall refer the patient back to his/her physician for a further discussion."

128. If a patient reports an adverse event, the Ambassador reports the incident only to AbbVie. The Ambassadors do not report the events to patients' doctors, even though the Ambassadors may well be visiting the patient's doctor's office for various office-assistance reasons. Not only is there no opportunity for Ambassadors to report adverse events on their weekly reporting, but Ambassadors are instructed not to put in writing any questions at all about patients interactions, not just those limited to adverse events.

129. And while they are instructed to tell the patients to call their doctors about adverse events, Ambassadors do not ensure that they do so—despite regularly joining phone calls with patients for other calls (namely to ensure payment).

130. Approximately ten percent of Suarez' patients experienced an adverse event while taking Humira, including injection site reactions, failure to improve (or worsening conditions), and infections.

131.    Ironically, Relator knows of at least one instance in which a patient who tried to report an adverse event to a doctor's office was simply routed back to the Ambassador *by the doctor's office* so that the Ambassador (and not the doctor) could address the patient's concerns.

132.    Following the initial, major visit, Ambassadors typically make two additional in-person visits.  Thereafter, Ambassadors then typically switch to phone contact with the patients.  All of the Ambassadors log their patient visits on company databases.  On these databases, there are pre-sent drop boxes and there are no spaces available for characterizing the calls or for reporting adverse events—precluding the ability to create a written record of the same.

### B.    Ambassadors Are Directed to Hide and Distort Their Patient Interactions in Written Records.

133.    AbbVie leadership directs Ambassadors to obscure the true nature and actual functioning of the Program in their written records and communications.

134.    The company has instructed the Ambassadors not to refer specifically to Humira in writing up patient visits, despite the fact that Humira is the only reason for their presence in the patient's home.  As manager Lane Murray wrote to Relator:  "Thanks for sharing your Magic Moments with the team!! I appreciate the fact that you took the time to be a leader on this by encouraging our team to follow your lead and submitting their Moments of Wow! …….PS Also, don't forget that we cannot utilize the name of the drug when writing these up. . . (instead, say 'current therapy' or their 'current drug' etc….) We'll discuss writing these up a little more tomorrow!"   In the follow-up discussion, Mr. Murray, consistent with other messaging from other AbbVie managers, expressed concerns about creating a paper trail about Humira.

135.    Indeed, Ambassadors are specifically and repeatedly told that if they have a question about what they permissibly can do in the course of their patient interactions, they should not write it down and call their supervisor instead.  This point was made during

Ambassador training programs and reiterated frequently by AbbVie management personnel, including Tracey Calamita, Lane Murray, and Sean Garrison.

136.    Taken together, the prohibitions detailed herein against mentioning Humira by name, against using the word "patients" to describe the patients, against recording time with doctors, and against recording adverse events have served to limit the record of the Ambassadors' actual work, and evidence AbbVie's knowledge and intent in deploying the Ambassador program to make money, but hiding that true motive from scrutiny by preventing the development of a written record.

### C.    Leveraging Patient Interactions to Inform AbbVie's Marketing Efforts.

137.    Another key objective of the Ambassador Program and goal in the initial patient meetings is to get patients to enroll on the website "MyHumira."  This website reflects AbbVie's effort to use the Ambassador program to target the marketing of Humira through the Ambassador Program.  MyHumira is a service platform through which AbbVie compiles specific data about each patient's personal information, including geographic location, disease profile, provider information, Humira usage, payment source information, and Ambassador interaction, among other things.  This allows AbbVie to track macro information about the drug and the doctors that prescribe it, in order to better target its marketing efforts.

138.    Every one of the Suarez' managers, including Tracey Calamita, Reed Morton, Donald Lane Murray, Sean Garrison, and Maya Stewart (National Ambassador Manager), repeatedly reminded the Suarez (and other Ambassadors) to carefully track patient data so that AbbVie could better focus its resources.  The common phrase was to "focus resources to have maximal return."

**D.** **Serving as the Conduit to Keep Government Payor Patients on Humira During the Coverage "Donut Hole."**

139.    The Program was designed to reach and did reach government payor patients, on whose behalf claims were submitted to Medicare and Medicaid.  In this context, Ambassadors occupy a crucial role in assisting patients with coverage for Humira, tasks that (as noted above) require the Ambassadors to spend about a third of the first visit on payment information.

140.    Some of this work is simply replacing what otherwise is the work of the doctors' office staff in dealing with insurance companies.  AbbVie has instructed Ambassadors that while they may not call insurers directly, they can (and should) be on the phone when patients call, and can (and should) encourage patients to initiate calls to learn about coverage.  This includes government insurers like Medicare and Medicaid.

141.    AbbVie representatives provide insurance assistance, including helping patients navigate open enrollment periods in their insurance plans, and respond to patient questions about insurance coverage and copays, all in order to ensure their continued coverage. In so doing, AbbVie representatives fulfill the role of professional staff and office administrators, and field questions about deductibles, co pays, coinsurance, and health savings accounts.

142.    While Ambassadors encourage commercial patients to obtain Humira co-pay cards, they take a different but equally effective approach with Government Payor patients.  For that population, Ambassadors are required to contact Medicare to determine the patients' payment status: namely, how much the patient must pay in the first couple of months of treatment, when the payment is relatively manageable, and at what point the patient's coverage stops during the gap period before coverage resumes (the so-called "Donut Hole").

143.    At that point, armed with that information, the Ambassador refers the patient to the "Patient Assistance Foundation."

144.     AbbVie has given away tens of thousands of free dosages of Humira that, among things, and intentionally, help Part D Medicare patients fill the "Donut Hole."  The Ambassadors have a crucial role in connecting patients with the AbbVie Patient Assistance Foundation that provides these free drugs.

145.     As AbbVie managers told Suarez, true, independent charity foundation assistance for Humira runs out in the first couple of months of the year, but AbbVie's *own* Patient Assistance Foundation has ample free supply to give patients during their Medicare Part D payment gap period.

146.     In Suarez' experience, *all* patients (save one or two who appeared to be quite wealthy) were able to obtain free drugs from AbbVie through the Patient Assistance Foundation based on how AbbVie's Patient Assistance Foundation laxly defined "need."

147.     As touted at national meetings attended by all the Ambassadors, AbbVie gave out substantial amounts of free drugs per year.  Relator recalls the amount from 2013 to be 94,000 dosages.   This degree of assistance to Government Payor patients enables hundreds or thousands of patients to get launched on this costly drug that, as addressed above, is difficult to discontinue usage.

148.     Finally, and further underscoring the attention AbbVie pays to Medicare reimbursement information, AbbVie management provides information about open enrollment periods for Medicare plans and requires Ambassadors to try to push their patients into plans that maximize reimbursement for Humira. In Suarez' experience, the open-enrollment period for government insurance, in or about November of the two years he worked as an Ambassador, were particularly busy, with calls to Medicare and Medicaid along with patients to secure and verify coverage for Humira occurring multiple times a week throughout that window.

1850057.7

### E.  Examples of the Ambassador Program in Practice.

149.    Like other Ambassadors, Relator was expected to memorialize "success" stories in which the outcome of the interaction with a patient was to get them on Humira, or in which a physician responded particularly well to the Ambassador Services.  These stories were often distributed in email in what the company referred to as "Magic Moments," "Moments of Wow," "Making Magic" incidents, and/or "Highlight Stories."

150.    Examples that Relator saw or penned include anecdotes where patients said "I really wasn't gonna take this, if you hadn't called me I just wasn't ready for this…." and an anecdote where a "client [was] thinking about stopping…" but was convinced by the Ambassador not to.

151.    In or about December 2014, Relator Suarez emailed his team summarizing "10 very common THANK YOU comments" that Ambassadors report hearing from patients as moments of "WOW." Fourth on the list, he noted patients thanking Ambassadors because "Medicare Part D is so confusing, thank you for being there with me as I called on this…"

152.    The following serve as additional illustrative examples of the type of patient work Suarez undertook as part of the Nurse Ambassador program. These are representative cases only.

153.    In or about summer 2013, Relator received a patient assignment to an elderly woman living near 95th street and the Interstate 95 freeway in Miami.  The patient was a psoriasis patient, and Suarez visited her in her home for injection training and orientation to the Ambassador Program.  While there, they discussed the patient's insurance coverage, and Relator learned she was having difficulty obtaining Medicare coverage for her prescription. Relator and the patient called Medicare that day and were able to arrange for coverage.

154.    In or about July 2013, Relator Suarez sent his supervisors an account of a "Happy Ending" for a Medicare patient living in the Little Haiti area of Miami.  Prior to visiting this

patient, Relator Suarez visited the offices of Dr. Sullivan in Miami to "reinforce[e] the Nurse Ambassador Role." After the visit to Dr. Sullivan, Suarez relayed they had "obviously made an impression" because the doctor then "activated" Relator Suarez' Nurse Ambassador services. However, as Sales Representative John Little warned Suarez, Dr. Sullivan would use the Program for the "tough" cases that would otherwise require him and his staff significant extra work.

155.    Suarez visited the patient, who was legally blind, in his home in the Little Haiti neighborhood, and assisted in presenting an appeal to obtain assistance from the Patient Assistance Foundation during the Medicare coverage gap (also known as the "donut hole"). Suarez helped gather proof of income (noting Medicare on his bank statement) and the appeal was ultimately successful.

156.    This success story was shared within the broader team in an email from Maya Stewart, the National Ambassador Manager, recognizing Suarez for his work. Notably, after this initial experience dealing with a "challenging" patient of Dr. Sullivan's, Dr. Sullivan was impressed and encouraged by the hands-on services in the Ambassador program. He continued to write Humira prescriptions, and took to assigning his more "difficult" or "challenging" patients to Suarez.

157.    On or about October 18, 2013, Suarez received public praise in a "Patient Highlight" email sent to the team by Maya Stewart. Suarez was working with a psoriasis patient in Miami who, when he turned 65 in April 2013, had changed insurance to Medicare. He was no longer able to afford Humira on the new plan. As she related, this patient's doctor had been previously reluctant to use the Ambassador Program and decided to "test" the Program with this challenging issue. Suarez was assigned to the patient, and worked with him to appeal the

coverage denial from Medicare. The patient was *again* denied, and Suarez escalated the issue and again appealed it. The prescription for Humira was ultimately approved for Medicare coverage following Suarez' work.

158. After the success in obtaining Medicare coverage, and as related to AbbVie colleagues in the email from Ms. Stewart, both the patient and the physician were "thrilled at the level of support provided by the Ambassador Program." In fact, the physician "communicated that they will be encouraging each patient to enroll in the Ambassador Program **due to the high level of support provided."** In the same email, Stewart noted that Medicare coverage story, and the physician's positive response, was "**forwarded to the sales organization and Senior Leadership**."

159. Also in or about October 2013, Relator Suarez and colleagues communicated about a particularly difficult case of an 83-year-old Medicare patient, originally from Alaska but living in Nogales, Arizona at the time. This patient had been flying from Nogales, Arizona to Seattle, Washington to see a dermatologist who prescribed him Humira. Ultimately, Roxanne— another Ambassador based in Nogales—visited the patient in his home in Nogales, and "coached and watched him inject."

160. In the latter half of his employment with AbbVie, in or about fall 2013 or spring 2014, Relator recalls visiting a female patient in the Miami area who worked at the local animal shelter. The patient suffered from psoriasis, and was experiencing difficulty in securing her Medicare coverage for her Humira prescription. Relator stepped in to assist, and they successfully contacted Medicare to verify her coverage.

161. Absent access to Discovery, Relator cannot state the amounts paid by these physicians for administrative work and staffing support. However—and in the context that the

average cost per physician per year to interact with health plans *alone* is approximately $68,859-

-on information and belief, these physicians, and others whose patients were enrolled in the

Ambassador Program, saved money in having to pay less in their staff time and overtime pay,

and in hiring and employing staff members to address administrative work for patients. Further,

these doctors (and others) had more time and capacity to see (and bill for) more patients because

Ambassadors stepped in to address patient and administrative work for Humira that otherwise

would have occupied the doctor's time.

## IX.     **The Ambassador Program Was Nationwide and Operated Consistently Throughout the Country.**

162.     During his tenure with AbbVie, Suarez was a frequent attendee, and presenter, at

trainings for Ambassadors from throughout the United States.

163.     In or about April 2013, Suarez attended a training meeting at headquarters in

Chicago as he onboarded to the Program along with several others.  During that meeting, he

recalls receiving instruction to "stop thinking like a nurse" or words to that effect.

164.     In or about September 2013, AbbVie held a national meeting for the Immunology

team in Puerto Rico, including both Ambassadors and Sales Representatives.  At this meeting,

which Suarez attended, Ambassadors received training on patient interview techniques, including

deflecting questions about Humira's serious side effects. Ambassadors attended that training

from throughout the United States.

165.     In or about January 2014, Suarez presented at an Ambassador Training in

Chicago, titled the "Q1 Initial Sales Training Class" in which he provided training at AbbVie's

headquarters for new Ambassadors from across territorial regions

166.    At a national sales meeting in March 2014, Relator was selected as a team captain for his region. In this position, he trained Ambassadors from throughout the Southeast region, including from Georgia and North Carolina.

167.    In or about September 2014, Relator attended a National Immunology Sales Team meeting in San Antonio, Texas.  This meeting included joint meetings and training sessions for Sales Representatives and Ambassadors from across the country.

168.    Suarez also gained first-hand exposure to the nationwide operation of the Program through working as a translator for other Ambassadors. Suarez is a fluent Spanish speaker, and was frequently asked to translate for Spanish speaking patients over the phone. For example, he assisted Ambassador Mary Willingham with a Spanish speaking patient in Boston, as well as Candice Whitten with a Spanish speaking patient in the Charlotte, North Carolina region, and assisted other Ambassadors with their patients on numerous other occasions.

169.    Through his role as a national trainer, as well as through routine communications with Ambassadors and Sales Representatives in regions outside of Florida, Suarez observed the work of other Ambassadors throughout the country.

170.    In addition to these first-hand observations from Suarez' own experience as to the nationwide scope of the conduct alleged, AbbVie also uses a "low touch" program for patients who already have been taking Humira for longer periods which was also designed to offer a sweeping geographic reach. Specifically, established patients communicate with company-paid nurses who work from home only by telephone. Second, as of approximately fall 2014 the company piloted a program ("Operation Dakota") in which prospective Humira patients living in sparsely-populated areas have contact with Ambassadors by telephone or video, so that no market would be beyond the reach of the Ambassador Program.

## X.     Falsity, Materiality, and Scienter.

171.     The illegal promotional schemes served their intended purpose, as they induced doctors to write prescriptions of Humira, and ensured that patients kept refilling those prescriptions each much, with the resulting boost to AbbVie's bottom line.

172.     Defendant has caused Medicaid, Medicare, and other Government Programs and *Qui Tam* States to pay hundreds of millions of dollars that they should not have paid, unjustly enriching AbbVie by allowing it to be paid for claims that were not reasonable and necessary and/or that were produced by kickbacks.

### A.     AbbVie's Kickbacks to Providers Caused the Submission of False Claims.

173.     AbbVie provides healthcare professionals with services of value in return for or to induce purchasing, ordering, arranging for or recommending purchasing or ordering of good or items for which payment was made by Government Programs, in violation of the federal Anti-Kickback statute, 42 U.S.C. § 1320a-7b(b), and state analogs.

174.     These kickbacks caused healthcare professionals to prescribe or recommend that other healthcare professionals prescribe Humira.

175.     Government Programs, including Medicare and Medicaid, do not cover claims for drugs where there is a kickback involved in the underlying transaction—including claims that were submitted for payment of a drug as a result of a kickback given to a healthcare professional to prescribe that drug.  Claims submitted to Government Programs where a kickback is involved in the underlying transaction are false within the meaning of the federal False Claims Act and State analogs.

176.     In order to enroll in and bill Medicare, providers must sign CMS Form 855, which states:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. … I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

177.    Similarly, any provider who submits claims to Medicaid must sign a provider agreement with each Medicaid program to which it submits claims.

178.    Government Programs paid reimbursements for those false claims, and as a result have incurred and continue to incur significant damages due to AbbVie's illegal use of kickbacks.

179.    AbbVie leadership knew and intended that the Program primarily functioned to boost revenue, not educate patients, including as evidenced by the directions given to Ambassadors not to document certain aspects of their work in the Program, the compensation structure which rewards Ambassadors for inducing prescriptions, and AbbVie's monitoring of the Return on Investment of the Program.

**B.    AbbVie's False Certifications of Compliance with the Law Constituted the Making of False Statements.**

180.    The Medicaid Rebate Agreement with the United States Secretary of Health and Human Services, which is part of the Social Security Act, 42 U.S.C. § 1396s, provides that drug products are only eligible for reimbursement if and when parties to the agreement are in compliance with applicable federal and state laws.

181.    These laws include, but are not limited to, the federal and corresponding state anti-kickback statutes, the FDAMA, and the Food, Drug & Cosmetic Act and all related regulations.

182.     As described in this Complaint, AbbVie has knowingly and repeatedly violated these laws in the promotion of Humira and employment of the Ambassador Program.

183.     Accordingly, AbbVie, expressly and impliedly, falsely certified their compliance with these federal and state statutes and regulations.

**C.     Materiality is Satisfied.**

184.     AbbVie provided kickbacks to doctors who opted to prescribe its expensive drug. Materiality is satisfied as a matter of law because where (as here) claims for repayment are tainted by a kickback, that kickback is material to the government's decision to pay a claim. *Guilfoile v. Shields*, 913 F.3d 178, 190 (1st Cir. 2019).

**D.     Scienter is Satisfied.**

185.     The FCA requires no specific intent to defraud.  Instead, scienter is satisfied where there is "deliberate ignorance" or "reckless disregard" (as well as actual knowledge) of the fraud on the part of the Defendant. *See* 28 U.S.C. § 3729(b)(1)(A).

186.     Scienter is satisfied here because, as shown in the paragraphs above, AbbVie knew, and intended, to induce and reward prescriptions for Humira through the Nurse Ambassador program, thereby causing the submission of a false claim for payment.

187.      AbbVie paid kickbacks to counteract plateauing sales of its most important product, and measured and tracked the return on its investment in doing so.  It incentivized prescriptions through evaluating and compensating Ambassadors based on prescription-related metrics.

188.     As detailed herein, AbbVie undertook to obscure the true nature of the Ambassador Program, including directing Ambassadors not to create a paper trail of their work with patients and visits to doctors, or their collaborations with the Sales team, all the while

touting Ambassadors as a resource to the physician's office. Providing doctors with valuable resources in exchange for Humira prescriptions was unlawful, and AbbVie knew it.

189. Alternatively, AbbVie acted with deliberate ignorance or reckless disregard of its fraudulent conduct, resulting in false claims as outlined above.

## XI. <u>Claims for Relief.</u>

### <u>COUNT I</u>
### Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

190. Plaintiff-Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

191. AbbVie knowingly presented and caused to be presented to the Federal Government false or fraudulent claims for payment in violation of 31 U.S.C. § 3729(a)(1).

192. As a result of the actions as set forth above in this Complaint, the United States of America has been, and may continue to be, severely damaged.

### <u>COUNT II</u>
### Violation of False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

193. Plaintiff-Relator incorporates herein by reference the preceding paragraphs of the Complaint as though fully set forth herein.

194. AbbVie knowingly made, used, or caused to be made or used, false or fraudulent records or statements material to the payment of a false or fraudulent claims, thereby causing false or fraudulent claims for payment to actually be paid or approved, in violation of 31 U.S.C. § 3729(a)(2).

195. The United States of America, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid and may still be paying or reimbursing for Humira prescribed to patients enrolled in Government Programs.

196.    As a result of the actions as set forth above in this Complaint, the United States of America has been, and may continue to be, severely damaged.

## COUNT III
### Violation of the State of California False Claims Act,
### Cal. Gov't Code § 12650 *et seq*.

197.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

198.    This is a civil action brought by Plaintiff-Relator, on behalf of the State of California, against Defendant under the California False Claims Act, Cal. Gov't Code § 12652(c).

199.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Cal. Gov't Code § 12651(a)(1).

200.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of Cal. Gov't Code § 12651(a)(2).

201.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of California, or its political subdivisions, in violation of Cal. Gov't Code § 12651(a)(7).

202.     The payment or receipt of bribes or kickbacks is prohibited under Cal. Bus. & Prof. Code § 650 and 650.1, and is also specifically prohibited in treatment of Medi-Cal patients pursuant to Cal. Welf. & Inst. Code § 14107.2.

203.     AbbVie violated Cal. Bus. & Prof. Code§ 650 and 650.1 and Cal. Welf. & Inst. Code § 14107.2 by engaging in the conduct alleged herein.

204.     AbbVie also violated Cal. Gov't Code § 12651(a) by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, Cal. Bus. & Prof. Code §§ 650-650.1, and Cal. Welf. & Inst. Code § 14107.2, compliance with which are express and implied conditions of payment for claims submitted to the State of California.

205.     The State of California, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of state and state subdivision funded health insurance programs.

206.     As a result of AbbVie's actions, as set forth above, the State of California and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT IV
**Violation of the State of Colorado Medical False Claims Act,**
**Colo. Rev. Stat. § 25.5-4-303.5, *et seq*.**

207.     Plaintiff-Relator incorporates by reference the preceding paragraphs of the Complaint as though fully set forth herein.

208.     This is a civil action brought by Plaintiff-Relator in the name of the State of Colorado, against AbbVie pursuant to the State of Colorado False Claims Act, Colo. Rev. Stat. § 25.5-4-306.

209.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval to an officer or employee of the state of Colorado under the Colorado Medical Assistance Act, in violation of Colo. Rev. Stat. § 25.5-4- 305(1)(a).

210.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to false or fraudulent claims for payment or approval to an officer or employee of the state of Colorado under the Colorado Medical Assistance Act, in violation of Colo. Rev. Stat. § 25.5-4-305(1)(b).

211.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state in connection with the Colorado Medical Assistance Act, in violation of Colo. Rev. Stat. § 25.5-4-305(1)(f).  AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the state in connection with the Colorado Medical Assistance Act, in violation of Colo. Rev. Stat. § 25.5-4-305(1)(f).

212.     Colo. Rev. Stat. Ann. § 25.5-4-414 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly,

in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Colorado Medicaid program.

213.     AbbVie violated Colo. Rev. Stat. Ann. § 25.5-4-414 by engaging in the conduct alleged herein, and further violated the Colorado Medicaid False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and Colo. Rev. Stat. Ann. § 25.5-4-414, compliance with which are express and implied conditions of payment for claims submitted to the State of Colorado.

214.     The State of Colorado, or its political subdivisions, unaware of the falsity of the claims and/or statements made or caused to be made, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of state and state subdivision-funded health insurance programs.

### COUNT V
**Violation of the State of Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. § 17b-301a *et seq*.**

215.     Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

216.     This is a civil action brought by Plaintiff-Relator on behalf of the State of Connecticut, against AbbVie under the Connecticut False Claims Act for Medical Assistance Programs, Conn. Gen. Stat. § 17b-301d.

217.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Connecticut, or its political subdivisions, false or fraudulent

claims for payment or approval under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(1).

218.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to secure the payment or approval by the State of Connecticut, or its political subdivisions, false or fraudulent claims under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(2).

219.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Connecticut, or its political subdivisions, under a medical assistance program administered by the Department of Social Services, in violation of Conn. Gen. Stat. § 17b-301b(7).

220.    Conn. Gen. Stat. § 53a-161c prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Connecticut Medicaid program.

221.    AbbVie violated Conn. Gen. Stat. § 53a-161c by engaging in the conduct alleged herein.

222.     AbbVie further violated the Connecticut False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and Conn. Gen. Stat.§ 53a-161c, compliance with which are express and implied conditions of payment for claims submitted to the State of Connecticut.

223.     The State of Connecticut, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state and state subdivision funded health insurance programs.

224.     As a result of AbbVie's actions, as set forth above, the State of Connecticut and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT VI**
**Violation of the State of Delaware False Claims and Reporting Act,**
**Del. Code Ann. tit. 6, § 1201 *et seq*.**

225.     Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

226.     This is a civil action brought by Plaintiff-Relator on behalf of the State of Delaware, against AbbVie under the Delaware False Claims and Reporting Act, Del. Code Ann. tit. 6, § 1203(b).

227.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Delaware, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Del. Code Ann. tit. 6, § 1201(a)(1).

228.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, § 1201(a)(2).

229.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Delaware, or its political subdivisions, in violation of Del. Code Ann. tit. 6, § 120l(a)(7).

230.    Del. Code Ann. tit. 31, § 1005 prohibits the solicitation or receipt of any remuneration (including kickbacks, bribes or rebates) directly or indirectly, overtly or covertly, in cash or in kind in return for the furnishing of any medical care or services for which payment may be made in whole or in part under any public assistance program.

231.    AbbVie violated Del. Code Ann. tit. 31, § 1005 by engaging in the conduct alleged herein.

232.    AbbVie further violated Del. Code Ann. tit. 6, § 1201(a) by their deliberate and systematic violation of federal and state laws, including the FDCA, the Anti- Kickback Act, and Del. Code Ann. tit. 31, § 1005, compliance with which are express and implied conditions of payment for claims submitted to the State of Delaware.

233.    The State of Delaware, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or

statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of healthcare programs funded by the State of Delaware.

234.    As a result of AbbVie's actions, as set forth above, the State of Delaware and/or its political subdivisions have been, and may continue to be, severely damaged.

<u>COUNT VII</u>
**Violation of the District of Columbia False Claims Act, D.C. Code § 2-308.13 *et seq*.**

235.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

236.    This is a civil action brought by Plaintiff-Relator on behalf of the District of Columbia, against AbbVie under the District of Columbia False Claims Act, D.C. Code § 2-308.15(b).

237.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the District, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of D.C. Code § 2-308.14(a)(l).

238.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be used, and may still be making, using, or causing to be made or used, false records or statements to get false claims paid or approved by the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(2).

239.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made

or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the District, or its political subdivisions, in violation of D.C. Code § 2-308.14(a)(7).

240.    D.C. Code § 4-802(c) prohibits soliciting, accepting, or agreeing to accept any type of remuneration for "(1) Referring a recipient to a particular provider of any item or service or for which payment may be made under the District of Columbia Medicaid program, or (2) Recommending the purchase, lease, or order of any good, facility, service, or item for which payment may be made under the District of Columbia Medicaid Program."

241.    AbbVie violated D.C. Code § 4-802(c) by engaging in the conduct alleged herein.

242.    AbbVie further violated D.C. Code§ 2-381.02(a) by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, D.C. Code§ 4-802(c), compliance with which are express and implied conditions of payment for claims submitted to the District of Columbia

243.    The District of Columbia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the District.

244.    As a result of AbbVie's actions, as set forth above, the District of Columbia and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT VIII
### Violation of the State of Florida False Claims Act, Fla. Stat. § 68.081 *et seq*.

245.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

246.    This is a civil action brought by Plaintiff-Relator on behalf of the State of Florida, against AbbVie under the Florida False Claims Act, Fla. Stat. § 68.083(2).

247.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Florida, or its agencies, false or fraudulent claims for payment or approval, in violation of Fla. Stat. § 68.082(2)(a).

248.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(b).

249.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Florida, or its agencies, in violation of Fla. Stat. § 68.082(2)(g).

250.    Fla. Stat. § 409.920 makes it a crime to "[k]nowingly charge, solicit, accept, or receive anything of value, other than an authorized copayment from a Medicaid recipient, from any source in addition to the amount legally payable for an item or service provided to a Medicaid recipient under the Medicaid program or knowingly fail to credit the agency or its fiscal agent for any payment received from a third-party source;" or "knowingly, solicit, offer, pay or receive any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing or arranging of the furnishing of any item or service for which payment may be made,

in whole or in part, under the Medicaid program, or in return for obtaining, purchasing, leasing, ordering, or arranging for or recommending, obtaining, purchasing, leasing, or ordering any goods, facility, item, or service, for which payment may be made, in whole or in part, under the Medicaid program."

251.    Fla. Stat. § 456.054(2) also prohibits the offering, payment, solicitation, or receipt of a kickback to a healthcare provider, whether directly or indirectly, overtly or covertly, in cash or in kind, in exchange for referring or soliciting patients.

252.    AbbVie violated Fla. Stat. § 409.920(c) and (e) and § 456.054(2) by engaging in the conduct alleged herein.

253.    AbbVie further violated Fla. Stat. § 68.082(2) by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-kickback Act, Fla. Stat. § 409 .920( c) and (e) and § 456.054(2) , compliance with which are express and implied conditions of payment for claims submitted to the State of Florida.

254.    The State of Florida, or its agencies, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance plans funded by the State of Florida or its agencies.

255.    As a result of AbbVie's actions, as set forth above, the State of Florida and/or its agencies have been, and may continue to be, severely damaged.

## COUNT IX
### Violation of the State of Georgia False Medicaid Claims Act,
### Ga. Code Ann. § 49-4-168 *et seq.*

256.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

257.     This is a civil action brought by Plaintiff-Relator on behalf of the State of Georgia, against AbbVie pursuant to the Georgia False Medicaid Claims Act, Ga. Code Ann. § 49-4-168.2(b).

258.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the Georgia Medicaid program false or fraudulent claims for payment or approval, in violation of Ga. Code Ann. § 49-4-168.1(a)(1).

259.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Georgia Medicaid program, in violation of Ga. Code Ann. § 49-4-168.1(a)(2).

260.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Georgia, or its political subdivisions, in violation of Ga. Code Ann. § 49-4-168.1(a)(7).

261.     AbbVie further violated the Georgia False Medicaid Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA and the federal Anti-Kickback Act, , compliance with which are express and implied conditions of payment for claims submitted to the State of Georgia.

262.    The State of Georgia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of Medicaid.

263.    As a result of AbbVie's actions, as set forth above, the State of Georgia and/or political subdivisions have been, and may continue to be, severely damaged.

### COUNT X
**Violation of the State of Hawaii False Claims Act, Haw. Rev. Stat. § 661-21 *et seq*.**

264.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

265.    This is a civil action brought by Plaintiff-Relator on behalf of the State of Hawaii, against AbbVie under the Hawaii False Claim Act, Haw. Rev. Stat. § 661-25.

266.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Hawaii, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Haw. Rev. Stat. § 661-21(a)(l).

267.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made and used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(2).

268.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Hawaii, or its political subdivisions, in violation of Haw. Rev. Stat. § 661-21(a)(7).

269.    AbbVie further violated Haw. Rev. Stat. § 661-21(a) by their deliberate and systematic violation of federal and state laws, including the FDCA and Anti-kickback Act, , compliance with which are express and implied conditions of payment for claims submitted to the State of Hawaii.

270.    The State of Hawaii, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

271.    As a result of AbbVie's actions, as set forth above, the State of Hawaii and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XI
### Violation of the State of Illinois False Claims Act, 740 Ill. Comp. Stat. § 175/1 *et seq*.

272.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

273.    This is a civil action brought by Plaintiff-Relator on behalf of the State of Illinois, against AbbVie under the Illinois False Claims Act, 740 Ill. Comp. Stat. 175/4(b).

274.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(A).

275.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to get false or fraudulent claims paid or approved by the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(B).

276.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to conceal, avoid or decrease an obligation to pay or transmit money to the State of Illinois, or its political subdivisions, in violation of 740 Ill. Comp. Stat. 175/3(a)(1)(G).

277.    In addition, 305 Ill. Comp. Stat. 5/8A-3(b) of the Illinois Public Aid Code (Vendor Fraud and Kickbacks) prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Illinois Medicaid program.

278.    AbbVie violated 305 Ill. Comp. Stat. 5/8A-3(b) by engaging in the conduct alleged herein.

279.    AbbVie furthermore violated 740 Ill. Comp. Stat. 175/3(a) by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and the Illinois Vendor Fraud and Kickback statute, compliance with which are express and implied conditions of payment for claims submitted to the State of Illinois.

280.    The State of Illinois, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

281.    As a result of AbbVie's actions, as set forth above, the State of Illinois and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XII
**Violation of the Illinois Insurance Frauds Prevention Act, 740 Ill. Comp. Stat. § 92/5, *et seq*.**

282.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

283.    AbbVie's use of the Ambassador Program was intended to induce Humira usage for patients insured by both public and private payors and insurance companies in Illinois.

284.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, offered and/or paid "remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer," acts which are expressly prohibited by the Illinois Insurance Frauds Prevention Act, Ill. Comp. Stat. 92/5.

285.    As a result of AbbVie's actions, as set forth above, the State of Illinois has been, and may continue to be, severely damaged.

### COUNT XIII
**Violation of the State of Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5 *et seq*.**

286.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

287.     This is a civil action brought by Plaintiff-Relator on behalf of the State of Indiana, against AbbVie under the Indiana False Claims and Whistleblower Protection Act, Ind. Code § 5-11-5.5-4(a).

288.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally presented, or caused to be presented, and may still be presenting or causing to be presented, false claims to the State of Indiana, or its political subdivisions, for payment or approval, in violation of Ind. Code § 5-11-5.5-2(b)(l).

289.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain payment or approval of false claims from the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(2).

290.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly or intentionally made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to avoid an obligation to pay or transmit money to the State of Indiana, or its political subdivisions, in violation of Ind. Code § 5-11-5.5-2(b)(6).

291.     Ind. Code § 12-17.6-6-12 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in

kind in return for furnishing any item or service for which payment may be made in whole or in part under the Indiana Medicaid program.

292.    AbbVie violated Ind. Code § 12-17.6-6-12 by engaging in the conduct alleged herein.

293.    AbbVie further violated Indiana's False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and Ind. Code § 12-17.6-6-12, compliance with which are express and implied conditions of payment for claims submitted to the State of Indiana.

294.    The State of Indiana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

295.    As a result of AbbVie's actions, as set forth above, the State of Indiana and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XIV
### Violation of the State of Iowa False Claims Act, Iowa Code § 685.1, *et seq*.

296.    Plaintiff-Relator incorporatesby reference the preceding paragraphs of the Complaint as though fully set forth herein.

297.    This is a civil action brought by Plaintiff-Relator on behalf of the State of Iowa against AbbVie under the State of Iowa False Claims Act, Iowa Code § 685.3(2)(a).

298.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of Iowa Code § 685.2(1)(a).

299.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to obtain payment or approval of false claims by the State of Iowa, in violation of Iowa Code § 685.2(1)(b).

300.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state of Iowa, in violation of Iowa Code § 685.2(1)(g).

301.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing and improperly avoiding or decreasing obligations to pay or transmit money to the State of Iowa, in violation of Iowa Code § 685.2(1)(g).

302.     AbbVie furthermore violated the Iowa False Claims Law, Iowa Code § 685.1, *et seq*. by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, compliance with which are express and implied conditions of payment for claims submitted to the State of Iowa.

303.     The State of Iowa, unaware of the falsity of the claims and/or statements made or caused to be made by AbbVie, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of state funded health insurance programs.

304.     As a result of AbbVie's actions, as set forth above, the State of Iowa has been, and may continue to be, severely damaged.

## COUNT XV
### Violation of the State of Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:437.1 *et seq.*

305.     Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

306.     This is a civil action brought by Plaintiff-Relator on behalf of the State of Louisiana's medical assistance programs, against AbbVie under the Louisiana Medical Assistance Programs Integrity Law, La. Rev. Stat. Ann. § 46:439.1.

307.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented, or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims, in violation of La. Rev. Stat. Ann. § 46:438.3(A).

308.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly engaged in misrepresentation, and may still be engaging in misrepresentation, to obtain, or attempt to obtain, payment from medical assistance programs funds, in violation of La. Rev. Stat. Ann. § 46:438.3(B).

309.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly submitted, and may continue to submit, claims for goods, services or supplies which were medically unnecessary or which were of substandard quality or quantity, in violation of La. Rev. Stat. Ann. § 46:438.3(D).

310.    In addition, La. Rev. Stat. Ann. § 46:438.2(A) prohibits the solicitation, receipt, offering or payment of any financial inducements, including kickbacks, bribes and/or rebates, directly or indirectly, overtly or covertly, in cash or in kind, for furnishing healthcare goods or services paid for in whole or in part by the Louisiana medical assistance programs.

311.    AbbVie violated La. Rev. Stat. Ann.§ 46:438.2(A) by engaging in the conduct alleged herein.

312.    AbbVie further violated La. Rev. Stat. Ann. § 46:438.3 by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and La. Rev. Stat. Ann.§ 46:438.2(A) , compliance with which are express and implied conditions of payment for claims submitted to the State of Louisiana.

313.    The State of Louisiana, its medical assistance programs, political subdivisions and/or the Department, unaware of the falsity of the claims and/or statements made by AbbVie, or their actions as set forth above, acted in reliance, and may continue to act in reliance, on the accuracy of AbbVie's claims and/or statements in paying for prescription drugs and prescription drug-related management services for medical assistance program recipients.

314.    As a result of AbbVie's actions, as set forth above, the State of Louisiana, its medical assistance programs, political subdivisions and/or the Department have been, and may continue to be, severely damaged.

## COUNT XVI
### Violation of the State of Maryland False Health Claims Act,
### Md. Code Ann. Health-Gen. § 2-601, *et seq*.

315.    Plaintiff-Relator incorporatesby reference the preceding paragraphs of the Complaint as though fully set forth herein.

316.     This is a civil action brought by Plaintiff-Relator on behalf of the State of Iowa against AbbVie under the State of Maryland False Health Claims Act, Md. Code Ann. Health-Gen. § 2-604(a)(1)(i).

317.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval, in violation of Md. Code Ann. Health-Gen. § 2-602(a)(1).

318.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to obtain payment or approval of false claims by the State of Iowa, in violation of Md. Code Ann. Health-Gen. § 2-602(a)(2).

319.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements material to obligations to pay or transmit money to the State of Iowa, in violation of Md. Code Ann. Health-Gen. § 2-602(a)(7).

320.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money to the State of Iowa, in violation of Md. Code Ann. Health-Gen. § 2-602(a)(8).

321.     In addition, MD Code Ann., Criminal Law, § 8-512, prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Maryland Medicaid program.

322.     AbbVie violated the MD Code Ann., Criminal Law, § 8-512 by engaging in the conduct alleged herein.

323.     AbbVie further violated the Maryland False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and Section 8-512 of Maryland's Criminal Law, compliance with which are express and implied conditions of payment for claims submitted to the State of Maryland.

324.     The State of Maryland, unaware of the falsity of the claims and/or statements made or caused to be made by AbbVie, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of state-funded health insurance programs.

325.     As a result of AbbVie's actions, as set forth above, the State of Maryland has been, and may continue to be, severely damaged.

## COUNT XVII
### Violation of the Commonwealth of Massachusetts False Claims Act, Mass. Gen. Laws ch. 12, § 5A *et seq.*

326.     Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

327.     This is a civil action brought by Plaintiff-Relator on behalf of the Commonwealth of Massachusetts, against AbbVie under the Massachusetts False Claims Act, Mass. Gen. Laws ch. 12 § 5C(2).

328.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of Mass. Gen. Laws ch. 12 § 5B(1).

329.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of claims by the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(2).

330.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Massachusetts, or its political subdivisions, in violation of Mass. Gen. Laws ch. 12 § 5B(8).

331.     In addition, Mass. Gen. Laws Ann. Chap. 118E § 41 prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Massachusetts Medicaid program.

332.     AbbVie violated Mass. Gen. Laws Ann. Chap. 118E § 41 by engaging in the conduct alleged herein.

333.    AbbVie further violated Mass. Gen. Laws Ann. Chap. 12 § 5B by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, Mass. Gen. Law Ann. Chap. 118E § 41, compliance with which are express and implied conditions of payment for claims submitted to the State of Massachusetts.

334.    The Commonwealth of Massachusetts, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

335.    As a result of AbbVie's actions, as set forth above, the Commonwealth of Massachusetts and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XVIII
**Violation of the State of Michigan Medicaid False Claims Act,
Mich. Comp. Laws § 400.601 *et seq*.**

336.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

337.    This is a civil action brought by Plaintiff-Relator on behalf of the State of Michigan, against AbbVie under the Michigan Medicaid False Claims Act, Mich. Comp. Laws § 400.610a(1).

338.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or false representations of material facts in an application for Medicaid benefits, in violation of Mich. Comp. Laws § 400.603(1).

339.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made false statements or false representations of a material fact for use in determining rights to a Medicaid benefit, in violation of Mich. Comp. Laws § 400.603(2).

340.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, and may still be concealing or failing to disclose, an event affecting its initial or continued right to receive a Medicaid benefit, or the initial or continued right of any other person on whose behalf AbbVie have applied for or is receiving a benefit with intent to obtain a benefit to which AbbVie were not entitled or in an amount greater than that to which AbbVie were entitled, in violation of Mich. Comp. Laws § 400.603(3).

341.    AbbVie, in possession of facts under which it is aware or should be aware of the nature of their conduct and that their conduct is substantially certain to cause the payment of a Medicaid benefit, knowingly made, presented or caused to be made or presented, and may still be presenting or causing to be presented, to an employee or officer of the State of Michigan, or its political subdivisions, false claims under the Social Welfare Act, Mich. Comp. Laws §§ 400.1-400.122, in violation of Mich. Comp. Laws § 400.607(1).

342.    In addition, Mich. Comp. Laws Ann. § 400.604 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Michigan Medicaid program.

343.    AbbVie violated Mich. Comp. Laws Ann. § 400.604 by engaging in the conduct alleged herein.

344.     AbbVie further violated Michigan Comp. Laws. Serv. § 400.607 by their deliberate and systematic violation of federal and state laws, including the FDCA, the federal Anti-Kickback Act, and Mich. Comp. Laws Ann. § 400.604, compliance with which are express and implied conditions of payment for claims submitted to the State of Michigan.

345.     The State of Michigan, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of Medicaid.

346.     As a result of AbbVie's actions, as set forth above, the State of Michigan and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XIX
### Violation of the State of Minnesota False Claims Act, Minn. Stat. § 15C.01, *et seq*.

347.     Plaintiff-Relator incorporatesby reference the preceding paragraphs of the Complaint as though fully set forth herein.

348.     This is a civil action brought by Plaintiff-Relator on behalf of the State of Minnesota and its political subdivisions against AbbVie under the State of Minnesota False Claims Act, Minn. Stat. § 15C.05(a).

349.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented, or caused to be presented, and may still be presenting or causing to be presented, a false claim for payment or approval to an officer or employee of the state Minnesota or a political subdivision thereof, in violation of Minn. Stat. § 15C.02(a)(1).

350.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or

caused to be made or used, and may still be making, using, or causing to be made or used, a false record or statement to obtain payment or approval of false claims by the State of Minnesota or a political subdivision thereof, in violation of Minn. Stat. § 15C.02(a)(2).

351.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Minnesota, in violation of Minn. Stat. § 15C.02(a)(7).

352.     In addition, Minn. Stat. § 256B.0914, prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Minnesota Medicaid program.

353.     AbbVie violated Minn. Stat. § 256B.0914 by engaging in the conduct alleged herein.

354.     AbbVie further violated the Minnesota False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and Minn. Stat. § 256B.0914, compliance with which are express and implied conditions of payment for claims submitted to the State of Minnesota.

355.     The State of Minnesota, unaware of the falsity of the claims and/or statements made or caused to be made by AbbVie, and in reliance on the accuracy of those claims and/or statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of state funded health insurance programs.

356. As a result of AbbVie's actions, as set forth above, the State of Minnesota has been, and may continue to be, severely damaged.

<u>**COUNT XX**</u>
**Violation of the State of Montana False Claims Act,**
**Mont. Code Ann. § 17-8-401 *et seq*.**

357. Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

358. This is a civil action brought by Plaintiff-Relator on behalf of the State of Montana against, AbbVie under the Montana False Claims Act, Mont. Code Ann. § 17-8-406(1).

359. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Montana, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Mont. Code Ann. § 17-8-403(1)(a).

360. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(b).

361. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Montana, or its political subdivisions, in violation of Mont. Code Ann. § 17-8-403(1)(g).

362.     In addition, MCA § 45-6-313 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Montana Medicaid program.

363.     AbbVie violated MCA § 45-6-313 by engaging in the conduct alleged herein.

364.     AbbVie furthermore violated the Montana False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and MCA § 45-6-313, compliance with which are express and implied conditions of payment for claims submitted to the State of Montana.

365.     The State of Montana, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

366.     As a result of AbbVie's actions, as set forth above, the State of Montana and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXI
**Violation of the State of Nevada False Claims Act, Nev. Rev. Stat. § 357.010 *et seq*.**

367.     Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

368.     This is a civil action brought by Plaintiff-Relator on behalf of the State of Nevada, against AbbVie under the Nevada False Claims Act, Nev. Rev. Stat. § 357.080(1).

369.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

presented or caused to be presented, and may still be presenting or causing to be presented, false claims for payment or approval, in violation of Nev. Rev. Stat. § 357.040(1)(a).

370.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain payment or approval of false claims, in violation of Nev. Rev. Stat. § 357.040(1)(b).

371.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Nevada, or its political subdivisions, in violation of Nev. Rev. Stat. § 357.040(1)(g).

372.     In addition, N.R.S. § 422.560 prohibits the solicitation, acceptance or receipt of anything of value in connection with the provision of medical goods or services for which payment may be made in whole or in part under the Nevada Medicaid program.

373.     AbbVie violated N.R.S. § 422.560 by engaging in the conduct alleged herein.

374.     AbbVie further violated N.R.S. § 357.040(1) by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and N.R.S. § 422.560, compliance with which are express and implied conditions of payment for claims submitted to the State of Nevada.

375.     The State of Nevada, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or

statements, paid, and may continue to pay, for prescription drugs and prescription drug- related

management services for recipients of health insurance programs funded by the state or its

political subdivisions.

376.    As a result of AbbVie's actions, as set forth above, the State of Nevada and/or its

political subdivisions have been, and may continue to be, severely damaged.

### COUNT XXII
**Violation of the State of New Jersey False Claims Act,**
**N.J. Stat. Ann. § 2A:32C-1 *et seq*.**

377.    Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this

Complaint as though fully set forth herein.

378.    This is a civil action brought by Plaintiff-Relator on behalf of the State of New

Jersey, against AbbVie pursuant to the New Jersey Fraud False Claims Act, N.J. Stat. Ann.

§ 2A:32C-5(b).

379.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the

information involved, or with actual knowledge of the falsity of the information, knowingly or

intentionally presented or caused to be presented, and may still be presenting or causing to be

presented, to an employee, officer or agent of the State of New Jersey, or to any contractor,

grantee, or other recipient of State funds, false or fraudulent claims for payment or approval, in

violation of N.J. Stat. Ann. § 2A:32C-3(a).

380.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the

information involved, or with actual knowledge of the falsity of the information, knowingly

made, used or caused to made or used, and may still be making, using or causing to be made or

used, false records or statements to get false or fraudulent claims paid or approved by the State of

New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(b).

381.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Jersey, or its political subdivisions, in violation of N.J. Stat. Ann. § 2A:32C-3(g).

382.    In addition, N.J.S.A. § 30:4D-17 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New Jersey Medicaid program.

383.    AbbVie violated N.J.S.A. § 30:4D-17 by engaging in the conduct alleged herein.

384.    AbbVie further violated the New Jersey False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and N.J.S.A. § 30:4D-17, compliance with which are express and implied conditions of payment for claims submitted to the State of New Jersey.

385.    The State of New Jersey, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of Medicaid.

386.    As a result of AbbVie's actions, as set forth above, the State of New Jersey and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXIII
### Violation of the State of New Mexico Medicaid False Claims Act,
### N.M. Stat. Ann. § 27-14-1, *et seq*.

387.     Plaintiff-Relator incorporatesby reference the preceding paragraphs of the Complaint as though fully set forth herein.

388.     This is a civil action brought by Plaintiff-Relator on behalf of the State of New Mexico against AbbVie under the State of New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-7(B).

389.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, a false or fraudulent claim for payment under the Medicaid program, in violation of N.M. Stat. Ann. § 27-14-4(A).

390.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to obtain false or fraudulent claims under the Medicaid program paid for or approved by the state, in violation of N.M. Stat. Ann. § 27-14-4(C).

391.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of New Mexico or one of its political subdivisions, relative to the Medicaid program, in violation of N.M. Stat. Ann. § 27-14-4(E).

392.     In addition, N.M. Stat. Ann. § 30-44-7 *et seq*. prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New Mexico Medicaid program.

393.     AbbVie violated N.M. Stat. Ann. § 30-44-7 *et seq*. by engaging in the conduct alleged herein.

394.     AbbVie further violated N.M. Stat. Ann. § 27-14-1 *et seq*. by their deliberate and systematic violation of federal and state laws, including the FDCA and federal Anti-Kickback Act, compliance with which are express and implied conditions of payment for claims submitted to the State of New Mexico.

395.     The State of New Mexico, or its political subdivisions, unaware of the falsity of the claims and/or statements made or caused to be made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and drug- related management services for recipients of health insurance programs funded by the state or its political subdivisions.

396.     As a result of AbbVie's actions, as set forth above, the State of New Mexico or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XXIV
### Violation of the State of New York False Claims Act,
### N.Y. State Fin. Law § 187 *et seq*.

397.     Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

398.     This is a civil action brought by Plaintiff-Relator on behalf of the State of New York, against AbbVie under the New York False Claims Act, N.Y. State Fin. Law § 190(2).

399.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.Y. State Fin. Law § 189(1)(a).

400.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.Y. State Fin. Law § 189(1)(b).

401.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to an obligation to pay or transmit money to the State of New York, or its political subdivisions, in violation of N.Y. State Fin. Law § 189(1)(g).

402.    In addition, New York law prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the New York Medicaid program. NY Soc. Serv. § 366-d.

403.    AbbVie violated NY Soc. Serv. § 366-d by engaging in the conduct alleged herein.

404.    AbbVie further violated the New York State False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, the federal Anti-

Kickback Act, and NY Soc. Serv. § 366-d, compliance with which are express and implied conditions of payment for claims submitted to the State of New York.

405.     The State of New York, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of health insurance programs funded by the state or its political subdivisions.

406.     As a result of AbbVie's actions, set forth above, the State of New York and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXV
### Violation of the State of North Carolina False Claims Act,
### N.C. Gen. Stat. § 1-605 *et seq.*

407.     Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

408.     This is a civil action brought by Plaintiff-Relator on behalf of the State of North Carolina, against AbbVie under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-608(b).

409.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval, in violation of N.C. Gen. Stat. § 1-607(a)(1).

410.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims, in violation of N.C. Gen. Stat. § 1-607(a)(2).

411.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of North Carolina, or its political subdivisions, in violation of N.C. Gen. Stat. § 1-607(a)(7).

412.    In addition, N.C. Gen. Stat. Ann. § 108A-63 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the North Carolina Medicaid program.

413.    AbbVie violated N.C. Gen. Stat. Ann. § 108A-63 by engaging in the conduct alleged herein.

414.    AbbVie further violated the North Carolina False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and N.C. Gen. Stat. Ann. § 108A-63, compliance with which are express and implied conditions of payment for claims submitted to the State of North Carolina.

415.    The State of North Carolina, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of health insurance programs funded by the state or its political subdivisions.

416.    As a result of AbbVie's actions, as set forth above, the State of North Carolina and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXVI
### Violation of the State of Oklahoma Medicaid False Claims Act,
### Okla. Stat. tit. 63, § 5053 *et seq.*

417.     Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

418.     This is a civil action brought by Plaintiff-Relator on behalf of the State of Oklahoma, against AbbVie pursuant to the Oklahoma Medicaid False Claims Act, Okla. Stat. tit. 63, § 5053.2(B)(1).

419.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Oklahoma, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Okla. Stat. tit. 63, § 5053.1(B)(1).

420.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(2).

421.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Oklahoma, or its political subdivisions, in violation of Okla. Stat. tit. 63, § 5053.1(B)(7).

422. In addition, Okla. Stat. Ann. tit. 56, § 1005 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Oklahoma Medicaid program.

423. AbbVie violated Okla. Stat. Ann. tit. 56, § 1005 by engaging in the conduct alleged herein.

424. AbbVie furthermore violated the Oklahoma Medicaid False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and Okla. Stat. Ann. tit. 56, § 1005, compliance with which are express and implied conditions of payment for claims submitted to the State of Oklahoma. The State of Oklahoma, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug- related management services for recipients of Medicaid.

425. As a result of AbbVie's actions, as set forth above, the State of Oklahoma and/or its political subdivisions have been, and may continue to be, severely damaged.

### COUNT XXVII
**Violation of the State of Rhode Island False Claims Act,
R.I. Gen. Laws § 9-1.1-1 *et seq*.**

426. Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

427. This is a civil action brought by Plaintiff-Relator on behalf of the State of Rhode Island, against AbbVie pursuant to the Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-4(b).

428. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Rhode Island or a member of Rhode Island's National Guard, false or fraudulent claims for payment or approval, in violation of R.I. Gen. Laws § 9-1.1-3(a)(1).

429. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false records or statements to get false or fraudulent claims paid or approved by the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(2).

430. AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Rhode Island, or its political subdivisions, in violation of R.I. Gen. Laws § 9-1.1-3(a)(7).

431. In addition, R.I. Gen. Laws § 40-8.2-9 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Rhode Island Medicaid program.

432. AbbVie violated R.I. Gen. Laws § 40-8.2-9 by engaging in the conduct alleged herein.

433.     AbbVie further violated the Rhode Island False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and R.I. Gen. Laws § 40-8.2-9, compliance with which are express and implied conditions of payment for claims submitted to the State of Rhode Island.

434.     The State of Rhode Island, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

435.     As a result of AbbVie's actions, as set forth above, the State of Rhode Island and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXVIII**
**Violation of the State of Tennessee Medicaid False Claims Act,**
**Tenn. Code Ann. § 71-5-181 *et seq*.**

436.     Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

437.     This is a civil action brought by Plaintiff-Relator on behalf of the State of Tennessee, against AbbVie under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-183(b).

438.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to the State of Tennessee, or its political subdivisions, false or fraudulent claims for payment under the Medicaid program,, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(A).

439.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records or statements to get false or fraudulent claims under the Medicaid program paid for or approved by the State of Tennessee, or its political subdivisions, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(B).

440.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false or fraudulent records or statements to conceal, avoid or decrease an obligation to pay or transmit money to the State of Tennessee, or its political subdivisions, relative to the Medicaid program, in violation of Tenn. Code Ann. § 71-5-182(a)(1)(D).

441.     AbbVie violated Tenn. Code Ann. § 71-5-182(a)(l) by their deliberate and systematic violation of federal and state laws, including the FDCA and Anti-Kickback Act, compliance with which are express and implied conditions of payment for claims submitted to the State of Tennessee.

442.     The State of Tennessee, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of the Medicaid program.

443.     As a result of AbbVie's actions, as set forth above, the State of Tennessee and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXIX
### Violation of the State of Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*

444.     Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

445.    This is a civil action brought by Plaintiff-Relator on behalf of the State of Texas against, AbbVie under the Texas Medicaid Fraud Prevention Act, Tex. Hum. Res. Code Ann. § 36.101(a).

446.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made or caused to be made, and may still be making or causing to be made, false statements or misrepresentations of material fact that permitted AbbVie to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the benefit or payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(1).

447.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly concealed or failed to disclose, or caused to be concealed or not disclosed — and may still be concealing or failing to disclose, or causing to be concealed or not disclosed — information that permitted AbbVie to receive a benefit or payment under the Medicaid program that was not authorized or that was greater than the payment that was authorized, in violation of Tex. Hum. Res. Code Ann. § 36.002(2).

448.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, caused to be made, induced or sought to induce, and may still be making, causing to be made, inducing or seeking to induce, false statements or misrepresentations of material fact concerning information required to be provided by a federal or state law, rule, regulation or provider agreement pertaining to the Medicaid program, in violation of Tex. Hum. Res. Code Ann. § 36.002(4)(B).

449.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, and may still be making, claims under the Medicaid program for services or products that were inappropriate, in violation of Tex. Hum. Res. Code Ann. § 36.002(7)(C).

450.     In addition, § 36.002(5) imposes liability on one who "knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program."

451.     AbbVie violated § 36.002(5) by engaging in the conduct alleged herein.

452.     AbbVie violated Hum. Res. Code § 36.002 by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and § 36.002(5) , compliance with which are express and implied conditions of payment for claims submitted to the State of Texas.

453.     The State of Texas, or it political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance on the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of Medicaid.

454.     As a result of AbbVie's actions, as set forth above, the State of Texas and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXX**
**Violation of the State of Vermont False Claims Act**
**32 V.S.A. § 630 *et seq*.**

455.     Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

456.    This is a civil action brought by Plaintiff-Relator on behalf of the State of Vermont, against AbbVie under the State of Vermont False Claims Act, 32 V.S.A. § 632(b)(1).

457.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the State of Vermont, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of 32 V.S.A. § 631(a)(1).

458.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the State of Vermont, or its political subdivisions, in violation of 32 V.S.A. § 631(a)(2).

459.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the State of Vermont, or its political subdivisions, in violation of 32 V.S.A. § 631(a)(9).

460.    In addition, 33 V.S.A. § 141(d) prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Vermont Medicaid program.

461.    AbbVie violated 33 V.S.A. § 141(d) by engaging in the conduct alleged herein.

462.     AbbVie furthermore violated Vermont's False Claims Act, §631(a), by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and 33 V.S.A. § 141(d), compliance with which are express and implied conditions of payment for claims submitted to the State of Vermont.

463.     The State of Vermont, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

464.     As a result of AbbVie's actions, as set forth above, the State of Vermont and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXXI
### Violation of the Commonwealth of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq*.

465.     Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

466.     This is a civil action brought by Plaintiff-Relator on behalf of the Commonwealth of Virginia, against AbbVie under the Commonwealth of Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.5(A).

467.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to an officer or employee of the Commonwealth of Virginia, or its political subdivisions, false or fraudulent claims for payment or approval, in violation of Va. Code Ann. § 8.01-216.3(A)(1).

468.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly

made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(2).

469.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Commonwealth of Virginia, or its political subdivisions, in violation of Va. Code Ann. § 8.01-216.3(A)(7).

470.    In addition, Va. Code Ann. § 32.1-315 prohibits the solicitation, receipt or offering of any remuneration, including any bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any good, service or item for which payment may be made in whole or in part under the Virginia Medicaid program.

471.    AbbVie violated Va. Code Ann. § 32.1-315 by engaging in the conduct alleged herein.

472.    AbbVie furthermore violated Virginia's Fraud Against Tax Payers Act, § 8.01-216.3a, by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and Va. Code Ann. § 32.1-315, compliance with which are express and implied conditions of payment for claims submitted to the Commonwealth of Virginia.

473.    The Commonwealth of Virginia, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance upon the accuracy of

these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

474.    As a result of AbbVie's actions, as set forth above, the Commonwealth of Virginia and/or its political subdivisions have been, and may continue to be, severely damaged.

## COUNT XXXII
### Violation of the State of Washington Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.005, *et seq*.

475.    Plaintiff-Relator incorporatesby reference the preceding paragraphs of the Complaint as though fully set forth herein.

476.    This is a civil action brought by Plaintiff-Relator on behalf of the State of Washington against AbbVie under the Washington State Medicaid Fraud False Claims Act, Wash. Rev. Code § 74.66.050(1).

477.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, presented or caused to be presented, and may still be presenting or causing to be presented, false or fraudulent claims for payment or approval under the state of Washington Medicaid program, in violation of Wash. Rev. Code § 74.66.020(1)(a).

478.    AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used, or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to false or fraudulent claims to get false or fraudulent claims paid or approved by the state of Washington Medicaid program, in violation of Wash. Rev. Code § 74.66.020(1)(b).

479.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, made, used or caused to be made or used, and may still be making, using or causing to be made or used, false records or statements material to obligations to pay or transmit money or property to the state of Washington Medicaid program, in violation of Wash. Rev. Code § 74.66.020(1)(g).

480.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, concealed or improperly avoided or decreased, and may still be concealing or improperly avoiding or decreasing, obligations to pay or transmit money or property to the state of Washington Medicaid program, in violation of Wash. Rev. Code § 74.66.020(1)(g).

481.     In addition, Wash. Rev. Code 74.09.240, prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly, in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Washington Medicaid program.

482.     AbbVie violated Wash. Rev. Code 74.09.240 by engaging in the conduct described herein.

483.     AbbVie furthermore violated the Washington Medicaid Fraud Act, Wash. Rev. Code 74.66.005, *et seq.*, by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act, and Wash. Rev. Code 74.09.240, compliance with which are express and implied conditions of payment for claims submitted to the State of Washington.

484.     The State of Washington, unaware of the falsity of the claims and/or statements made or caused to be made by AbbVie, and in reliance upon the accuracy of these claims and/or

statements, paid, and may continue to pay, for prescription drugs and drug-related management services for recipients of state-funded health insurance programs.

485.     As a result of AbbVie's actions, as set forth above, the State of Washington and/or its political subdivisions have been, and may continue to be, severely damaged.

**COUNT XXXIII**
**Violation of the State of Wisconsin False Claims for Medical Assistance Law,**
**Wis. Stat. § 20.931 *et seq.***

486.     Plaintiff-Relator incorporates herein by reference the preceding paragraphs of this Complaint as though fully set forth herein.

487.     This is a civil action brought by Plaintiff-Relator on behalf of the State of Wisconsin, against AbbVie under the Wisconsin False Claims for Medical Assistance Law, Wis. Stat. § 20.931(5)(a).

488.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly presented or caused to be presented, and may still be presenting or causing to be presented, to any officer, or employee, or agent of the State of Wisconsin, or its political subdivisions, false or fraudulent claims for medical assistance, in violation of Wis. Stat. § 20.931(2)(a).

489.     AbbVie, in reckless disregard or deliberate ignorance of the truth or falsity of the information involved, or with actual knowledge of the falsity of the information, knowingly made, used, or caused to be made or used, and may still be making, using, or causing to be made or used, false records or statements to obtain approval or payment of false claims for medical assistance, in violation of Wis. Stat. § 20.931(2)(b).

490.     In addition, Wis. Stat. Ann. § 49.49 prohibits the solicitation or receipt of any remuneration, including any kickback, bribe or rebate, directly or indirectly, overtly or covertly,

in cash or in kind in return for furnishing any item or service for which payment may be made in whole or in part under the Wisconsin Medicaid program.

491.    AbbVie violated Wis. Stat. Ann. § 49.49 by engaging in the conduct alleged herein.

492.    AbbVie further violated the Wisconsin False Claims Act by their deliberate and systematic violation of federal and state laws, including the FDCA, federal Anti-Kickback Act and Wis. Stat. Ann. § 49.49, compliance with which are express and implied conditions of payment for claims submitted to the State of Wisconsin.

493.    The State of Wisconsin, or its political subdivisions, unaware of the falsity of the claims and/or statements made by AbbVie, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay, for prescription drugs and prescription drug-related management services for recipients of state funded health insurance programs.

494.    As a result of AbbVie's actions, as set forth above, the State of Wisconsin and/or its political subdivisions have been, and may continue to be, severely damaged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff-Relator prays for judgment against AbbVie as follows:

A.      That AbbVie be ordered to cease and desist from submitting any more false claims, or further violating the FCA and the State *Qui Tam* Statutes;

B.      That judgment be entered in the United States of America's favor and against AbbVie in the amount of each and every false or fraudulent claim, multiplied as provided for in 31 U.S.C. § 3729(a)(1), plus a civil penalty of not less $5,500 or more than $11,000 per claim as provided by 31 U.S.C. § 3729(a)(1), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, to the extent such multiplied penalties shall fairly compensate the

United States of America for losses resulting from the various schemes undertaken by Defendant, together with penalties for specific claims to be identified at trial after full discovery;

      C.      That judgment be entered in the *Qui Tam* States' favor and against Defendant in the amount of the damages sustained by the State *Qui Tam* Statutes multiplied as provided for in the State *Qui Tam* Statutes, plus civil penalties in the ranges provided by the State *Qui Tam* Statutes;

      D.      That Plaintiff-Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(D), Cal. Gov't Code § 12652(G), Colo. Rev. Stat. § 25.5-4-306(4), Conn. Gen. Stat. § 17b-301e, Del. Code Ann. Tit. 6, § 1205, D.C. Code Ann. § 2- 381.03(F)(1), Fla. Stat. § 68.085, Ga. Code Ann. § 49-4-168.2, Haw. Rev. Stat. § 661-27, 740 Ill. Comp. Stat. § 175/4(D), 740 Ill. Comp. Stat. 92/25, Ind. Code § 5-11-5.5-6(A), Iowa Code § 685.3, La. Rev. Ann. Stat. § 46:439.4, Md. Code Ann. Health-Gen. § 2-605, Mass. Ann. Laws Ch. 12, § 5F, Mich. Comp. Laws Serv. § 400.610a(9), Minn. Stat. § 15C.13, Mont. Code Ann. § 17-8-410, Nev. Rev. Stat. § 357.220, N.J. Stat Ann. § 2A:32C-7, N.M. Stat. Ann. § 27-14-9, N.Y. Fin. Law § 190(6), N.C. Gen. Stat. § 1-610, Okla. Stat. Tit. 63, § 5053.4, R.I. Gen. Laws § 9-1,1-4(D), Tenn. Code Ann. § 71-5-183(D)(1)(A), Tex. Hum. Res. Code § 36.110, the Vermont False Claims Act, 32 V.S.A. § 630 *et seq.*, Va. Code Ann. § 8.01-216.7, Wash. Rev. Code § 74.66.070, and Wis. Stat. § 20.931(11);

      E.      That Defendants be ordered to disgorge all sums by which it has been enriched unjustly by its wrongful conduct; and

      F.      That judgment be granted for Plaintiff-Relator for all costs, including, but not limited to, court costs, litigation costs, expert fees, and all attorneys' fees incurred by Plaintiff-Relator in the prosecution of this suit; and

G.     That Plaintiff-Relator be granted such other and further relief as the Court deems just and proper.

## **JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiff-Relator hereby demands a trial by jury of all issues so triable.

Dated: November 26, 2019          Respectfully submitted,

/s/ *Robert A. Clifford*_____
Robert A. Clifford
RAC@cliffordlaw.com
Shannon M. McNulty
SMM@cliffordlaw.com
Clifford Law Offices, PC
120 N. LaSalle Street, 31st Floor
Chicago, Illinois 60602
Telephone: 312.899.9090
Facsimile: 312.251.1160

Rachel Geman (pro hac vice)
rgeman@lchb.com
Jason L. Lichtman (SBN 6290052)
jlichtman@lchb.com
Katherine I. McBride (pro hac vice to be filed)
kmcbride@lchb.com
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: 212.355.9500
Facsimile: 212.355.9592

*Attorneys for Plaintiff-Relator Lazaro Suarez*