**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA *ex rel.* LAZARO SUAREZ, and on behalf of the STATE OF CALIFORNIA, *et al.*, | ) ) ) ) | |
| Plaintiff-Relator, | ) ) ) | Case No. 1:15-cv-08928 |
| v. | ) ) | Hon. Rebecca Pallmeyer |
| ABBVIE INC. and ABBOTT LABORATORIES, | ) ) ) | |
| Defendants. | ) | |

**BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S
SECOND AMENDED COMPLAINT**

Dated:  January 27, 2020

Andrew A. Kassof, P.C.
Elizabeth S. Hess, P.C.
Brenton A. Rogers
Britt Cramer
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
akassof@kirkland.com
ehess@kirkland.com
brogers@kirkland.com
britt.cramer@kirkland.com
Telephone: 312-862-2000
Facsimile: 312-862-2200

*Counsel for Defendants
AbbVie Inc. and Abbott Laboratories*

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ...................................................................................... ii

BACKGROUND ..................................................................................................... 4

I.      ABBVIE'S AMBASSADOR SUPPORT PROGRAM ................................... 4

II.      PROCEDURAL HISTORY ......................................................................... 6

     A.     This Court's Dismissal of the First Amended Complaint ...................... 6

     B.     Suarez's Second Amended Complaint .................................................. 7

LEGAL STANDARD ............................................................................................. 8

ARGUMENT .......................................................................................................... 8

I.      SUAREZ DOES NOT ALLEGE A FALSE CLAIM. ................................... 8

II.      THE COMPLAINT LACKS THE REQUIRED PARTICULARITY ...................... 13

III.      SUAREZ STILL DOES NOT ALLEGE SCIENTER. ................................. 16

     A.     Suarez Fails to Allege AbbVie Knowingly and Willfully Violated the AKS ...................................................................................................... 17

     B.     Suarez's Complaint Also Fails to Satisfy the FCA's Objective Scienter Requirement ....................................................................................... 18

IV.      THE PUBLIC DISCLOSURE BAR REQUIRES DISMISSAL ................................ 20

     A.     Suarez's Allegations Were Publicly Disclosed .................................... 22

     B.     The Complaint Is Substantially Similar to the Publicly Disclosed Allegations ........................................................................................ 25

     C.     Suarez Is Not an Original Source of the Allegations ............................ 26

V.      SUAREZ'S ALTERNATIVE THEORIES DO NOT STATE A CLAIM. ................. 27

     A.     Pharmaceutical Regulations .................................................................. 27

     B.     State-Law Claims ................................................................................ 29

CONCLUSION ...................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................................................................8

*Bellevue v. Universal Health Services of Hartgrove, Inc.*,
867 F.3d 712 (7th Cir. 2017) .......................................................................... *passim*

*Cause of Action v. Chicago Transit Authority*,
815 F.3d 267 (7th Cir. 2016) .......................................................................... *passim*

*Geinosky v. City of Chicago*,
675 F.3d 743 (7th Cir. 2012) .............................................................................5

*Graham Cty. Soil & Water Conservation District v. U.S. ex rel. Wilson*,
559 U.S. 280 (2010)..........................................................................................20

*In re Plavix Marketing, Sales Practice & Products Liability Litigation (No. II)*,
332 F. Supp. 3d 927 (D.N.J. 2017) ..................................................................28

*Prather v. AT&T, Inc.*,
847 F.3d 1097 (9th Cir. 2017) ..........................................................................26

*Safeco Insurance Co. of America v. Burr*,
551 U.S. 47 (2007)......................................................................................18, 19

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*,
563 U.S. 401 (2011)..........................................................................................21

*U.S. ex rel. Beauchamp v. Academi Training Center*,
816 F.3d 37 (4th Cir. 2016) ..............................................................................21

*U.S. ex rel. Berkowitz v. Automation Aids, Inc.*,
896 F.3d 834 (7th Cir. 2018) .......................................................................... *passim*

*U.S. ex rel. Bogina v. Medline Industries, Inc.*,
809 F.3d 365 (7th Cir. 2016) .......................................................................21, 26

*U.S. ex rel. Dolan v. Long Grove Manor, Inc.*,
2014 WL 3583980 (N.D. Ill. July 18, 2014).....................................................13

*U.S. ex rel. Donegan v. Anesthesia Associates of Kansas City, PC*,
833 F.3d 874 (8th Cir. 2016) ............................................................................18

*U.S. ex rel. Feingold v. AdminaStar Federal, Inc.*,
   324 F.3d 492 (7th Cir. 2003) ...................................................................25

*U.S. ex rel. Forney v. Medtronic, Inc.*,
   2017 WL 2653568 (E.D. Pa. June 19, 2017) ............................................ *passim*

*U.S. ex rel. Ge v. Takeda Pharmaceutical Co.*,
   737 F.3d 116 (1st Cir. 2013) ...................................................................28

*U.S. ex rel. Grenadyor v. Ukrainian Village Pharmacy, Inc.*,
   772 F.3d 1102 (7th Cir. 2014) .............................................13, 15, 27, 29

*U.S. ex rel. Hixson v. Health Management Systems, Inc.*,
   613 F.3d 1186 (8th Cir. 2010) .............................................................3, 19

*U.S. ex rel. John v. Hastert*,
   82 F. Supp. 3d 750 (N.D. Ill. 2015) .........................................................5

*U.S. ex rel. LaFauci v. AbbVie Inc.*,
   2019 WL 1450791 (D.N.J. Apr. 2, 2019) ..................................................6

*U.S. ex rel. Lisitza v. Par Pharmaceutical Cos.*,
   2017 WL 3531678 (N.D. Ill. Aug. 17, 2017) ..........................................24

*U.S. ex rel. McGrath v. Microsemi Corp.*,
   690 F. App'x 551 (9th Cir. 2017) ...........................................................18

*U.S. ex rel. Miller v. AbbVie Inc.*,
   No. 3:16-cv-02111, Dkt. 60 (N.D. Tex. May 9, 2019) ...............................6

*U.S. ex rel. NHCA-TEV, LLC v. Teva Pharmaceutical Products Ltd.*,
   2019 WL 6327207 (E.D. Pa. Nov. 26, 2019) .....................................10, 13

*U.S. ex rel. NHCA-TEV, LLC v. Teva Pharmaceutical Products Ltd.*,
   No. 2:17-cv-2040-JD (E.D. Pa. Dec. 17, 2018), Dkt. 30 .........................10

*U.S. ex rel. Osheroff v. Humana, Inc.*,
   776 F.3d 805 (11th Cir. 2015) ...........................................................21, 26

*U.S. ex rel. Patel v. Catholic Health Initiatives*,
   2019 WL 6208665 (5th Cir. Nov. 20, 2019) ...........................................28

*U.S. ex rel. Petratos v. Genentech Inc.*,
   855 F.3d 481 (3d Cir. 2017) ...................................................................27

*U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC*,
   836 F.3d 770 (7th Cir. 2016) .....................................................................2

*U.S. ex rel. Purcell v. MWI Corp.*,
807 F.3d 281 (D.C. Cir. 2015) ...................................................................16, 18, 19

*U.S. ex rel. Ribik v. HCR ManorCare, Inc.*,
2017 WL 3471426 (E.D. Va. Aug. 10, 2017) ........................................................28

*U.S. ex rel. SCEF, LLC v. AstraZeneca, Inc.*,
2019 WL 5725182 (W.D. Wash. Nov. 5, 2019) .....................................................10

*U.S. ex rel. Schneider v. J.P. Morgan Chase Bank, N.A.*,
224 F. Supp. 3d 48 (D.D.C. 2016) .........................................................................28

*U.S. ex rel. Solomon v. Lockheed Martin Corp.*,
878 F.3d 139 (5th Cir. 2017) .................................................................................25

*U.S. ex rel. Streck v. Allergan, Inc.*,
746 F. App'x 101 (3d Cir. 2018) ......................................................................18, 19

*U.S. ex rel. Streck v. Takeda Pharmaceuticals America, Inc.*,
381 F. Supp. 3d 932 (N.D. Ill. 2019) .....................................................................18

*U.S. ex rel. Winkelman v. CVS Caremark Corp.*,
827 F.3d 201 (1st Cir. 2016) ..................................................................................26

*U.S. ex rel. Young v. Suburban Home Physicians*,
2017 WL 6625940 (N.D. Ill. Dec. 28, 2017) ...................................................14, 16

*United States v. EMD Serono, Inc.*,
370 F. Supp. 3d 483 (E.D. Pa. 2019) .....................................................................10

*United States v. Patel*,
17 F. Supp. 3d 814 (N.D. Ill. 2014) .......................................................................16

*United States v. Sanford-Brown, Ltd.*,
840 F.3d 445 (7th Cir. 2016) .................................................................................28

*United States v. Wheeler*,
540 F.3d 683 (7th Cir. 2008) .................................................................................16

*United States v. Williams*,
218 F. Supp. 3d 730 (N.D. Ill. 2016) .....................................................................16

*Universal Health Services, Inc. v. U.S. ex rel. Escobar*,
136 S. Ct. 1989 (2016) .....................................................................................18, 27

**Statutes**

42 U.S.C. § 1320a-7b(b) ....................................................................................1, 9, 15

iv

False Claims Act, 31 U.S.C. §§ 3729-33 ................................................................................ *passim*

N.M. Stat. § 27-14-7(B), (E)(2) ...................................................................................29

Pub. L. No. 111-148, 124 Stat. 119, 901, § 10104(j)(2) (Mar. 23, 2010)......................................20

**Rules**

Rule 9(b) ................................................................................................ *passim*

Rule 12(b)(6).................................................................................................8

**Regulations**

68 Fed. Reg. 23731-01 (May 5, 2003).....................................................................1, 2, 9

70 Fed. Reg. 70623-03 (Nov. 22, 2005) ...........................................................................9

78 Fed. Reg. 79202 (Dec. 27, 2013) ................................................................................9

**Other Authorities**

OIG Advisory Opinion No. 00-10 (Dec. 15, 2000) ........................................................9

OIG Advisory Opinion No. 06-03 (Apr. 18, 2006) .......................................................10

OIG Advisory Opinion No. 06-14 (Sept. 21, 2006) ......................................................10

OIG Advisory Opinion No. 06-19 (Oct. 26, 2006).......................................................10

OIG Advisory Opinion No. 06-21 (Nov. 2, 2006)........................................................10

OIG Advisory Opinion No. 12-10 (Aug. 23, 2012).......................................................10

Relator Lazaro Suarez has not cured any of the multiple defects that led to dismissal of his First Amended Complaint. The core theory of his case remains the same—that AbbVie's patient support program for its medication Humira was actually a concealed kickback to prescribing doctors, supposedly rendering claims for government reimbursement for Humira "false" under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729-33, and similar state laws. No matter how many factual details Suarez tries to add, he cannot overcome the critical flaw in his theory: AbbVie's support services ***integrally related to its own product*** are not kickbacks as a matter of law.

Beyond that fundamental problem, the Second Amended Complaint ("SAC") also fails to address this Court's rulings on pleading with particularity and scienter. Nor does the complaint correct the other shortcomings AbbVie identified in its prior motion to dismiss, including that Suarez's allegations run headlong into the public disclosure bar. Dismissal—this time with prejudice—is therefore required for several independent reasons.

***First***, Suarez still has not alleged that AbbVie provided unlawful "remuneration" to doctors or patients in violation of the Anti-Kickback Statute ("AKS"). 42 U.S.C. § 1320a-7b(b). As this Court's dismissal order recognized, Suarez's central theory that "offering free product support or reimbursement support services could violate the AKS merely because it saves physicians money" is "a premise that appears inconsistent with the OIG guidance" that permits manufacturers to offer "programs specifically tied to support of the purchased product." Dkt. 74 (MTD Op.), at 12, 18 (quoting 68 Fed. Reg. 23731-01, 23735 (May 5, 2003)). But Suarez once again "has alleged only the provision of Humira-related services" and has not "sufficiently pleaded that Humira-related 'goods or services provided by AbbVie eliminate an expense that the physician would have otherwise incurred (i.e., have independent value to the physician).'" *Id.* at 14-15 (brackets omitted) (quoting 68 Fed. Reg. at 23737). The new complaint merely offers additional "details concerning

the types of services Ambassadors provide," but still does not "explain[] how the services provided substantial independent value—as opposed to 'permissible product support'—for physicians." *Id*. at 16 (quoting *U.S. ex rel. Forney v. Medtronic, Inc.*, 2017 WL 2653568, at *4 (E.D. Pa. June 19, 2017)). The Court already held that is not enough. The complaint therefore fails to allege "remuneration" and cannot state a claim as a matter of law.

*Second*, even if Suarez's core theory were viable, and it is not, Suarez fails to allege any AKS violation or false claim with particularity, as Rule 9(b) requires. *See id.* at 18-24. Once again, "[t]hough he names doctors that benefited from the Ambassador Program generally, [Suarez] does not allege that any doctors (let alone any specific doctors) reduced their expenses or downsized their own staff as a result of Ambassadors' support services." *Id*. at 18. He also still "does not name a specific patient for whom a doctor prescribed Humira in exchange for a kickback," or "that a claim was submitted to a government health care program for any such patient." *Id*. at 20. The new "representative" examples Suarez points to as purported "[e]vidence linking AbbVie's conduct to specific government reimbursements for Humira," *see* SAC ¶¶ 11 n.2, 152-60, do not come close, as they fail to "describe the 'who, what, when, where, and how'" of the alleged fraud. *U.S. ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 839 (7th Cir. 2018). Just like his original complaint, "the facts [Suarez] alleges do not 'necessarily,' or even reliably, 'lead one to the conclusion that AbbVie presented claims to the Government.'" MTD Op., at 24 (brackets omitted) (quoting *U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 778 (7th Cir. 2016)).

*Third*, Suarez fails to plead scienter under either the AKS or the FCA. Under the AKS, "[Suarez's] burden is to allege facts supporting an inference that AbbVie thought the Ambassador Program was *impermissible*." *Id*. at 26. Suarez does not. Instead, he offers only conclusory

allegations of knowledge, *see* SAC ¶¶ 185-89, plus allegations that AbbVie mischaracterized its motives for creating the Ambassador Program, *see, e.g.*, *id.* at ¶¶ 8, 179, neither of which is sufficient. And this Court already found that AbbVie's public promotion of the services offered by the Ambassador Program "dispels any inference that AbbVie was trying to conceal the services that [Suarez] contends violate the AKS." MTD Op., at 26-27.

Independently, Suarez has not pled the requisite scienter under the FCA because he cannot "show that there is no reasonable interpretation of the law that would make the allegedly false statement true," and therefore cannot show AbbVie "knowingly" violated the law. *U.S. ex rel. Hixson v. Health Mgmt. Sys., Inc.*, 613 F.3d 1186, 1191 (8th Cir. 2010). To the contrary, "OIG guidance recognizes that a pharmaceutical company can provide product and reimbursement support services without violating the law." MTD Op., at 26.

***Fourth***, the FCA's public disclosure bar requires dismissal because Suarez's allegations are "substantially the same [as] allegations or transactions [that have been] publicly disclosed" and he is not an "original source of the information." 31 U.S.C. § 3730(e)(4)(A). AbbVie openly advertised its patient support program, stating on its website that patients could seek help with issues ranging from injections to insurance. Commentators on other websites outlined the precise theory in this case—that the program influenced doctors to prescribe Humira. Anyone could have "drawn" the same (mistaken) "inference" of fraud alleged by Suarez "from the available facts," *Cause of Action v. Chi. Transit Auth.*, 815 F.3d 267, 281 (7th Cir. 2016), and so he has brought nothing new to the table. That is dispositive under the public disclosure bar.

***Fifth***, Suarez's hastily pled alternative theories of liability fare no better. His allegation that AbbVie violated federal drug-marketing rules is undeveloped and—more importantly— untethered from any actual false claims for payment. And the state-law counts not only fail for all

the same reasons as Suarez's federal theory, but also because he does not allege *any* conduct, much less improper conduct, in virtually all of those states.

In short, Suarez again has not adequately pled any of his claims. Given that he has already had the opportunity to fix his complaint and further amendment would be futile, especially in light of his fundamentally flawed liability theory, the Court should dismiss the complaint with prejudice.

## BACKGROUND

AbbVie disputes Suarez's factual allegations, which are inaccurate and misleading. But for the purposes of this motion, AbbVie—as it must—assumes their truth. *See Berkowitz*, 896 F.3d at 839. The following allegations come from the Second Amended Complaint.

## I.    ABBVIE'S AMBASSADOR SUPPORT PROGRAM

AbbVie is a pharmaceutical company that develops and manufactures groundbreaking medications like Humira, an injectable biologic drug that treats many serious autoimmune diseases. SAC ¶¶ 2, 22, 51-54. Patients can self-inject Humira, but they require training on how to safely and effectively do so. *Id.* ¶ 53. Humira "patients generally need [injections] approximately every two weeks," and it is vital that they receive ongoing support. *Id.* "[O]nce a patient starts on Humira, they will be advised to stay on it indefinitely. Indeed, patients are warned that if they abruptly stop treatment … they may have a 'severe' reaction or 'flare up' of their condition after which they may not respond to Humira or other similar treatment." *Id.*

To provide patients with support to meet these unique needs, AbbVie launched its "Ambassador Program." *Id.* ¶ 68. Under the Program, AbbVie employs a staff of registered nurses ("Ambassadors") tasked with helping patients safely use Humira. *Id.* For example, Ambassadors "communicat[e] with patients in response to questions about their treatment and disease states," provide in-home "injection training," and ensure needy patients have access to free doses during gaps in insurance coverage. *Id.* ¶¶ 68, 144, 153, 159. They also provide guidance to patients on

4

how to navigate Humira-related insurance issues. *Id.* ¶ 157. And Ambassadors offer products that help patients effectively use Humira, such as travel coolers (Humira must be kept refrigerated) and "'Talking Training Pens' used to train patient[s] on how to inject themselves." *Id.* ¶¶ 71, 108.

Suarez does ***not*** allege that Ambassadors offered ***any*** services unrelated to Humira and Humira patients. In fact, the complaint opens with the admission that Ambassadors are available "[i]f, *and only if*, a doctor chooses to prescribe Humira." *Id.* ¶ 3. Suarez concedes that, as an Ambassador himself, he personally "worked *exclusively* in connection with … Humira." *Id.* ¶ 17 (emphasis added).

Rather, Suarez's theory is that claims for Humira reimbursement were "false" because the Ambassador Program itself was supposedly a veiled kickback scheme—and apparently a poorly disguised one, given that AbbVie openly advertised on patient- and physician-facing websites.[1] *Id.* ¶ 84. Specifically, he asserts that the Program improperly influenced doctors to prescribe Humira because Ambassadors "perform[ed] administrative and patient care tasks" that "freed up" physicians to focus on billable activities. *Id.* ¶ 5. Although AbbVie indisputably was providing support for its own product—and only its own product—Suarez nonetheless claims that these efforts were kickbacks that conferred "independent value" on doctors. *Id.* ¶ 6.

---

[1]   *E.g.* Ex. A. Humira.com, *How to inject HUMIRA® (adalimumab)—Giving Yourself the Medicine*, https://web.archive.org/web/20150905102756/https://www.humira.com/global/how-to-inject-humira (captured Sept. 5, 2015; last accessed Jan. 22, 2020) (explaining patients could receive "[i]n-person injection training" and "step-by-step guidance from a registered nurse in [their] home, office, or clinic," and nurses could "follow up with [patients] for the first few months of treatment"). AbbVie respectfully requests this Court take judicial notice of these "matters of public record." *Cause of Action*, 815 F.3d at 277 n.13; *see* MTD Op., at 27 (acknowledging AbbVie's website); *U.S. ex rel. John v. Hastert*, 82 F. Supp. 3d 750, 764 (N.D. Ill. 2015) (taking judicial notice of news articles "to conclude that the information contained in [the plaintiff's] complaint ha[d] previously been publicly disclosed and was in the public realm"); *see also Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (Court may consider "information that is subject to proper judicial notice" without converting 12(b)(6) motion to summary judgment).

## II.     PROCEDURAL HISTORY

On October 8, 2015, Suarez filed this *qui tam* action against AbbVie and its predecessor, Abbott Laboratories, alleging violations of the FCA and several state-law analogs. Dkt. 1. On March 13, 2018, the government declined to intervene—as did all thirty-one states and the District of Columbia—and the Court ordered the complaint unsealed. Dkts. 26-28.

### A.     This Court's Dismissal of the First Amended Complaint

Defendants moved to dismiss Suarez's Amended Complaint on October 31, 2018. *See* Dkt. 58. The Court granted the motion.[2] MTD Op., at 31. In a thorough opinion, the Court ruled that Suarez had not adequately alleged a violation of the AKS in light of extensive agency guidance permitting drug manufacturers to offer product-support services. *Id.* at 10-19. The Court held that Suarez failed to show the Ambassador Program offered non-Humira goods or services or saved doctors money they otherwise would have spent. *Id.* at 11-19. The Court also held that Suarez did not plead his claims with particularity, much less the particularity required to state a claim for nationwide fraud. *Id.* 19-25. And it determined that Suarez had not alleged that AbbVie acted with the necessary scienter, *id.* at 25-28, or stated a claim for conspiracy, a reverse-FCA violation, or any violation of other federal and state laws. *Id.* at 29-30 & n.10. The Court gave Suarez leave to amend most of his claims, but dismissed Count IV (the reverse-FCA claim) and Count XXIV (the New Hampshire claim) with prejudice. *Id.* at 30-31 & n.10.

---

[2]     Just a few months earlier, two other district courts dismissed FCA lawsuits against AbbVie that also involved the Ambassador Program at the pleading stage. *See U.S. ex rel. LaFauci v. AbbVie Inc.*, 2019 WL 1450791 (D.N.J. Apr. 2, 2019); *U.S. ex rel. Miller v. AbbVie Inc.*, No. 3:16-cv-02111, Dkt. 60 (N.D. Tex. May 9, 2019).

B.     **Suarez's Second Amended Complaint**

On November 26, 2019, Suarez filed a Second Amended Complaint, adding dozens of paragraphs of new allegations and revising or deleting several others.  The new complaint rehashes and expands his prior allegations that AbbVie sought to conceal its "true motive" in enacting the Ambassador Program, *e.g. id.* ¶¶ 1-2, 8, 65-67 77-82, 88-89, 92, 100-02, 179, 185-89; quotes generic statistics and industry data about the costs of running a medical practice, *e.g. id.* ¶¶ 5-6, 55-64; alleges that Suarez engaged in activities outside of Florida while serving as an Ambassador, *e.g. id.* ¶¶ 19, 162-70; and provides sparse anecdotes about mostly nameless doctors and patients who allegedly encountered or praised the Ambassador Program, *e.g. id.* ¶¶ 152-60; *cf. id.* ¶¶ 68-71, 116, 118, 121-22, 141.

Notably, the revised complaint does ***not***:

- allege that Ambassadors provide any services unrelated to Humira, *see* MTD Op., at 13-14;

- allege that Ambassadors relieve healthcare providers of costs they would "otherwise incur[]" but for their decision to prescribe Humira, *id.* at 15;

- allege that any particular doctors reduced their expenses or downsized their staff as a result of Ambassadors' support services, *id.* at 18-19;

- allege with particularity the "who, what, when, and how" of occasions where a specific doctor prescribed Humira to a specific patient in exchange for a kickback, causing a government healthcare program to actually reimburse the prescription, *id.* at 9, 19-25;

- allege that Suarez lacks access to claim information, *id.* at 23;

- allege with specificity that AbbVie's purported fraud took place in 30 states and the District of Columbia, *id.* at 24-25;

- allege facts supporting an inference that AbbVie thought the Ambassador Program was impermissible, *id.* at 25-27;

- allege facts supporting an inference that AbbVie implemented the Ambassador Program with knowledge of wrongdoing, *id.* at 27-28; or

- allege services provided through the Ambassador Program that were not publicly disclosed on AbbVie's websites. *See id.* at 28.

## LEGAL STANDARD

To avoid dismissal under Rule 12(b)(6), Suarez must plead "sufficient factual information to state a claim to relief that is plausible on its face." *Berkowitz*, 896 F.3d at 839. In other words, he must allege "more than a sheer possibility that [AbbVie] has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Additionally, because he alleges fraud under the FCA and AKS, Suarez must plead his claims with particularity under Rule 9(b). *Berkowitz*, 896 F.3d at 839. The Court must therefore dismiss all counts unless the complaint includes, at minimum, "the 'who, what, when, where, and how' of the fraud." *Id.*

## ARGUMENT

Suarez's new complaint is just as flawed as its predecessor. *First*, Suarez still does not allege an unlawful kickback, and his new assertions only confirm that the Ambassador Program complied with settled interpretations of the AKS that permit patient support programs. This alone dooms the complaint. *Second*, and independently, Suarez does not plead his claims with the particularity Rule 9(b) requires. *Third*, the complaint does not allege AKS or FCA scienter. *Fourth*, the public-disclosure bar requires dismissal, as AbbVie widely advertised the very same conduct that Suarez now says is illegal. *Fifth*, the complaint's bare-bones allegations still do not state a violation of federal marketing rules or state-law analogues to the FCA. In light of these persistent defects, dismissal with prejudice is warranted.

## I. SUAREZ DOES NOT ALLEGE A FALSE CLAIM.

Suarez's theory here is the same as before: that AbbVie violated the AKS when it implemented the Ambassador Program to assist Humira patients, and that this purported violation tainted claims for the drug. *See* SAC ¶¶ 11, 23. But just as before, nothing in Suarez's new

complaint shows that the Program offered unlawful "remuneration" under the AKS. 42 U.S.C. § 1320a-7b(b); *see also* MTD Op., at 10-19. As this Court correctly ruled, the law is clear that patient support programs are permissible when they offer "only the provision of [drug]-related services" and do not confer substantial "independent value" on physicians by eliminating expenses they would have "otherwise incurred" but for the drug. MTD Op., at 14-15; *Forney*, 2017 WL 2653568, at *4. Everything in the complaint again shows that "AbbVie provided these exact type of support services—and no others." MTD Op., at 15. In fact, Suarez admits at the outset that the Program kicks in "[i]f, *and only if*, a doctor chooses to prescribe Humira" and that he "worked exclusively in connection with … Humira." SAC at ¶¶ 3, 17.

Consistent governmental guidance establishes that AbbVie was entitled to offer goods and services integrally related to Humira that provided no substantial value untethered from the medication. *See* 78 Fed. Reg. 79202, 79210 (Dec. 27, 2013) ("We have long distinguished between free items and services that are integrally related to the offering provider's or supplier's services and those that are not."); 68 Fed. Reg. at 23735 ("Standing alone, services that have no substantial independent value to the purchaser may not implicate the [AKS]."). Indeed, the government has identified several examples of acceptable products and services, all of which are similar or even identical to those Suarez alleges here. *E.g.* 78 Fed. Reg. at 79210 (computers that "could be used only … to print out test results produced by the laboratory company"); 68 Fed. Reg. at 23735 ("billing assistance tailored to the purchased products, reimbursement consultation, and other programs specifically tied to the purchased product"); OIG Adv. Op. No. 00-10 (Dec. 15, 2000) (acting as a "clearinghouse for information" on insurance and reimbursement); 70 Fed.

Reg. 70623-03 (Nov. 22, 2005) (free drugs to needy patients).[3]  And in recent *qui tam* lawsuits

like this one, the government has reiterated its "strong interest in ensuring that patients have access

to basic product support"—an objective that numerous courts have credited.  *U.S. ex rel. NHCA-*

*TEV, LLC v. Teva Pharm. Prods. Ltd.*, 2019 WL 6327207, at *3-5 (E.D. Pa. Nov. 26, 2019);[4] *cf.*

MTD Op., at 16 ("The United States has expressed concerns similar to this court's …."); Oral

Argument at 46:15, *U.S. ex rel. CIMZNHCA, LLC v. UCB, Inc.*, No. 19-2273 (7th Cir., Jan. 23,

2020)[5] (government counsel explaining that "the United States has made a determination that it is

not in the interest of the public that this whole industry be dragged through years of litigation based

on practices that the United States has determined don't set out an articulable violation of the

[AKS]").

     Here, Suarez's complaint again identifies only patient support services that were integrally

related to helping patients use Humira and that offered no substantial independent value.  For

example, he claims that Ambassadors were tasked with "fulfilling the Humira prescription and

answering patient questions about it," "making sure the patient has access to reimbursement or, as

needed, free drugs," "advis[ing] patients on ways in which to limit adverse events at injection

---

[3]    *See also* OIG Adv. Ops. No. 12-10 (Aug. 23, 2012) ("free insurance pre-authorization services"), No. 06-03 (Apr. 18, 2006) (patient assistance programs), No. 06-14 (Sept. 21, 2006) (same), No. 06-19 (Oct. 26, 2006) (same), No. 06-21 (Nov. 2, 2006) (same).

[4]    *Accord United States v. EMD Serono, Inc.*, 370 F. Supp. 3d 483, 489-90 (E.D. Pa. 2019); *U.S. ex rel. SCEF, LLC v. AstraZeneca, Inc.*, 2019 WL 5725182, at *2-3 (W.D. Wash. Nov. 5, 2019); *cf.* Mem. of Law in Support of U.S.'s Mot. to Dismiss Relator's First Am. Compl. at 15-16, *U.S. ex rel. NHCA-TEV, LLC v. Teva Pharm. Prods. Ltd.*, No. 2:17-cv-2040-JD (E.D. Pa. Dec. 17, 2018), Dkt. 30 (emphasizing the government's "strong interest in … patients hav[ing] access to basic product support relating to their medication, such as … instructions on how to properly inject or store their medication").

[5]    Available at http://media.ca7.uscourts.gov/sound/external/pnr.19-2273.19-2273_01_23_2020.mp3 (last accessed January 26, 2020).  *See also id.* at 45:32 (government counsel explaining that "part of the education is to allow patients to inject themselves with their drug which obviously … is good for the patients … [and] also saves the United States … Medicare costs").

sites," and "discuss[ing] with patients their backgrounds and related diagnoses." SAC ¶¶ 118-22. Indeed, the new allegations ostensibly aimed at overcoming the original pleading defects—those describing "representative cases" of Ambassador assistance—*solely concern Humira-related work*. *See id.* ¶¶ 153-60 (discussing cases involving "injection training," "obtain[ing] assistance … during the Medicare coverage gap," and "securing … coverage for [a] Humira prescription"). And although the complaint reiterates the conclusory allegation that the Ambassador Program saved doctors "time and money they (or their staff) would otherwise have [had] to spend on patient care and administration," *id.* ¶ 68, those alleged savings still just concern Humira-related costs, *e.g. id.* ¶¶ 6, 68 (noting "communications with patients in response to questions about their treatment and disease states"); 152-60 (describing only Humira-related services in the "representative" examples). As this Court has already explained, the notion that "free product support or reimbursement support services could violate the AKS merely because [they] save[] physicians money … appears inconsistent with [the government] guidance" that *permits* assistance programs specifically tailored to particular drugs. MTD Op., at 18. Here, everything about the Ambassador Program was specifically tailored to Humira, as Suarez's allegations recognize.

Crucially, Suarez cites no facts showing that, in the absence of a Humira prescription, physicians would have *otherwise* needed to perform the patient support tasks Ambassadors fulfilled. Nor can he, since by Suarez's own allegations Ambassadors provided exclusively Humira-related support that addressed the special challenges that the medication presents. Indeed, the complaint highlights this flaw when it admits that Humira imposes "particularly prevalent" costs "given that Humira (and Humira patients) typically require significant non-billable support due to chronic disease states, concerns about side effects, and the need to learn and manage self-injections." SAC ¶ 6; *see also id.* ¶ 59 (admitting that "Humira is particularly challenging for

11

doctors"). According to the complaint, the tasks Ambassadors perform are unique to Humira and thus not something physicians would need to do if they did not prescribe it.

So too for the Humira-related goods Suarez takes issue with—the same items he identified in his prior complaint: "Talking Training Pens" that teach patients "how to inject themselves," "Humira travel kits" to "enable patients to travel with Humira," computer "terminals" that were "dedicated" to Humira, "preprinted Prior Authorization and other benefit forms," and "free dosages of Humira." *Compare id.* ¶¶ 6, 108-10, 144, *with* MTD Op., at 7, 11-12 (noting the same items). All of these products necessarily go hand-in-hand with Humira itself, so Suarez must again "concede[] the point" that AbbVie was entitled to support its product and patients with these items. MTD Op., at 12.

Finally, "[e]ven assuming that offering free product support or reimbursement support services could violate the AKS"—and it cannot—Suarez still has not "ple[d] with the particularity required by Rule 9(b)" that physicians actually saved money. *Id.* at 18. Although Suarez now theorizes that the Ambassador Program surely must have reduced pressures on busy medical practices, *see* SAC ¶¶ 161, his complaint never offers the "who, what, when, where, and how" of specific financial benefits, *Berkowitz*, 896 F.3d at 839 (citation and quotation marks omitted). For example, Suarez adds some general statistics about "estimated" and "average" administrative costs, but he never links this high-level data to actual doctors—let alone to doctors who prescribed Humira or had any association with the Ambassador Program. *See* SAC ¶¶ 5, 55-64 & nn.4-12. In fact, when the complaint later names a handful of doctors who supposedly were affiliated with the Program, it says nothing at all about how they benefitted financially. *E.g. id.* ¶¶ 75-76, 97, 99, 111; *compare* MTD Op., at 18 (recognizing Suarez had "name[d] doctors" but failed to provide sufficiently particular information). Suarez even admits that he "cannot state the amounts paid by

[the 'representative'] physicians for administrative work." SAC ¶ 161. Nor does he allege with particularity that doctors would have *actually* performed the same Humira-support services offered by Ambassadors, and so the complaint fails to show that the Ambassador Program had any impact on physicians in the first place. Thus, Suarez still lacks the necessary concrete examples showing that doctors "reduced their expenses or downsized their own staff as a result of Ambassadors' support services." MTD Op., at 18.

In the end, Suarez simply has doubled down on his earlier allegations that AbbVie provided support services tied to Humira, "and no others." *Id.* at 15. These services are "integrally related" to Humira and confer no "substantial independent value" on doctors, and are thus perfectly lawful under longstanding interpretations of the AKS. *Id.* at 11-13. As courts and the government recognize, they are not improper remuneration but rather essential to the government's "strong interest" in improving patient-care. *NHCA-TEV*, 2019 WL 6327207, at *3 (citation omitted). With no particular allegations that AbbVie provided anything more than Humira-related assistance, Suarez's claims fail again as a matter of law.

## II.     THE COMPLAINT LACKS THE REQUIRED PARTICULARITY.

The complaint still also fails to satisfy Rule 9(b)'s heightened pleading standard. Rule 9(b) requires relators to "allege either that the [defendant] submitted a claim to [the government] on behalf of a specific patient who had received a kickback, or at least name a … patient who had received a kickback." *U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1107 (7th Cir. 2014); *see also* MTD Op., at 19 (requiring Suarez to "link specific allegations of fraud or deceit—in this case, kickbacks—to claims for government payment"). In other words, a relator must "allege … specific facts demonstrating what occurred at the individualized transactional level." *Berkowitz*, 896 F.3d at 841.

13

Like last time, Suarez does not sufficiently "allege that a claim was submitted to a government health care program for any … patient" "for whom a doctor prescribed Humira in exchange for a kickback." MTD Op., at 20. Although he tacks on a few allegedly "representative" examples about unnamed patients, *see* SAC ¶¶ 152-60, these thin allegations still "plainly fall short of pleading fraud under Rule 9(b)," *U.S. ex rel. Dolan v. Long Grove Manor, Inc.*, 2014 WL 3583980, at *5 (N.D. Ill. July 18, 2014) (rejecting complaint that cited specific patients because allegations left open several "questions" about the treatment of these patients and the resulting claims). For example, Suarez's few allegations that actually name a doctor say that the patient received assistance from *AbbVie's* Patient Assistance Foundation—not funding from the *government*. *See* SAC ¶¶ 154-56. The other allegations implicating Medicare do not name the physicians who supposedly were influenced by the Ambassador Program. *E.g. id.* ¶¶ 153, 157-60. Nor do they show that the Ambassador Program was what caused doctors to write Humira prescriptions. On the contrary, the "examples" merely show that Ambassadors' accomplishments prompted physicians who were *already* prescribing Humira to use *the Ambassador Program*—not the reverse, as Suarez's theory suggests. *E.g. id.* ¶¶ 154-56 (noting that a doctor "continued to write Humira prescriptions"), 157-58 (alleging that Suarez's services overcame an already-prescribing doctor's "reluctan[ce] to use the Ambassador Program"). Thus, he still has not "name[d] a specific patient for whom a doctor prescribed Humira *in exchange for* a kickback." MTD Op., at 20 (emphasis added). Without more, Suarez cannot show fraud "at the individualized transactional level." *Berkowitz*, 896 F.3d at 841.

Nor can Suarez avail himself of a relaxed particularity standard. As this Court already explained, Suarez must do two things to avoid Rule 9(b)'s usual requirements: "allege[] that he

lack[s] access to claim information," and "allege[] facts *necessarily* le[ading] to the conclusion that [AbbVie] presented claims to the Government." MTD Op., at 22-23. He does neither.

*First*, Suarez does not alleged a lack of access to "claim information." *Id.* at 23. Although he halfheartedly requests discovery on "the amounts paid by [the 'representative'] *physicians* for administrative work and staffing support," SAC ¶ 161 (emphasis added), that is very different from alleging that he lacks access to information about claims presented to or paid *by the government*— the party-in-interest in this suit, *see* MTD Op., at 22-23. This omission alone is dispositive.

*Second*, Suarez's allegations do not "necessarily" imply the submission of false claims. *Id.* The substance of his complaint is a hodgepodge of lawful patient support activities and general statistical information about physician expenses—a far cry from the sort of detailed information courts have held sufficient in other cases. *E.g. id.* at 22-24 (collecting and distinguishing cases in which relators alleged far more information). Suarez's amended allegations therefore still "just as easily allow for an inference that doctors prescribed Humira ... because they thought the drug was medically necessary," and not because AbbVie offered anything of independent value. *Id.* at 23-24. Nothing demands the conclusion that AbbVie submitted a claim to the government in a case where it also violated the AKS.

Independently, even if the complaint were sufficiently particular with respect to the identified patients—and it is not—those discrete allegations still would not state a claim for *nationwide* fraud. *See id.* at 24-25; *Forney*, 2017 WL 2653568, at *5 ("[B]lanket allegations of a nationwide scheme do not meet the particularity requirement of Rule 9(b)."); *cf. Grenadyor*, 772 F.3d at 1108 (noting relator pled information concerning just two out of seven states). At most, Suarez's allegations about patients mention six states. *See* SAC ¶¶ 153 (Florida), 159 (Alaska, Arizona, Washington), 168 (Massachusetts and North Carolina). And those that pertain to any

state aside from Florida are exceptionally vague. *E.g. id.* ¶¶ 159 (noting an Arizona patient was "originally from Alaska" and "had been flying … to Seattle, Washington to see a dermatologist"), 168 (mentioning only that Suarez "assisted" with patients in Massachusetts and North Carolina). Nor do his passing references to AbbVie employees and events in few other states amount to particularized allegations of unlawful activity in those locations. *E.g. id.* ¶¶ 163-70. Once again, Suarez's general assertions about the Ambassador Program's nationwide reach cannot support the "infer[ence] … that the alleged fraud took place in [29] states and the District of Columbia." MTD Op., at 25 (rejecting Suarez's allegations about "national sales meetings" and the "'Operation Dakota' initiative" as insufficient).

## III.    SUAREZ STILL DOES NOT ALLEGE SCIENTER.

To state an AKS-based FCA claim, a relator must allege the defendant acted with the scienter necessary to violate both statutes. Suarez fails to do so for two reasons. *First*, under the AKS, he again pleads no facts showing that AbbVie acted "knowingly and willfully," 42 U.S.C. § 1320a-7b(b)(2)—*i.e.*, "'kn[e]w that [its] conduct was in some way unlawful,'" *United States v. Williams*, 218 F. Supp. 3d 730, 736 (N.D. Ill. 2016) (quoting *United States v. Wheeler*, 540 F.3d 683, 690 (7th Cir. 2008)); *see also id.* at 740-41 (rejecting a vagueness challenge because the AKS's "high scienter requirement" demands that the defendant have "knowledge that the act is unlawful"); *United States v. Patel*, 17 F. Supp. 3d 814, 824 (N.D. Ill. 2014), *aff'd*, 778 F.3d 607 (7th Cir. 2015). Second, and independently, AbbVie cannot be liable under the FCA for "knowingly" submitting a false claim because it acted under an objectively reasonable interpretation of the AKS, defeating scienter as a matter of law. *See U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 284, 287-88 (D.C. Cir. 2015).

16

### A.      Suarez Fails to Allege AbbVie Knowingly and Willfully Violated the AKS

Nothing in the complaint shows that AbbVie "intended to engage in conduct that [it] knew was wrongful." MTD Op., at 25 (quoting *Patel*, 17 F. Supp. 3d at 824). As this Court has explained, it is Suarez's "burden … to allege facts supporting an inference that AbbVie thought the Ambassador Program was *impermissible*." *Id.* at 26; *see also U.S. ex rel. Young v. Suburban Home Physicians*, 2017 WL 6625940, at *3 (N.D. Ill. Dec. 28, 2017) (dismissing an AKS complaint because the relators did not "plead … facts supporting the inference that defendants knew their conduct was wrongful"). He has not done so. The complaint points to no statements or documents showing that AbbVie believed the Ambassador Program was unlawful. *E.g. Forney*, 2017 WL 2653568, at *5 (noting that the relator failed to allege that any "employee knew that providing free services violated the AKS or that the providers [the defendant] serviced would submit false claims"). Moreover, given that this Court has already recognized that extensive agency "guidance [permits] a pharmaceutical company [to] provide product and reimbursement support services," it is implausible to say that AbbVie knowingly and willfully violated the law. MTD Op., at 26; *see also Young*, 2017 WL 6625940, at *3 (refusing to "impute … knowledge to [the d]efendant" when the complaint failed to show that the alleged "conduct was wrongful"). Were there any doubt whatsoever, AbbVie's decision to publicly promote the allegedly improper features of the Ambassador Program on its website belies any possible inference of scienter. *See* MTD Op., at 27. Likewise, Suarez's allegations that AbbVie openly operated a vast, nationwide network of Ambassadors and helped countless patients in a highly regulated industry cannot be squared with the conclusion that AbbVie knew that its conduct was wrongful. *See* SAC ¶¶ 162-170.

Suarez's response is to reiterate and expand his allegations that AbbVie's efforts to disguise the "true nature of the Ambassador Program" are evidence of a guilty mind. MTD Op., at 8, 26;

*see also id.* at 4 (noting allegations that "[t]he program's true goal … is not patient education and support"); *compare* First Am. Compl. (Dkt. 20) ¶¶ 52, 54-55, 57-60, 67-68, 71-72, 77, 86-87, 98-100 119-21, 124-25, 131-37 (alleging that AbbVie had a profit motive, downplayed Ambassadors' medical functions, and instructed Ambassadors not to document their activities), *with* SAC ¶¶ 2, 8, 65-67 77-84, 88-93, 100-07, 133-36, 179, 185-89 (similar).  But he still has cited nothing that connects "the alleged cover-up efforts" to specific unlawful activities, as this Court said he must to state a claim.  MTD Op., at 26-27.  Nor does the complaint add anything that responds to this Court's earlier recognition that "AbbVie's Humira website dispels any inference that AbbVie was trying to conceal the services that [Suarez] contends violated the AKS."  *Id.* at 24; *see also* Ex. B[6] (offering "help with injections, … co-pay savings, … on-call nurse support, and more"); Ex. A (indicating that patients could receive "[i]n-person injection training … from a registered nurse in [their] home, office, or clinic," as well as "Injection Training Kit[s]" and "On-the-Go Kit[s]"—all "at no additional cost").  In light of these open disclosures, Suarez cannot allege a knowing violation of the AKS.

### B. Suarez's Complaint Also Fails to Satisfy the FCA's Objective Scienter Requirement

Suarez cannot allege the scienter necessary under the FCA either.  To violate the FCA, a person must "knowingly present[] … a false or fraudulent claim" to the government.  *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 1999 (2016) (citation omitted).  Courts assess that "rigorous" scienter requirement, *id.* at 2002, under an "objective knowledge standard," *Purcell*, 807 F.3d at 284, 290.  Where "the statutory text and relevant court and agency guidance

---

[6]    Humira.com, *Sign Up for myHUMIRA Savings & Resources*, https://web.archive.org/web/20150905130354/https://www.humira.com/my-humira/sign-up (captured Sept. 5, 2015; last accessed Jan. 22, 2020).

allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a knowing or reckless violator." S*afeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 69-70 & n.20 (2007).[7]  A defendant thus cannot "knowingly" submit a false claim unless the applicable rules clearly prohibited payment.  *Purcell*, 807 F.3d at 287-288 ("[T]he FCA does not reach … claims made based on reasonable but erroneous interpretations of a defendant's legal obligations." (quotation marks omitted)).

Objective reasonableness is a pure question of law for the Court.  *Safeco*, 551 U.S. at 69-70 & n.20; *Purcell*, 807 F.3d at 288.  If the defendant's understanding of the law was objectively reasonable, then the Court must dismiss unless the relator adequately alleges the defendant "had the benefit of guidance from the courts of appeals or the [relevant agency] that might have warned it away from the view it took." *Safeco*, 551 U.S. at 70 & n.20; *see also U.S. ex rel. Streck v. Allergan, Inc.*, 746 F. App'x 101, 110 (3d Cir. 2018) (affirming dismissal of an FCA claim where the defendants' interpretation of an ambiguous statute was objectively reasonable, and the relator did not adequately plead the defendants were warned away from their interpretation); *Hixson*, 613 F.3d at 1190 (affirming dismissal and holding that "a statement that a defendant makes based on a reasonable interpretation of a statute cannot support a claim under the FCA if there is no authoritative contrary interpretation of that statute").

---

[7]   Every court of appeals to consider the issue has concluded *Safeco*'s scienter standard applies equally to the FCA.  *See Purcell*, 807 F.3d at 290-91; *U.S. ex rel. Donegan v. Anesthesia Assocs. of Kansas City, PC*, 833 F.3d 874, 879-80 (8th Cir. 2016); *U.S. ex rel. McGrath v. Microsemi Corp.*, 690 F. App'x 551, 552 (9th Cir. 2017); *U.S. ex rel. Streck v. Allergan, Inc.*, 746 F. App'x 101, 106 (3d Cir. 2018).  A court in this district likewise recently applied *Safeco* to the FCA.  *See U.S. ex rel. Streck v. Takeda Pharm. Am., Inc.*, 381 F. Supp. 3d 932, 938-40 (N.D. Ill. 2019) (applied *Safeco* to the FCA but denied motion to dismiss in light of longstanding government guidance "sufficient to have warned defendants away" from their interpretation of the law).

19

These principles require dismissal here. As this Court recognized, Suarez's "allegations do not support an inference that AbbVie acted with actual knowledge of wrongdoing," MTD Op., at 28, and he has added nothing to cure that defect. Nor can Suarez plausibly show a reckless violation under *Safeco*'s objective standard. *See Purcell*, 807 F.3d at 284, 290. Given agency guidance on patient support programs, AbbVie's position that the Ambassador Program is lawful and appropriate is reasonable as a matter of law; the AKS and relevant guidance expressly permit the support services AbbVie provides for Humira. *See supra*, I (collecting authorities). At worst, that question is subject to more than one reasonable interpretation. Accordingly, Suarez cannot possibly "show that there is no reasonable interpretation of the [AKS] that would make the allegedly false statement true." *Hixson*, 613 F.3d at 1191. Nor do Suarez's allegations identify any authoritative agency guidance or court of appeals opinion that could have warned AbbVie away from its view that its services were permissible. That defeats scienter under the FCA as a matter of law. *E.g.*, *Streck*, 746 F. App'x at 110 (affirming dismissal because defendants' interpretation of agency guidance was reasonable); *Purcell*, 807 F.3d at 291 (same); *Hixson*, 613 F.3d at 1190-91 (same).

## IV.    THE PUBLIC DISCLOSURE BAR REQUIRES DISMISSAL.

The FCA's public disclosure bar requires a court to "dismiss an [FCA] action … if substantially the same allegations or transactions … were publicly disclosed" unless "the person bringing the action is an original source of the information." 31 U.S.C. § 3730(4)(A). Congress enacted this bar "to strike a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits." *Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 294-95 (2010). As Congress recognized, "where a public disclosure has occurred, the relevant governmental authority is already in a position to vindicate society's interests, and a

*qui tam* action would serve no purpose." *Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 716 (7th Cir. 2017) (brackets and citation omitted).

When, as here, the government declines to intervene in an FCA action, the public disclosure bar requires dismissal of any suit involving "allegations … [that] have been 'publicly disclosed' through one of the [statute's] enumerated channels" if that suit is "'based upon,' *i.e.*, 'substantially similar to,'" information that has already been made public. *Cause of Action*, 815 F.3d at 274; 31 U.S.C. § 3730(e)(4)(A).[8] "A *qui tam* action *even partly based upon* publicly disclosed allegations or transactions … is nonetheless based upon such allegations or transactions." *Cause of Action*, 815 F.3d at 282 (emphasis added). When the public disclosure bar is triggered, a relator cannot proceed unless he has "knowledge that is independent of and materially adds" to the public disclosures. 31 U.S.C. § 3730(e)(4)(B)(2). Thus, a relator must do more than "merely 'add[] details' to what is already known in outline." *U.S. ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 370 (7th Cir. 2016) (citation omitted); *see also Bellevue*, 867 F.3d at 721 (relator whose "allegations [are] substantially similar to … publicly disclosed allegations" does not "materially add to the public disclosure" and cannot be "an original source" (quotation marks omitted)).

Here, the facts underlying the alleged fraud were disclosed through a variety of publicly accessible sources, including AbbVie-created websites, and Suarez has not (and cannot) establish himself as an "original source" of that information.

---

[8]   In 2010, Congress amended the public disclosure bar, changing the trigger from whether a relator's allegations are "based upon" public disclosures to whether allegations are "substantially the same" as the public disclosures. *See* Pub. L. No. 111-148, 124 Stat. 119, 901, § 10104(j)(2) (Mar. 23, 2010). This amendment did not materially alter the applicable standard. *See Bellevue*, 867 F.3d at 718 (noting that "this change [was] not significant" and "incorporate[d]" prior judicial interpretations). The amendment also modified the definition of "original source," but this was also "a clarification rather than a substantive change." *Id.*

### A. Suarez's Allegations Were Publicly Disclosed

"[T]he purpose of a public disclosure is to alert the responsible authority that fraud may be afoot." *Cause of Action*, 815 F.3d at 275 (citation omitted). To qualify as a public disclosure, "the relevant information" must have been "placed in the public domain" and must contain "the critical elements exposing the transaction as fraudulent." *Bellevue*, 867 F.3d at 718 (citation omitted); *see also Bogina*, 809 F.3d at 370 (holding information was publicly disclosed where "[t]he government was … on notice of the possibility of a broader bribe-kickback scheme before [the relator] sued"). A public disclosure can occur through any of the sources listed in the statute, including through the "news media," 31 U.S.C. § 3730(e)(4)(A)(iii)—a term that has a "broad sweep," *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 408 (2011) (brackets omitted). Courts thus uniformly hold that "publicly available websites," like AbbVie's, "qualify as 'news media' for purposes of the public-disclosure provision." *U.S. ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 813 (11th Cir. 2015); *accord U.S. ex rel. Beauchamp v. Academi Training Ctr.*, 816 F.3d 37, 43 n.6 (4th Cir. 2016) ("Courts have unanimously construed the term 'public disclosure' to include websites and online articles."); *see also Cause of Action*, 815 F.3d at 274 ("[M]aterial is in the public domain when the information is open or manifest to the public at large.").

Here, Suarez alleges that AbbVie's Ambassador Program—through which he alleges that registered nurses assisted patients with administering their injections and managing their insurance claims—induced doctors to prescribe Humira, and that these services were therefore kickbacks, rendering false resulting claims for reimbursement. SAC ¶¶ 1-7, 68-69, 72, 75, 84, 118, 173-74. Even if these allegations had merit—and they do not—the public disclosure bar requires their dismissal because the "facts … providing a basis for [Suarez's] inference that fraud has been committed" were already "open or manifest to the public at large." *Cause of Action*, 815 F.3d at 274, 278 (citation omitted).

Information about the alleged features of the Ambassador Program was readily available on publicly available websites well before Suarez sued in October 2015. He alleges, for instance, that Ambassadors were tasked with "fulfilling the Humira prescription and answering patient questions about it," "making sure the patient has access to reimbursement or, as needed, free drugs," and "advis[ing] patients on ways in which to limit adverse events at injection sites." SAC ¶¶ 118-22. But these features of the Ambassador Program were already set forth in detail on AbbVie-created websites. AbbVie's patient-facing website for Humira, humira.com, advised: "HUMIRA offers resources to help you with your treatment plan from the very start. *From help with injections, to co-pay savings, to on-call nurse support*, and more, you can choose the services and tools that are most useful to you." Ex. B. The same website indicated that patients could receive "[i]n-person injection training … from a registered nurse in [their] home, office, or clinic." Ex. A. Humira's website for medical professionals, humirapro.com, similarly stated that patients could avail themselves of "Nurse Injection Training" including "in person" or "at home." Ex. C[9]; *compare* SAC ¶¶ 68-69, 118-22, 153-60 (describing Ambassador-patient interactions).

Other supposedly fraudulent features of the Ambassador Program were also described on the Internet before Suarez filed his complaint. Setting aside the accuracy of these postings, the mere fact that they existed constitutes a public disclosure. One participant on an internet message board (pseudonym "exposure_therapy"), for instance, wrote in January 2014: "[M]y Humira rep … came to my apartment, . . . *help[ed] me to sort out my insurance coverage[]*, and taught me

---

[9]    Humirapro.com, *Designed to help support your patients with their HUMIRA treatment plan*, https://web.archive.org/web/20150929183503/http://www.humirapro.com:80/Utility/ MyHumiraPatient.aspx (captured Sept. 29, 2015; last accessed Jan. 22, 2020).

how to do the injection using a practice pen." Ex. D.[10]  Another participant on the same site (pseudonym "aydyl") reflected: "I still call [my Nurse Ambassador] every other day when I'm not feeling well because she *comunicates [sic] with my doctor*." *Id.* (emphasis added).  A different website also described the program in April 2014, emphasizing "receiv[ing] [gratis] alcohol swabs, calendars and journals to track my injections and progress, a travel kit and ongoing support from [an Ambassador] anytime I have questions"—features that mirror Suarez's allegations here.  Ex. E.[11]  The poster added: "The best benefit is my co-pay was reduced for [sic] $50 to $5 since I was enrolled in an assistance program offered by Abbvie [sic]."  *Id.*  A February 2015 post also reviewed the Ambassador Program, noting that Ambassadors were responsible for providing training on "How HUMIRA works," "Proper injection techniques," "Helping patients … [with] rebate renewal or financial hardship sponsorships," and "Reporting side effects directly to AbbVie."  Ex. F.[12]  These public posts all concerned the *very same features* of the Ambassador Program on which Suarez focuses in his complaint.  *E.g.* SAC ¶¶ 68-69, 118-22, 153-60.

Not only were AbbVie's supposedly improper services publicly disclosed, but so were the "critical elements" necessary to draw Suarez's mistaken conclusion that these services unlawfully induced doctors to prescribe Humira.  *Bellevue*, 867 F.3d at 718.  In fact, one person did just that.  As early as August 2013, a website publicly asserted that the services offered under the

---

[10]  Reddit.com, *r/CrohnsDisease: My Humira ambassador program question* (Jan 9, 2014, 6:42 PM), https://www.reddit.com/r/CrohnsDisease/comments/1utmut/my_humira_ambassador_program_ question/ (emphasis added) (last accessed Jan. 22, 2020).

[11]  TalkPsoriasis, *Starting Humira very soon—need advice* (Apr. 18, 2014, 10:27 PM), https://www.inspire.com/groups/talk-psoriasis/discussion/starting-humira-very-soon-need-advice/ (last accessed Jan. 22, 2020).

[12]  Pretty Rotten Guts, *Exciting HUMIRA News* (Feb. 17, 2015, 12:19 AM), http://prettyrottenguts.tumblr.com/post/111252220435/humira-news-february-2015 (last accessed Jan. 22, 2020).

Ambassador Program constituted significant "incentives" and "in-kind" remuneration for busy doctors to prescribe Humira, thereby amounting to "huge gifts to the doctor." Ex. G[13]; *compare* SAC ¶¶ 3-7, 55-76, 171. "For a busy rheumatology or dermatology practice," the author continued, "this is like AbbVie providing two or three extra staff members free of charge. *It's hard to overestimate the incentive this provides for the practice to use Humira.*" *Compare* Ex. G (emphasis added), *with* SAC ¶¶ 3-7, 171; *see also* SAC ¶ 68 ("The Ambassador Program provides independent value to doctors who prescribe Humira because it saves them time and money they (or their staff) would otherwise have to spend on patient care and administration."). Suarez's complaint simply "parrot[s]" these public disclosures. *U.S. ex rel. Lisitza v. Par Pharm. Cos.*, 2017 WL 3531678, at *12 (N.D. Ill. Aug. 17, 2017).

### B. The Complaint Is Substantially Similar to the Publicly Disclosed Allegations

All of this makes clear that Suarez's complaint is "substantially similar to the publicly disclosed allegations." *Bellevue*, 867 F.3d at 719-20. "[S]everal factors" bear on this analysis, including whether Suarez "present[s] genuinely new and material information beyond what has been publicly disclosed"; whether he "allege[s] a different kind of deceit"; whether his "allegations require independent investigation and analysis to reveal any fraudulent behavior"; whether his "allegations involve an entirely different time period than the publicly disclosed allegations"; and whether he "supplied vital facts not in the public domain." *Id.* (citation and quotation marks omitted). None of these factors is present here.

For one, Suarez's "allegations pertain to the same entity … and describe the same allegedly fraudulent conduct … as the publicly disclosed information." *Cause of Action*, 815 F.3d at 282;

---

[13] Dr. David Healy, *Welcome to the Humiraverse* (Aug. 15, 2013), https://davidhealy.org/welcome-to-the-humiraverse/ (last accessed Jan. 22, 2020).

*accord Bellevue*, 867 F.3d at 719-20. Moreover, his complaint concerns the same practices and time period disclosed in the public allegations. *See* SAC ¶ 16 (alleging that Suarez worked as a Nurse Ambassador in 2013 and 2014, a time period covered by the public disclosures). The complaint also lacks allegations about AbbVie's patient support program that were not previously in the public domain. Because anyone with an internet connection would have had all the information necessary to draw the same flawed inferences and make the same flawed claims Suarez makes here, his complaint is "substantially similar" to the public disclosures, and the public disclosure bar requires dismissal. *See U.S. ex rel. Feingold v. AdminaStar Fed., Inc.*, 324 F.3d 492, 497 (7th Cir. 2003) ("Because [relator] points to no evidence upon which this suit depends that is not publicly disclosed, we hold that [he] has based this action on publicly disclosed documents …."); *U.S. ex rel. Solomon v. Lockheed Martin Corp.*, 878 F.3d 139, 145 (5th Cir. 2017) (holding a complaint is publicly disclosed if publicly available facts "could have been synthesized to form the same inference [relator] … alleges in his complaint").

## C. Suarez Is Not an Original Source of the Allegations

The Court must therefore dismiss Suarez's claims unless he can establish he is an "original source." *See* 31 U.S.C. § 3730(e)(4)(A). But a relator cannot become an "original source" simply by "recogniz[ing] the legal consequences" of publicly disclosed facts. *Prather v. AT&T, Inc.*, 847 F.3d 1097, 1105 (9th Cir. 2017). Rather, the relator's knowledge must be "independent" and "materially add[]" to the public disclosures. 31 U.S.C. § 3730(e)(4)(B)(2). Failure to satisfy either requirement requires dismissal. *See Bellevue*, 867 F.3d at 720-21 (declining to decide whether relator possessed independent knowledge because he did not satisfy the materiality requirement).

Suarez's complaint alleges nothing so "sufficiently significant or essential … as to fall into the narrow category of information that materially adds to what has already been revealed through public disclosures." *U.S. ex rel. Winkelman v. CVS Caremark Corp.*, 827 F.3d 201, 211 (1st Cir.

2016); *see also Bogina*, 809 F.3d at 370 (holding that a relator was not an original source where the difference between his allegations and public disclosures was "unimpressive"). The relevant patient support services—and Suarez's theory that these were incentives to doctors to prescribe Humira—were all publicly disclosed. Thus, even crediting Suarez's kickback theory, his complaint cannot "materially add to the public disclosures, which were already sufficient to give rise to an inference that [AbbVie was] providing illegal remuneration," however incorrect. *Osheroff*, 776 F.3d at 815; *accord Bellevue*, 867 F.3d at 721 (holding that the relator did not have independent knowledge because "he has not materially added to the publicly disclosed allegations") (alterations and quotation marks omitted); *Cause of Action*, 815 F.3d at 283 (same). Suarez thus cannot escape the public disclosure bar, and his claims must be dismissed.

## V.     SUAREZ'S ALTERNATIVE THEORIES DO NOT STATE A CLAIM.

The complaint reiterates two cursory theories in addition to its primary AKS-based claim: that AbbVie's supposed failure to comply with various pharmaceutical regulations resulted in the submission of false claims, and that AbbVie violated state-law analogues to the FCA. *See* SAC ¶¶ 33, 180; *see also* MTD Op., at 30 & n.10. Neither states a claim.

### A.     Pharmaceutical Regulations

Suarez's vague allegations about pharmaceutical laws do not allege an FCA violation. Once again, Suarez broadly asserts that AbbVie violated various federal drug-marketing rules. *See* SAC ¶¶ 33-35, 181; MTD Op., at 30 n.10. But "[v]iolating a regulation is not synonymous with filing a false claim." *Grenadyor*, 772 F.3d at 1107. Because the FCA is not "an all-purpose antifraud statute … or a vehicle for punishing garden-variety breaches of contract or regulatory violations," *Berkowitz*, 896 F.3d at 842 (citation omitted), "it is not enough to allege … that the [defendant] engaged in a practice that violated a federal regulation," *Grenadyor*, 772 F.3d at 1107. Rather, a relator must link the defendant's conduct to specific payment claims. *Id.*

27

At no point does the complaint make the required connection between its fleeting references to pharmaceutical laws and any specific requests for Humira reimbursement. *E.g.* SAC ¶¶ 33-35. Suarez never even alleges the details of these purported violations, much less links any purported misconduct to the submission of a false claim for reimbursement. Rule 9(b) demands much more. *See Grenadyor*, 772 F.3d at 1107; MTD Op., at 19-20.

Independently, the complaint fails to allege that the supposed marketing violations were material to the government's decision to pay. "The materiality standard is demanding" and "rigorous," and it excludes "garden-variety breaches of contract or regulatory violations." *Escobar*, 136 S. Ct. at 2002-03. A relator must "plead[] facts to support allegations of materiality." *Id.* at 2004 n.6. Here, however, Suarez does not even try to explain why these vaguely alleged regulatory violations would impact reimbursement of Humira prescriptions. *See U.S. ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 490 (3d Cir. 2017) (affirming the dismissal of a complaint when "there [were] no factual allegations showing that [the government] would not have reimbursed the[] claims" if it had full knowledge of the defendant's conduct); *U.S. ex rel. Patel v. Catholic Health Initiatives*, 2019 WL 6208665, at *4 (5th Cir. Nov. 20, 2019) ("Nothing in Relators' filings suggests that the government would stop the flow of funds … if it knew the truth."); *see also United States v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016) ("[Relator] has offered no evidence that the government's decision to pay … would likely or actually have been different had it known of [the] alleged noncompliance."). The alleged regulatory violations are not actionable under the FCA, and these claims must be dismissed. *E.g.*, *U.S. ex rel. Ge v. Takeda Pharm. Co.,* 737 F.3d 116, 124 (1st Cir. 2013) ("Because FCA liability attaches only to false *claims*, merely alleging facts related to a defendant's alleged *misconduct* is not enough." (citations omitted)).

### B. State-Law Claims

The state-law claims are also meritless. As before, these claims are based on the same allegations as the federal claims, and so they fail for the same reasons. *E.g.*, *In re Plavix Mktg., Sales Practice & Prods. Liab. Litig. (No. II)*, 332 F. Supp. 3d 927, 960 (D.N.J. 2017) (dismissing claims under state false claims acts "[f]or the same reasons" as the claims under the federal FCA); *U.S. ex rel. Schneider v. J.P. Morgan Chase Bank, N.A.*, 224 F. Supp. 3d 48, 61 (D.D.C. 2016) (same), *aff'd*, 878 F.3d 309 (D.C. Cir. 2017); *cf.* MTD Op., at 30 (noting that Suarez previously "concede[d] that his claims for violations of state-law equivalents to the FCA rise and fall with his FCA claims"). Certainly nothing in the new complaint shows why the state-law claims should be treated any different from the federal ones. *See* SAC ¶ 32 (asserting "[s]tate laws have similar prohibitions"). Furthermore, Suarez does not allege any facts tying AbbVie's conduct to any Medicaid claim submitted in any state, let alone with the particularity Rule 9(b) requires. *See Forney*, 2017 WL 2653568, at *5; *U.S. ex rel. Ribik v. HCR ManorCare, Inc.*, 2017 WL 3471426, at *3 (E.D. Va. Aug. 10, 2017). In fact, Suarez only so much as mentions patients associated with just 4 of the 30 jurisdictions that he claims to represent, *e.g.* SAC ¶¶ 153 (Florida), 159 (Washington), 168 (North Carolina and Massachusetts), and these cursory examples fall well short of the particularity Rule 9(b) requires.[14]

### CONCLUSION

For all of these reasons, AbbVie respectfully requests that the Court dismiss the complaint with prejudice. Suarez has had multiple "opportunities to plead his claims," including after

---

[14] Some state-law claims also have substantive problems. For example, New Mexico limits relator standing to "affected person[s]" and requires the State to "determine[] that there is substantial evidence that a violation … has occurred." N.M. Stat. § 27-14-7(B), (E)(2). Suarez has not satisfied these requirements.

receiving guidance from this Court, but his theories still fail as a matter of law. *Grenadyor*, 772 F.3d at 1109 (affirming denial of leave to amend FCA complaint).

Dated: January 27, 2020

Respectfully submitted,

_/s/ Brenton A. Rogers_

Andrew A. Kassof, P.C.
Elizabeth S. Hess, P.C.
Brenton A. Rogers
Britt Cramer
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
akassof@kirkland.com
ehess@kirkland.com
brogers@kirkland.com
britt.cramer@kirkland.com
Telephone: 312-862-2000
Facsimile: 312-862-2200

*Counsel for Defendants*
*AbbVie Inc. and Abbott Laboratories*

## CERTIFICATE OF SERVICE

I hereby certify that on January 27, 2020, the foregoing was electronically filed with the Clerk of Court using the CM-ECF system which will send notification of such filing to all counsel of record.

*/s/ Brenton A. Rogers*
Brenton A. Rogers
