**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* LAZARO SUAREZ, and on behalf of the STATE OF CALIFORNIA, *et al.*, | |
| Plaintiff-Relator. | Case No. 1:15-cv-08928 |
| v. | Honorable Rebecca R. Pallmeyer |
| ABBVIE INC., | |
| Defendant. | |

**BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS RELATOR'S
SECOND AMENDED COMPLAINT**

1930845.9

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION .................................................................................................. 1

II.     RELEVANT FACTUAL BACKROUND.......................................................... 1

        A.    Prescribing Humira is Expensive and Resource-Intensive for Doctors................ 2

        B.    AbbVie Used the Ambassador Program to Eliminate Expenses and
              Encourage Doctors to Prescribe Humira........................................................ 3

        C.    AbbVie Sought to Legitimize the Program Under the Guise of "Patient
              Education." ................................................................................................ 4

        D.    As Relator Exposed, AbbVie Put Profits over Patients and Secretly Paid
              the Nurses Like Sales Reps........................................................................ 5

III.    PROCEDURAL HISTORY.................................................................................. 7

IV.     PLEADING STANDARD..................................................................................... 7

V.      ARGUMENT ........................................................................................................ 8

        A.    AbbVie May Not Provide "Anything of Value" to Encourage Doctors to
              Prescribe its Drug...................................................................................... 8

        B.    AbbVie Used its Own Personnel to Reduce Physicians' Expenses in
              Exchange for Prescribing Humira.............................................................. 9

              1.    AbbVie's Services Represent "Independent Value." ............................. 10

              2.    Abbvie's Cases and Authorities Are Distinguishable............................ 12

        C.    Relator Pled AbbVie's Kickback Scheme with Particularity. ............................ 14

              1.    The Complaint Puts AbbVie on Notice Using Detailed Examples. ........ 14

              2.    While He Has Already Done So, Relator Respectfully Submits that
                    He Need Not Identify a "Specific Patient" to State a Claim.................. 16

              3.    The Ambassador Kickback Scheme Operated Nationwide. ................... 18

        D.    Relator's Allegations Satisfy Scienter Pleading Requirements. ......................... 18

              1.    Pleading Standards For Scienter. ......................................................... 19

              2.    Relator Adequately Pleads Scienter....................................................... 19

              3.    AbbVie's Arguments Are Misplaced and Premature. ........................... 21

                    a.    AbbVie Seeks to Import an Overly High Standard For
                          Scienter. ................................................................................. 21

                    b.    AbbVie Misstates the Content and Significance of the
                          Selective OIG Guidance on Which it Relies.............................. 22

**TABLE OF CONTENTS**
**(continued)**

Page

E.   Relator is the First to Expose AbbVie's Marketing Kickback Scheme. .............. 24

1.   The Public Disclosure Bar. ....................................................... 24

2.   Relator's Allegations are Not "Substantially Similar" to AbbVie's Alleged Public Materials. ......................................................... 25

a.   Courts Apply "Substantial Similarity" Narrowly to Encourage Exposure of Fraud. .................................... 25

b.   AbbVie's Alleged Disclosures Do Not Expose its Fraudulent Scheme .................................................. 26

3.   Relator is an Original Source. ................................................. 28

a.   Relator is an Insider. .................................................. 28

b.   Relator Materially Adds to Any Public Allegations. ................... 29

F.   Relator Pled His State Law Claims Appropriately. ............................. 30

VI.   CONCLUSION .................................................................... 30

- ii -

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009).............................................................................................. 7

*Borsellino v. Goldman Sachs Grp., Inc.,*
   477 F.3d 502 (7th Cir. 2007) .............................................................................. 14

*Cause of Action v. Chicago Transit Auth.,*
   815 F.3d 267 (7th Cir. 2016) ....................................................................... 25, 29

*Dubicz v. Commonwealth Edison Co.,*
   377 F.3d 787 (7th Cir. 2004) .............................................................................. 30

*Flores v. Bd. of Trustees of Cmty. Coll. Dist. No. 508,*
   103 F. Supp. 3d 943 (N.D. Ill. 2015) ................................................................. 27

*Gen. Elec. Capital Corp. v. Lease Resolution Corp.,*
   128 F.3d 1074 (7th Cir. 1997) ............................................................................ 14

*Glaser v. Wound Care Consultants, Inc.,*
   570 F.3d 907 (7th Cir. 2009) .............................................................................. 24

*Goldberg v. Rush Univ. Med. Ctr.,*
   929 F. Supp. 2d 807 (N.D. Ill. 2013) ........................................................... 15, 17

*Guilfoile v. Shields,*
   913 F. 3d 178 (1st Cir. 2019)................................................................................ 9

*Halo Electronics, Inc. v. Pulse Electronics, Inc.,*
   136 S. Ct. 1923 (2016)........................................................................................ 22

*Health Choice Grp., LLC v. Bayer Corp.,*
   No. 5:17-CV-126-RWS-CMC, 2018 WL 3637381 (E.D. Tex. June 29, 2018) ..................... 13

*Leveski v. ITT Educ. Servs., Inc.,*
   719 F.3d 818 (7th Cir. 2013) ......................................................................... 28, 29

*Mason v. Medline Indus., Inc.,*
   731 F. Supp. 2d 730 (N.D. Ill. 2010) ................................................................. 20

*McCauley v. City of Chicago,*
   671 F.3d 611 (7th Cir. 2011) ................................................................................ 7

*People v. Guiamelon,*
   205 Cal. App. 4th 383 (2012) ............................................................................. 30

*Phone Recovery Servs., LLC v. Verizon Wash., D.C., Inc.,*
   191 A.3d 309 (D.C. 2018) .................................................................................. 26

- iii -

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*,
631 F.3d 436 (7th Cir. 2011) ................................................................. 7, 16, 17

*Purcell v. Gilead Scis., Inc.*,
No. CV 17-3523, 2020 WL 762473 (E.D. Pa. Feb. 13, 2020) ................................ 9

*Rockwell Int'l Corp. v. United States*,
549 U.S. 457 (2007) ................................................................................ 29

*U.S. ex rel. Baltazar v. Warden*,
635 F.3d 866 (7th Cir. 2011) ................................................................... 25

*U.S. ex rel. Banigan v. PharMerica, Inc.*,
No. 18-1487, 2020 WL 813258 (1st Cir. Feb. 19, 2020) ................................... 29

*U.S. ex rel. Bilotta v. Novartis Pharm. Corp.*,
50 F. Supp. 3d 497 (S.D.N.Y. 2014) ........................................................... 20

*U.S. ex rel. Bogina v. Medline Indus., Inc.*,
809 F.3d 365 (7th Cir. 2016) ................................................................... 24

*U.S. ex rel. Boise v. Cephalon, Inc.*,
No. CIV.A. 08-287, 2015 WL 1724572 (E.D. Pa. Apr. 15, 2015) ......................... 11

*U.S. ex rel. Brown v. Celgene Corp.*,
No. CV 10-3165-GHK SSX, 2014 WL 3605896 (C.D. Cal. July 10, 2014) ........... 30

*U.S. ex rel. Calilung v. Ormat Indus., Ltd.*,
No. 3:14-CV-00325-RCJ, 2015 WL 1321029 (D. Nev. Mar. 24, 2015) ................ 29

*U.S. ex rel. Chilcott v. KBR, Inc.*,
No. 09-CV-4018, 2013 WL 5781660 (C.D. Ill. Oct. 25, 2013) ............................ 23

*U.S. ex rel. Davis v. D.C.*,
679 F.3d 832 (D.C. Cir. 2012) ................................................................... 29

*U.S. ex rel. Derrick v. Roche Diagnostics Corp.*,
318 F. Supp. 3d 1106 (N.D. Ill. 2018) .................................................... 8, 9, 15

*U.S. Ex rel. Dolan v. Long Grove Manor, Inc.*,
No. 10 C 368, 2014 WL 3583980 (N.D. Ill. July 18, 2014) ............................... 17

*U.S. ex rel. Feingold v. AdminaStar Fed., Inc.*,
324 F.3d 492 (7th Cir. 2003) ................................................................... 27

*U.S. ex rel. Forney v. Medtronic*,
No. CV 15-6264, 2017 WL 2653568 (E.D. Pa. June 19, 2017) ...................... 12, 21

*U.S. ex rel. Gear v. Emergency Med. Assocs. of Ill.*,
No. 00 C 1046, 2004 WL 1433601 (N.D.Ill. June 25, 2004) .............................. 17

**TABLE OF AUTHORITIES**
**(continued)**

Page

*U.S. ex rel. Godecke v. Kinetic Concepts, Inc.*,
 937 F. 3d 1201 (9th Cir. 2019) ................................................. 19

*U.S. ex rel. Goldberg v. Rush University Medical Center*,
 680 F.3d 933 (7th Cir. 2012) ................................................. 26

*U.S. ex rel. Graziosi v. R1 RCM, Inc.*,
 No. 13-1194, 2019 WL 861368 (N.D. Ill. Feb. 22, 2019) .................................................. 26

*U.S. ex rel. Hartpence v. Kinetic Concepts, Inc.*,
 No. 08-1885, 2016 WL 8919455 (C.D. Cal. Nov. 16, 2016) ................................................. 28

*U.S. ex rel. Hawkins v. ManTech Int'l Corp.*,
 No. CV 15-2105 (ABJ), 2020 WL 435490 (D.D.C. Jan. 28, 2020) ...................................... 15

*U.S. ex rel. Heath v. Wisconsin Bell, Inc.*,
 760 F.3d 688 (7th Cir. 2014) ................................................. 26

*U.S. ex rel. Hixson v. Health Management Systems, Inc.*,
 613 F.3d 1186 (8th Cir.2010); ................................................. 22

*U.S. ex rel. Kalec v. NuWave Monitoring*, LLC,
 84 F.Supp.3d 793 (N.D. Ill. 2015) ................................................. 15, 17

*U.S. ex rel. Lusby v. Rolls-Royce Corp.*,
 570 F.3d 849 (7th Cir. 2009) ................................................. 7, 14

*U.S. ex rel. McGee v. IBM Corp.*,
 81 F. Supp. 3d 643 (N.D. Ill. 2015) ................................................. 19

*U.S. ex rel. NHCA-TEV, LLC v. Teva Pharm. Prod. Ltd.*,
 No. CV 17-2040, 2019 WL 6327207 (E.D. Pa. Nov. 26, 2019) ............................................ 13

*U.S. ex rel. Osheroff v. Humana Inc.*,
 776 F.3d 805 (11th Cir. 2015) ................................................. 27

*U.S. ex rel. Perri v. Novartis Pharm. Corp.*,
 No. CV 15-6547, 2019 WL 6880006 (D.N.J. Feb. 21, 2019).................................................. 8

*U.S. ex rel. Phalp v. Lincare Holdings Inc.*,
 857 F.3d 1148 (11th Cir. 2017) ................................................. 22

*U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC*,
 836 F.3d 770 (7th Cir. 2016) ................................................. 14

*U.S. ex rel. Purcell v. MWI Corp.*,
 807 F.3d 281 (D.C. Cir. 2015)................................................. 23

*U.S. ex rel. Reed v. KeyPoint Gov't Sols.*,
 923 F.3d 729 (10th Cir. 2019................................................. 29

1930845.9

## TABLE OF AUTHORITIES
### (continued)

**Page**

*U.S. ex rel. Rigsby v. State Farm Fire & Cas. Co.*,
794 F.3d 457 (5th Cir. 2015) ........................................................................ 24

*U.S. ex rel. Streck v. Bristol Myers Squibb Co.*,
No. 13-7547, 2018 WL 6300578 (E.D. Pa. 2019) ........................................ 19, 23

*U.S. ex rel. Streck v. Takeda Pharmaceuticals America, Inc.*,
381 F. Supp. 3d 932 (N.D. Ill. 2019) ........................................................... 23

*U.S. ex rel. Strunck v. Mallinckrodt Ard LLC*,
Nos. 12-175, 2020 WL 362717 (E.D. Pa. Jan. 21, 2020) ............................. 19, 23

*U.S. ex rel. Turner v. Michaelis Jackson & Assocs.*,
No. 03–CV–4219–JPG, 2007 WL 496384 (S.D.Ill. Feb. 13, 2007) .............. 18

*U.S. ex rel. Upton v. Family Health Network, Inc.*,
900 F. Supp. 2d 821 (N.D. Ill. 2012) ........................................................... 14

*U.S. ex rel. Witkin v. Medtronic, Inc.*,
189 F. Supp. 3d 259 (D. Mass. 2016) ........................................................... 10, 11, 21

*U.S. ex rel. Wood v. Allergan*,
246 F. Supp. 3d 772 (S.D.N.Y. 2017) ........................................................... 9, 11, 12

*U.S. ex rel. Young v. Suburban Home Physicians*,
2017 WL 6625940 (N.D. Ill. Dec. 28, 2017) ................................................ 21

*U.S. v. Bank of Farmington*,
166 F.3d 853 (7th Cir. 1999) ........................................................................ 24

*U.S. v. Medtronic, Inc.*,
189 F. Supp. 3d 259 (D. Mass. 2016) ........................................................... 21

*U.S. v. Omnicare, Inc.*,
No. 07 C 5777, 2011 WL 1059148 (N.D. Ill. Mar. 21, 2011) ..................... 8

*U.S. v. Patel*,
778 F.3d 607 (7th Cir. 2015) ........................................................................ 8

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.*,
20 F.3d 771 (7th Cir. 1994) .......................................................................... 14

**Statutes**

31 U.S.C. § 3729 *et seq.* ................................................................................ 8, 19

31 U.S.C. § 3730 *et seq.* ................................................................................ 24, 28

42 C.F.R. § 1008.53 ....................................................................................... 14

42 U.S.C. § 1320a ........................................................................................... 8

42 U.S.C. § 1320a-7b(b)(2) ........................................................................... 8

- vi -

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

Tex. Hum. Res. Code Ann. § 36.002 ............................................................ 30

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................... 7

Fed. R. Civ. P. 9(b) ................................................................... 7, 12, 14, 16

**Other Authorities**

OIG Advisory Opinion No. 04-16, 2004 WL 5701861 .................................. 8

OIG Advisory Opinion No. 11-08, 2011 WL 4526111 .................................. 8

OIG Compliance Program Guidance for Pharm. Mfrs., 68 FR 23731-01 ............................. 9, 11

OIG Supp. Compliance Program Guidance for Hospitals, 70 Fed. Reg. 4858-01 ........................ 8

1930845.9

## I.     <u>INTRODUCTION</u>

In his Second Amended Complaint, plaintiff-relator Lazaro Suarez ("Relator") details AbbVie's hidden scheme to improperly induce and reward prescriptions of Humira. AbbVie routinely offers valuable professional services to physicians in exchange for Humira prescriptions. In particular, AbbVie developed the Ambassador Program, through which it sends its own private nurses to work directly with Humira patients. Once there, these nurses (including Relator) performed general patient management and other work that doctors would otherwise have to provide themselves. For example, physicians spend up to $78,913 each year dealing with health insurance plans alone. Having an AbbVie nurse provide these and other services for free is thus an attractive, illegal incentive for doctors to prescribe Humira.

For nearly two years as an Ambassador, Relator worked with numerous physicians and their patients on a daily basis and trained Ambassadors from across the country to do the same. After growing concerned about the Program's financial motivations, he brought this action under the qui tam provision of the federal False Claims Act and analogous state laws. Relator's Second Amended Complaint ("Complaint") includes robust detail and specific examples of the way this scheme played out in practice, based on his own first-hand experiences. AbbVie's motion to dismiss should be denied because it overlooks these well-pled allegations and wrongly states that the fraud exposed in this case was disclosed to the public.

## II.     <u>RELEVANT FACTUAL BACKROUND</u>

The Complaint details AbbVie's unlawful and remarkably effective scheme to boost Humira prescriptions. Humira is AbbVie's powerful injectable biologic used to treat a variety of gastro-intestinal, rheumatologic, and other auto-immune conditions. ¶ 51, 60.[1] Patients generally need to inject themselves (or receive injections) with Humira twice a month. ¶ 53. Due to

---

[1] Here and throughout, citations to ¶ refer to the Second Amended Complaint, Dkt. 78.

potentially serious side effects—including the risk of fatal cancers and infections—it carries a "black box," the strictest warning level for prescription drugs. ¶ 54. Humira is hugely expensive and has been the highest-selling drug in the world for several years. ¶ 67. This success is due, in part, to the kickback scheme that AbbVie deployed to combat plateauing sales after Humira's first ten years on the market—a scheme that Relator exposed in bringing this case. ¶ 10.

Relator Lazaro Suarez, RN is a Registered Nurse and former employee of Quintiles, Inc., an AbbVie subcontractor. He had approximately 15 years of clinical experience before he became an Ambassador for Humira, where he worked for nearly two years, from 2013 to 2014. ¶ 20. Suarez was based in Florida during this time and was flown throughout the country to train Ambassadors joining the rapidly expanding Program. ¶ 162-169.

### A. Prescribing Humira is Expensive and Resource-Intensive for Doctors.

Generally speaking, doctors make money by seeing patients and billing insurance companies (public or private) for those visits. ¶ 5, 57. They do not get paid for administrative and other patient management work attendant to those visits and other follow-up patient needs. *Id*. This administrative burden is significant: one study estimated that physicians spend up to 20% of their workday on these non-billable tasks, keeping doctors from using that time profitably. ¶ 55-57. For example, professional medical staff spend an average of 3.8 hours *per day* interacting with health plans alone. ¶ 63-64.

Within an already complex system, Humira requires a great deal of non-billable work due to, among other things, its cost, patients' chronic diseases, and its side effects. ¶ 6. Many physicians had been disinclined to prescribe it, given other alternatives. ¶ 59. This calculus changed when AbbVie took all of these considerations "off the table," and in the process relieved doctors of some general, non-billable patient duties. ¶ 95.

1930845.9

**B.** **AbbVie Used the Ambassador Program to Eliminate Expenses and Encourage Doctors to Prescribe Humira.**

AbbVie initially brought Humira to market in 2002 as a second-line treatment for Rheumatoid Arthritis. ¶ 52. Ten years later, Humira prescriptions were stagnating, in part because of competitor drugs. ¶ 2, 10, 66. In response, AbbVie (originally as Abbott Labs) partnered with Quintiles (now IQVIA) to address the flattened sales and protect its profits. ¶ 66.

From there, AbbVie launched the "Ambassador Program," through which it provides its own nurses as an "extension" of the doctor's office—*if and only if* the doctor chooses to prescribe Humira. ¶ 85, 89. These nurses provide patient care, pharmacy and insurance authorization assistance, open enrollment resources, advice on insurance products, and other medical advice, services, and support. ¶ 68, 141, 148. This includes assistance in selecting the right insurance plan (public or private), and responding to questions about coverage and copays. ¶ 141. For Medicare patients, Ambassadors are also required to contact Medicare to determine the patients' payment status: namely, how much the patient must pay in the first months of treatment, and at what point the patient's coverage stops during the gap period (the so-called "Donut Hole"). ¶ 142.

In practice, Ambassadors conduct hours-long visits to patients in their homes and then continue with follow up communications addressing general questions and concerns that would otherwise be directed to the physician's office. ¶ 69. Ambassadors frequently consulted with patients about their overall medical histories and health issues (a review of their complete medical history was part of the initial intake process). *Id*. Often, the patient had not yet decided to fill their prescription when assigned an Ambassador, and thus Ambassadors highly influence the decision to take Humira at all. ¶ 117. Indeed, patients told Relator that they "likely would not have started" without his encouragement and assuaging their concerns. *Id*.

Questions and concerns from chronically ill patients demand time consuming and technical responses. By way of reference, doctors in one study reported receiving an average of 23.7 calls and 16.8 emails from patients *per day* with questions and concerns. ¶ 56. Following that study, the practice hired additional staff to handle "the increased tasks associated with the comprehensive management of chronic diseases"—much like those treated by Humira. ¶ 56.

Here, these dozens of daily calls extend well beyond basic product support and include questions like: "My leg is bruised near where I injected, what does this mean?; I have a rash on my stomach, should I be worried?; Can I inject Humira after a glass of wine?; I'm in open enrollment, which plan is best for me, the HMO or PPO?; Can I bring Humira on an airplane?" *See, e.g.* ¶ 69. Without an Ambassador, these types of questions (and many others)—and the time required to answer them—fall to the physician. ¶ 72. In this way, Ambassadors save doctors time and money, and the doctor has more time to see and bill for more patients. ¶ 68. This is a kickback, and one with a carefully measured return on investment for AbbVie. ¶ 80, 138, 179.[2]

### C.   AbbVie Sought to Legitimize the Program Under the Guise of "Patient Education."

All kickbacks present the harm of improper influence on clinical decision-making. This case presents additional harms, too, as the Ambassador Program places a barrier in doctor-patient communications. With an AbbVie-paid nurse serving as the direct point of contact for patients taking Abbvie's drug, far fewer patients had their questions and concerns about safety answered by an independent medical professional. ¶ 12, 116. A pharmaceutical representative, even if it is a nurse, is not a substitute for a physician.

AbbVie publicly claims the Ambassador Program is about patient education, which is false, and more importantly failed to disclose its key elements. ¶ 8, 77. As Relator came to learn,

---

[2] To further reduce barriers to claims and coverage for Humira, AbbVie also placed dedicated terminals in doctors 'offices that print benefit verification forms and other insurance-related documents. ¶ 110.

the Program is and always has been about boosting and protecting profits from Humira. ¶ 5, 10, 179. Contrary to the goal of "patient education," Ambassadors are specifically instructed *not* to provide balanced information about Humira. ¶ 86, 116, 123-124. Instead, Ambassadors are trained to abandon their role as "educators" and deflect patients' questions about cancer and other risks in favor of making sure they fill and re-fill their prescriptions. ¶ 116, 127, 164. Ambassadors recorded successes, in which they effectively persuaded a patient to take or remain on Humira (meaning more money to AbbVie), as "Magic Moments" or "Moments of Wow." ¶ 134, 149. Despite their regular contact, Ambassadors did not report patients' adverse events to their doctors, instead reporting them only to AbbVie and keeping physicians in the dark. ¶ 128.

The organizational structure of the Program itself is revealing and evidences the scheme at hand. Despite working in a "patient education" program, Ambassadors work with, and report to, the *sales* department as well as the Ambassador department. ¶ 85-87. In the early years of the Program, Ambassadors *actually were part of the sales force itself,* making sales calls to pitch and market the Program. ¶ 93-97. They also attended speaker dinners, where they could discuss the Program. ¶ 111-112. This gave the company greater access to physicians' offices, particularly those who had resisted detailing visits from sales representatives. ¶ 88. The sales-based role of the Ambassadors for a so-called patient education program supports the profit-motive of the Program. AbbVie not only fails to disclose, but it hides (and trained its Ambassadors to hide) these and other facts about its "education" program. ¶ 8.

      **D.**     <u>**As Relator Exposed, AbbVie Put Profits over Patients and Secretly Paid the Nurses Like Sales Reps.**</u>

AbbVie's kickbacks worked. At annual meetings in 2013 and 2014, a VP-level executive boasted that Ambassadors had resurrected the plateauing sales for Humira, using before-and-after graphs of Humira sales with and without Ambassadors. ¶ 10. Encouraged by these

- 5 -

successes, AbbVie Senior Management routinely applied pressure on Ambassadors to increase the reach of the Program even further. One VP of U.S. Immunology urged Relator and others that "patient enrollment in this program is *critical* to the long-term success of HUMIRA." ¶ 78.

To ensure success, AbbVie instituted policies and practices, exposed by Relator here, aimed to maximize profits while concealing the true nature of the Program. For example, Ambassadors were instructed not to refer to Humira by name in their written reports. ¶ 134-136. Similarly, to avoid detection of their collaboration with the sales team, Ambassadors were instructed to use "limited" email with them, and to be "CAREFUL, CAREFUL" about those communications. ¶ 92. Managers also warned Ambassadors not to record all time they spend with doctors, and not to publicly refer to their "patients" as "patients." ¶ 104-106, 114-115. Again, AbbVie knew it was eroding the clinical boundaries of the physician-patient relationship, for the purpose of boosting its sales.

Notably, Ambassadors' performance is measured on metrics that are wholly unrelated to patient education. ¶ 82. And, crucially, all of the Ambassadors' variable compensation depends on bottom-line, prescription-related metrics. ¶ 10, 82-83. Ambassadors can earn up to 20% of their overall compensation in quarterly bonuses dependent on the number of offices that launch the program or patients who take Humira. *Id.* On at least a dozen occasions, Relator himself received a financial reward related to the volume of Humira prescriptions he generated. ¶ 18. The Program emphasized and rewarded the Ambassadors' salesmanship over any nursing assistance with the product.

Ambassadors' compensation and evaluation cannot factually or legally be squared with the false pretense of a patient education program. Managers stressed that the prescription-based metrics demonstrate the value of the Program to senior level management. ¶ 138 ("[F]ocus

resources to have maximal return."). AbbVie tracks the success of the Program by conducting "return-on-investment" analyses, weighing the costs (and, likely, the legal risks) against the huge profits generated by Humira's expanding market share and volume. ¶ 80. Such internal analysis substantiates that the Program's primary purpose is financial, not educational. *Id.*

## III.     PROCEDURAL HISTORY

In October 2015, Mr. Suarez commenced this action. Dkt. 1. He later amended his complaint to remove a claim under the California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871.7 (Dkt. 20), which is now the subject of a separate action in which the State of California has intervened. *State of California, et al. v. AbbVie Inc.*, Case No. RG 18893169, (Cal. Sup. Ct., Alameda).  On March 13, 2018, the remaining governmental entities declined to intervene in this action. The Court then granted AbbVie's motion to dismiss Relator's first amended complaint with leave to amend. Dkt. 74. AbbVie now moves to dismiss the Second Amended Complaint. Dkt. 87.

## IV.     PLEADING STANDARD

Under Rule 12(b)(6), courts determine whether the factual allegations in the complaint plausibly suggest an entitlement to relief. *Ashcroft v. Iqbal,* 556 U.S. 662 (2009); *see also McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011). In an action sounding in fraud, a plaintiff must also "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). False Claims Act suits thus must allege the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme. *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849 (7th Cir. 2009). But courts should not "erroneously take an overly rigid view of the [Rule 9(b)] formulation," which is intended to put a defendant on notice of the particular claims against it. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011).

- 7 -

## V.    ARGUMENT

For a doctor choosing between Humira with an Ambassador on the one hand, and a different course of treatment that does not come with a free nurse on the other, the incentive to choose Humira is obvious. This is illegal, and for good reason—the anti-kickback rules "protect patients from doctors whose medical judgments might be clouded by improper financial considerations" like these. *See U.S. v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015).

### A.    AbbVie May Not Provide "Anything of Value" to Encourage Doctors to Prescribe its Drug.

The FCA imposes civil liability on any person who "knowingly presents, or causes to be presented" a false or fraudulent claim for payment to the United States. 31 U.S.C. § 3729(a)(1)(A). A claim is false under the FCA if the defendant supplied a kickback as an impetus for the underlying transaction. 42 U.S.C. § 1320a–7b(g); *U.S. v. Omnicare, Inc.*, No. 07 C 5777, 2011 WL 1059148, *3 (N.D. Ill. Mar. 21, 2011). Under the Anti-Kickback Statute ("AKS"), a kickback is a knowing and willful "offer[] or pay[ment] [of] remuneration . . . to any person to induce such person . . . to purchase . . . order . . . or recommend purchasing . . . or ordering any good . . . or item for which payment may be made . . . under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2). The term "remuneration" is broad and refers to "anything of value." *U.S. ex rel. Derrick v. Roche Diagnostics Corp.*, 318 F. Supp. 3d 1106, 1112-13 (N.D. Ill. 2018) (citation omitted); *U.S. ex rel. Perri v. Novartis Pharm. Corp.*, No. CV 15-6547, 2019 WL 6880006, at *11 (D.N.J. Feb. 21, 2019) ("anything of value in any form whatsoever").[3]

---

[3] As further context of the provision of "value," the Office of the Inspector General ("OIG") has instructed that arrangements under which physicians are relieved of "financial obligations they would otherwise incur" pose a "significant risk" leading to an inference "that the remuneration may be in exchange for generating business." OIG Supp. Compliance Program Guidance for Hospitals, 70 Fed. Reg. 4858-01, 4866. S*ee also, e.g.*, OIG Advisory Opinion No. 04-16, 2004 WL 5701861, at *4 (November 18, 2004) ("[T]he free services . . . may be viewed, functionally, as a price reduction or discount."); OIG Advisory Opinion No. 11-08, 2011 WL 4526111 at *4 (June 14, 2011) ("Fraud and abuse risks are compounded where . . . a … health care professional is involved in the marketing activity.").

Even if *one purpose* of an offer of value is to pay kickbacks, that is a legal violation, regardless if the prescription is (for example) medically necessary or "legitimately" prescribed. *See Guilfoile v. Shields*, 913 F. 3d 178, 190 (1st Cir. 2019); *see also Purcell v. Gilead Scis., Inc.*, No. CV 17-3523, 2020 WL 762473, at *7 (E.D. Pa. Feb. 13, 2020) (AKS compliance "is a material condition of payment under the False Claims Act").

**B.      AbbVie Used its Own Personnel to Reduce Physicians' Expenses in Exchange for Prescribing Humira.**

AbbVie touts Ambassadors to doctors as free "extensions of your office" available to fulfill critical tasks if they choose to prescribe an AbbVie drug. ¶ 4, 85, 89. Despite these free services, AbbVie argues that the Program does not provide a kickback because it has "no independent value" separate from Humira. Dkt. 87 at 9-10. AbbVie's argument is wrong; the AKS prohibits offering "*anything*" of value to induce a prescription. *Roche Diagnostics*, 318 F. Supp. 3d at 1113. Eliminating an expense is such an offer. As the OIG has set forth:

> if goods or services provided by the [drug] manufacturer *eliminate an expense that the physician would have otherwise incurred (i.e., have independent value to the physician)* . . . the arrangement may be problematic [under the AKS] if the arrangement is tied directly or indirectly to the generation of federal health care program business for the manufacturer.

OIG Compliance Prog. Guidance for Pharm. Mfrs, 68 FR 23731-01, 23737 (emphasis added). Importantly, a (purportedly, in this case) "legitimate purpose for an arrangement," including "patient education," does not alter the analysis. *Id.; see also Roche Diagnostics*, 318 F. Supp. 3d at 1112-13. The presence of the "illegal purpose" such as inducing business renders a program a kickback regardless of other conduct. *Id.*

Ambassadors perform time-consuming tasks that otherwise must be performed by doctors and their staff. *See, e.g.,* ¶ 65-76. These services include house calls lasting for several hours with general medical discussion, training on self-injections, follow-up phone calls with patients,

and "replacing what otherwise is the work of the doctors' office staff in dealing with insurance companies." ¶ 69, 92, 102, 104, 140.  The doctors' offices  also draw on the Ambassador's experience as medical professionals to give advice the physician would otherwise have to give, including advice like "taking Benadryl prior to administering a Humira injection" to address adverse reactions. ¶ 121.  Without an Ambassador, the physician loses staff hours to such tasks. With an Ambassador, doctors can focus resources on profitable work, and even use the services as a marketing tool, with some practices touting the Program as a "concierge" service. ¶ 75.

Relator has plausibly alleged that these extensive free services are kickbacks because physicians and their staff are responsible for them when those physicians do not prescribe Humira. *See, e.g.,* ¶ 68, 95, 140, 161.[4] *See also* State of California's Statement of Interest, Dkt. 90 at 4 (concluding that these "free professional services and support" plausibly allege false claims induced by kickbacks under the California False Claims Act).

### 1.    AbbVie's Services Represent "Independent Value."

Numerous courts have recognized kickback schemes analogous to AbbVie's here. The decision in *Witkin* is particularly on point. In that case, the relator alleged that the defendant Medtronic offered kickbacks to induce prescriptions of its "iPro" insulin pumps. Specifically, defendant hosted "iPro clinics"— staffed by Medtronic nurses—in which they fitted patients with an iPro device in order to evaluate their current diabetes management. *U.S. ex rel. Witkin v. Medtronic, Inc.*, 189 F. Supp. 3d 259 (D. Mass. 2016). Relator alleged that these clinics were used to "compensate providers in order to generate additional pump orders" and were run "at no cost to the host physicians and entirely independently of a physician or his or her staff." *Id.* Importantly, without the Medtronic staff running the iPro clinics, physicians "*otherwise would*

---

[4] Whether or not use of an Ambassador results in an actual layoff is, of course, not the standard (nor should it be, given the reality of busy and typically under-staffed health practices): Ambassadors absorb the work of paid health care providers and staff.

*have had to expend additional money or time* to administer [those] services himself or pay staff to do so." *Id.* at 270 (emphasis added). As such, the iPro clinics—although inherently tied only to Medtronic's iPro insulin device—plausibly constituted a kickback. *Id.*

As this Court has observed (Dkt. 74 at 17), the relator in *Witkin* also alleged that the Medtronic nurses promoted ways in which the doctors could bill Medicare for the iPro clinics, even though the work was performed by Medtronic staff. *Id.* But that *in no way* distinguishes it from Relator's allegations here, as the *Witkin* relator "did not pursue [that] theory of false claims" and the court's conclusion did not turn on this alleged billing advice. As the *Witkin* court observed, "even a physician *legitimately* billing Medicare for properly-supervised iPro clinic services has received remuneration," given that he would otherwise have to expend money and time to provide the services. *Id. Accord* OIG Compliance Prog. Guidance, 68 FR 23731-01, 23737 (services "have independent value to the physician" where they "eliminate an expense").

Similarly, in *Boise v. Cephalon*, a court denied a motion to dismiss when relators contended that drug manufacturers provided free office personnel who "provide[d] free services to ensure that the physicians obtained reimbursement from Medicare and Medicaid *without having to pay their own staff to perform the work*." In so doing, "Cephalon relieved some of the burden that providers encountered" in obtaining reimbursement for its drugs. *U.S. ex rel. Boise v. Cephalon, Inc.*, No. CIV.A. 08-287, 2015 WL 1724572, at *3 (E.D. Pa. Apr. 15, 2015) (emphasis added). In this way, Cephalon allowed "physicians to prescribe and utilize [the drugs] for off-label uses *without concern for the time, resources or lost profits associated with addressing reimbursement issues*." *Id.* at *11.

*Wood v. Allergan's* lengthy treatment of kickback allegations is also instructive, in that Allergan allegedly provided physicians a free "suite of products and office supplies." 246 F.

- 11 -

Supp. 3d 772, 806 (S.D.N.Y. 2017), *rev'd on unrelated grounds*, 899 F.3d 163 (2d Cir. 2018). *Wood* addressed tangible items (prescription pads) and this case deals with both professional staffing support and tangible items (¶ 110). Regardless of the nature of the kickback, it is unlawful to cover a cost otherwise incurred by the prescriber. *Id.* at 807.

AbbVie's significant and time intensive efforts go well beyond basic information about Humira, and save doctors time and money, constituting an unlawful kickback.

### 2. Abbvie's Cases and Authorities Are Distinguishable.

In *Forney,* on which AbbVie heavily relies, the relator failed to explain *how* a free support service "crossed the line separating permissible product support from illegal remuneration with independent value to the purchaser." *U.S. ex rel. Forney v. Medtronic,* No. CV 15-6264, 2017 WL 2653568, at *4 (E.D. Pa. June 19, 2017). That relator pled only that "Medtronic provided technical product support." *Id*. This unexplained statement, without more, did not satisfy Rule 9(b). By contrast, the operative Complaint here offers significant detail explaining *how* the panoply of professional services and other kickbacks cover expenses that physicians would otherwise have to pay for, bringing them outside of the realm of basic product support.[5] *See Allergan*, 246 F. Supp. 3d at 807 ("At a minimum, [relator's] allegations raise a question of fact—whether ophthalmologists would otherwise have had to cover the costs of these drugs . . . ."). Such allegations are "not suitable for resolution at the motion to dismiss stage." *Id*.

Apart from *Forney,* AbbVie's cases involve a "professional relator" who filed twelve

---

[5] *See, e.g.*, ¶ 68 (Humira patients "typically require significant non-billable support due to chronic disease states, concerns about side effective, and the need to learn and manage self-injections . . . Ambassadors step in to provide [this] extensive professional and patient management work"); ¶ 69 (Ambassadors communicate "with patients in response to questions about their disease states, pharmacy and insurance authorization assistance, open enrollment resources, paperwork help, advice on insurance products, and other services and support); ¶ 70 (Ambassadors spend time addressing "myriad patient questions and concerns that would otherwise be directed to the physician's office . . . including those having nothing to do with Humira. Patients . . . frequently used the opportunity to raise questions and concerns about their medical histories and other health issues . . . preventing yet another call to the doctor").

similar, non-specific qui tam complaints. *See* Dkt. 87 at 10 n. 4 (citing government filings and court decisions pertaining to the professional relator). Those cases were largely dismissed on the basis of the government's right to dismiss qui tam actions, to which courts are "extremely deferential." *U.S. ex rel. NHCA-TEV, LLC v. Teva Pharm. Prod. Ltd*., No. CV 17-2040, 2019 WL 6327207, at *1 (E.D. Pa. Nov. 26, 2019). They do not undermine detailed allegations of fraud by a true eyewitness, as in this case. In those cases, the government moved to dismiss by detailing issues with overlapping form pleadings and observing that "basic product support" services were not enforceable kickbacks under those circumstances. *Id.*, Dkt. 30 at 16. Setting aside that this case does not involve mere "basic product support," the government's position in moving to dismiss was limited expressly to "those particular cases." *Id.*

This case is different, as evidenced by the fact that the government has filed no similar motion here, instead opting on two occasions to *oppose* AbbVie's motions to dismiss. Dkt. 61, 88. And the detailed allegations from Relator's own insider knowledge in this case are not allegations about "basic" product support like a "toll free hotline." Instead, AbbVie sent highly-trained nurses into patients' homes, where they spent hours with patients and routinely followed up by phone to take all of those related non-billable obligations off the table for the doctor.[6]

Finally, AbbVie cites to a series of OIG opinion letters about distinct programs that supposedly bless AbbVie's actions in this case. Not so. The notion that AbbVie, post-hoc, can use, let alone rely, on OIG opinion letters regarding the legality of other programs, that did not

---

[6] In opposing the earlier motion to dismiss, Relator contended that one of these cases, *Health Choice Grp., LLC v. Bayer Corp.* included allegations about a "similar" support program that were upheld for purposes of Rule 12. No. 5:17-CV-126-RWS-CMC, 2018 WL 3637381 (E.D. Tex. June 29, 2018). In so doing, Relator did not intend to suggest that the programs were identical, but rather that both cases implicated professional support services as kickbacks. Subsequent events have made their distinctions clear—*Bayer* was "brought by a professional relator" using a repeat complaint template—exactly the opposite of the specific, insider information provided in this case. And as noted above, the United States submitted two Statements of Interest here in opposing AbbVie's motions to dismiss—and expressly did not say in either Statement, as it did in *Bayer*, that AbbVie's Program is not a kickback.

- 13 -

use kickbacks, is wrong. Even if the Ambassador Program was intended and implemented as AbbVie publicly describes it (it wasn't), AbbVie may not rely on OIG advisory opinions to immunize an unrelated program, as these opinions are expressly limited to only those individuals or entities that "join in the request for the opinion." *See* 42 C.F.R. § 1008.53 ("No individual or entity other than the requestor(s) may rely on an advisory opinion.").

### C.   Relator Pled AbbVie's Kickback Scheme with Particularity.

The plaintiff who pleads fraud must "reasonably notify the defendants of their purported role in the scheme." *Vicom, Inc. v. Harbridge Merch. Servs., Inc*., 20 F.3d 771, 778 (7th Cir. 1994). A well-pled fraud claim will identify: (1) the person(s) who made the alleged misrepresentation; (2) the time, place, and content of the misrepresentation; and (3) the method by which it was communicated. *Gen. Elec. Capital Corp. v. Lease Resolution Corp*., 128 F.3d 1074, 1078 (7th Cir. 1997); *see also Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir. 2007). A plaintiff who pleads a scheme involving numerous transactions over a period of years, however, need only provide representative examples. *See, e.g.*, *U.S. ex rel. Upton v. Family Health Network, Inc*., 900 F. Supp. 2d 821, 829-30 (N.D. Ill. 2012).

### 1.   The Complaint Puts AbbVie on Notice Using Detailed Examples.

AbbVie argues that the law requires Relator to have identified a "transactional" false claim including a specific Government Payor patient. This is *not* the standard. *See Lusby*, 570 F.3d at 854. In *Lusby*, the Seventh Circuit held that an FCA claim satisfied Rule 9(b) even though it did not provide details or specific documents showing that the defendant had actually made a false claim. *Id*. The Circuit explained that while "it is essential to show a false statement," a relator need not "produce invoices . . . at the outset of the suit." *Id*.[7]

---

[7] *See also, e.g.*, *U.S. ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 777-78 (7th Cir. 2016) ("[A] plaintiff does not need to present, or even include allegations about, a specific document or

Instead, a complaint must only put forth "some indicia of reliability . . . to support the allegation of an actual false claim for payment being made to the Government." *U.S. ex rel. Kalec v. NuWave Monitoring*, *LLC*, 84 F.Supp.3d 793, 803–04 (N.D. Ill. 2015); *see also U.S. ex rel. Derrick v. Roche Diagnostics Corp.*, 318 F. Supp. 3d 1106, 1112 (N.D. Ill. 2018) ("[I]t is enough that her allegations support an inference that Humana necessarily submitted claims covering items or services resulting from an AKS violation."). Other decisions are in accord that relators need not plead "specific invoices." *U.S. ex rel. Hawkins v. ManTech Int'l Corp.*, No. CV 15-2105 (ABJ), 2020 WL 435490, at *10 (D.D.C. Jan. 28, 2020) (citing *U.S. ex rel. Heath v. AT & T, Inc.*, 791 F.3d 112, 124 (D.C. Cir. 2015)); *Purcell*, 2020 WL 762473, at *6 (citing *Foglia v. Renal Ventures Mgmt., LLC*, 754 F.3d 153, 157-58 (3d Cir. 2014)).

Here, Relator offers thorough details of the scheme and numerous examples of specific doctors and patients wrapped up in submitting false claims to government insurance programs. First, Relator named doctors who prescribed Humira (or who prescribed it at an increased rate) as a result of the Ambassador Program.[8] While Relator did not have access to their internal accounting (and was not required to have it), given his years of experience and that the average cost per physician per year to interact with health plans is $68,859, Relator alleges plausibly that physicians "saved money in having to pay less in their staff time and overtime pay, and in hiring and employing staff members to address administrative work for patients." ¶ 161. Relator

---

bill" so long as "the alleged facts necessarily [lead] one to the conclusion" that the defendants presented such claims); *Goldberg v. Rush Univ. Med. Ctr.*, 929 F. Supp. 2d 807, 818 (N.D. Ill. 2013) (collecting FCA cases interpreting Rule 9(b) "with flexibility" recognizing that knowledge of FCA violations is often "inferential").

[8] *See also, e.g.*, ¶ 76 (examples of high prescribing dermatologists who "worked especially closely with Ambassadors"); ¶ 99 ("Relator attended a re-launch meeting with Dr. Robert Sarro's office. Dr. Sarro and his assistant had been persuaded that the Ambassador Program would 'make their lives easier.'"); ¶ 75 (describing that doctors in the "competitive South Florida dermatology market for wealthy older patients, even came to brag about the [Ambassador] program and imply it was a service the doctor had arranged for his or her own patients" and naming a specific practice group and individual doctor within it); ¶ 97, 111, 154 (identifying specific doctors by name).

1930845.9

himself was held out as a free extension of the doctor's office in his own sales visits. ¶ 89.

Second, Relator identifies numerous government insurance patients with whom he worked directly. *See e.g.*, ¶ 153 (elderly Medicare patient in Miami). Relator describes a Medicare patient in Miami prescribed Humira by Dr. Sullivan, who was "impressed and encouraged" by Relator's work with the patient. ¶ 154-156. And Relator describes how a manager informed "the sales organization" when he helped obtain Medicare coverage for another patient. ¶ 157-158; ¶ 149-161 (examples of government insurance patients enrolled in the Ambassador program). This significant representation of government payor patients is expected, given Abbvie's policies targeting them in particular. ¶ 13, 148 ("AbbVie . . . requires Ambassadors to try to push their patients into [Medicare] plans that maximize reimbursement for Humira."). This type of claims assistance "provides a strong inference that claims were actually submitted as a result of the kickback." *Cephalon*, 2015 WL 1724572, at *11.

Finally, Relator details specific mechanisms through which AbbVie's actions led to false claims, including identifying the specific forms and certifications (i.e., the false claims for payment) used to wrongfully obtain reimbursement under Medicare and Medicaid. ¶ 175-183. AbbVie is on ample notice of the details of its alleged fraud. *See, e.g.*, *Pirelli*, 631 F.3d at 442.

### 2. <u>While He Has Already Done So, Relator Respectfully Submits that He Need Not Identify a "Specific Patient" to State a Claim.</u>

Instead of arguing that it does not have proper notice of the claims against it in this case (because it cannot credibly do so) AbbVie instead focuses on cases in which a court held that a Relator needed to identify a "specific patient" to satisfy Rule 9(b) under the particular facts of that case. These cases do not change the outcome here, given that Relator meets this standard. But further, Relator respectfully submits this is not the standard as to the fraudulent scheme he alleges herein, and in light of the detailed allegations in the Complaint.

1930845.9

In *Grenadyor*, for example, the relator alleged that a Ukrainian pharmacy "defrauded the government by making gifts *to customers* . . . in order to induce *them* [the customers] to have their prescriptions filled by it rather than by competing pharmacies." *U.S. ex rel. Grenadyor v. Ukrainian Village Pharmacy, Inc.*, 772 F.3d 1102,1104 (7th Cir. 2014) (emphasis added). The Seventh Circuit affirmed the district court's dismissal under 9(b). *Id.* at 1107. It held, in particular, that "by failing to identify a single patient who received multiple gift bags . . . the complaint fails to allege with the requisite particularity that any customer" received one. *Id.* Put another way, the defendant could not reasonably be said to be on notice of the claims against it when the complaint did not identify anyone who received an allegedly wrongful kickback.

AbbVie's other case, *Dolan*, lacked requisite detail about the alleged fraud: although the relator pled that "Patient Z" received (and billed for) unnecessary physical therapy, the relator did not provide any basis for his belief that the therapy was unnecessary. *U.S. ex rel. Dolan v. Long Grove Manor, Inc*., No. 10 C 368, 2014 WL 3583980, at *5 (N.D. Ill. July 18, 2014).

Such cases do not counsel for dismissal here. Relator has explained in ample detail how the Program offers physicians unlawful remuneration. As the court in *Goldberg* explained, defendants "miss[] the mark" by focusing on the failure to name specific *patients* when *doctors* are the focus of a scheme. 929 F. Supp. 2d at 819–20; *see also U.S. ex rel. Gear v. Emergency Med. Assocs. of Ill*., No. 00 C 1046, 2004 WL 1433601 at *6 (N.D. Ill. June 25, 2004). Relator thus respectfully submits that cases such as *Kalec v. NuWave Monitoring*, which require examples of patients when *doctors* are the instrument of the fraud, are mistaken. 84 F. Supp. 3d at 807[9]; *cf. Pirelli*, 631 F.3d at 442 (analysis of the particularity requirement varies by case).

---

[9] Notably, while the complaint in *Kalec* did not name a patient, it *also* did not offer reliable indicia that a claim was submitted as a result of the scheme. Rather, plaintiff included a blanket, unsupported statement that payment for services "was made in large part by Medicare." *Kalec*, 84 F. Supp. 3d at 807.

### 3. The Ambassador Kickback Scheme Operated Nationwide.

Relator alleges that AbbVie caused submission of false claims from *at least* March 2013 when he began working as an Ambassador and induced such claims himself. ¶ 16. He describes his position anchored in Florida, as well as his role as a trainer for Ambassadors throughout the country. ¶ 16, 19, 169. He names Chicago, Illinois, San Antonio, Texas, and Puerto Rico as examples of locations in which he trained or attending trainings for Ambassadors. *See generally* ¶ 162-170; *see also* ¶ 163, 164 (national meeting in September 2013 in Chicago in which Relator and other Ambassadors received training to "stop thinking like a nurse"); ¶ 166 (Relator trained Ambassadors onboarding from Georgia, North Carolina, and "throughout the Southeast region" in March 2014). He also details his personal knowledge of and work with patients in the Program across the country. ¶ 153 (Florida patient); ¶ 159 (Alaska, Arizona, Washington patient); ¶ 168 (Massachusetts and South Carolina patients). The geographic reach of his work is not surprising given the rapid roll-out of the Program across the United States. ¶ 67 (as of May 2014, 10,000 patients across the country were supported by an Ambassador). Relator also alleges the use of phone and other outreach to patients through "Operation Dakota" which ensured that Ambassadors were available, even in remote areas. ¶ 170.

Against this backdrop, AbbVie's arguments that Relator has somehow failed to allege the nationwide scope of AbbVie's fraud should be rejected out of hand. *See, e.g.*, *U.S. ex rel. Turner v. Michaelis Jackson & Assocs.*, No. 03–CV–4219–JPG, 2007 WL 496384, at *4 (S.D. Ill. Feb. 13, 2007) (holding that "it would be both impractical and inefficient to require detailed allegations of the who, what, when, where and how of every single submission of a false claim" when "a complaint alleges numerous instances of fraud over a multi-year period").

### D. Relator's Allegations Satisfy Scienter Pleading Requirements.

Relator alleges that AbbVie used the Ambassador Program to incentivize doctors to

prescribe a dangerous and expensive drug, deployed a hidden sales force to accomplish this, and carefully hid and covered-up material facts about the Program. These allegations are adequate under both the AKS and the FCA.  AbbVie's arguments to the contrary misapprehend the law.

### 1.    Pleading Standards For Scienter.

The FCA requires a defendant to have "knowingly" engaged in the conduct at issue, such as causing the submission of a false claim for payment. The statute defines "knowingly" to include not only "actual knowledge," but also "deliberate ignorance" or "reckless disregard" of the truth or falsity of the information, and further provides that "no proof of specific intent to defraud is required." *See* 28 U.S.C. § 3729(b)(1)(A); *U.S. ex rel. Godecke v. Kinetic Concepts, Inc.*, 937 F. 3d 1201, 1211 (9th Cir. 2019). Further, scienter needs to be alleged only generally. 31 U.S.C. § 3729(b); *U.S. ex rel. McGee v. IBM Corp.*, 81 F. Supp. 3d 643, 668 (N.D. Ill. 2015).

Recent opinions at the motion to dismiss and even summary judgment stages have emphasized that scienter analysis requires the development of a factual record. *See, e.g., U.S. ex rel. Strunck v. Mallinckrodt Ard LLC,* Nos. 12-175, 13-1776, 2020 WL 362717, at *6 (E.D. Pa. Jan. 21, 2020); *U.S. ex rel. Streck v. Bristol Myers Squibb Co.*, No. 13-7547, 2018 WL 6300578, at *12 (E.D. Pa. Nov. 29, 2018); *cf. U.S. ex rel. Drummond v. Bestcare Lab. Servs., LLC*, 18-20501, 2020 WL 762534 (5th Cir. Feb. 17, 2020) (rejecting defendant's reliance on sub-regulatory guidance in granting summary judgment for the government on scienter, although noting state of mind issues often were inappropriate for resolution before trial).

### 2.    Relator Adequately Pleads Scienter.

Relator alleges that, faced with a leveling off of sales, AbbVie designed a program to increase sales of Humira by giving doctors valuable consideration through nurses secretly acting as biased health care providers and sales representatives. *See, e.g.*, ¶ 85-97, 123-128. AbbVie went so far as to send Ambassadors, who it evaluated and rewarded on sales metrics, *on sales*

*visits and speaker dinners* before apparently becoming concerned about the optics of these arrangements. ¶ 89, 93, 111-112, 125. All along, AbbVie required Ambassadors to hide the true nature of their work, and even rigged its systems to make it appear that Ambassadors were using more health and safety information than they actually were. ¶ 124.[10] Finally, while there is no specific intent requirement, AbbVie knew or should have known that its conduct, intended to increase sales through providing materials of value to doctors (and patients), ran afoul of the AKS and the FCA. *See also, e.g.*, ¶ 27-31 (OIG guidance that pre-dated the start of the Program).

Relator's allegations here are on all fours with cases holding that a relator adequately alleged scienter.[11] For example, in *Godecke*, the court explained that scienter was established at the pleading stage from various "building block[s]" of items that, in isolation, could be argued to be insufficient, such as a manager policy of allowing exceptions to a requirement and, similar to here, a tracking system that was set up to mask actual facts. *Godecke*, 937 F. 3d at 1211.

In *Bilotta*, also similar to here (but less egregious given the absence of direct patient interaction), scienter was pleaded based on allegations of sales rep compensation being tied to prescriptions coupled with speaker events that did not provide medical information and a failure to monitor. *U.S. ex rel. Bilotta v. Novartis Pharm. Corp.*, 50 F. Supp. 3d 497, 519-20 (S.D.N.Y. 2014). And, in *Mason*, while defendant dismissed the scienter allegations as conclusory, the court—noting the FCA's "fairly low standard with respect to the necessary intent"—referred to allegations that the company paid kickbacks to solicit purchasing agreements when it knew providers would seek reimbursement from the government. *Mason v. Medline Indus., Inc.*, 731 F. Supp. 2d 730, 739-40 (N.D. Ill. 2010) (defendant liable for "foreseeable consequences").

---

[10] To the extent AbbVie suggests that Relator has alleged a cover-up but not the underlying fraud, this still completely ignores the allegations of the threshold issues that AbbVie was covering up in the first place: the inducements to doctors.

[11] *See also* § II.D supra.

### 3.    AbbVie's Arguments Are Misplaced and Premature.

#### a.    AbbVie Seeks to Import an Overly High Standard For Scienter.

In claiming Relator did not allege scienter under the AKS, AbbVie ignores Relator's allegations that AbbVie induced prescriptions in exchange for items of value, and wrongly implies that smoking-gun evidence is required at the pleading stage. AbbVie relies primarily on criminal cases in the post-trial posture and that are thus clearly inapposite. Moreover, the FCA cases AbbVie cites are completely distinguishable.[12]

In *U.S. ex rel. Young v. Suburban Home Physicians*, which involved claims under the complicated Stark Act, the relators only alleged the existence of (presumably legal) patient referrals, and failed to adequately allege that the referrals were made for purposes of inducement. No. 14-2793, 2017 WL 6625940 at *3 (N.D. Ill. Dec. 28, 2017).  In *Forney*, 2017 WL 2653568 at *5 (granting motion to dismiss with leave to replead), the court's one-paragraph treatment of scienter noted that relator did not allege that Medtronic's subjective purpose was to induce referrals. *But see, e.g., U.S. v. Medtronic, Inc*., 189 F. Supp. 3d 259, 271–72 (D. Mass. 2016) (holding that relator alleged intent adequately by asserting defendant's motive to "curry favor" and obtain "economic buy in" from physicians to increase prescriptions). Here, in direct contrast, Relator explains AbbVie's purposes and motivations in detail, with substantial references to specific documents and conversations. *See* ¶ 78-79, 81 (internal emails and documents on prescription-based performance targets); ¶ 92, 105 (internal emails cautioning against creating a paper trail); ¶ 138 ("[F]ocus resources to have maximal return."). Thus, AbbVie's argument that Relator has not alleged scienter under the AKS is wrong.

---

[12] AbbVie does not challenge the pleading of any state's specific AKS analog. *See also* Dkt. 90 at 4-5 (addressing AKS analog under California law).

> **b.** **AbbVie Misstates the Content and Significance of the Selective OIG Guidance on Which it Relies.**

AbbVie's assertion that OIG guidance is "objective" and that it therefore undercuts scienter fails for numerous independent reasons, including: (a) it is an after-the-fact position, (b) it bypasses the clear violation of the AKS in favor of distinguishable guidance, and (c) it is based on a self-serving and incorrect view of the guidance itself.

*First*, and as the U.S. Government and the State of California ably have explained in their respective Statements of Interest, "the FCA looks to a defendant's knowledge at the time of the violation," rather than a simulated 'objective' reading after the fact, and any other reading runs afoul of the FCA (and state law). Dkts.61 and 88 at 1-2 (citing *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 136 S. Ct. 1923 (2016)); Dkt. 90; s*ee also U.S. ex rel. Phalp v. Lincare Holdings Inc.*, 857 F.3d 1148, 1155-56 (11th Cir. 2017) (scienter can exist even if a defendant's interpretation of an ambiguous regulation is reasonable). Recent, persuasive appellate authority, including opinions issued after AbbVie submitted its motion, confirm that an FCA defendant cannot avoid liability (let alone get a pass on a motion to dismiss) so easily. *See, e.g.*, *U.S. ex rel. Drummond*, 2020 WL 762534, at *3.

To the extent any other circuit has held or suggested otherwise, that should not be persuasive here because, among other reasons, those circuits did so under cases with readily distinguishable facts. As a court in the Central District of Illinois explained in expressly disagreeing with some of the chief authority on which AbbVie relies:

> The Court herein disagrees with the Eighth Circuit's requirement in *U.S. ex rel. Hixson v. Health Mgmt. Sys., Inc*. that a FCA plaintiff must "show that there is no reasonable interpretation of the law that would make the allegedly false statement true" in order to withstand a motion to dismiss. 613 F.3d 1186, 1191 (8th Cir.2010) . . . *Applied strictly, Hixson's rule would put an impossible burden on the drafters of statutes, regulations, and government contracts to avoid all potential ambiguity in order to prevent intentional fraud against the government; it would incentivize the intentional twisting of language in order to find profitable*

- 22 -

> *erroneous interpretations of the controlling text, even though all those subject to*
> *the text were well-aware of its intended meaning.*

*U.S. ex rel. Chilcott v. KBR, Inc.*, No. 09-CV-4018, 2013 WL 5781660, at *7 (C.D. Ill. Oct. 25,

2013) (footnotes omitted and emphasis added).

Similarly, in *U.S. ex rel. Strunck*, the court held that "[r]egulatory guidance does not

preclude a finding that the Complaint alleges scienter" and confirmed that if a defendant claims

it considered guidance to be ambiguous, this itself raises questions about its state of mind that are

proper only "after full development of the factual record." *Id.* at *6 (internal citations omitted).

*See also Streck*, 2018 WL 6300758, at *13 (denying motion to dismiss on scienter grounds).[13]

Even AbbVie's main case, *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 288 (D.C.

Cir. 2015), which, notably, was in a post-trial posture, observed that a defendant's knowledge is

not a purely legal question. Overall, the better-reasoned cases show that even if AbbVie had a

reasonable post-hoc interpretation of the statute (which notably it doesn't offer) or non-binding

guidance, this would not defeat scienter. And, the weight of authority supports, at minimum, that

a motion to dismiss is not the proper vehicle to effectively rule on a merits defense.

*Second*, AbbVie presupposes the legal landscape is ambiguous, which ignores the clear

prohibition in the AKS against offering inducements for prescriptions. This case is similar to

*Drummond,* where defendant argued that its conduct was immunized by the Medicare Claims

Processing manual. (Here, AbbVie points to OIG opinion letters). The court held that "the

guidance that the Defendants point to in the CMS manual is a policy statement that has no

binding legal effect." 2020 WL 762534 at *2 (internal quotation omitted).  *See also* State of

California's Statement of Interest, Dkt. 90 at 5 ("OIG guidance is not binding on the State, and

---

[13] In *Takeda*, which AbbVie cites here, the court looked at the other two *Streck* cases—the Third Circuit's
and the E.D. Pa.'s—and, noting the motion to dismiss context, held "the balance tips in favor of the denial
of the Rule 12(b)(6) motion" (and thus in favor of the district court case). *U.S. ex rel. Streck v. Takeda
Pharmaceuticals America, Inc*., 381 F. Supp. 3d 932, 940 (N.D. Ill. 2019).

1930845.9

does not transform AbbVie's conduct from Illegal to legal for purposes of the CFCA.").

*Third,* the OIG guidance that AbbVie cites bless, and only speak to, completely unrelated arrangements and do not cover the conduct here. *See* § V.B.2.

### E. Relator is the First to Expose AbbVie's Marketing Kickback Scheme.

Relator worked for nearly two years as an Ambassador. In this position, he amassed significant, first-hand information about the policies, strategies, and day-to-day functioning of the Ambassador Program. This included the true reason the Program was deployed (sales) and how that motivation shaped internal policies and practices and incentivized employee compensation. None of this was disclosed to the public. Yet AbbVie argues that this case is foreclosed by the "public disclosure bar" which precludes claims that are "substantially similar" to previously disclosed fraud. 31 U.S.C. § 3730(e)(4)(A); *see also, e.g., U.S. ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 368 (7th Cir. 2016). AbbVie is wrong for two reasons, each of which independently compels denying its motion. First, the fraudulent scheme in this case was never publicly disclosed. Second, Relator is an "original source" and exempt from the bar.

#### 1. The Public Disclosure Bar.

The Seventh Circuit has held that the public disclosure bar must be "understood in the context of the 1986 amendments" in which it was enacted, which aimed to "broaden the qui tam provisions" and "increas[e] incentives for the exposure of fraud." *U.S. v. Bank of Farmington*, 166 F.3d 853, 858 (7th Cir. 1999); *accord U.S. ex rel. Rigsby v. State Farm Fire & Cas. Co.*, 794 F.3d 457, 471 (5th Cir. 2015).[14] Consistent with this exhortation, when applying the public disclosure bar, courts in this circuit conduct a three-step inquiry. *See e.g. Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 913 (7th Cir. 2009). First, courts examine whether the

---

[14] The public disclosure bar was amended in 2010, but this was not a "significant change" from the previous (1986) version. *Bogina*, 809 F.3d at 368.

allegations in the complaint have been "publicly disclosed." *Cause of Action v. Chicago Transit Auth.,* 815 F.3d 267, 274 (7th Cir. 2016). If so, courts next determine whether the relator's allegations are "substantially similar to" those in the public sphere. *Id.* Finally, if both of the first two prongs are met, courts evaluate whether the relator is an "original source of the information upon which [the] lawsuit is based." *Id.* (internal quotation marks omitted).

### 2. Relator's Allegations are Not "Substantially Similar" to AbbVie's Alleged Public Materials

#### a. Courts Apply "Substantial Similarity" Narrowly to Encourage Exposure of Fraud.

In comparing a relator's allegations to an alleged public disclosure, the Seventh Circuit has "cautioned against 'viewing FCA claims at the highest level of generality . . . in order to wipe out qui tam suits." *Cause of Action,* 815 F.3d at 281. *See also U.S. ex rel. Baltazar v. Warden*, 635 F.3d 866, 869–70 (7th Cir. 2011); *U.S. ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 936 (7th Cir. 2012). In *Absher,* the Seventh Circuit addressed the "quantum and quality of factual content necessary to expose a transaction as fraudulent and thus trigger the public-disclosure bar." *Cause of Action*, 815 F.3d at 278–79 (citing *U.S. ex rel. v. Absher v. Momence Meadows Nursing Ctr.*, 764 F.3d 699, 707 (7th Cir. 2014)). In that case, plaintiff brought a qui tam action alleging that a nursing facility failed to comply with established standards of care and submitted false claims for that sub-standard care. *Absher*, 764 F.3d at 708. Prior to that suit, government reports had addressed non-compliance in that same facility.

The Seventh Circuit held that public reports of sub-standard care "did not disclose facts establishing that [defendant] misrepresented the standard of care in submitting claims for payment to the government." *Id.* at 708-09. Indeed, it "is not enough" for the government to know about the substandard care, even though this would mean that it "necessarily knew that at least some of [defendant's] claims for payment were" false. *Id.* To the contrary, "the entire qui

tam regime is premised on the idea that the government's knowledge of misrepresented claims . . . without knowledge that they are misrepresented[] does not in itself translate into effective enforcement of the laws against fraud. *Id*. at 709 n.10.

Similarly, in *Goldberg*, the Seventh Circuit held that the bar did not apply where the alleged disclosure and the relator's allegations both concerned a hospital's billing for unsupervised medical resident work, but the *way* in which the residents were unsupervised (performing "all by their lonesome" versus supervised only during "critical portions of the procedure") was different. 680 F.3d at 935-36. The court explained, "[u]nless we understand the 'unsupervised services'… as covering all ways that supervision could be missing or inadequate [] the allegations of these relators are not 'substantially similar.'" *Id*.

In line with these decisions, courts routinely decline to find a public disclosure in cases, like this one, where a relator offers key details about the means used to effectuate a fraud. *See, e.g.*, *U.S. ex rel. Graziosi v. R1 RCM, Inc.*, No. 13-1194, 2019 WL 861368, at *9 (N.D. Ill. Feb. 22, 2019); *Phone Recovery Servs., LLC v. Verizon Wash., D.C., Inc.*, 191 A.3d 309, 320 (D.C. 2018). Put another way, independent efforts to expose fraud as fraud are not subject to the public disclosure bar even when based on publicly available information. *See, e.g.*, *U.S. ex rel. Heath v. Wisconsin Bell, Inc.*, 760 F.3d 688, 691 (7th Cir. 2014).

  **b.**  <u>**AbbVie's Alleged Disclosures Do Not Expose its Fraudulent**</u>
<u>**Scheme.**</u>

In support of the argument that Relator's claims have been disclosed publicly, AbbVie references websites describing the parts of the Program that AbbVie allows the public to see, blog posts by patients describing interactions with Ambassadors, and an online blog run stating Humira Nurses could serve as "incentives" for doctors. Dkt. 87 at 23-25. This is not public disclosure, which occurs "*only* when either the allegation of fraud or the critical elements of the

- 26 -

fraudulent transaction themselves" have been disclosed. *Absher*, 764 F.3d at 707-08 (emphasis in original) (internal quotation marks omitted); *see also Cause of Action,* 815 F.3d at 279. AbbVie's many attachments to its motion to dismiss are also improper because "motions to dismiss [typically] . . . cannot include materials outside the pleadings." *See Flores v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 103 F. Supp. 3d 943, 948 (N.D. Ill. 2015) (citation omitted).[15]

The web pages describe "features of the Ambassador Program" including "help with injections" as well as information regarding Ambassadors' assistance with insurance coverage. None of this information alerts the government or the public to AbbVie's *intentional* scheme to induce and reward prescriptions of Humira through the Program. Similarly, the marketing materials cited do not reveal the medical counseling provided to patients for matters well beyond learning to use Humira. The website does not disclose that Ambassadors will not report adverse reactions to doctors. And it does not provide allegation or detail about the way that intent was manifested in internal policies, practices, and compensation frameworks, such as the improper collaboration between Ambassadors and sale representatives in the field. ¶ 93-97. It certainly does not explain how that (undisclosed) knowing and intentional scheme would lead to false claims to the government.

The blog in which a doctor states that AbbVie Nurses serve as "incentives," for example, does not disclose a scheme to induce prescriptions and false claims for coverage. Relator's Complaint, in contrast, includes ample details about the functioning of AbbVie's scheme and

---

[15] AbbVie does not cite single court within this circuit that has accepted an online blog to constitute a public disclosure. While, in the cases AbbVie cites, courts construed "public disclosure" to include certain websites and online articles—for example, the defendant's own promotional websites "intended to disseminate information about the clinic's programs." *U.S. ex rel. Osheroff v. Humana Inc*., 776 F.3d 805, 813 (11th Cir. 2015)—Relator respectfully contends that a bright line rule that *any* online material constitutes a disclosure—without inquiry into the circulation or credibility—is beyond the holdings of those cases and not appropriate or in line with the purposes of the statute, which exists "to bring to the attention of the relevant authority that there has been a false claim against the government." *U.S. ex rel. Feingold v. AdminaStar Fed., Inc*., 324 F.3d 492, 495 (7th Cir. 2003) (emphasis added).

how it ensured its success. The Complaint sets forth how Ambassadors visited patients in their homes and were trained to hide Humira's side effects, and accompanied sales representatives to doctor's offices to encourage prescriptions. ¶ 69, 86, 100, 116, 123. It includes evidence of the efficacy of the Program in meeting these objectives. ¶ 78-79 (internal emails setting enrollment targets for Ambassadors); ¶ 81 (describing internal "Field Coaching Logs" used to evaluate Ambassadors). And of AbbVie's efforts to conceal its true purpose. ¶ 92 (be "CAREFUL" about written communications with the sales team); ¶ 105 (internal email instructing "don't document" time spent at doctor's offices). The public disclosure bar does not apply.

### 3. Relator is an Original Source.

AbbVie's motion should be denied on the independent grounds that Relator is unquestionably an original source. An "original source" is one who "has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government." 31 U.S.C. § 3730(e)(4)(B). To qualify for the exception, the Relator must be an "original source of the allegations *in the complaint*," not the allegations publicly disclosed. *See Leveski v. ITT Educ. Servs., Inc*., 719 F.3d 818, 836 (7th Cir. 2013) (emphasis added). This is undoubtedly the case here.

AbbVie contends the original source exception does not apply because Relator's allegations do not "materially add" to the public information. The argument falls flat against the detailed and documented allegations available only in Relator's Complaint. Indeed, as a "whistleblowing insider" with first-hand knowledge from his employment as an Ambassador, Relator is the "paradigmatic" original source. *U.S. ex rel. Hartpence v. Kinetic Concepts, Inc*., No. 08-1885, 2016 WL 8919455, at *9 (C.D. Cal. Nov. 16, 2016) (citation omitted).

### a. Relator is an Insider.

AbbVie does not contest that Relator voluntarily provided his information to the

Government. Likewise, there can be no meaningful dispute that his knowledge is "independent" of the alleged public disclosures because "knowledge obtained from personal observation of a fraudulent act. . . . clearly . . . qualif[ies] for the exception." *U.S. ex rel. Banigan v. PharMerica, Inc.*, No. 18-1487, 2020 WL 813258, at *8 (1st Cir. Feb. 19, 2020); *see also, e.g.*, *Cause of Action,* 815 F.3d at 283; *Leveski*, 719 F.3d at 837. Relator worked for nearly two years as a Nurse Ambassador. ¶ 16. His eyewitness accounts are entirely his own.

### b.    <u>Relator Materially Adds to Any Public Allegations.</u>

Even in a case in which public disclosure had occurred, the bar would not apply if the relator adds materially to the public information. This is true when "the relator's information [is] different and more valuable to the government than the information underlying the public disclosure, which might be nothing more than speculation or rumors." *U.S. ex rel. Davis v. D.C.*, 679 F.3d 832, 838 (D.C. Cir. 2012) (citing *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 472 (2007)). For example, "the relator may have an eyewitness account . . . which could aid the government." *Id.*; s*ee also U.S. ex rel. Calilung v. Ormat Indus., Ltd.*, No. 3:14-CV-00325-RCJ, 2015 WL 1321029, at *21 (D. Nev. Mar. 24, 2015).[16] In this case, any ostensible public disclosure is far from the equivalent to Relator's firsthand details. [17]

The *Bogina* decision cited by AbbVie does not counsel otherwise. Relator's allegations are not comparable to a case following an already-filed qui tam action, alleging the same fraud against Medicare Part A and adding Medicare Part B and merely expanding the time period.

---

[16] *Cf. Cause of Action*, 815 F.3d at 283 (concluding allegations did not "materially add" to public disclosure where they were "substantially similar" to public allegations); *but see U.S. ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 757 (10th Cir. 2019) (observing that this conclusion in *Cause of Action* which "collaps[es] the materially-adds inquiry into the substantially-the-same inquiry" is "simply unpersuasive" as a matter of logic).

[17] *See, e.g.* ¶ 9, 82 (compensation structure); ¶ 100 (Relator attended lunch with a physician in August 2014 and was praised publicly by AbbVie's Senior Immunology Specialist thereafter, noting that they were "looking forward to continuing this optimization in our top offices").

F.     **Relator Pled His State Law Claims Appropriately.**[18]

Abbvie cites to no state law with more stringent requirements than the federal FCA. Because the Complaint adequately pleads violations of the federal FCA, it likewise adequately alleges violations of the state statutes. *See* Dkt. 87 at 29 (acknowledging that courts construe state qui tam statutes consistently with the federal FCA). Conversely, Abbvie ignores statutes such as California's that include different and less stringent requirements, or Texas's, that does not require submission of a false claim, and Abbvie has waived those arguments. Dkt. 90 (State of California's Statement of Interest); Tex. Hum. Res. Code Ann. § 36.002.

Relator's New Mexico claim should fare no differently. AbbVie provides no support for the allegation that Relator is not an "affected person" under the statute. *See U.S. ex rel. Brown v. Celgene Corp.,* No. CV 10-3165-GHK SSX, 2014 WL 3605896, at *12 (C.D. Cal. July 10, 2014) (rejecting similar argument as defendant provided "no basis" for a narrow reading of the term, and similar language in Delaware statute includes an "employee or former employee" of the company). Likewise, language permitting a relator to proceed in a non-intervened case where the state recognizes "substantial evidence" of a violation is satisfied, as New Mexico joined— without caveat, which some states did include—in the notice of declination. *See* Dkt. 26.

VI.    **CONCLUSION**

For the reasons stated above, Relator asks this Court to deny the motion to dismiss in its entirety. In the alternative, Relator respectfully asks this Court to grant leave to amend. *See, e.g.*, *Dubicz v. Commonwealth Edison Co.*, 377 F.3d 787, 792 (7th Cir. 2004) (leave to amend should be granted "liberally"). Finally, Relator requests to be heard at oral argument.

---

[18] AbbVie cursorily argues that Relator has not alleged a false claim resulting from a violation of federal drug marketing rules. Dkt. 87 at 27-28. This elides Relator's allegations of AbbVie's interactions with patients, which are a hidden form of sales interactions, violates these rules and shows why the kickbacks in this case are so pernicious. ¶¶ 33-35.

Dated: March 11, 2020          Respectfully submitted,

*/s/ Rachel Geman*
Rachel Geman (pro hac vice)
rgeman@lchb.com
Jason L. Lichtman
jlichtman@lchb.com
Katherine I. McBride (pro hac vice to be filed)
kmcbride@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: 212.355.9500
Facsimile: 212.355.9592

Robert J. Nelson (pro hac vice to be filed)
rnelson@lchb.com
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008

*/s/ Robert A. Clifford*
Robert A. Clifford
rac@cliffordlaw.com
Shannon M. McNulty
smm@cliffordlaw.com
Kristofer S. Riddle
ksr@cliffordlaw.com
CLIFFORD LAW OFFICES
120 N. LaSalle Street, Suite 3100
Chicago, IL 60602
(312) 899-9090

*Attorneys for Plaintiff-Relator Lazaro Suarez*

1930845.9

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2020 the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*/s/ Rachel J. Geman*

1930845.9