**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA ex rel. | ) | |
| LAZARO SUAREZ, and on behalf of the | ) | |
| STATE OF CALIFORNIA, et al., | ) | |
| | ) | |
| Plaintiff-Relator, | ) | Case No. 1:15-cv-08928 |
| | ) | |
| v. | ) | Hon. Rebecca Pallmeyer |
| | ) | |
| ABBVIE INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REPLY BRIEF IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S SECOND AMENDED COMPLAINT**

Dated: June 1, 2020

Andrew A. Kassof, P.C.
Elizabeth S. Hess, P.C.
Brenton A. Rogers, P.C.
Britt Cramer
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
akassof@kirkland.com
ehess@kirkland.com
brogers@kirkland.com
britt.cramer@kirkland.com
Telephone: 312-862-2000
Facsimile: 312-862-2200

*Counsel for Defendant
AbbVie Inc.*

# TABLE OF CONTENTS

**Page(s)**

I.    SUAREZ'S AKS THEORY IS FUNDAMENTALLY FLAWED ................................ 2

    A.    "Eliminating an Expense" Tied to Humira Is Not Illegal "Remuneration." ........... 2

    B.    Suarez Cannot Distinguish AbbVie's Legal Authority ........................................... 4

    C.    Suarez's Authorities Are Inapposite ...................................................................... 5

II.    THE COMPLAINT FAILS FOR LACK OF PARTICULARITY ............................ 8

    A.    Suarez Misstates the Rule 9(b) Standard .............................................................. 8

    B.    Suarez Does Not Satisfy Rule 9(b) ....................................................................... 9

    C.    Suarez Has Not Pled Nationwide Fraud .............................................................. 11

III.    SUAREZ STILL HAS NOT PLED SCIENTER .......................................................... 12

    A.    Suarez Has Not Pled A Knowing And Willful AKS Violation. ........................... 12

    B.    Suarez Does Not Allege A Knowing Violation Of The FCA .............................. 14

        1.    *Safeco*'s Objective Knowledge Standard Applies to the FCA .................. 14

        2.    Suarez and the United States Misread the FCA's Text............................. 18

        3.    None of Suarez's or the Government's Authorities Limit *Safeco* ............ 19

        4.    Suarez Has Not Alleged Scienter Under the FCA .................................... 21

IV.    THE PUBLIC DISCLOSURE BAR REQUIRES DISMISSAL .................................. 22

V.    SUAREZ'S STATE LAW CLAIMS MUST BE DISMISSED ................................... 26

    A.    The State Law Claims Fail Along With The Federal FCA Claim ........................ 26

    B.    California's Statement Does Not Save Suarez's California FCA Allegations ....................................................................................................... 26

VI.    SUAREZ SHOULD NOT HAVE FURTHER OPPORTUNITY TO AMEND ........ 30

CONCLUSION ...................................................................................................................... 30

i

**TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Alioto v. Town of Lisbon*,
    651 F.3d 715 (7th Cir. 2011) ......................................................................3, 26, 30

*Am. Fed'n of Gov't Emps. v. Rumsfeld*,
    262 F.3d 649 (7th Cir. 2001) .........................................................................5

*Bellevue v. Universal Health Servs. of Hartgrove, Inc.*,
    867 F.3d 712 (7th Cir. 2017) ......................................................................23, 25

*California ex rel. Bowen v. Bank of Am. Corp.*,
    126 Cal. App. 4th 225 (2005) ......................................................................28

*California ex rel. McCann v. Bank of Am., N.A.*,
    191 Cal. App. 4th 897 (2011) ......................................................................27

*California v. Altus Fin.*,
    36 Cal. 4th 1284 (2005) ............................................................................28

*Cause of Action v. Chi. Transit Auth.*,
    815 F.3d 267 (7th Cir. 2016) ....................................................................22, 23, 24

*City of Pomona v. Superior Ct.*,
    89 Cal. App. 4th 793 (2001) ......................................................................28

*Cty. of Los Angeles v. Superior Gunite, Inc.*,
    2015 WL 2393770 (Cal. Ct. App. 2015) .........................................................27

*Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*,
    559 U.S. 280 (2010)................................................................................25

*Guilfoile v. Shields*,
    913 F.3d 178 (1st Cir. 2019) .......................................................................7

*Hagood v. Sonoma Cty. Water Agency*,
    81 F.3d 1465 (9th Cir. 1996) ......................................................................17

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
    136 S. Ct. 1923 (2016)............................................................................19, 20

*Laraway v. Sutro & Co., Inc.*,
    96 Cal. App. 4th 266 (2002) ......................................................................28

ii

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................................12

*Mao's Kitchen, Inc. v. Mundy*,
   209 Cal. App. 4th 132 (2012) ...............................................................28

*Mason v. Medline Indus., Inc.*,
   731 F. Supp. 2d 730 (N.D. Ill. 2010) ...................................................14

*People v. Guiamelon*,
   205 Cal. App. 4th 383 (2012) ...............................................................29

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
   631 F.3d 436 (7th Cir. 2011) ................................................................27

*Purcell v. Gilead Scis. Inc.*,
   2020 WL 762473 (E.D. Pa. 2020) ....................................7, 16, 17, 21

*Safeco Ins. Co. of Am. v. Burr*,
   551 U.S. 47 (2007) ....................................................................... *passim*

*San Francisco Unified Sch. Dist. ex rel. Contreras v. First Student, Inc.*,
   224 Cal. App. 4th 627 (2014) ...............................................................28

*San Francisco Unified Sch. Dist. ex rel. Contreras v. Laidlaw Transit, Inc.*,
   182 Cal. App 4th 438 (2010) ................................................................28

*Thompson Pac. Constr., Inc. v. City of Sunnyvale*,
   155 Cal. App. 4th 525 (2007) ...............................................................27

*U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*,
   764 F.3d 699 (7th Cir. 2014) ................................................................24

*U.S. ex rel. Beauchamp v. Academi Training Ctr.*,
   816 F.3d 37 (4th Cir. 2016) ..................................................................25

*U.S. ex rel. Berkowitz v. Automation Aids, Inc.*,
   896 F.3d 834 (7th Cir. 2018) ...........................................................8, 19

*U.S. ex rel. Bilotta v. Novartis Pharm. Corp.*,
   50 F. Supp. 3d 497 (S.D.N.Y. 2014) ...................................................13

*U.S. ex rel. Bogina v. Medline Indus., Inc.*,
   809 F.3d 365 (7th Cir. 2016) ................................................................26

*U.S. ex rel. Boise v. Cephalon, Inc.*,
   2015 WL 1724572 (E.D. Pa. 2015) ...................................................5, 6

iii

*U.S. ex rel. Derrick v. Roche Diagnostics Corp.*,
   318 F. Supp. 3d 1106 (N.D. Ill. 2018) .................................................................7

*U.S. ex rel. Donegan v. Anesthesia Assocs. of Kansas City, PC*,
   2015 WL 3616640 (W.D. Mo. 2015) ................................................................18

*U.S. ex rel. Donegan v. Anesthesia Assocs. of Kansas City, PC*,
   833 F.3d 874 (8th Cir. 2016) ............................................................................15

*U.S. ex rel. Drummond v. BestCare Lab. Servs., L.L.C.*,
   950 F.3d 277 (5th Cir. 2020) ............................................................................21

*U.S. ex rel. Forney v. Medtronic, Inc.*,
   2017 WL 2653568 (E.D. Pa. 2017) ............................................................. *passim*

*U.S. ex rel. Goldberg v. Rush Univ. Med. Ctr.*,
   680 F.3d 933 (7th Cir. 2012) ............................................................................24

*U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharm., Inc.*,
   772 F.3d 1102 (7th Cir. 2014) ...........................................................9, 10, 12, 30

*U.S. ex rel. Harman v. Trinity Indus. Inc.*,
   872 F.3d 645 (5th Cir. 2017) ............................................................................15

*U.S. ex rel. Hawkins v. ManTech Int'l Corp.*,
   2020 WL 435490 (D.D.C. 2020) .........................................................................8

*U.S. ex rel. Health Choice Grp., LLC v. Bayer Corp.*,
   No. 5:17-cv-126 (E.D. Tex.), Dkt. 116................................................................21

*U.S. ex rel. Hixson v. Health Mgmt. Sys., Inc.*,
   613 F.3d 1186 (8th Cir. 2010) ...............................................................17, 19, 22

*U.S. ex rel. John v. Hastert*,
   82 F. Supp. 3d 750 (N.D. Ill. 2015) ..................................................................24

*U.S. ex rel. K & R Limited Partnership v. Mass. Housing Fin. Agency*,
   530 F.3d 980 (D.C. Cir. 2008).........................................................................20

*U.S. ex rel. Kalec v. NuWave Monitoring, LLC*,
   84 F. Suppl. 3d 793 (N.D. Ill. 2015) ...............................................................8, 9

*U.S. ex rel. Lusby v. Rolls-Royce Corp.*,
   570 F.3d 849 (7th Cir. 2009) ..............................................................................8

*U.S. ex rel. Marshall v. Woodward, Inc.*,
   812 F.3d 556 (7th Cir. 2015) ............................................................................17

*U.S. ex rel. McGrath v. Microsemi Corp.*,
   690 F. App'x 551 (9th Cir. 2017) ................................................................15, 22

*U.S. ex rel. Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*,
   276 F.3d 1032 (8th Cir. 2002) .............................................................................20

*U.S. ex rel. Oliver v. Parsons Co.*,
   195 F.3d 457 (9th Cir. 1999) ...............................................................................20

*U.S. ex rel. Perri v. Novartis Pharm. Corp.*,
   2019 WL 6880006 (D.N.J. 2019) ...........................................................................7

*U.S. ex rel. Phalp v. Lincare Holdings, Inc.*,
   857 F.3d 1148 (11th Cir. 2017) ...........................................................................21

*U.S. ex rel. Purcell v. MWI Corp.*,
   807 F.3d 281 (D.C. Cir. 2015) ....................................................................*passim*

*U.S. ex rel. Reilly v. Adventist Health*,
   2020 WL 2522114 (E.D. Cal. 2020) .....................................................................27

*U.S. ex rel. Ribik v. HCR ManorCare, Inc.*,
   2017 WL 3471426 (E.D. VA. 2017) .....................................................................26

*U.S. ex rel. Solomon v. Lockheed Martin Corp.*,
   878 F.3d 139 (5th Cir. 2017) ...............................................................................23

*U.S. ex rel. Streck v. Allergan, Inc.*,
   746 F. App'x 101 (3d Cir. 2018) ..............................................................15, 17, 18, 22

*U.S. ex rel. Streck v. Allergan, Inc.*,
   894 F. Supp. 2d 584 (E.D. Pa. 2012) ...................................................................18

*U.S. ex rel. Streck v. Takeda Pharm. Am., Inc.*,
   381 F. Supp. 3d 932 (N.D. Ill. 2019) ...................................................................21

*U.S. ex rel. Strunck v. Mallinckrodt Ard LLC*,
   2020 WL 362717 (E.D. Pa. 2020) ........................................................................13

*U.S. ex rel. Watson v. King-Vassel*,
   728 F.3d 707 (7th Cir. 2013) ...............................................................................18

*U.S. ex rel. Witkin v. Medtronic, Inc.*,
   189 F. Supp. 3d 259 (D. Mass. 2016) ..........................................................5, 6, 13

*U.S. ex rel. Wood v. Allergan*,
   246 F. Supp. 3d 772 (S.D.N.Y. 2017) ..............................................................5, 7

*U.S. ex rel. Yannacopoulos v. Gen. Dynamics*,
  652 F.3d 818 (7th Cir. 2011) ...................................................................17

*U.S. ex rel. Young v. Suburban Home Physicians*,
  2017 WL 6625940 (N.D. Ill. 2017) ......................................................12, 13

*U.S. ex. rel. Chilcott v. KBR, Inc.*,
  2013 WL 5781660 (C.D. Ill. 2013)...........................................................21

*United States v. Neifert–White Co.*,
  390 U.S. 228 (1968)...................................................................................28

*United States v. Williams*,
  218 F. Supp. 3d 730 (N.D. Ill. 2016) .......................................................12

*Urquilla-Diaz v. Kaplan Univ.*,
  780 F.3d 1039 (11th Cir. 2015) ................................................................18

**Statutes**

35 U.S.C. § 284 ...............................................................................................19, 20

Cal. Bus. & Prof. Code § 650 .............................................................................29

Cal. Gov. Code § 12651...............................................................................26, 28

Cal. Gov. Code § 12652.......................................................................................30

Cal. Health & Safety Code § 119402.................................................................29

False Claims Act, 31 U.S.C. § 3729-33 .................................................... *passim*

**Rules**

Fed. R. Civ. P. 9(b) ................................................................................... *passim*

**Regulations**

68 Fed. Reg. 23731-01 (May 5, 2003)...........................................................3, 29, 30

70 Fed. Reg. 4858-01 (Jan. 31, 2005)...................................................................7

OIG Adv. Op. No. 04-16 (Nov. 18, 2004)...........................................................7

OIG Adv. Op. No. 11-08 (June 14, 2011) ............................................................7

Suarez's response to AbbVie's motion to dismiss his amended complaint is written as if this Court's September 30, 2019 opinion and order dismissing his previous complaint did not exist. That opinion comprehensively examined Suarez's multiple independent pleading deficiencies: his failure to allege any false claim, to plead with the required particularity, and to allege scienter. Nowhere in his opposition does Suarez even acknowledge the problems the Court identified, much less explain how he has fixed them. In fact, he cites the Court's opinion just *once*, and then only to take issue with its reasoning. Suarez instead rehashes arguments this Court has already rejected. Those arguments are just as flawed now as they were before, the new complaint is just as deficient as the old one, and the Court should dismiss it for the same reasons.

***First***, and most fundamentally, Suarez still insists that providing doctors "anything of value" in connection with a Humira prescription necessarily constitutes "remuneration" under the Anti-Kickback Statute ("AKS") and that AbbVie's patient support programs are thus *per se* unlawful because they save doctors time and money. Dkt. 91 (Resp.), at 8-10. This Court already rejected that theory, explaining that "OIG guidance provides that support services a pharmaceutical manufacturer offers in connection with the sale of its own products—including billing assistance tailored to the purchased products and reimbursement consultation—do not, on their own, implicate the [AKS]." Dkt. 74 (MTD Op.), at 15. Because Suarez still "alleges that AbbVie provided these exact types of support services—and no others," his claim necessarily fails. *Id*.

***Second***, Suarez never grapples with the Court's instruction that he must "plead with the particularity required by Rule 9(b)" that AbbVie actually paid illegal kickbacks and submitted false claims. *Id*. at 18-24. The "thorough details … and numerous examples of specific doctors and patients" purportedly added to his complaint, Resp. at 14-16, are window dressing. Nowhere does he actually "allege that a claim was submitted to a government health care program for any

… patient" "for whom a doctor prescribed Humira in exchange for a kickback."  MTD Op. at 20.

Nor does he add "more detail" that could "support [an] inference" of nationwide fraud.  *Id.* at 25.

**Third**, Suarez misunderstands scienter under the AKS and the False Claims Act ("FCA").

He continues to claim that AKS scienter can be inferred from his allegations that AbbVie disguised

the true motives of the Ambassador Program, *see* Resp. at 21, ignoring the Court's prior ruling

that "it is unclear whether the alleged cover-up efforts have any relation to the services alleged to

constitute illegal remunerations," MTD Op. at 26-27.  Nor does he acknowledge the finding that

AbbVie's website "dispels any inference that AbbVie was trying to conceal the services that [he]

contends violates the AKS."  *Id.* at 27.  Finally, Suarez has no real answer to the holding that

scienter is undermined by "OIG guidance recogniz[ing] that a pharmaceutical company can

provide product and reimbursement support services without violating the law."  *Id.* at 26.

Besides disregarding the Court's prior opinion, Suarez also fails to answer AbbVie's other,

independent dismissal arguments regarding FCA scienter and the public disclosure bar.  For these

many reasons, the complaint should again be dismissed, this time with prejudice.

## I.  SUAREZ'S AKS THEORY IS FUNDAMENTALLY FLAWED.

### A.  "Eliminating an Expense" Tied to Humira Is Not Illegal "Remuneration."

Suarez again claims that providing "anything of value" to doctors in connection with a

prescription is necessarily illegal "remuneration."  Resp. at 8-9.  That is not the law, nor could it

be.  Every effective therapeutic drug is useful to doctors because it helps their patients, but merely

offering a drug for sale is not illegal.  Nor is there anything unlawful about making the drug more

effective (and thus more useful to doctors) to encourage more prescriptions.  Likewise, patient

support services tied to a particular drug may provide value to doctors by assisting their patients,

but that is not illegal either.  *U.S. ex rel. Forney v. Medtronic, Inc.*, 2017 WL 2653568, at *4 (E.D.

Pa. June 19, 2017) ("Offering well-supported products might induce physicians to purchase

[them], but only because they are better-supported products than competing products.").  As this Court recognized, pertinent agency guidance tracks this logic: a patient support program violates the AKS only if it offers *more* than "[drug]-related services" and confers substantial "*independent value*" on doctors.  MTD Op. at 13-16 (emphasis added); 68 Fed. Reg. 23731-01, 23735 (May 5, 2003) ("Standing alone, services that have no substantial independent value to the purchaser may not implicate the [AKS]").  The Ambassador Program does none of these things.

Suarez argues that AbbVie's patient support programs provide independent value to doctors by "[e]liminating an expense," but this theory makes the same fundamental mistake as before.  Resp. at 9-10.  Eliminating an expense is improper only if that expense was one that the prescriber would have *otherwise* incurred had she *not* prescribed the medication.  As this Court already found, the notion that "offering free product support or reimbursement support services could violate the AKS merely because it saves physicians money" is inconsistent with extensive guidance that permits assistance tailored to specific drugs.  MTD Op. at 18; *see also* Dkt. 87 (MTD Br.), at 9-10 & n.3 (collecting authorities).[1]  Thus, the proper question is not just whether AbbVie eliminated an expense, but whether that expense was unrelated to Humira.

As his response largely acknowledges, every expense Suarez alleges was avoided is Humira-related: "house calls" to Humira patients, "training on self-injections" of Humira, "follow-up phone calls with [Humira] patients," helping Humira patients "in dealing with insurance companies," and giving advice like "taking Benadryl prior to administering a Humira injection." Resp. at 9-10.  Although he claims in passing that Ambassadors engage in "general medical discussion[s]" with Humira patients, *id.* at 9 (citing SAC ¶ 69), nowhere in his complaint does

---

[1]    Suarez again fails to explain how Humira-related *goods* are improper in light of extensive authority to the contrary.  *See* MTD Br. at 9-10, 12.  As the Court previously observed, this omission "concedes the point."  MTD Op. at 12; *see also Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011).

Suarez actually allege any specific discussions unrelated to Humira. To the contrary, every allegation about what Ambassadors did is tied to helping patients properly use their Humira prescriptions. MTD Br. at 10-12; *see also* MTD Op. at 14 (a court "can consider only the pleadings" in adjudicating a motion to dismiss). Indeed, Suarez's own "representative" examples confirm that Ambassadors focused exclusively on Humira. SAC ¶¶ 153-60.

      **B.**     **Suarez Cannot Distinguish AbbVie's Legal Authority.**

Suarez cannot overcome the many cases refuting his theory. He tries to distinguish *Forney*, for example, on the ground that "the operative Complaint here offers significant detail explaining *how* the panoply of professional services and other kickbacks cover expenses that physicians would otherwise have to pay for, bringing them outside the realm of basic product support." Resp. at 12. This Court previously disagreed, finding that although Suarez "offered details concerning the type of services Ambassadors provide, he has not sufficiently explained how the services provided substantial independent value—as opposed to 'permissible product support'—for physicians." MTD Op. at 16. *Forney* held that companies are entitled to offer "better-supported products than competing products" and that relators must specifically allege how services saved doctors money they otherwise would have spent had they not prescribed the product. 2017 WL 2653568, at *4. Because Suarez still cannot and does not offer any such allegations, the Court should again apply *Forney*.

Also flawed are Suarez's efforts to downplay several cases where the government expressed support for patient assistance programs. Resp. at 12-13 & n.6. He argues that these cases involved a "professional relator" and not a "true eyewitness," but that fact does nothing to undermine the government's substantive statements about the importance of patient support. *See* MTD Br. at 10 & n.4. He also notes that some of these cases involved different methods of patient support—a "toll free hotline" versus Ambassadors' in-home visits, Resp. at 13—but that is a

distinction without difference. The cases share the common principle, equally applicable here, that manufacturers may support their own products. Finally, while Suarez makes much of the fact that the government has "opt[ed] on two occasions to oppose AbbVie's motions to dismiss," *id.*, he fails to acknowledge that those identical filings narrowly addressed scienter under the FCA and that "[t]he government otherwise takes no position" on his claims. *See* Dkt. 61 at 8; Dkt. 88, (U.S. Statement), at 8 (same).

Suarez's attack on OIG opinion letters is likewise unavailing. Resp. at 13-14. AbbVie does not "rely" on those opinions "to immunize an unrelated program." *Id*. at 14. The opinions are instead "informal interpretations [that] are entitled to respect to the extent that they have the power to persuade." *Am. Fed'n of Gov't Emps. v. Rumsfeld*, 262 F.3d 649, 656 (7th Cir. 2001). This persuasive authority reinforces the proposition that a manufacturer may provide support for its products without running afoul of the AKS. *See* MTD Br. at 9-10.

### C. Suarez's Authorities Are Inapposite.

This Court has already expressly distinguished the chief authorities on which Suarez relies. *Compare* Resp. at 10-12, *with* MTD Op. at 17-18. These cases—*U.S. ex rel. Witkin v. Medtronic, Inc.*, 189 F. Supp. 3d 259 (D. Mass. 2016), *U.S. ex rel. Boise v. Cephalon, Inc.*, 2015 WL 1724572 (E.D. Pa. Apr. 15, 2015), and *U.S. ex rel. Wood v. Allergan*, 246 F. Supp. 3d 772, 806 (S.D.N.Y. 2017)—again "do not influence the outcome here." MTD Op. at 17.

As the Court has recognized, *Witkin* involved the defendant helping "doctors … obtain payouts from government health care programs for services they did not provide." *Id.* at 18. Specifically, the defendant offered free services to patients, but then turned around and taught physicians how to bill them to the government—an arrangement that "transform[ed] … an *otherwise innocuous* patient-promotion practice into an offer of remuneration." *Witkin*, 189 F.

Supp. 3d at 270 (emphasis added). In contrast, Suarez never alleges physicians billed the government for Ambassadors' services.

Suarez implies that the relator "did not pursue" the theory that the defendant violated the FCA by helping doctors obtain unearned payments, Resp. at 11, but that is not true. The theory the relator chose not to pursue in *Witkin* was that the *physicians'* (not the manufacturer's) claims were independently false. 189 F. Supp. 3d at 270. The relator *did* pursue the theory that the *manufacturer's* claims violated the AKS in light of the remuneration they had provided doctors— *i.e.*, facilitating government payment for services that the doctors did not perform. The court was addressing *that* theory when it concluded that "even a physician legitimately billing Medicare for properly-supervised … services has received remuneration when he otherwise would have had to expend additional money or time to administer the services himself or pay staff to do so." *Id.* (emphasis omitted). Again, nothing of the sort happened here—doctors received no payment from the government for Ambassador activities.

In *Cephalon*, the relators "alleged that [the] defendant supplied physicians with 'front office' personnel in the form of Cephalon sales representatives who were instructed to provide free services to ensure that the physicians obtained reimbursement from Medicare and Medicaid without having to pay their own staff to perform the work." MTD Op. at 18 (quoting *Cephalon*, 2015 WL 1724572, at *11). Unlike those representatives, who were allegedly "taught to assist the *physician's* front office with *any issues* related to prior authorizations," *Cephalon*, 2d Am. Compl., 2014 WL 8185092 at ¶ 237 (emphasis added), Suarez alleges only that Ambassadors assist *patients* with reimbursement for *Humira*. Additionally, the Cephalon representatives told doctors to include "false" language on authorization requests. *Cephalon*, 2015 WL 1724572, at *4. Suarez does not allege any similar conduct by Ambassadors.

6

Finally, in *Wood*, the court emphasized free drug samples, care kits, and office supplies that allegedly had "independent value to the physician." 246 F. Supp. 3d at 807. The free drugs were necessary for surgery but not reimbursable by Medicare; the care kits were not connected to a specific product but could be used for a variety of procedures; and the doctors "would otherwise have had to purchase their own prescription pads." *Id.* at 806-09. Suarez's "allegations do not concern free products, but rather product-related support services that OIG guidance characterizes as permissible." MTD Op. at 17. "And unlike in *Wood*, [Suarez] does not allege a quid pro quo agreement between AbbVie and doctors," and "alleges only in a conclusory manner that the Ambassadors' services eliminated costs that doctors would otherwise have had to cover" if they did not prescribe Humira. *Id.*

Apart from these three decisions, Suarez largely relies on AKS cases that have nothing to do with patient support programs endorsed by case law and government guidance. Resp. at 8-9; *e.g. U.S. ex rel. Derrick v. Roche Diagnostics Corp.*, 318 F. Supp. 3d 1106, 1110-14 (N.D. Ill. 2018) (multimillion dollar "debt forgiveness" in exchange for formulary placement); *U.S. ex rel. Perri v. Novartis Pharm. Corp.*, 2019 WL 6880006, at *1 (D.N.J. Feb. 21, 2019) ("substantial commercial discounts and rebates"); *Guilfoile v. Shields*, 913 F.3d 178, 184-85 (1st Cir. 2019) (payments for referral of hospital contracts); *Purcell v. Gilead Scis. Inc.*, 2020 WL 762473, at *3-4 (E.D. Pa. Feb. 13, 2020) (direct payments to physicians under the guise of sham speaking events). He also re-invokes agency materials that have no application here, *compare* Resp. at 8 n.3, *with* Dkt. 60 at 8-9 & n.4; *e.g.* 70 Fed. Reg. 4858-01, 4866 (Jan. 31, 2005) (arrangements between hospitals and physicians); OIG Adv. Op. Nos. 04-16 (Nov. 18, 2004) (arrangements between laboratories and dialysis facilities); 11-08 (June 14, 2011) (arrangements between equipment suppliers and diagnostic testing facilities)—all while failing to engage with the agency materials

cited by AbbVie and already embraced by this Court, *see* MTD Br. at 9-10; MTD Op. at 12-15. Simply put, Suarez asks the Court to evaluate essentially the same allegations under the same law and come to a different result. It should not.

## II. THE COMPLAINT FAILS FOR LACK OF PARTICULARITY.

### A. Suarez Misstates the Rule 9(b) Standard.

AbbVie has never argued, and this Court never required, that Suarez must provide "specific invoices" to support his complaint. Resp. at 15. But, under Rule 9(b), he must "allege … specific facts demonstrating what occurred at the individualized transactional level." *U.S. ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 841 (7th Cir. 2018).

Suarez's cases are not to the contrary. Resp. at 14-15. For example, in *U.S. ex rel. Lusby v. Rolls-Royce Corp.* the relator "describe[d] tests said to prove [product] deficienc[ies]," cited internal "audits … confirm[ing his] conclusions," "name[d] specific parts shipped on specific dates," and identified "details of payment." 570 F.3d 849, 853-54 (7th Cir. 2009). In *U.S. ex rel. Hawkins v. ManTech International Corp.*, the relator "obtain[ed] a document reflecting the number of his labor hours reported to the United States" that showed specific misrepresentations on particular dates, and "identified specific managers who instructed employees … to misrepresent their hours." 2020 WL 435490, at \*10 (D.D.C. Jan 28, 2020). And in *U.S. ex rel. Kalec v. NuWave Monitoring, LLC*—which Suarez first cites with approval, then later tries to distinguish, *see* Resp. at 15, 17—the court allowed the relators to proceed on only a single, non-AKS count backed by specific examples of services that were billed on a particular date and performed by a relator himself, *Kalec*, 84 F. Supp. 3d 793, 801, 806 (N.D. Ill. 2015) ("Plaintiffs … cite Dr. Kalec's June 18, 2010 services as a representative example."). It then dismissed the rest of the counts, including an AKS claim for which the relators "fail[ed] to identify a single patient" and thus "fail[ed] to specifically link the alleged kickback scheme to an actual claim that was submitted to

Medicare." *Kalec*, 84, F. Supp. 3d at 807. Far from helping Suarez, these cases illustrate why his complaint lacks the required detail.

Suarez renews his attacks on Seventh Circuit precedent like *Grenadyor*, claiming that a relator must point to specific patients only when the patients—as opposed to doctors—are the target of the scheme. *Compare* Resp. at 16-17, *with* Dkt. 60 at 17-18. But as this Court explained last time, "*Grenadyor* did not limit its conclusion to circumstances in which the alleged fraud targets patients," and the need "to link a kickback with a patient and a submitted claim is to ensure [an] actual filing of a false claim—not merely the violation of a regulation." MTD Op. at 21. That logic is necessarily correct, for without a patient actually filling a prescription and using Humira, there could be no claim submitted for reimbursement. As for Suarez's citation of district court decisions that supposedly excuse him from identifying patients, Resp. at 16-17, the Court succinctly explained last time that these decisions "predate *Grenadyor*," MTD Op. at 21.

Finally, Suarez again argues that the Court should relax the pleading requirements in this case. *Compare* Resp. at 14, 16-17, *with* Dkt. 60 at 14. But as the Court previously explained, any sort of "relaxed application of Rule 9(b)" requires Suarez *both* (1) to allege "lack[ of] access to claim information" and (2) to identify facts that "necessarily create the inference that a false claim was submitted to the government." MTD Op. at 23. He does neither. Suarez never alleges that he lacks access to claims data. His contention that he "did not have access to [*doctors'*] internal accounting" is a red herring, Resp. at 15, because the question is whether he has information about *AbbVie's* claims for payment. Nor do his allegations "necessarily" imply the submission of false claims, as discussed in detail below.

### B. Suarez Does Not Satisfy Rule 9(b).

Once again, Suarez fails to "name a specific patient for whom a doctor prescribed Humira in exchange for a kickback" or "allege that a claim was submitted to a government health care

program for [such a] patient." MTD Op. at 20; *U.S. ex rel. Grenadyor v. Ukrainian Vill. Pharm., Inc.*, 772 F.3d 1102, 1107 (7th Cir. 2014). Although Suarez now claims to have "identif[ied] numerous government insurance patients with whom he worked directly," Resp. at 16, he points to no allegations that any of these patients received their prescription because of a kickback, *see* MTD Op. at 20. In fact, the complaint refutes that conclusion—all of these patients had already been prescribed Humira by the time they met an Ambassador. SAC ¶¶ 153-60.

Regardless, Suarez cannot create an inference of fraud even under a relaxed application of Rule 9(b). His main strategy is again to cite doctors who supposedly "prescribed Humira (or who prescribed it at an increased rate) as a result of the Ambassador Program." Resp. at 15 & n.8 (citing SAC ¶¶ 75-76, 97, 99, 111, 154); *compare* Dkt. 60, at 15 & n.9. But as this Court already explained, naming doctors who ostensibly "prescribed more Humira as a result of the Program" is not good enough absent an allegation "that any of the doctors ever prescribed Humira to … government payor patients." MTD Op. at 23. After all, a kickback must implicate government funding to offend the AKS. *Grenadyor*, 772 F.3d at 1107. Suarez's allegations never make that link. *Compare* SAC ¶¶ 75-76, 97, 99, 111, *with* First Am. Compl. ¶¶ 70, 76, 78, 81-82. Although he asserts—in conclusory fashion and with no supporting factual allegations—that certain doctors prescribed more Humira, he never links *these* doctors to government funding. SAC ¶¶ 97, 111. And when Suarez names a *different* doctor who supposedly prescribed Humira to a Medicare beneficiary, he never alleges that *this* doctor prescribed Humira because of the Ambassador Program. *Id.* ¶¶ 154-56. On the contrary, Suarez claims that the doctor merely "continued to write Humira prescriptions"—in other words, maintained the status quo. *Id.* ¶ 156. Accordingly, the allegations "just as easily allow for an inference that doctors prescribed Humira to government payor patients because they thought the drug was medically necessary." MTD Op. at 23-24.

Nor can Suarez help his cause by claiming that physicians on "average" spend thousands of dollars on administrative tasks. Resp. at 15. Generalized data about other doctors hardly shows that any particular physician whose patients used the Ambassador Program saved money—much less that these hypothetical savings induced Humira prescriptions to Medicare patients. Suarez's "years of experience" and publicly available statistics are not specific allegations of kickbacks impacting government coffers. *Id.*

Finally, there is no merit to Suarez's argument that he has cited "specific mechanisms …, including identifying the specific forms and certifications … used to wrongfully obtain reimbursement under Medicare and Medicaid." *Id.* at 16. This reasoning is nothing more than conjecture that a defendant certainly must have billed the government just because it had the ability to do so. As the Court already held, "[e]xplaining how any person or entity could hypothetically submit false claims does not suggest that AbbVie necessarily did so as a result of the alleged kickback scheme." MTD Op. at 24.

### C.     Suarez Has Not Pled Nationwide Fraud.

Suarez contends that his allegations about activities in Florida; meetings, trainings, and patients in a few other states; and AbbVie's "Operation Dakota" program establish nationwide fraud. Resp. at 18. But this information is little different from last time, when the Court held insufficient "allegations concerning only South Florida," "national sales meetings," and the expansion of the "Program to sparsely-populated areas." MTD Op. at 24-25. Moreover, Suarez's supposedly new allegations about patients, meetings, and trainings are irrelevant because they do not allege fraud. None of his patient examples show a prescription in exchange for a kickback— rather, they illustrate that Suarez encountered patients who already had prescriptions. SAC ¶¶ 153-60. Additionally, Suarez never alleges that the patients in Massachusetts or North Carolina were "Medicare or Medicaid recipients"—a prerequisite of a false claim for government payment.

11

*Grenadyor*, 772 F.3d at 1107; SAC ¶ 168. His allegations about events in the other states are weaker still, for they do not show any patients or prescriptions—let alone improperly induced ones—in these locations. As before, Suarez is trying to extrapolate his flawed observations in Florida to the entire United States without any of the "detail [necessary] to support [an] inference" of widespread fraud. MTD Op. at 25.

### III. SUAREZ STILL HAS NOT PLED SCIENTER.

#### A. Suarez Has Not Pled A Knowing And Willful AKS Violation.

Because Suarez's claims are premised on the AKS, he must show that AbbVie "acted with the requisite scienter under the AKS: a knowing and willful violation." MTD Op. at 25. Yet he devotes just two paragraphs to the AKS, instead addressing most of his scienter discussion to the FCA. *See* Resp. at 21. And in these two paragraphs, he fails to respond to AbbVie's arguments, based on the Court's prior ruling, that its "website openly advertise[d its] services" and that "OIG guidance recogniz[ing] that a pharmaceutical company can provide product and reimbursement support services" negates scienter. MTD Op. at 26-27.

The arguments Suarez does make about the AKS get him nowhere. He suggests that courts should not resolve scienter on a motion to dismiss, *see* Resp. at 21, but the AKS's "high scienter requirement" is a critical component of a violation, *United States v. Williams*, 218 F. Supp. 3d 730, 740 (N.D. Ill. 2016), and so the law "require[s] that claimants plead some facts supporting the inference that defendants knew their conduct was wrongful," *U.S. ex rel. Young v. Suburban Home Physicians*, 2017 WL 6625940, at *3 (N.D. Ill. Dec. 28, 2017); *cf. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ("[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof."). Thus, it is unsurprising that this Court and others, including those in this district, have addressed scienter in granting motions to dismiss. MTD Op. at 25-27; *Young*, 2017 WL 6625940, at *3; *Forney*, 2017 WL 2653568, at *5. Any other approach

12

would nullify traditional pleading rules and let relators avoid their "burden [of] alleg[ing] facts." MTD Op. at 26.

Nor are these cases distinguishable, as Suarez claims. *See* Resp. at 21. In *Young*, the relator alleged no conduct that was "obviously wrongful," 2017 WL 6625940, at *3—so too here given the legal guidance confirming AbbVie's interpretation, *see* MTD Op. at 26. And in *Forney*, the relator alleged that the defendant "touted its willingness to provide free services" and "induced physicians and others with purchasing power to select [defendant's] devices," 2017 WL 2653568, at *5—similar to the allegations here that AbbVie advertised its services to doctors with the goal of encouraging prescriptions.

Suarez again argues that AbbVie engaged in a cover-up, *see* Resp. at 21, but "allegations that AbbVie took pains to paper over the true nature of the Ambassador Program" are an insufficient basis to infer scienter where "it is unclear whether the alleged cover-up efforts have any relation to the services alleged to constitute illegal remunerations in this case," MTD Op. at 8, 26. Thus, Suarez's allegation that AbbVie—a for-profit company—had a hidden profit motive, *see* Resp. at 21, fails to create any inference that AbbVie knew its conduct was unlawful. *See* MTD Op. at 4 (noting allegations that "[t]he program's true goal … is not patient education and support"); MTD Br. at 18 (comparing the complaints).

Finally, Suarez's scattered citations to AKS cases are inapposite because none involves anything like AbbVie's properly tailored patient support program. Resp. at 19-21. Rather, they feature "sham events" to disguise direct payments to doctors, *U.S. ex rel. Bilotta v. Novartis Pharm. Corp.*, 50 F. Supp. 3d 497, 520 (S.D.N.Y. 2014), improper subsidization of copays in the face of agency warnings, *U.S. ex rel. Strunck v. Mallinckrodt Ard LLC*, 2020 WL 362717, at *1-3, 6 (E.D. Pa. Jan. 22, 2020), helping doctors bill for services they did not actually provide, *Witkin*,

189 F. Supp. at 270-72, and "bribes" to healthcare providers, *Mason v. Medline Indus., Inc.*, 731 F. Supp. 2d 730, 733 (N.D. Ill. 2010). In contrast, AbbVie strictly followed government guidance and thus had no reason to think its conduct was improper.

### B. Suarez Does Not Allege A Knowing Violation Of The FCA.

FCA scienter is assessed under the "objective knowledge standard" the Supreme Court articulated in *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47 (2007), and thus "does not reach … claims made based on reasonable but erroneous interpretations of a defendant's legal obligations." *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-88, 290 (D.C. Cir. 2015). Suarez's opposition confirms that he cannot meet this standard. Resp. at 19-24. Instead, he tries to dodge his burden entirely by treating *Safeco* as if it were not binding. The same is true of the United States, which filed a narrow statement of interest limited to disputing the scope and meaning of *Safeco*. *See* U.S. Statement at 1-2, 8. The only question, then, is who is correct about the law—and every court of appeals that has considered the question has sided with AbbVie.

### 1. *Safeco*'s Objective Knowledge Standard Applies to the FCA.

Suarez and the United States contend that "the existence of an 'objectively reasonable' reading of the AKS" does not "defeat[] a finding of *scienter*." *Id.* at 1; Resp. at 22. The Supreme Court and the courts of appeals have already considered and rejected that argument.

*Safeco* examined the scienter requirement in the Fair Credit Reporting Act ("FCRA"), which—like the FCA—reaches only "knowing or reckless" conduct. 551 U.S. at 57, 70 n.20. The Supreme Court concluded that recklessness is judged according to an "objective standard," holding defendant Safeco's conduct could not meet the statute's scienter requirement absent an "objectively unreasonable" interpretation of the statute's legal requirements. *Id.* at 68-70. In doing so, the Court rejected as "unsound" the plaintiffs' argument that subjective belief—or even affirmative evidence of "bad faith"—should matter. *Id.* at 70 n.20. Instead, the Court found

14

scienter must be assessed—as a matter of *law*—under an objective standard, because "Congress could not have intended" to make a defendant liable for knowing or reckless violations if the defendant "followed an interpretation that could reasonably have found support in the courts, *whatever [its] subjective intent may have been*." *Id.* (emphasis added). The Court based its holding on the common law definition of recklessness, reasoning that because recklessness ordinarily requires awareness of an objective risk, a defendant cannot act recklessly—let alone knowingly—if the apparent risk it took was "not objectively unreasonable." *Id.* at 69.

In addition to determining that Safeco's interpretation of the law was objectively reasonable, the Supreme Court considered whether Safeco "had the benefit of guidance from the courts of appeals or the Federal Trade Commission (FTC) that might have warned it away from the view it took." *Id.* at 70. None existed. "Given this dearth of guidance and the less-than-pellucid statutory text," the Court concluded that "Safeco's reading was not objectively unreasonable" and thus could not rise to the level of reckless disregard as a matter of law. *Id.*

Every court of appeals to consider this question—including the Third, Eighth, Ninth, and D.C. Circuits—has held that *Safeco*'s objective scienter standard applies to the FCA. *See Purcell*, 807 F.3d at 290-91; *U.S. ex rel. Donegan v. Anesthesia Assocs. of Kansas City, PC*, 833 F.3d 874, 879-80 (8th Cir. 2016); *U.S. ex rel. McGrath v. Microsemi Corp.*, 690 F. App'x 551, 552 (9th Cir. 2017); *U.S. ex rel. Streck v. Allergan, Inc.*, 746 F. App'x 101, 106 (3d Cir. 2018); *see also U.S. ex rel. Harman v. Trinity Indus. Inc.*, 872 F.3d 645, 657–58 & n.39 (5th Cir. 2017) (describing as "strong" the argument that "a reasonable interpretation of any ambiguity inherent in a regulation belies the scienter necessary" to violate the FCA). These courts properly recognized that the Supreme Court's analysis of the common-law definition of recklessness applies with equal force to the FCA because the statutory text offers "no reason to deviate from the common law

understanding in applying the statute." *Safeco*, 551 U.S. at 69; *see also id.* at 57-58 (a "common law term in a statute comes with a common law meaning, absent anything pointing another way").

Suarez finds it "notabl[e]" that *Purcell* "was in a post-trial posture," but misses the significance of that posture. Resp. at 23. In *Purcell*, the D.C. Circuit applied *Safeco* to overturn a jury verdict finding an FCA violation. 807 F.3d at 283-84. After one of the defendant's employees testified that "he and his fellow employees *knew* they were applying the wrong definition" of the relevant term in their certification to the government, *id.* at 290 (emphasis added), the jury returned a verdict for the relator. Relying on *Safeco*, however, the D.C. Circuit vacated the verdict and entered judgment for the defendant as a matter of law, holding that because the defendant "could reasonably have concluded" that its interpretation was correct—even though it apparently had not—it did not act with the scienter the FCA requires. *Id.* at 288. The court explained that the relator's substantial evidence of the defendant's "subjective intent" was legally "irrelevant." *Id.* at 290. "Under the FCA's knowledge element," "the court's focus is on the objective reasonableness of the defendant's interpretation of an ambiguous term and whether there is any evidence that the agency warned the defendant away from that interpretation." *Id.*

Critically, the court held that under the FCA "objective reasonableness" is a "legal question[]" for the court, concluding as a matter of law that the defendant's interpretation of the law was objectively reasonable. *Id.* at 288-90. Although the court recognized that evidence of the defendant's contemporaneous, subjective understanding "might imply" that "MWI did not hew to its reasonable interpretation in good faith[,] … the Supreme Court clarified that subjective intent—including bad faith—is irrelevant when a defendant seeks to defeat a finding of knowledge based on its reasonable interpretation of a regulatory term." *Id.* at 290. Again applying *Safeco*, the D.C. Circuit held that MWI was entitled to "rely" on that objectively reasonable interpretation to avoid

liability, at least until "there was 'guidance from the courts of appeals' or relevant agency 'that might have warned [MWI] away from the view it took.'" *Id.* at 289.

The Third Circuit followed suit in *Streck*. While the United States claims otherwise, U.S. Statement at 5-6, *Streck* expressly relied on *Safeco*'s objective standard in affirming the dismissal of an FCA claim at the pleading stage for lack of scienter: the court cited both *Safeco* and *Purcell* in holding that the defendant's "reasonable interpretation of an ambiguous statute was inconsistent with the reckless disregard [the relator] was required to allege." *Streck*, 746 F. App'x at 110; *see also id.* at 106 (the FCA does not "reach those claims made based on reasonable but erroneous interpretations of a defendant's legal obligations"). The Third Circuit affirmed dismissal—even though it was "not prepared to say that" the defendant's interpretation "is the best interpretation of the statute"—because "we nevertheless are confident that . . . it was not objectively unreasonable." *Id.* at 110. The Eighth Circuit took the same approach in *U.S. ex rel. Hixson v. Health Management Systems, Inc.*, applying the *Safeco* standard to the FCA and affirming dismissal on the pleadings. 613 F.3d 1186, 1190-91 (8th Cir. 2010).

Although the Seventh Circuit has not yet addressed this specific question, when it does, it too will be bound by Supreme Court authority. Until then, its precedent already is consistent with *Safeco*. The Seventh Circuit recognizes that "mere differences in interpretation growing out of a disputed legal question" cannot violate the FCA. *U.S. ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 836 (7th Cir. 2011). Courts must therefore find the defendant "lacked 'knowledge' if the particular false statements were the result of a difference in interpretation." *U.S. ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 562 (7th Cir. 2015); *see also Hagood v. Sonoma Cty. Water Agency*, 81 F.3d 1465, 1478 (9th Cir. 1996) ("To take advantage of a disputed legal question … is to be neither deliberately ignorant nor recklessly disregardful.").

17

### 2. Suarez and the United States Misread the FCA's Text.

In the face of this uniform appellate case law, the United States argues that *Safeco* "does not control under the FCA" because the Supreme Court interpreted the meaning of "reckless disregard" in that case, whereas the FCA's scienter provision also encompasses "actual knowledge" and "deliberate ignorance." U.S. Statement at 5. But *Safeco*'s key holding extended to both "knowing" *and* "reckless" violations: "Where, as here, the statutory text and relevant court and agency guidance allow for more than one reasonable interpretation, it would defy history and current thinking to treat a defendant who merely adopts one such interpretation as a *knowing or reckless* violator." 551 U.S. at 70 n.20 (emphasis added).

As the Seventh Circuit has explained, "'reckless disregard' … is the most capacious of the three" FCA definitions of "knowingly." *U.S. ex rel. Watson v. King-Vassel*, 728 F.3d 707, 712 (7th Cir. 2013). Thus, if a relator cannot allege recklessness, "it follows *a fortiori*" that he has failed to allege actual knowledge or deliberate ignorance, since those "scienter requirement[s] plainly demand[] even more culpability than that needed to constitute reckless disregard." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058 n.15 (11th Cir. 2015). As the district court in *Streck* put it when rejecting the same argument in a prior government statement of interest, "recklessness is the floor for the required mental state for a FCA claim," and therefore the government's argument is "distinction … without a difference." *U.S. ex rel. Streck v. Allergan, Inc.*, 894 F. Supp. 2d 584, 600 n.11 (E.D. Pa. 2012), *aff'd*, 746 F. App'x 101; *accord U.S. ex rel. Donegan v. Anesthesia Assocs. of Kansas City, PC*, 2015 WL 3616640, at *9-10 (W.D. Mo. June 9, 2015) ("The Court is not persuaded by this argument."), *aff'd*, 833 F.3d 874.

Not only did *Safeco*'s holding explicitly apply both to recklessness and higher levels of intent, but logic dictates that it must. When the relevant legal standard is susceptible to more than one reasonable interpretation and there is no contrary authoritative guidance, a party may *think* it

18

knows what the law requires, but without authoritative guidance resolving the issue, there is nothing to *know*, or to deliberately or even recklessly ignore. At most one can *predict* how the law will eventually be interpreted, but that is very different from *knowing* what the law presently requires. That is why *Safeco* holds that a party's "subjective intent" is legally irrelevant if there is an "interpretation that could reasonably" support its conduct. 551 U.S. at 70 n.20. And that is why the D.C. Circuit recognized *Safeco* "avoid[s] the potential due process problems posed by penalizing a private party for violating a rule without first providing adequate notice of the substance of the rule." *Purcell*, 807 F.3d at 287; *see also U.S. ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 842 (7th Cir. 2018) (concerns about "fair notice and open-ended liability" require "strict enforcement" of the FCA's scienter requirement); *Hixson*, 613 F.3d at 1190-91 (explaining that to establish scienter, "relators must show that there is no reasonable interpretation of the law that would make the allegedly false statement true").

### 3. None of Suarez's or the Government's Authorities Limit *Safeco*.

Suarez and the United States also contend that *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 136 S. Ct. 1923 (2016), called *Safeco*'s holding into question. Resp. at 22; U.S. Statement at 1-4. Not so. Far from undermining *Safeco*, the Supreme Court in *Halo* specifically and expressly reaffirmed *Safeco*'s core "objectively reasonable" holding for recklessness.

*Halo* considered a unique statute—§ 284 of the Patent Act—which gives district courts discretion to "punish" a "full range of culpable behavior" for patent infringement by "increas[ing] the damages" without providing any "precise rule or formula" for doing so. 136 S. Ct. at 1932-33. Unlike the FCA and FCRA, § 284 sets no scienter standard for enhanced patent damages— not "willful," not "knowing," and not "reckless." Instead, the appropriate standard was developed by the courts, which generally authorized "[a]wards of enhanced damages under the Patent Act over the past 180 years" to punish "egregious infringement behavior … characteristic of a pirate."

*Id*. The Court explained that, unlike the FCRA—which, like the FCA, incorporates the ordinary common law meaning of recklessness—the Patent Act's subjective intent standard turns on the concept of "bad-faith infringement," which, it explained, "*is* an *independent* basis for enhancing patent damages." *See id.* at 1933 n.* (second emphasis added). The Supreme Court thus instructed courts to follow "nearly two centuries of application and interpretation of the Patent Act" for "egregious cases of misconduct beyond typical infringement." *Id.* at 1934-35. In other words, enhanced patent damages under § 284 turn on historical precedents that have nothing to do with the common-law standard for recklessness that *Safeco* addressed.

Outside of patent cases, *Halo* specifically reaffirmed *Safeco*'s objectively reasonable standard, including in the very footnote cited by the government. U.S. Statement at 1. The Court explained that "in considering whether there had been a knowing or reckless violation of the Fair Credit Reporting Act, a showing of bad faith was not relevant absent a showing of objective recklessness." *Halo*, 136 S. Ct. at 1933 n* (citing *Safeco*, 551 U.S. at 70 n.20). Thus, courts of appeals routinely apply *Safeco* to the FCA without invoking *Halo* because *Halo* is inapposite: it is limited to the patent context, with its unique standard for "egregious" infringement. *Halo* neither applied *Safeco* nor changed *Safeco*'s objectively reasonable standard.

Suarez and the government's other authorities are no better. Both *Allina* and *Oliver* predate *Safeco*, and both come from courts of appeals (the Eighth and Ninth Circuits) that have since applied *Safeco* to the FCA—a crucial point the government fails to mention. *See* U.S. Statement at 3 (citing *U.S. ex rel. Minn. Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032 (8th Cir. 2002), and *U.S. ex rel. Oliver v. Parsons Co.*, 195 F.3d 457 (9th Cir. 1999)). The government also cites *U.S. ex rel. K & R Limited Partnership v. Massachusetts Housing Finance*

*Agency*, 530 F.3d 980, 983 (D.C. Cir. 2008), which predates the D.C. Circuit's decision in *Purcell*, a leading case explicitly applying *Safeco* to the FCA.

As for *Drummond* and *Phalp*, neither purported to limit *Safeco*'s application to the FCA. Neither decision even cites *Safeco*, and both are entirely consistent with it. In *Drummond*, the court rejected the defendants' interpretation of the law only after noting that it "border[ed] on the absurd" and that there was "no way to read" agency guidance to support it. *U.S. ex rel. Drummond v. BestCare Lab. Servs., L.L.C.*, 950 F.3d 277, 282 (5th Cir. 2020). And in *U.S. ex rel. Phalp v. Lincare Holdings, Inc.*, the court explained scienter "can exist even if a defendant's interpretation is reasonable," but only if the defendant had "actual knowledge of a different *authoritative* interpretation." 857 F.3d 1148, 1155-56 (11th Cir. 2017) (emphasis added). That is precisely *Safeco*'s holding, *see* 551 U.S. at 69-70, and exactly the standard AbbVie articulated in its brief, MTD Br. at 19.[2]

### 4. Suarez Has Not Alleged Scienter Under the FCA.

Suarez identifies no authoritative guidance from the Department of Health and Human Services or a court of appeals that could have warned AbbVie away from its objectively reasonable view that product support services do not violate the AKS. Nor could he. As the government explained in almost a dozen cases that similarly alleged that product support services violate the AKS, the OIG actually considers such services tied to specific products—and particularly nurse educator programs like AbbVie's—to be "appropriate and beneficial," not unlawful kickbacks. *See, e.g.*, *U.S. ex rel. Health Choice Grp., LLC v. Bayer Corp.*, No. 5:17-cv-126 (E.D. Tex.), Dkt.

---

[2]  Suarez's citations to district court cases confirm his lack of appellate authority, and do not help him. For example, *U.S. ex. rel. Chilcott v. KBR, Inc.* is unpublished and heavily relies on pre-*Safeco* decisions. 2013 WL 5781660, at *6-7 (C.D. Ill. Oct. 25, 2013). It also conflicts with later decisions by courts of appeals and other district courts within this circuit. *See U.S. ex rel. Streck v. Takeda Pharm. Am., Inc.*, 381 F. Supp. 3d 932, 938-40 (N.D. Ill. 2019).

116 (Government Mot. to Dismiss) at 16; *see also* MTD Br. at 4 & n.3 (collecting citations). As this Court explained, "OIG guidance provides that support services a pharmaceutical manufacturer offers in connection with the sale of its own products … do not, on their own, implicate the anti-kickback statute." MTD Op. at 15; *accord id.* at 13-14, 18, 26. Once again, that is all Suarez has alleged here. AbbVie's interpretation of the AKS simply cannot be "objectively unreasonable" when it is endorsed by the very government agency tasked with developing relevant guidance.

Suarez's assertion that OIG guidance is not binding proves AbbVie's point. Resp. at 23-24. Under *Safeco*, the burden is on Suarez, not AbbVie, to allege case law or agency guidance sufficiently authoritative to have "warned [the defendant] away from the view it took." *Safeco*, 551 U.S. at 70; *Purcell*, 807 F.3d at 288. He points to none. Where, as here, the only relevant guidance—authoritative or not—*supports* the defendant's interpretation of the law, there is no fact question related to scienter, and dismissal is required. *Purcell*, 807 F.3d at 290-91 (no scienter as a matter of law); *Streck*, 746 F. App'x at 106 (affirming dismissal of complaint); *Hixson, Inc.*, 613 F.3d at 1190-91 (same); *McGrath*, 690 F. App'x at 552 (same).

## IV.    THE PUBLIC DISCLOSURE BAR REQUIRES DISMISSAL.

Suarez does not deny that that numerous public sources, including AbbVie's own websites, exhaustively described the Ambassador Program and even alleged it provided "incentives" to doctors. MTD Br. at 23-25. He nevertheless argues that these public materials did not reveal "the fraudulent scheme in this case," because they did not disclose "the true reason the [Ambassador] Program was deployed (sales) and how that motivation shaped internal policies and practices and incentivized employee compensation." Resp. at 24. Suarez once again misapprehends the law.

The public disclosure bar precludes claims that are "substantially similar to" information in the public sphere, meaning that an "action *even partly* based upon publicly disclosed allegations or transactions … is nonetheless based upon such allegations or transactions." *Cause of Action v.*

*Chi. Transit Auth.*, 815 F.3d 267, 282 (7th Cir. 2016) (emphasis added). Public disclosures need not address the "true reason" for the allegedly fraudulent transactions, nor are they required to characterize the transactions as fraudulent or allege that a defendant's conduct was "knowing and intentional"—as Suarez suggests. Resp. at 27. Rather, the information need only reveal "the critical elements exposing the transaction as fraudulent" and give enough information to infer the rest. *Bellevue v. Universal Health Servs. of Hartgrove, Inc.*, 867 F.3d 712, 718 (7th Cir. 2017); *Cause of Action*, 815 F.3d at 281 (noting that the government could "infer scienter from the publicly disclosed Audit Report"). Relators cannot avoid the bar simply by appending legal conclusions and scienter allegations to matters of public knowledge. *See Cause of Action*, 815 F.3d at 278 (complaint barred if facts "providing a basis for the inference that fraud has been committed" are in "the public domain"); *U.S. ex rel. Solomon v. Lockheed Martin Corp.*, 878 F.3d 139, 145 (5th Cir. 2017) (disclosure occurs if facts "could have been synthesized to form the same inference [realtor] alleges in his complaint").

Suarez's entire (mistaken) theory is that the Ambassador Program itself is a kickback that necessarily violates the AKS—and in turn the FCA. *See* Resp. at 9 ("[T]he AKS prohibits offering '*anything*' of value to induce a prescription."); *id.* at 20 n.10 (arguing that the "underlying fraud"—*i.e.*, the Program—is distinct from the supposed "cover-up"). If Suarez were correct about this *per se* violation, then the alleged "fraud" was fully revealed by AbbVie's public disclosures that it offered "help with injections, … co-pay savings, … on-call nurse support, and more," and that Ambassadors were providing "[i]n-person injection training" in the "home, office, or clinic." MTD Br. at 23 (collecting disclosures). Those services alone would provide ample "basis for [an] inference that fraud has been committed." *Cause of Action*, 815 F.3d at 274, 278.

This is not a case in which the public disclosures imparted "knowledge of misrepresented claims without knowledge that they are misrepresented" or failed to disclose critical details about the alleged scheme, as Suarez contends. Resp. at 25-26 (quoting *U.S. ex rel. Absher v. Momence Meadows Nursing Ctr., Inc.*, 764 F.3d 699, 708-09 (7th Cir. 2014) and *U.S. ex rel. Goldberg v. Rush Univ. Med. Ctr.*, 680 F.3d 933, 935-36 (7th Cir. 2012)). Here, public materials disclosed everything about the Ambassador Program that Suarez claims made the program illegal— including allegations made years earlier by at least one public commentator (who had no apparent insider knowledge) that the Program offered "in-kind" remuneration for busy doctors to prescribe Humira and thereby amounted to "huge gifts to the doctor." MTD Br. at 23-25.

Suarez also insists that "the marketing materials cited do not reveal the medical counseling provided to patients for matters well beyond learning to use Humira." Resp. at 27. But Suarez's complaint makes no such specific factual allegations, either. Beyond his conclusory allegation that Ambassadors addressed "patient questions and concerns … including those having nothing to do with Humira or the diagnosis," SAC ¶ 69, Suarez never identifies a single instance of "medical counseling" unrelated to Humira, *compare id.* ¶¶ 153-60 ("representative" examples all exclusively involving Humira); *see also* Part I.A, *supra*.

Because the public disclosures AbbVie identified squarely implicate the FCA's statutory bar, Suarez is left to argue that the Court should not consider them at all. First, he claims that AbbVie's materials are not subject to judicial notice. Resp. at 27. He is wrong. AbbVie does not offer these documents for their truth, but instead to demonstrate what "was in the public realm"— a necessary predicate of an FCA public disclosure argument and an appropriate object for judicial notice. *U.S. ex rel. John v. Hastert*, 82 F. Supp. 3d 750, 764 (N.D. Ill. 2015) (taking notice of newspaper articles); *see also Cause of Action*, 815 F.3d at 277 n.13. Indeed, if courts could not

consider sources of public disclosure, they could not follow Congress's directive to "dismiss an action or claim" under the bar. 31 U.S.C. § 3730(e)(4)(A). This Court also considered AbbVie's website in its prior opinion—something else Suarez fails to contend with. *See* MTD Op. at 27.

Second—and despite recognizing contrary authority—Suarez suggests that these easily accessible materials, including information from AbbVie's own websites, should not qualify as public disclosures. *See* Resp. at 27 n.15. But courts squarely disagree, and Suarez cites no case adopting his cramped view. *U.S. ex rel. Beauchamp v. Academi Training Ctr.*, 816 F.3d 37, 43 n.6 (4th Cir. 2016) ("Courts have unanimously construed the term 'public disclosure' to include websites and online articles."). Moreover, he is wrong not just on the law, but also the policy driving it: the bar exists to prevent *relators* (not defendants) from canvassing public materials— such as the sources AbbVie cites—and suing based on that web-surfing. *See Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 295 (2010) (the bar "strike[s] a balance between encouraging private persons to root out fraud and stifling parasitic lawsuits").

Finally, even if Suarez were an "insider," Resp. at 28-29, he *still* would not qualify as an "original source" because nothing he cites "materially add[s] to the publicly disclosed allegations," *Bellevue*, 867 F.3d at 720 (declining to decide whether the relator had "independent knowledge"). This is not a case where allegations confirm preexisting "speculation or rumors," as Suarez suggests. Resp. at 29. Rather, all his claims—and especially his "representative" allegations about patients—mirror the Ambassador functions described on public websites.[3] SAC ¶¶ 153-60. Under

---

[3]  In declining to address the public-disclosure question last time, the Court explained that an amended complaint would "likely contain new facts that could affect the [C]ourt's analysis." MTD Op. at 28. Suarez's expanded allegations of Ambassador activities leave no doubt that he is reiterating publicly available information. Indeed, he adds other information that is indisputably public—for example, the studies about physicians' "average" administrative expenses—further confirming that his complaint could be cobbled together by anyone with an internet connection. *E.g.* SAC ¶¶ 5, 56-57, 62-64.

settled law, this duplication requires dismissal. *U.S. ex rel. Bogina v. Medline Indus., Inc.*, 809 F.3d 365, 370 (7th Cir. 2016) (relator is not an original source when differences between allegations and public disclosures are "unimpressive").

## V.      SUAREZ'S STATE LAW CLAIMS MUST BE DISMISSED.

### A.      The State Law Claims Fail Along With The Federal FCA Claim.

Suarez's state-law claims fail because he ties their success to his inadequate federal claims. *See* Resp. at 30 ("Because the Complaint adequately pleads violations of the federal FCA, it likewise adequately alleges violations of the state statutes."); SAC ¶ 32 ("State laws have similar prohibitions."); MTD Op. at 30 (noting similar concessions); MTD Br. at 29 (collecting cases linking federal and state claims). Although Suarez gestures at two states, Texas and California, that supposedly have different requirements, his failure to provide additional substantive analysis results in waiver, *see Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011), especially in light of AbbVie's argument that his federal and state claims rise and fall together, *see* MTD Br. at 29. Regardless, his complaint alleges no actionable conduct in, or a single patient from, either Texas or California, so Suarez's offhand references to state law do not state a claim. *See Forney*, 2017 WL 2653568, at *5 (dismissing state-specific allegations); *U.S. ex rel. Ribik v. HCR ManorCare, Inc.*, 2017 WL 3471426, at *3 (E.D. VA. Aug. 10, 2017) (same).

### B.      California's Statement Does Not Save Suarez's California FCA Allegations.

The State of California ("the State") has submitted a brief statement of interest defending Suarez's claim under the California False Claims Act ("CFCA"). Its arguments cannot rescue Suarez's defective CFCA claim.

First, Suarez's complaint does not contain a single factual allegation tied in any way to the State of California. It is axiomatic that the *California* False Claims Act applies only to claims submitted to the State of California. *See* Cal. Gov. Code § 12651(a) (stating that individuals are

liable "to the state or to the political subdivision" harmed); Dkt. 90 (Cal. Statement), at 2 (acknowledging liability under the CFCA is limited to false claims made "to the State of California"). Yet, while the State contends that Suarez alleges a kickback scheme resulting in Humira prescriptions "which [were] ultimately reimbursed by California's Medicaid program, Medi-Cal," it cites nothing in the complaint to support that contention. Cal. Statement at 4. In fact, the complaint contains *no* allegation of *any* activity in California, much less any activity rendering claims submitted to Medi-Cal fraudulent.

Second, the State's effort to flee from the FCA's rigorous pleading standard underscores that Suarez cannot meet it. It is well established that the Rule 9(b) pleading standard applies to all fraud claims—including state law claims—brought in federal court. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441 (7th Cir. 2011) ("When a plaintiff in federal court alleges fraud under [a state law], the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies."); *U.S. ex rel. Reilly v. Adventist Health*, 2020 WL 2522114, at *5 n.4 (E.D. Cal. May 18, 2020) (applying Rule 9(b) to a CFCA claim). Regardless, California is incorrect that the pleading standard for CFCA claims is lower than the pleading standard applied to FCA claims. Like FCA claims, CFCA claims are subject to "heightened pleading requirements." *Cty. of Los Angeles v. Superior Gunite, Inc.*, 2015 WL 2393770, at *7 (Cal. Ct. App. May 19, 2015). Therefore, a plaintiff asserting a CFCA claim must plead "with particularity" the "time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *California ex rel. McCann v. Bank of Am., N.A.*, 191 Cal. App. 4th 897, 906-7 (2011); *Thompson Pac. Constr., Inc. v. City of Sunnyvale*, 155 Cal. App. 4th 525, 545 (2007).

While the State insists that California courts "have directed that the statute be read broadly," it ignores that California courts have noted that the breadth of the CFCA is similar to that of the FCA. Cal. Statement at 2; *see City of Pomona v. Super. Ct.*, 89 Cal. App. 4th 793, 802 (2001) (citing *United States v. Neifert–White Co.*, 390 U.S. 228, 232 (1968) ("Like the California False Claims Act, the federal act is to be construed broadly rather than restrictively.")). As this Court recognized, "the heightened pleading requirements of [Rule] 9(b) apply" to FCA claims, notwithstanding that broad interpretation. MTD Op. at 9. Likewise, as even the State's precedent recognizes, a broad interpretation of the CFCA does not weaken the statute's heightened pleading standard. *San Francisco Unified Sch. Dist. ex rel. Contreras v. Laidlaw Transit, Inc.*, 182 Cal. App 4th 438, 453 n.12 (2010); *see also City of Pomona v. Super. Ct.*, 89 Cal. App. 4th 793 (2001).[4]

Third, Suarez's CFCA claim must be dismissed for the independent reason that he has not adequately pled scienter. Because the "CFCA … was modeled on the federal False Claims Act," *Mao's Kitchen, Inc. v. Mundy*, 209 Cal. App. 4th 132, 146 (2012), California courts have instructed that it is appropriate to apply FCA precedent in interpreting the CFCA, *see California v. Altus Fin.*, 36 Cal. 4th 1284, 1299 (2005); *Laraway v. Sutro & Co., Inc.*, 96 Cal. App. 4th 266, 275 (2002) ("Federal decisions are persuasive on the meaning of the [CFCA]."); *California ex rel. Bowen v. Bank of Am. Corp.*, 126 Cal. App. 4th 225, 240 n.11 (2005) (same). This is especially appropriate where, as here, the relevant language in the statutes is identical. *Compare* Cal. Gov. Code § 12651(a)(1)-(2), *with* 31 U.S.C. § 3729(a)(1)(a)-(b). California courts recognize this overlap and apply the federal scienter standard to CFCA claims. *E.g. San Francisco Unified Sch. Dist. ex rel.*

---

[4]   The State "does not separately address the parties' arguments as to the pleading standard" but simply asserts that "from the State's perspective, the level of detail easily provides the proverbial 'who, what, when where, why' to Defendant." Cal. Statement at 4 n.1. The State's perspective, unsupported by any authority, is mistaken. Suarez's allegations do not meet the CFCA's heightened pleading standard for the same reasons they fail under Rule 9(b). MTD Br. at 13-16.

*Contreras v. First Student, Inc.*, 224 Cal. App. 4th 627, 646 (2014) (explaining that "[t]he definition of 'knowingly' in the federal FCA is the same as the definition of the CFCA").

The State cites no authority holding that the scienter standard under the CFCA is lower than its federal analog. The sole case it relies on, *People v. Guiamelon*, 205 Cal. App. 4th 383 (2012), is inapposite. Cal. Statement at 4-5. *Guiamelon* analyzed differences between the federal Anti-Kickback Statute and its California state equivalent, Business and Professions Code § 650. 205 Cal. App. 4th at 402-08. For the same reasons that Suarez fails to satisfy the FCA's scienter standard, his CFCA claim must be dismissed. *See* Dkt. 58 at 25-28; MTD Br. at 16-20.

Regardless, Suarez cannot meet even a lower scienter standard. The State admits that Suarez must show that AbbVie acted with "'deliberate ignorance' or 'reckless disregard' for the truth or falsity of information." Cal. Statement at 4. As this Court recognized, AbbVie's actions were consistent with not only a reasonable interpretation of relevant federal guidance, but an objectively *correct* reading of the law. MTD Op., at 18 (federal guidance permits pharmaceutical manufacturers to offer "programs specifically tied to the support of the purchased product" and AbbVie's conduct was not consistent with a finding of "deliberate indifference" or "reckless disregard") (quoting 68 Fed. Reg. 23731-01, 23735 (May 5, 2003)); *see also* MTD Br. at 16-20.

While the State now contends that relevant OIG guidance is not binding for the purposes of the CFCA, it cites no case law or statutory support for that assertion. Cal. Statement at 5. To the contrary, California law expressly requires that pharmaceutical manufacturers follow the relevant OIG guidance permitting manufacturers to offer "programs specifically tied to support of the purchased product." *See* Cal. Health & Safety Code § 119402(a) (requiring all pharmaceutical manufacturers to adopt a "Comprehensive Compliance Program" that aligns with OIG's "Compliance Program Guidance for Pharmaceutical Manufacturers" issued in April 2003

29

(*available at* 68 Fed. Reg. 23,731-01)).  AbbVie's compliance with federal guidance negates any inference of scienter, and the State does not identify any basis to believe AbbVie deliberately ignored or recklessly disregarded that it was violating the CFCA any more than the federal FCA.

Finally, the State fails to respond to AbbVie's public disclosure bar argument, which independently ends Suarez's CFCA claim.  Like the FCA, the CFCA's public disclosure bar requires dismissal where "substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed."  Cal. Gov. Code § 12652(d)(3)(A).  Information about the Ambassador Program was readily available on public websites before Suarez filed his complaint.  MTD Br. at 22-26.  This independently bars Suarez's CFCA claim.[5]

## VI.     SUAREZ SHOULD NOT HAVE FURTHER OPPORTUNITY TO AMEND.

Suarez's failure to engage with this Court's opinion confirms he should not get to try again.  Rather than trying to "solve [the] outstanding problems," he filed a new complaint curing none of the defects the Court identified.  *Grenadyor*, 772 F.3d at 1109.  Then, he submitted a brief treating the opinion like it did not exist.  There is no reason to think further efforts will be any better.

## <u>CONCLUSION</u>

AbbVie respectfully requests that the Court dismiss Suarez's complaint, with prejudice.  Additionally, because Suarez's theories and arguments are the same as last time, AbbVie submits that oral argument is unnecessary.

---

[5]     Suarez's federal-marketing claims also must be dismissed.  His two-sentence footnote flunks Rule 9(b) because it does not link the vaguely described misconduct to specific claims, *see* Resp. at 30 n.18; *Grenadyor*, 772 F.3d at 1107, and he also entirely ignores AbbVie's argument about materiality, thus waiving the point, *see* MTD Br. at 28; *Alioto*, 651 F.3d at 721.

Dated: June 1, 2020

Respectfully submitted,

*/s/ Brenton A. Rogers*

Andrew A. Kassof, P.C.
Elizabeth S. Hess, P.C.
Brenton A. Rogers, P.C.
Britt Cramer
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
akassof@kirkland.com
ehess@kirkland.com
brogers@kirkland.com
britt.cramer@kirkland.com
Telephone: 312-862-2000
Facsimile: 312-862-2200

*Counsel for Defendant*
*AbbVie Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 1, 2020, the foregoing was electronically filed with the Clerk of Court using the CM-ECF system which will send notification of such filing to all counsel of record.

<u>/s/ Brenton A. Rogers</u>
Brenton A. Rogers